**Bowling Green State University**
## ScholarWorks@BGSU

Criminal Justice Faculty Publications                                    Human Services

2014

# Police sexual misconduct: A national scale study of arrested officers

Philip M. Stinson
*Bowling Green State University - Main Campus*, stinspm@bgsu.edu

John Liederbach
*Bowling Green State University - Main Campus*, jlieder@bgsu.edu

Steven L. Brewer
*PSU*, slb64@psu.edu

Brooke E. Mathna
*IUP*, b.e.mathna@iup.edu

Follow this and additional works at: http://scholarworks.bgsu.edu/crim_just_pub

 Part of the Criminology Commons, and the Criminology and Criminal Justice Commons

Repository Citation

Stinson, Philip M.; Liederbach, John; Brewer, Steven L.; and Mathna, Brooke E., "Police sexual misconduct: A national scale study of arrested officers" (2014). *Criminal Justice Faculty Publications*. Paper 30.
http://scholarworks.bgsu.edu/crim_just_pub/30

This Article is brought to you for free and open access by the Human Services at ScholarWorks@BGSU. It has been accepted for inclusion in Criminal Justice Faculty Publications by an authorized administrator of ScholarWorks@BGSU.

POLICE SEXUAL MISCONDUCT                                                                                          1

## Abstract

Police sexual misconduct is often considered a hidden crime that routinely goes unreported.  The current study provides an empirical data on cases of sex-related police crime at law enforcement agencies across the United States.  The study identifies and describes incidents where sworn law enforcement officers were arrested for one or more sex-related crimes through a quantitative content analysis of published newspaper articles and court records.  The primary news information source was the Google News search engine using 48 automated Google Alerts. Data are analyzed on 548 arrest cases in the years 2005-2007 of 398 officers employed by 328 nonfederal law enforcement agencies located in 265 counties and independent cities in 43 states and the District of Columbia.  Findings indicate that police sexual misconduct includes serious forms of sex-related crime and that victims of sex-related police crime are typically younger than 18 years of age.

*Keywords:* police sexual misconduct, police sexual violence, police crime, sex-related police crime

Police Sexual Misconduct: A National-Scale Study of Arrested Officers

Police work is conducive to sexual misconduct.  The job affords unique opportunities for rogue police officers to engage in acts of sexual deviance and crimes against citizens they encounter.  These opportunities derive from the context of police work—the same framework that provides the basis for legitimate policing.  Police routinely operate alone and largely free from any direct supervision, either from administrators or fellow officers.  Police commonly encounter citizens who are vulnerable, usually because they are victims, criminal suspects, or perceived as "suspicious" and subject to the power and coercive authority granted to police.  Police-citizen interactions often occur in the late-night hours that provide low public visibility and ample opportunities to those officers who are able and willing to take advantage of citizens to commit acts of sexual deviance and to perpetrate sex crimes.

The issue encompasses a continuum of acts ranging from less serious forms of police sexual misconduct to more egregious offenses often referred to as police sexual violence in the scholarly literature.  Studies in this line of research have covered on-duty consensual sex (Barker, 1978; LaGrange, 1998) as well as the sexual harassment of crime victims, criminal suspects, and female drivers (Sapp, 1994; Walker & Irlbeck, 2002).  Scholars have also extensively documented misconduct involving unwarranted custodial strip searches (Kraska & Kappeler, 1995; Vaughn, 1999).  Empirical data on sex-related police misconduct that falls on the more egregious end of the continuum has been less common; but documentation of the crimes of individual police who perpetrate rapes, sexual assaults, and acts of sexual molestation also exists within journalistic accounts and popular literature (see, e.g., Avila, Lynn, & Pearle, 2010; Buettner, 2012; Snyder, 2011; Stamper, 2006).  The International Association of Police Chiefs has recognized the magnitude of the problem and has held official roundtable discussions

and published policy recommendations that describe sex-related misconduct as an issue that "warrants the full attention of law enforcement leadership" (International Association of Chiefs of Police, 2011, p. 1).

Cases of sex-related misconduct and crime have been described as hidden offenses that are likely to go unreported and, hence, difficult to document and study.  Victims may not report instances of police sexual misconduct to authorities because they feel humiliated or they may fear retaliation (Kraska & Kappeler, 1995; Walker & Irlbeck, 2002).  Victims may also encounter barriers to filing a complaint since that process can be unnecessarily difficult and/or intimidating (Collins, 1998).  Researchers are also hard-pressed for data on cases that *do* get officially reported because of the reluctance of officers and organizations to expose cases of sex-related police misconduct to outside scrutiny.  Kraska and Kappeler (1995) complained that the obstacles to acquiring official data on the phenomenon "cannot be overstated" and that "it is almost impossible to obtain information without a court order or a covert and perhaps ethically problematic research design" (p. 91).  American police departments typically do not collect and distribute data on coercive police practices (Kane, 2007).  Data has been compiled instead using a range of alternative methodologies including surveys, interviews, published federal court opinions, and limited news searches.  The existing line of research has clearly advanced knowledge over the course of three decades; but, much of what is known about sex-related police misconduct derives from research that is either purely qualitative or based on a comparatively small sample of cases, in many instances derived from a single or handful of agencies and/or jurisdictions.

The purpose of the current study is to provide empirical data on cases of sex-related police misconduct and crime.  Our research identifies and describes incidents in which police

were arrested for criminal offenses associated with sex-related misconduct through a content analysis of published newspaper articles.  The primary information source was the internet-based Google News[TM] search engine and its Google Alerts[TM] email update service.  The Google News search engine and Google Alerts has recently been used as an innovative method to collect data on a variety of hard-to-research topics including public concerns about vaccines (Larson et al., 2013), stray bullet shootings (Wintemute, Claire, McHenry, & Wright, 2012), the criminal misuse of TASER's by police (Stinson, Reyns, & Liederbach, 2012), and human trafficking (Denton, 2010).  Use of the Google News search engine and Google Alerts in the present study led to the identification and analyses of an unprecedented number of cases of sex-related police misconduct and crime.  The next section provides some context to our research through an overview of existing studies on sex-related police misconduct and crime.  The review is organized to demonstrate how the primary theme of this line of research has changed over time from studies focused on nonviolent consensual forms of misconduct to research designed to document the phenomenon of police sexual violence.

**Sex-Related Police Misconduct: From Police "Groupies" to Sexual Violence**

Some studies on sex-related police misconduct focus primarily on the commission of non-violent consensual acts.  Barker's (1978) survey of police officers found that consensual sex on-duty was quite common, particularly in patrol cruisers.  Likewise, Sapp (1994) describes various forms of misconduct including sexual contacts initiated by police "groupies" or other females who are "lonely or mentally disturbed" (p. 197) individuals who seek attention and affection from police.  Sapp (1994) also details encounters wherein citizens offer sexual services as a *quid pro quo* for favors, additional protection, preferential treatment, or what Barker (1978) describes as a "get out of jail free card" (pp. 267–268).  The research demonstrates that police

officers and police managers themselves believe that less serious, consensual, and/or non-violent cases of sexual misconduct occur regularly (Maher, 2003, 2008).

Kraska and Kappeler (1995) contribute what is likely the most-often cited study on the topic. Their work provides much needed data and a critical literature review that contradicts the prevailing assumption that the problem "most often involved consensual sex, sexual favors, and rogue officers" (Kraska & Kappeler, 1995, p. 91) and incorporates perspectives from the feminist literature to define sexual misconduct as cases of police sexual violence *against* woman. This view demonstrates how occupational culture, sexism, and the "highly masculine organizational hierarchy" (Kraska & Kappeler, 1995, p. 90) of police form a context that promotes and encourages sex discrimination, harassment, and violence against women (see also Christopher Commission, 1991; Harris, 1973). Kraska and Kappeler (1995) use published opinions of the federal district courts in civil actions asserting claims under 42 U.S.C. §1983 to identify and describe cases that mostly involved the use of strip or body cavity searches by police ($n = 67$), but also less commonly involved violations of privacy ($n = 8$), sexual assaults ($n = 8$), or rape ($n = 8$). Other studies use published court opinions to focus on police sexual violence liability under state tort law (Vaughn, 1999), municipal liability for police sexual violence (Kappeler & Vaughn, 1997), and the Section 1983 liability of individual officers engaged in police sexual violence (Eschholz & Vaughn, 2001).

The focus of research on sex-related police misconduct had clearly shifted to emphasize how police use their position to harass, coerce, or abuse females. The theme provides context for Walker and Irlbeck's (2002) work on what they refer to as the national problem of "driving while female," wherein police use the pretext of alleged traffic violations to sexually harass or abuse female drivers. A follow-up report by Walker and Irlbeck (2003) also includes victims of police

sexual misconduct who were teenagers involved in Law Enforcement Career Exploring programs or prostitutes.  Collectively, these studies identified 183 cases over a twelve year period; almost 40% of the cases involved teenage victims, and 34% occurred within the context of a traffic stop—all of the cases involved police who abuse their authority to "take advantage of vulnerable people" (2003, p. 2).  These common themes are also evident in Escholtz and Vaughn's (2001) study focused on police liability.  They specifically describe cases of "sexual extortion" where police intimidate vulnerable citizens with "lies and half-truths to engage in sexual activities in exchange for their freedom" (Eschholz & Vaughn, 2001, p. 395).

To this point, the line of studies had focused initially on nonviolent consensual acts and then shifted to include cases that clearly involved sexual harassment and coercion.  Data on cases that involve the most egregious forms of sex-related misconduct including rape and violent sexual assaults has been lacking—despite the fact that scholars often use the term "police sexual violence" as a label for many forms of sex-related misconduct.  One exception has been Kraska and Kappeler's (1995) data derived from content analyses of news accounts published in the "Across the Nation" section of *USA Today* over a 30 month period.  This portion of the research identified 31 police sexual violence cases, most of them sexual assaults ($n = 12$) and rapes ($n = 9$) perpetrated by police.  Walker and Irlbeck (2003) identify cases of sexual misconduct that "ranges from humiliation to rape" (p. 4) including some sexual assaults and rapes, but they do not provide statistics in terms of types of offenses.

Research on official reactions to cases of sex-related police misconduct—in terms of either the disposition of criminal cases or organizational discipline—has also been scarce.  We are aware of no existing studies designed to investigate the disposition of criminal cases involving sex-related police crime.  Previous studies that include data on the criminal case

dispositions of police who perpetrate other types of crimes demonstrate that case outcomes vary across different types of offenses as well as according to certain organizational and individual officer characteristics.  These studies also suggest that police most often *do not* lose their job as a result of an arrest for crimes associated with domestic violence or impaired driving (Stinson, Liederbach, Brewer, & Todak, 2013; Stinson & Liederbach, 2013).  Rabe-Hemp and Braithwaite (2013) identify 106 cases of police sexual violence to explore recidivism among police who perpetrate sex crimes.  Their findings suggest that (a) police sexual violence is a "pattern prone" offense that often involves recidivist officers who victimize multiple persons and (b) that a striking number of police accused of sex crimes manage to escape appropriate penalties and maintain police certification by moving from one jurisdiction to another.

Still, a review of this line of research exposes more questions than answers—the problem does not really concern a need to fill "gaps" in the literature, given that what we *do* know can best be described as a gap in our ignorance about the topic.  The issue derives primarily from the hidden nature of the problem and the resulting absence of any sort of official data.  Scholars have been forced to rely instead on other methods that have thus far limited both the number of identified cases and the generalizability of research findings.  For example, studies that use published opinions of the federal district courts in civil actions to identify cases are limited to those cases where the court has issued an opinion and order on a point of contested law and designated the opinion for publication.  The other primary method utilized within the most-often cited research on the topic has been content analyses of published newspaper accounts.  The method allows for the identification of another set of cases, but the samples of cases identified have thus far been comparatively small and not representative due to (a) the limitations of conventional electronic index web searches (Walker & Irlbeck, 2003) or (b) use of a small and/or

limited number of newspaper sources (Kraska & Kappeler, 1995; Rabe-Hemp & Braithwaite, 2013). Indeed, Rabe-Hemp and Braithwaite (2013) in their recent study on the phenomenon underscore the need for more data and replications "on a national scale" (p. 135).

## Method

Data for the current study were collected as part of a larger study on police crime. The larger study was designed to locate cases in which sworn law enforcement officers had been arrested for any type of criminal offense(s). Data were derived from published news articles using the Google News search engine and its Google Alerts email update service. Google Alerts searches were conducted using the same 48 search terms developed by Stinson (2009). The Google Alerts email update service sent a message each time one of the automated daily searches identified a news article in the Google News search engine that matched any of the designated search terms. The automated alerts contained a link to the URL for the news articles. The articles were located, examined for relevancy, printed, and archived for subsequent coding and content analyses. The larger study on police crime identified 2,149 criminal cases that involved the arrest of 1,773 sworn officers during the period of January 1, 2005 through December 31, 2007. The arrested officers were employed by 1,056 nonfederal law enforcement agencies located in 677 counties and independent cities in all 50 states and the District of Columbia. The present study focuses on the identification and description of the subset of cases in which police officers were arrested for sex-related criminal offenses.

### Coding and Content Analysis

Coding initially involved the identification of sex-related cases within the larger data set on police crime. The nature of police sexual misconduct arrests and official responses to the problem complicated the identification of sex-related criminal cases. The criminal charge(s) in

some cases did not correspond to the underlying nature of the criminal act(s) described in the news articles, either because the cases involved (a) multiple forms of crime and/or (b) the occurrence of preferential charging decisions presumably filed as a courtesy to the arrested officer.  Another issue occurred in cases where police were charged with generic "official misconduct" crimes in lieu of specific sex-related criminal offenses that may constitute an embarrassment to the employing agency.  These issues precluded straightforward coding schemes based solely on official charges.  The sex-related cases were identified instead using Stinson's (2009) typology of police crime.  The typology includes five broad categories of police crime including crimes that are sex-related, alcohol-related, drug-related, violence-related, and/or profit-motivated.  Each of the 2,149 cases identified in the larger study were coded according to the five-category typology.  The categories of the typology are not mutually exclusive in that police crimes often involve more than one of these types of misconduct.  In a case where an officer was charged with the forcible rape of a female motorist, for example, the case would be coded as both sex-related and violence-related.  Cases were also coded for the absence of presence of crimes involving police sexual violence.  We operationalize police sexual violence as "those situations in which a female citizen experiences a sexually degrading, humiliating, violating, damaging, or threatening act committed by a police officer through the use of force or police authority" (Kraska & Kappeler, 1995, p. 93).

Additional content analyses were conducted in order to code the cases in terms of the: (a) arrested officer, (b) employing agency, (c) each of the charged offenses, (d) victim characteristics, and (e) organizational employment outcomes and criminal case dispositions.  Each of the charged offenses were coded using the data collection guidelines of the National Incident-Based Reporting System (NIBRS) as the protocol for each criminal offense category

(see U.S. Department of Justice, 2000, pp. 21–52).  Fifty-seven offenses are included in the

NIBRS, consisting of 46 incident-based criminal offenses in one of 22 basic crime categories as

well as 11 additional arrest-based minor crime categories (see U.S. Department of Justice, 2000,

pp. 9–12).  We recorded each offense charged as well as the most serious offense charged in

each case.  The most serious offense charged was determined using the Uniform Crime Report's

(UCR) crime seriousness hierarchy (U.S. Department of Justice, 2004).  An additional eight non-

NIBRS offense categories were added (following an earlier pilot study of the same data set)

because officers were often arrested for criminal offenses not included in the NIBRS, including

indecent exposure and online solicitation of a child.  Cases were also coded to assess each

officer's history of being named as a party defendant in federal civil rights litigation pursuant to

42 U.S.C. §1983 (asserting a civil rights deprivation under the color of law) as a correlate of

police misconduct.  This was accomplished by accessing the master name index in the federal

courts' Public Access to Courts Electronic Records (PACER) system to search and cross-

reference the names of the individual arrested officers in our database.  Secondary data were

employed from the Census of State and Local Law Enforcement Agencies (U.S. Department of

Justice, 2008) to ascertain the number of full-time sworn officers employed by each agency as

well as from the U.S. Department of Agriculture's (2003) county-level urban to rural nine-point

rurality scale.

**Reliability**

Analytic procedures were undertaken to ensure reliability of the data.  An additional

coder was employed to independently code a random sample of five percent of the total number

of cases in the study.  Intercoder reliability was assessed by calculating the Krippendorf's alpha

coefficient (see Hayes & Krippendorff, 2007) across all of the variables ($N = 105$) in this study.

Krippendorf's alpha is often recognized as the standard reliability statistic for content analysis research (Riffe, Lacy, & Fico, 2005).  The Krippendorf's alpha coefficient (Krippendorf's $\alpha$ = .9174) is strong across the variables in this study (see Krippendorff, 2013).  The overall level of simple percentage of agreement between coders across all of the variables in this study (97.003%) also established a degree of reliability well above what is generally considered acceptable in content analysis research (see Riffe et al., 2005).

**Statistical Analysis**

Chi Square is used to measure the statistical significance of the association between two variables measured at the nominal level.  Cramer's *V* measures the strength of that relationship with values that range from zero to 1.0 and allows for an "assessment of the actual importance of the relationship" (Riffe et al., 2005, p. 191).  Stepwise binary logistic regression is used to determine which of the predictor variables are statistically significant in multivariate models.  Stepwise logistic regression models are appropriate where the study is purely exploratory and predictive (Menard, 2002).  This is an exploratory study because little is known empirically about police sexual misconduct arrests and the specific factors responsible for conviction and/or job loss subsequent to the arrest of a police officer for sex-related crimes.  Summary statistics are also reported for evaluation of regression diagnostics and each logistic regression model.

Classification tree analysis—also known as decision trees—is utilized as a statistical technique to uncover the causal pathways between independent predictors and sex-related police crime versus other types of police crime, job loss, and conviction.  This approach moves beyond the simple one-way additive relationship of linear statistical models by identifying the hierarchical interactions between the independent predictors and their compounding impact.  Classification trees examine the entire dataset and produce a graphical output that ranks the

variables by statistical importance.  The most influential variable is represented at the top of the tree (known as the root node).  This variable is used to split the data in a recursive manner through the creation of subsets into the lower branches of the tree.  Variable selection and splitting criteria are driven by the algorithm of the tree program.  Decision tree techniques have received attention due to their ability to handle interaction effects in data without being bound to statistical assumptions (Sonquist, 1970).  Classification tree analysis has been used to examine police practices including career-ending police misconduct (Kane & White, 2013), police drug corruption arrests (Stinson, Liederbach, Brewer, Schmalzried, et al., 2013), fatal and nonfatal TASER incidents (White & Ready, 2009), and police drunk driving (Stinson, Liederbach, Brewer, & Todak, 2013).

Classification and Regression Trees (CART) is a classification procedure that produces a binary decision tree and restricts partitioning at each node to two nodes, thus producing binary splits for each child node (Dension, Mallick, & Smith, 1998).  Brieman, Friedman, Olshen, and Stone's (1984) CART algorithm uses an extensive and exhaustive search of all possible univariate splits to determine the splitting of the data for the classification tree.  Partitioning will continue until the algorithm is unable to produce mutually exclusive and homogenous groups (De'ath & Fabricius, 2000; Dension et al., 1998).  After creating an exhaustive tree, CART will prune nodes that do not significantly contribute to overall prediction.  Although there are other tree building algorithms, we used CART for the current study because it fit our problem and produced good results.

The predictive power of logistic regression and classification trees is assessed through the area under the curve (AUC) component of the receiver operating characteristic (ROC).  The AUC assesses the predictive accuracy of a statistical model and serves as the preferred method

for assessing and comparing models (Bewick, Cheek, & Ball, 2004; Dolan & Doyle, 2000).  The

ROC curve considers the sensitivity versus 1- specificity, a representation of the true positive

rate versus the false positive rate (TPR vs. FPR).  The curve is displayed graphically by plotting

the true positive rate (TFP) on the y-axis and the false positive rate (FPR) on the x-axis.  ROC

curves are interpreted through the AUC, a score that ranges from zero to one.  A straight line

through a ROC curve is the equivalent of 0.5 and suggests that the model is no better at

prediction than flipping a coin.  A score of one indicates that the model is able to accurately

predict all cases.

**Strengths and Limitations**

      The news search methodology utilizing the Google News search engine and the Google

Alerts email update service provided an unparalleled amount of information on police sexual

misconduct arrests at law enforcement agencies across the United States.  Google News offers

some clear advantages over other aggregated news databases and the methodologies employed

by previous studies that used news-based content analyses to document cases of sex-related

police misconduct.  The Google Alerts email update service provides the ability to run persistent

automated queries of the Google News search engine and deliver real-time search results.  The

Google News search engine draws content from more than 50,000 news sources (Bharat, 2012)

and allows for access to a larger number of police misconduct cases than would be available

through other methods (Payne, 2013).

      There are three primary limitations of the data.  First, our research is limited by the

content and quality of information provided for each case.  The amount of information available

on each case varied, and data for several variables of interest were missing for some of the cases.

This is especially true for victim-related variables in this study as news organizations generally

do not report the names and other personally identifiable information (e.g., victim age,

relationship to the accused) of rape victims (Denno, 1993).  Second, the data are limited to cases

that involved an official arrest based on probable cause for one or more sex-related crimes.  We

do not have any data on police officers who engaged in police sexual misconduct if their conduct

did not result in an arrest.  Finally, we note that these data are the result of a filtering process that

includes the exercise of discretion by media sources in terms of both the types of stories covered

and the nature of the content devoted to particular stories (Carlson, 2007).  Ready, White, and

Fisher (2008), however, found that news coverage of officer misconduct is consistent with

official police records of these events.  Research also suggests that police agencies are not

especially effective at controlling media accounts of officer misconduct (Chermak, McGarrell, &

Gruenewald, 2006).  Despite the noted limitations, the use of news articles as the primary data

source is a long established method of analyzing deviant/illegal police behavior (see, e.g.,

Lawrence, 2000; Lersch & Feagin, 1996; Rabe-Hemp & Braithwaite, 2013; Ross, 2000)

**Results**

The news searches resulted in the identification of 548 cases in which police officers

were arrested for sex-related crimes during the years 2005-2007.  The cases involve the arrests of

398 sworn law enforcement officers employed by 328 state, local, and special law enforcement

agencies located in 265 counties and independent cities in 43 states and the District of Columbia

(all states except Hawaii, Maine, New Hampshire, North Dakota, South Dakota, Vermont, and

Wyoming).  Sixty-six of the arrested officers have more than one case because they had more

than one victim and/or were arrested on more than one occasion for sex-related crimes (ranging

from one arrested officer with 14 cases to 36 arrested officers with two cases).

The remainder of this section is organized into three parts.  Part one presents data on the arrested officers, their employing law enforcement agencies, and the most serious offense charged in each sex-related case.  Characteristics of the victims of the sex-related criminal cases are described in the second part.  The third part identifies, in separate regression models, the predictors of (a) an arrest for sex-related crimes versus arrests for other types of police crime, (b) job loss subsequent to arrest for a sex-related crime, and (c) criminal case conviction.

**Arrested Officers, Agencies, and Charged Offenses**

Table 1 presents information on the sex-related arrest cases in terms of the arrested officers and their employing law enforcement agencies.  Almost all of the cases involve male officers (99.1%).  Most of the cases involve police employed in a patrol or other street-level rank including officers, deputies, troopers, and detectives ($n = 449$, 81.9%).  There are 73 cases that involve police line and field supervisors including corporals ($n = 17$, 3.1%), sergeants ($n = 48$, 8.8%), and lieutenants ($n = 8$, 1.5%).  There are 26 cases that involve police managers and executives including captains ($n = 3$, 0.5%), and chiefs, superintendents, and sheriffs ($n = 23$, 4.2%).

<<<<< Insert Table 1 about here >>>>>

The modal category for known officer age at time of arrest is 36-43 ($n = 190$, 34.7%). The modal category for known years of service at time of arrest is zero to five years ($n = 180$, 32.8%).  Most of the cases involve officers employed by municipal police agencies ($n = 389$, 71.0%).  The modal category for agency size is 0-24 full-time sworn officers ($n = 160$, 30.3%). Most of the arrest cases involve officers employed in metropolitan counties ($n = 454$, 82.8%) and in the Southern region of the United States ($n = 263$, 48.0%).  Just over half of the sex-related crimes resulting in an officer's arrest occurred while the officer was on-duty ($n = 281$, 51.3%).

The arresting law enforcement agency in well over half of the sex-related arrest cases was a law enforcement agency other than the arrested officer's employer ($n = 337$, 61.5%).

The cases are coded in terms of the most serious offense charged. Forcible rape is the most serious offense charged ($n = 117$, 21.4%) in the most cases, followed by forcible fondling ($n = 107$, 19.5%), statutory rape ($n = 59$, 10.8%), forcible sodomy ($n = 54$, 9.9%), and child pornography ($n = 39$, 7.1%). There are 26 separate criminal offenses that make up the most serious offense charged in the sample of sex-related cases, and in some instances the most serious offense charged masks the sexual nature of the underlying criminal conduct resulting in the arrests. For example, in some cases the most serious offense charged is assault ($n = 24$, 4.4%), official misconduct ($n = 16$, 2.9%), and bribery ($n = 6$, 1.1%). The full table is available upon request from the corresponding author. Fewer than half of the cases were coded as involving acts of police sexual violence ($n = 254$, 46.4%), which corresponds with just over half of the alleged crimes being committed while the officer was on-duty ($n = 281$, 51.3%) and/or acting in his official capacity ($n = 290$, 52.9%).

**Victims of Sex-Related Police Crime**

Table 2 presents information on the characteristics of the victims of sex-related police crime. Most of the known victims are female ($n = 456$, valid% = 92.1%), however, there some male victims ($n = 39$).[1] The victims are typically young with most being minors under the age of 18 years ($n = 236$, valid% = 73.1%). The modal category for victim age is 14-15 years of age ($n = 92$, valid% = 28.5%). In terms of victim relationship to the arrested officer, most of the victims are strangers or non-stranger acquaintances ($n = 237$, valid% = 45.5%) or an unrelated child ($n = 223$, valid% = 42.8%). Relatively few of the victims are the current/former spouse ($n = 7$, valid% = 1.4%) or current/former boyfriend or girlfriend ($n = 11$, valid% = 2.1%).

<<<<< Insert Table 2 about here >>>>>

The victims differed depending on whether the officer was on-duty or off-duty when the crimes were committed in terms of victim relationship, where $\chi^2$ (7, $N$ = 521) = 176.675, $p$ <.001, $V$ = .582, and child versus adult victims, where $\chi^2$ (1, $N$ = 521) = 119.348, $p$ <.001, $V$ = .479. Most of the cases involving a child unrelated to the officer occurred when the officer was off-duty (n = 151, 67.7%), whereas most of the cases involving adult victims (i.e., nonstranger acquaintances and stranger) occurred when the officer was on-duty ($n$ = 195, 82.3%). Most of the cases involving a child victim (i.e., children related to the arrested officer as well as children unrelated to the arrested officer) occurred when the officer was off-duty ($n$ = 189, 71.9%), whereas most of the cases involving an adult victim occurred when the officer was on-duty ($n$ = 196, 76.0%).

**Predictors of Sex-Related Police Crime, Job Loss, and Criminal Conviction**

Bivariate analyses were conducted to explore the relationships between various predictor variables and various outcome variables of interest. The full bivariate tables are available from the corresponding author upon request. The first analysis examined sex-related police crime versus other types of police crime. The strongest predictors of an arrest for a sex-related crime versus an arrest for other types of police crime are the victim's age, where $\chi^2$ (69, $N$ = 684) = 269.017, $p$ <.001, $V$ = .627; the relationship of the victim to the arrested officer, where $\chi^2$ (7, $N$ = 1,410) = 347.484, $p$ <.001, $V$ = .496; the gender of the victim, where $\chi^2$ (1, $N$ = 1,254) = 304.433, $p$ <.001, $V$ = .493; and, the presence of a child victim, where $\chi^2$ (1, $N$ = 1,404) = 275.838, $p$ <.001, $V$ = .443.

Bivariate relationships were also examined between various predictors and final employment outcomes of the officers arrested for sex-related crimes as well as bivariate

relationships between various predictors and the arrested officers' criminal case dispositions. The strongest predictors of job loss (through either termination or resignation) are gender of the arrested officer, where $\chi^2$ (3, $N = 548$) = 38.847, $p < .001$, $V = .266$; whether the arrested officer's chief is under scrutiny as a result of the officer being arrested, where $\chi^2$ (3, $N = 548$) = 32.704, $p < .001$, $V = .244$; whether the arrested officer's supervisor was disciplined as a result of the officer being arrested, where $\chi^2$ (3, $N = 548$) = 32.286, $p < .001$, $V = .243$; whether the arrested officer was reassigned to another position as a result of being arrested, where $\chi^2$ (3, $N = 548$) = 30.49, $p < .001$, $V = .236$; and, years of service at time of arrest, where $\chi^2$ (30, $N = 548$) = 90.599, $p < .001$, $V = .235$. The strongest predictors of conviction are the number of full-time sworn officers employed by the arrested officer's employing law enforcement agency, where $\chi^2$ (10, $N = 267$) = 19.664, $p = .033$, $V = .273$; years of service at time of arrest, where $\chi^2$ (10, $N = 267$) = 17.745, $p = .059$, $V = .258$; categorical age at time of arrest, where $\chi^2$ (9, $N = 267$) = 16.232, $p = .062$, $V = .253$; and, type of law enforcement agency employing the arrested officer, where $\chi^2$ (9, $N = 267$) = 13.389, $p = .020$, $V = .224$.

Multivariate analyses were conducted to further investigate the relationship between three outcome variables of interest, (1) sex-related crime versus other types of police crime, (2) final employment outcome, and (3) criminal case disposition in separate regression models. Table 3 presents a forward stepwise binary logistic regression model predicting arrests for sex-related crimes versus arrests for other types of police crime (i.e., violence-related, drug-related, alcohol-related, and profit-motivated). Bivariate correlations computed for each of the independent variables revealed that none of the variables were highly correlated with each other. Multicollinearity is not a problem in the model, as indicated by no tolerance statistics below .790 and no variance inflation factors exceeding 1.266. A Durbin-Watson score of 1.723 indicates

that there is no autocorrelation in the model.  Regression results indicate that the overall model

of six predictors is statistically reliable in distinguishing between officers who are arrested for

sex-related crimes and those officers who are arrested for other types of police crime.  Those six

predictors are victim age, victim gender, alcohol-related crime, crime detected by citizen

complaint, criminal conviction, and family violence incidents.  The model correctly classifies

88.6% of the cases and has an AUC of .891.  Wald statistics indicate that all of the independent

variables in the model significantly predict an arrest for a sex-related crime versus an arrest for

some other type of police crime.

<<<<< Insert Table 3 about here >>>>>

Odds ratio interpretations provide context for prediction of an arrest for crime-related

crime versus an arrest for some other type of police crime.  As the categorical age of the victim

of a police crime goes up by one unit, the simple odds of the crime being sex-related decrease by

46.6%, controlling for all other independent variables in the model (see Table 2 for victim age

categories).  The simple odds of an officer's arrest for a sex-related crime versus some other type

of police crime decrease by 97% if the victim is male, controlling for all other variables in the

model.  The simple odds of an officer's arrest for a sex-related crime versus an arrest for some

other type of crime decrease by 89.5% if the crime is also alcohol-related, controlling for all

other independent variables in the model, and by 97.7% if the crime involves family violence,

controlling for all other variables in the model.  The other predictors in the model increase the

likelihood of an officer's arrest for a sex-related crime versus an arrest for some other type of

police crime.  If a crime against a police officer is detected by a citizen complaint to a law

enforcement agency, the simple odds are 3.7 times greater that the crime is sex-related,

controlling for all other variables in the model.  The simple odds of an arrested officer being

convicted of a crime go up by 54% if the incident was sex-related, controlling for all other independent variables.

Table 4 presents a forward stepwise binary logistic regression model predicting disposition of the sex-related criminal cases.  Bivariate correlations computed for each of the independent variables revealed that none of the variables were highly correlated with each other.  Multicollinearity is not a problem in the model, as indicated by all tolerance scores and variance inflation factors are 1.0.  A Durbin-Watson score of 1.827 indicates that there is no autocorrelation in the model.  Regression results indicate that the overall model of two predictors—officer's categorical age at time of arrest and type of law enforcement agency employing the arrested officer—is statistically reliable in distinguishing between officers who were convicted of a criminal offense and those who were not convicted.  The model correctly classified 83.2% of the cases and has an AUC of .618.  Wald statistics indicate that both of the independent variables in the model significantly predict conviction.

<<<<< Insert Table 4 about here >>>>>

Odds ratio interpretations provide context for prediction of sex-related criminal case outcomes.  The simple odds of an officer being convicted of any offense following their arrest for a sex-related crime go up by 27% for each four-year categorical increase in age at time of arrest, controlling for all other independent variables.  Courts treat older arrested officers more harshly than younger officers who are arrested for sex-related crimes.  The simple odds of an arrested officer being convicted decrease by 54.9% with a one unit increase in agency type (but it is a nominal variable, see Table 1 for the categorical list of law enforcement agency types that make up this variable).  This means that state troopers and deputy sheriffs are more likely to be

convicted of a sex-related crime than are officers employed by municipal, special, or tribal law enforcement agencies.

Table 5 presents a forward stepwise logistic regression model predicting loss of job following a police officer's arrest for a sex-related crime.  Bivariate correlations computed for each of the independent variables revealed that none of the variables were highly correlated with each other.  Tolerance statistics and variance inflation factors were also examined.  None of the tolerance statistics are below .828 and none of the variance inflation factors exceed 1.208, indicating that multicollinearity is not a problem in the model.  The Durbin-Watson score is 1.588, indicating that there is no autocorrelation in the model.  Regression results indicate that the overall model of five predictors (see Table 5 for list of predictors) is statistically reliable in distinguishing between officers who were separated from their employment as a sworn officer through job loss (i.e., termination or resignation) and those who are not known to have lost their law enforcement job as a result of being arrested for a sex-related crime.  The model correctly classifies 69.2% of the cases and has an AUC of .518.  Wald statistics indicate that all of the independent variables in the model significantly predict job loss.

<<<<< Insert Table 5 about here >>>>>

Interpretation of the odds ratios provide context for predicting job loss.  The disposition of an officer's sex-related criminal case has an impact on adverse employment outcomes.  The simple odds of an officer losing his or her job subsequent to being arrested for a sex-related crime are 1.4 times greater if the officer is ultimately convicted of one or more offenses charged, controlling for all other independent variables in the model.  The simple odds of an officer losing his or her job go down by 75% if the officer was suspended from his or her law enforcement job after being arrested for a sex-related crime.  Also, the simple odds of an officer losing his or her

job are 5.5 times greater if news articles report an agency scandal or cover up following an

officer's arrest for a sex-related crime when controlling for all other independent variables in the

model.

A history of other types of police misconduct impacts on whether an officer is going to

lose his or her job following an arrest.  More than one-fourth of the sex-related arrest cases ($n =$

156, 28.5%) involved an officer who had also been named individually as a party defendant in at

least one federal court civil action asserting a civil rights deprivation under the color of law

pursuant to 42 U.S.C. §1983 at some point during his or her law enforcement career.  The simple

odds of an officer losing his or her job following an arrest for sex-related crime are 1.2 times

greater if the arrested officer had also been sued in federal court pursuant to 42 U.S.C. §1983 at

some point in his or her career for violating someone's federally protected civil rights under the

color of law, controlling for all other variables.

The geographic location of an arrested officer's employing law enforcement agency also

impacts on job loss.  The simple odds of a police officer losing his or her job subsequent to an

arrest for a sex-related crime go down by 19.5% for every one unit increase in rurality (on the

U.S. Department of Agriculture's nine-point urban to rural scale) for the county where the officer

works, controlling for all other independent variables in the model.  That means that officers who

work in metropolitan counties are more likely to lose their jobs following an arrest for sex-

related crime than officers who work in nonmetropolitan counties.

Classification trees were used to derive the casual pathways between independent

predictors, sex-related crime, conviction, and job loss.  Table 6 presents the results of these

analyses.  Three tree models were created.  The trees examine, respectively, officers who were

arrested for sex-related police crime versus other types of police crime, criminal case disposition,

and final adverse employment outcomes.  The first tree predicting sex-related police crime versus other types of police crime correctly classifies 91.2% of the cases and has an AUC score of .922, 95% CI [.906, .937].  The model selected the variable "Age of Victim" as the splitting criterion. Victims who were less than or equal to 16.5 years of age have a 70.7% likelihood of being involved in a sexual misconduct case.  In comparison, victims over the age of 16.5 years have only a 16.8% chance of being involved in a sexual misconduct case.  The additional statistically significant variables include gender of the victim, age of the victim, police officer's rank, victim's relationship to the offender, and alcohol-related crime versus other crime.

<<<<< Insert Table 6 about here >>>>>

The tree model predicting job loss has an overall classification score of 76.1% and an AUC score of .830, 95% CI [.796, .865].  The variable "Officer Suspension" was selected as the splitting criterion.  Officers who had been suspended from their job following an arrest for a sex-related crime have a 41% likelihood of losing their job.  Officers who were not suspended following their arrest for a sex-related crime have a 71% likelihood of ultimately losing their job. The additional statistically significant variables for the model include having been named as a party defendant pursuant to a 42 USC §1983 cause of action in federal court civil litigation at some point during his or her law enforcement career, urban/rural county continuum, geographic region, state where employed, and most serious offense charged.

The tree model predicting criminal case disposition had an overall classification score of 86.1%, an AUC score of .871, 95% CI [.818, .925], and selected the variable "Years of Service" as the splitting criterion.  Officers who had more than 11.5 years of service at time of arrest have a 93.3% likelihood of being convicted of a crime.  In comparison, officers who had 11.5 or less years of service only have a 77.3% likelihood of being convicted of a crime.  The additional

statistically significant variables for the model included type of agency employing the arrested

officer and the age of the officer at time of arrest.

## Discussion

Police sexual misconduct and crime has been recognized as an important issue for

decades by scholars and law enforcement agencies.  Still, most observers continue to describe the

problem as "hidden" and suggest that cases that have been identified are only "the tip of the

iceberg" (Kraska & Kappeler, 1995, p. 97).  The sexual nature of these offenses and the absence

of official data have hampered study of the phenomenon.  Researchers have utilized methods

designed to overcome these obstacles including surveys, interviews, and content analyses of

published court opinions and news accounts.  This line of research continues to be limited,

however, in terms of sample size and the comparatively small number of cases that have thus far

been exposed.  This study identified an unprecedented 548 cases of police sex-related crime—all

of them occurring within a brief three-year window of time (2005-2007).  Our research utilized

what has become the preferred method to conduct news-based content analyses to describe cases

of sex-related police misconduct that happened in small towns, suburbs, and large cities

throughout the United States.  The current study provides some points of discussion in terms of

the nature of these crime, the characteristics of the victims, and the factors that seem to influence

the outcome of these cases.

Almost half of the cases (48%) in the study involved an arrested officer who was

employed by a law enforcement agency in the Southern region of the United States (i.e.,

Alabama, Arkansas, Florida, Georgia, Kentucky, Louisiana, Maryland, Mississippi, North

Carolina, Oklahoma, South Carolina, Tennessee, Texas, Virginia, West Virginia, and the District

of Columbia).  It is not clear why the incidence of sex-related police crime arrests is so high in

the South.  We do know, however, that there are more police officers employed in the South (*n* =

147,235, 33%) than in any other region of the country, there are more municipal law

enforcement agencies in the South (*n* = 3945, 35%) than in any of the other geographic regions,

and the average number of police officers per 1,000 inhabitants in the South (*n* = 2.6) is higher

than in the other regions (U.S. Department of Justice, 2010, Table 71).

Our findings in regard to the serious nature of these crimes demonstrate that the most

egregious forms of police sexual violence are *not* isolated events.  The study identified 118 cases

of rape (including adult and minor victims) perpetrated by police officers over the course of three

years.  The most serious offense charged in close to one-third of the cases (32.3%) was forcible

or statutory rape.  The study also identified other egregious forms of police sexual violence,

including 93 cases of forcible sodomy, 43 aggravated and simple assaults, and 11 cases that

involved a sexual assault with an object.  The proportion of cases that involved the most serious

forms of sex-related police crime in our study was considerably larger than expected based on

the existing research and the fact that data on the most egregious forms of police sexual violence

has been lacking.

The large proportion of serious cases in our sample was clearly influenced in part by our

methodology.  First, news-based searches appear to identify more serious cases of police sexual

misconduct than either surveys or content analyses of published court opinions (see, e.g., Kraska

& Kappeler, 1995; Maher, 2003, 2008).  Officer surveys reflect in part the influences of police

culture and the value of secrecy (Crank, 2004; Westley, 1956, 1970) and the media are likely to

deem serious cases as the most "newsworthy."   Second, our study identified only cases that

involved a criminal arrest.  Scholars have long recognized that law enforcement officers are

generally exempt from law enforcement because police typically do not arrest other police

officers (Black, 1976; Reiss, 1971; Stinson, Liederbach, Brewer, & Todak, 2013).  Thus, our

methodology is probably more likely to capture those cases that could not be ignored and

compelled an arrest because they were indeed egregious.  Still, the sheer number of violent sex

crimes in our study should concern both scholars and police executives regardless of the

methodology used to identify them empirically.

   The identified victims in this study were inordinately young.  The victims were less than

18 years of age in roughly three-fourths of the cases in which age data were available (*n* = 236,

73%).  A relatively small number of cases involved victims who were adults, including current

spouses and current or former boyfriends/girlfriends.  Research has already demonstrated that

sex crime victims overall tend to be young (Terry, 2013), but we also found that a large

percentage of victims (40%) were a child unrelated to the arrested officer.  Also, close to one-

half of all these cases occurred while the officer was off-duty (48%).  Taken together, these

findings seem to indicate scenarios in which adults allowed police both access and the

opportunity to victimize children under their care.  Caregivers in many instances may define law

enforcement officers as "trustworthy" given the occupational status of police, and caregivers

may be more likely to afford police officers a level of trust that exceeds the one typically

provided other unrelated adults.  That is, caregivers may be prone to "let their guard down" in

the presence of police in a manner that evokes the infamous scandals involving Catholic priests

and the wide-scale sexual abuse of minors (see, e.g., Terry, 2008; Terry et al., 2011).  Walker

and Irlbeck (2003) describe similar scenarios in their documentation of the sexual abuse of

dozens of minors involved in Law Enforcement Career Exploring programs.  Future research

should focus on the plight of the victims of sex-related police misconduct and attempt to

disentangle these relationships and further explore the unique vulnerabilities of children in these cases.

The study provides data on how police organizations respond to cases of sex-related misconduct. Three factors of note that seem to promote the ultimate termination of police arrested for sex-related crimes include (a) criminal conviction on one or more of the offenses charged, (b) history of other types of police misconduct, and (c) accompanying reports of a scandal or cover-up. Police organizations are probably more likely to invoke the most serious job-related sanctions in cases where the evidence of guilt has been clearly demonstrated in the courts as well as in cases involving police who may be perceived as "problem officers" on the basis of previous lawsuits. Public accusations of scandal and cover-up clearly make these cases more difficult to ignore. On the other hand, police arrested for sex-related crimes were less likely to lose their job if the case involved a previous suspension. This could be a signal of organizational reluctance to impose the most severe job-related penalties and define a suspension as "punishment enough" in some sex-related misconduct cases. Rabe-Hemp and Braithwaite (2013) demonstrate how police organizations fail to document, report, and adequately punish police who are recidivist sex offenders and thus allow the continuation of sexual assaults and further victimization.

**Policy Implications**

Sex-related misconduct presents considerable challenges to police organizations and executives. Both the International Association of Chiefs of Police (2011) and Walker and Irlbeck (2002) make recommendations that provide a framework for the identification of strategies to address the problem. The most obvious among them is the need for specific formal policies prohibiting sex-related misconduct. Police organizations commonly enact general

policies that define ethical standards, and many agencies have also adopted policies that specifically prohibit discrimination and sexual harassment.  These general policies are "completely inadequate" within this context because they do not specifically address situations in which police take advantage of their position and authority to commit sex crimes, initiate sexual contact, or respond inappropriately to perceived sexually motivated cues (International Association of Chiefs of Police, 2011, p. 6).  Written policies cannot—in and of themselves— prevent sex-related misconduct.  Written policies, however, do provide a clear statement of the organization's priorities, goals, and commitment to confronting the problem.  Specific policies against sex-related misconduct should also define organizational strategies designed to promote professional behavior, especially in situations known to provide an opportunity context for this form of misconduct (e.g., traffic enforcement, Law Enforcement Career Exploring programs). Policies against sex-related misconduct should also outline standards by which these incidents will be identified and investigated, particularly in cases that originate from a citizen complaint.

Protocols for both pre-service and in-service training need to reflect the content and intent of policy on the issue.  Training should obviously familiarize officers with specific policies prohibiting sex-related misconduct.  More importantly, training represents the single most important way to socialize police into a culture that does not tolerate sexual misconduct within the ranks.  The goal should be to educate officers on the problem of police sexual misconduct and to teach them how to identify and report sex-related misconduct when they observe it.  Training should also emphasize behaviors and techniques officers can use on the street to manage citizens' perceptions and the situational contexts that provide opportunities for sexual misconduct to occur.  Police organizations should require the inclusion of training based

on case studies, role plays, and real-world scenarios that depict the various forms of sex-related

misconduct and identify strategies to address them.

Finally, police organizations should consider a course of action that includes strategies

for more effective oversight involving the use of Early Intervention Systems (EIS) for

monitoring and prevention of sex-related misconduct.  Walker (2005) points out that EIS

originated as a means to identify and respond to complaints involving excessive force, but they

can also be used to "identify a wide range of performance issues" (p. 102).  Our findings

demonstrate that many officers arrested for sex-related crimes had been previously sued in

federal court for civil rights violations.  The finding suggests that sex-related crimes are often not

isolated events.  Rather, sex-related crimes often are part of a larger pattern indicative of officers

with wider performance problems.  Of course, EIS systems will not mitigate sex-related

misconduct absent both an organizational commitment to effectively utilize them and strategies

designed to build the abilities and expertise of mid-level police managers to supervise and

monitor street-level misconduct (see, e.g., Kyle, 2011a, 2011b).  Another potential obstacle to

using EIS systems as a tool to confront sex-related misconduct is the structure and limitations of

police complaint review processes, especially those that rely on citizen-initiated complaints

(Liederbach, Boyd, Taylor, & Kawucha, 2007; Petterson, 1991).  Victims of sex-related

misconduct are probably more reluctant than other types of citizens to initiate a complaint and

utilize formal complaint review processes given their unique vulnerabilities and demographics.

In the long view, police organizations may need to adopt entirely new protocols to accept and

investigate cases of sex-related misconduct.  The adoption process could involve legal and

procedural changes designed to improve access and the experience of victims similar to those

that have already been undertaken to improve police processing of rape cases (Dellinger Page,

2010; Estrich, 1987; Spohn & Tellis, 2012).

Notes

[1]Kraska and Kappeler's (CITE) definition of police sexual violence explains how sex crimes often result from encounters involving young females because of an inherent power differential and the interplay between issues of power and gender that work to produce opportunities for sex crimes.  Thus, Kraska and Kappeler's definition of police sexual violence focuses on crimes perpetrated against women.  We, however, include identified male victims in our study.  The fact that the identified male victims were most commonly either children or teens (MEAN 15) suggests that some of the same factors that contribute to the perpetration of sex crimes against women also operate in cases involving children or teens whether the victim is male or female, namely, differences in power between police and their victims.  The inclusion of young male victims also provides data on cases of police sexual misconduct that have not been identified in prior empirical research.

POLICE SEXUAL MISCONDUCT                                                                      32

References

Avila, J., Lynn, A., & Pearle, L. (2010, August 30). Police sergeant had secret life as serial

   rapist. *ABC News*. Retrieved from http://abcnews.go.com

Barker, T. (1978). An empirical study of police deviance other than corruption. *Journal of Police

   Science and Administration, 6*(3), 264–272.

Bewick, V., Cheek, L., & Ball, J. (2004). Statistics review 13: Receiver operating characteristic

   curves. *Critical Care, 8*(6), 508–512. doi:10.1186/cc3000

Bharat, K. (2012, September 22). Google News turns 10. *Google News Blog*. Retrieved from

   http://googlenewsblog.blogspot.com/2012/09/google-news-turns-10.html

Black, D. J. (1976). *The behavior of law*. New York: Academic Press.

Breiman, L., Friedman, J. H., Olshen, R. A., & Stone, C. J. (1984). *Classification and regression

   trees*. Belmont, CA: Wadsworth.

Buettner, R. (2012, May 7). Ex-officer sentenced to 75 years in prison for sexual assault. *The

   New York Times*. Retrieved from http://www.nytimes.com

Carlson, M. (2007). Order versus access: News search engines and the challenge to traditional

   journalistic roles. *Media, Culture & Society, 29*(6), 1014–1030.

   doi:10.1177/0163443707084346

Chermak, S. M., McGarrell, E., & Gruenewald, J. (2006). Media coverage of police misconduct

   and attitudes toward police. *Policing: An International Journal of Police Strategies &

   Management, 29*(2), 261–281. doi:10.1108/13639510610667664

Christopher Commission. (1991). *Report of the Independent Commission on the Los Angeles

   Police Department*. Los Angeles, CA: City of Los Angeles.

Collins, A. (1998). *Shielded from justice: Police brutality and accountability in the United States*. New York, NY: Human Rights Watch.

Crank, J. P. (2004). *Understanding police culture* (2nd ed.). Dayton, OH: Anderson/LexisNexis.

De'ath, G., & Fabricius, K. E. (2000). Classification and regression trees: A powerful yet simple technique for ecological data analysis. *Ecology*, *81*(11), 3178–3192. doi:10.1890/0012-9658(2000)081[3178:CARTAP]2.0.CO;2

Dellinger Page, A. (2010). True colors: Police officers and rape myth acceptance. *Feminist Criminology*, *5*(4), 315–334. doi:10.1177/1557085110384108

Denno, D. W. (1993). Perspectives on disclosing rape victims' names. *Fordham Law Review*, *61*(5), 1113–1131.

Dension, D. G. T., Mallick, B. K., & Smith, A. F. M. (1998). A Bayesian CART algorithm. *Biometrika*, *85*(2), 363–377. doi:10.1093/biomet/85.2.363

Denton, E. (2010). International news coverage of human trafficking arrests and prosecutions: A content analysis. *Women & Criminal Justice*, *20*, 10–26. doi:10.1080/08974451003641321

Dolan, M. C., & Doyle, M. (2000). Violence risk prediction: Clinical and actuarial measures and the role of the Psychopathy Checklist. *The British Journal of Psychiatry*, *177*(4), 303–311. doi:10.1192/bjp.177.4.303

Eschholz, S., & Vaughn, M. S. (2001). Police sexual violence and rape myths: Civil liability under Section 1983. *Journal of Criminal Justice*, *29*(5), 389–405. doi:10.1016/S0047-2352(01)00104-0

Estrich, S. (1987). *Real rape*. Cambridge, MA: Harvard University Press.

Harris, R. N. (1973). *The police academy: An inside view*. New York, NY: Wiley.

Hayes, A. F., & Krippendorff, K. (2007). Answering the call for a standard reliability measure

    for coding data. *Communication Methods and Measures*, *1*(1), 77–89.

    doi:10.1080/19312450709336664

International Association of Chiefs of Police. (2011). *Addressing sexual offenses and misconduct*

    *by law enforcement: Executive guide*. Alexandria, VA: International Association of

    Chiefs of Police.

Kane, R. J. (2007). Collect and release data on coercive police actions. *Criminology & Public*

    *Policy*, *6*(4), 773–780. doi:10.1111/j.1745-9133.2007.00485.x

Kane, R. J., & White, M. D. (2013). *Jammed up: Bad cops, police misconduct, and the New York*

    *City Police Department*. New York, NY: New York University Press.

Kappeler, V. E., & Vaughn, M. S. (1997). Law enforcement: When the pursuit becomes

    criminal: Municipal liability for police sexual violence. *Criminal Law Bulletin*, *33*(4),

    352–376.

Kraska, P. B., & Kappeler, V. E. (1995). To serve and pursue: Exploring police sexual violence

    against women. *Justice Quarterly*, *12*(1), 85–111. doi:10.1080/07418829500092581

Krippendorff, K. (2013). *Content analysis: An introduction to its methodology* (3rd ed.). Los

    Angeles, CA: Sage.

Kyle, K. (2011a, May 22). More latitude for police misconduct at SDPD. *Voice of San Diego*.

    San Diego, CA. Retrieved from http://voiceofsandiego.org/2011/05/22/more-latitude-for-

    police-misconduct-at-sdpd/

Kyle, K. (2011b, December 15). How a bad cop evaded detection. *Voice of San Diego*. San

    Diego, CA. Retrieved from http://voiceofsandiego.org/2011/12/15/how-a-bad-cop-

    evaded-detection/

LaGrange, R. (1998). *Policing American society* (2nd ed.). Chicago, IL: Nelson-Hall.

Larson, H. J., Smith, D., Peterson, P., Cumming, M., Eckersberger, E., Freifeld, C. C., …
Madoff, L. C. (2013). Measuring vaccine confidence: Analysis of data obtained by a
media surveillance system used to analyse public concerns about vaccines. *The Lancet
Infectious Diseases*. doi:10.1016/S1473-3099(13)70108-7

Lawrence, R. C. (2000). *The politics of force: Media and the construction of police brutality*.
Berkeley, CA: University of California Press.

Lersch, K. M., & Feagin, J. R. (1996). Violent police-citizen encounters: An analysis of major
newspaper accounts. *Critical Sociology*, *22*(2), 29–49.
doi:10.1177/089692059602200202

Liederbach, J., Boyd, L. M., Taylor, R. W., & Kawucha, S. K. (2007). Is it an inside job? An
examination of internal affairs complaint investigation files and the production of
nonsustained findings. *Criminal Justice Policy Review*, *18*, 353–377.
doi:10.1177/0887403407303799

Maher, T. M. (2003). Police sexual misconduct: Officers' perceptions of its extent and causality.
*Criminal Justice Review*, *28*(2), 355–381. doi:10.1177/073401680302800209

Maher, T. M. (2008). Police chiefs' views on police sexual misconduct. *Police Practice and
Research*, *9*(3), 239–250. doi:10.1080/15614260701797504

Menard, S. (2002). *Applied logistic regression analysis* (2nd ed.). Thousand Oaks, CA: Sage.

Payne, B. K. (2013). *White-collar crime: The essentials*. Thousand Oaks, CA: Sage.

Petterson, W. E. (1991). Police accountability and civilian oversight of policing: An American
perspective. In A. J. Goldsmith (Ed.), *Complaints against the police: The trend to
external review*. New York, NY: Oxford University Press.

Rabe-Hemp, C. E., & Braithwaite, J. (2013). An exploration of recidivism and the officer shuffle

in police sexual violence. *Police Quarterly*, *16*(2), 127–147.

doi:10.1177/1098611112464964

Ready, J., White, M. D., & Fisher, C. (2008). Shock value: A comparative analysis of news

reports and official records on TASER deployments. *Policing: An International Journal

of Police Strategies & Management*, *31*(1), 148–170. doi:10.1108/13639510810852620

Reiss, A. J. (1971). *The police and the public*. New Haven, CT: Yale University Press.

Riffe, D., Lacy, S., & Fico, F. G. (2005). *Analyzing media messages: Using quantitative content

analysis in research* (2nd ed.). Mahwah, NJ: Lawrence Erlbaum Associates.

Ross, J. I. (2000). *Making News of Police Violence: A Comparative Study of Toronto and New

York City*. Westport, CT: Praeger.

Sapp, A. D. (1994). Sexual misconduct by police officers. In T. Barker & D. L. Carter (Eds.),

*Police deviance* (pp. 187–199). Cincinnati, OH: Anderson.

Snyder, M. (2011, August 4). Ex-Marysville officer pleads no contest to molestation charge.

*abc27.com*. Retrieved from http://www.abc27.com

Sonquist, J. A. (1970). *Multivariate model building: The validation of a search strategy*. Ann

Arbor, MI: University of Michigan, Institute for Social Research, Survey Research

Center.

Spohn, C., & Tellis, K. (2012). The criminal justice system's response to sexual violence.

*Violence Against Women*, *18*(2), 169–192. doi:10.1177/1077801212440020

Stamper, N. (2006). *Breaking rank: A top cop's exposé of the dark side of American policing*.

New York, NY: Nation Books.

Stinson, P. M. (2009). *Police crime: A newsmaking criminology study of sworn law enforcement officers arrested, 2005-2007*. Indiana University of Pennsylvania, Indiana, PA. Retrieved from http://hdl.handle.net/2069/207

Stinson, P. M., & Liederbach, J. (2013). Fox in the henhouse: A study of police officers arrested for crimes associated with domestic and/or family violence. *Criminal Justice Policy Review*, *24*, 601–625. doi:10.1177/0887403412453837

Stinson, P. M., Liederbach, J., Brewer, S. L., Schmalzried, H. D., Mathna, B. E., & Long, K. L. (2013). A study of drug-related police corruption arrests. *Policing: An International Journal of Police Strategies & Management*, *36*(3), 491–511. doi:10.1108/PIJPSM-06-2012-0051

Stinson, P. M., Liederbach, J., Brewer, S. L., & Todak, N. E. (2013). Drink, drive, go to jail? A study of police officers arrested for drunk driving. *Journal of Crime and Justice*, *0*(0), 1–21. doi:10.1080/0735648X.2013.805158

Stinson, P. M., Reyns, B. W., & Liederbach, J. (2012). Police crime and less-than-lethal coercive force: A description of the criminal misuse of TASERs. *International Journal of Police Science & Management*, *14*(1), 1–19. doi:10.1350/ijps.2012.14.1.237

Terry, K. J. (2008). Stained glass: The nature and scope of child sexual abuse in the Catholic Church. *Criminal Justice and Behavior*, *35*(5), 549–569. doi:10.1177/0093854808314339

Terry, K. J. (2013). *Sexual offenses and offenders: Theory, practice and policy* (2nd ed.). Belmont, CA: Wadsworth - Cengage.

Terry, K. J., Smith, M. L., Schuth, K., Kelly, J. R., Vollman, B., & Massey, C. (2011). *The causes and context of sexual abuse of minors by catholic priests in the United States, 1950-2010: A report presented to the United States Conference of Catholic Bishops by*

*the John Jay College Research Team*. Washington, DC: United States Conference of

Catholic Bishops.

U.S. Department of Agriculture. (2003). *Measuring rurality: Rural-urban continuum codes.*

*[Computer file]*. Washington. DC: U.S. Department of Agriculture, Economic Research

Service. Retrieved from http://www.ers.usda.gov/briefing/rurality/ruralurbcon/

U.S. Department of Justice. (2000). *National Incident-Based Reporting System: Data collection*

*guidelines*. Washington, DC: U.S. Department of Justice, Federal Bureau of

Investigation, Criminal Justice Information Services Division. Retrieved from

http://www.fbi.gov/about-us/cjis/ucr/nibrs/nibrs_dcguide.pdf/view

U.S. Department of Justice. (2004). *Uniform crime reporting handbook*. Washington, DC: U.S.

Department of Justice, Federal Bureau of Investigation. Retrieved from

http://www.fbi.gov/about-us/cjis/ucr/additional-ucr-publications/ucr_handbook.pdf

U.S. Department of Justice. (2008). *Census of state and local enforcement agencies (CSLLEA)*.

2008 [ICPSR27681-v1 data set]. Ann Arbor, MI: Inter-university Consortium for

Political and Social Research [distributor], 2011-08-03. doi:10.3886/ICPSR27681.v1.

U.S. Department of Justice. (2010). *Crime in the United States, 2009*. Washington, DC: U.S.

Department of Justice, Federal Bureau of Investigation. Retrieved from

http://www2.fbi.gov/ucr/cius2009/data/table_71.html

Vaughn, M. S. (1999). Police sexual violence: Civil liability under state tort law. *Crime &*

*Delinquency*, *45*(3), 334–357. doi:10.1177/0011128799045003003

Walker, S. (2005). *The New World of Police Accountability*. Thousand Oaks, CA: Sage.

Walker, S., & Irlbeck, D. (2002). *Driving while female: A national problem in police*

*misconduct*. Omaha, NE: University of Nebraska at Omaha, Department of Criminal

Justice, Police Professionalism Initiative. Retrieved from

http://www.policeaccountability.org/drivingfemale.htm

Walker, S., & Irlbeck, D. (2003). *Police sexual abuse of teenage girls: A 2003 update on driving while female*. Omaha, NE: University of Nebraska at Omaha, Department of Criminal Justice, Police Professionalism Initiative. Retrieved from internal-pdf://PSA,%2520teenage%2520girls-1063221248/PSA,%2520teenage%2520girls.pdf

Westley, W. A. (1956). Secrecy and the police. *Social Forces*, *34*(3), 254–257.

Westley, W. A. (1970). *Violence and the police: A sociological study of law, custom, and morality*. Cambridge, MA: MIT Press.

White, M. D., & Ready, J. (2009). Examining fatal and nonfatal incidents involving the TASER: Identifying predictors of suspect death reported in the media. *Criminology & Public Policy*, *8*(4), 865–891. doi:10.1111/j.1745-9133.2009.00600.x

Wintemute, G., Claire, B. E., McHenry, V. S., & Wright, M. A. (2012). Epidemiology and clinical aspects of stray bullet shootings in the United States. *The Journal of Trauma and Acute Care Surgery*, *73*(1), 215–223. doi:10.1097/TA.0b013e31824c3abc

**Table 1.  Police Sexual Misconduct Arrest Cases: Arrested Officers and Agencies** ($N$ = 548)

| | $n$ | (%) | | $n$ | (%) |
|---|---|---|---|---|---|
| **Sex** | | | **Agency Type** | | |
| Male | 543 | (99.1) | Primary State Police | 29 | (5.3) |
| Female | 5 | (0.9) | Sheriff's Office | 91 | (16.6) |
| | | | County Police Dept. | 15 | (2.7) |
| **Function** | | | Municipal Police Dept. | 389 | (71.0) |
| Patrol & Street Level | 449 | (81.9) | Other Dept. | 24 | (4.4) |
| Line/Field Supervisor | 73 | (13.4) | | | |
| Management | 26 | (4.7) | **Full-Time Sworn Officers** | | |
| | | | 0-24 | 160 | (30.3) |
| **Officer Duty Status** | | | 25-99 | 95 | (17.3) |
| On-Duty | 281 | (51.3) | 100-999 | 157 | (28.6) |
| Off-Duty | 267 | (48.7) | 1,000 or more | 130 | (23.7) |
| **Age** | | | **Region of Agency** | | |
| 20-27 | 49 | (8.9) | South | 263 | (48.0) |
| 28-35 | 158 | (28.8) | Northeast | 109 | (19.9) |
| 36-43 | 190 | (34.7) | West | 100 | (18.2) |
| 44-51 | 87 | (15.9) | Midwest | 76 | (13.9) |
| 52 or older | 28 | (5.2) | | | |
| Missing | 36 | (6.6) | **Urban-Rural Code** | | |
| | | | Metropolitan County | 454 | (82.8) |
| **Years of Service** | | | Non-Metro County | 94 | (17.2) |
| 0-5 | 180 | (32.8) | | | |
| 6-11 | 112 | (20.4) | **Arresting Agency** | | |
| 12-17 | 77 | (14.1) | Employing Agency | 211 | (38.5) |
| 18 or more years | 72 | (13.1) | Another Agency | 337 | (61.5) |
| Missing | 107 | (19.5) | | | |

**Table 2. Police Sexual Misconduct Arrest Cases: Victim Characteristics** ($N$ = 548)

| | $n$ | (%) | (Valid %) | | $n$ | (%) | (Valid %) |
|---|---|---|---|---|---|---|---|
| Victim's Sex | | | | Victim's Relationship to Arrested Officer | | | |
| Female | 456 | (83.2) | (92.1) | Current Spouse | 3 | (0.5) | (0.6) |
| Male | 39 | (7.1) | (7.9) | Former Spouse | 4 | (0.7) | (0.8) |
| Missing | 53 | (9.7) | | Current Girlfriend or Boyfriend | 7 | (1.3) | (1.3) |
| | | | | Former Girlfriend or Boyfriend | 4 | (0.7) | (0.8) |
| Victim's Age | | | | Child or Stepchild | 23 | (4.2) | (4.4) |
| Birth-11 | 42 | (7.7) | (13.0) | Some Other Relative | 20 | (3.6) | (3.8) |
| 12-13 | 39 | (7.1) | (12.1) | Unrelated Child | 223 | (40.7) | (42.8) |
| 14-15 | 92 | (16.8) | (28.5) | Stranger or Acquaintance | 237 | (43.2) | (45.5) |
| 16-17 | 63 | (11.5) | (19.5) | Missing | 27 | (4.9) | |
| 18-19 | 24 | (4.4) | (7.4) | | | | |
| 20-24 | 25 | (4.6) | (7.7) | Victim's Law Enforcement Status | | | |
| 25-32 | 17 | (3.1) | (5.3) | Victim is Not a Police Officer | 517 | (94.3) | (99.2) |
| 33-41 | 18 | (3.3) | (5.6) | Victim is a Police Officer | 4 | (0.7) | (0.8) |
| 42 or older | 3 | (0.5) | (0.9) | Missing | 27 | (4.9) | |
| Missing | 225 | (41.1) | | | | | |

**Table 3. Police Sexual Misconduct Arrest Cases:  Logistic Regression Model Predicting Sex-Related Crime** ($N$ = 333)

| | $B$ | $SE$ | Wald | $p$ | Exp(B) | 95% CI for Exp(B) LL | UL |
|---|---|---|---|---|---|---|---|
| Victim Age (9 categories) | -0.628 | 0.082 | 58.257 | <.001 | 0.534 | 0.454 | 0.627 |
| Victim Gender | -3.523 | 0.467 | 56.875 | <.001 | 0.030 | 0.012 | 0.074 |
| Alcohol-related Crime | -2.255 | 0.527 | 18.346 | <.001 | 0.105 | 0.037 | 0.294 |
| Crime Detected by Citizen Complaint | 1.545 | 0.573 | 7.263 | .007 | 4.689 | 1.524 | 14.425 |
| Criminal Case Conviction | 1.303 | 0.445 | 8.585 | .003 | 3.680 | 1.539 | 8.799 |
| Family Violence Incident | -2.837 | 0.476 | 35.531 | <.001 | 0.059 | 0.023 | 0.149 |
| - 2 Log Likelihood | 204.483 | | | | | | |
| Model Chi-Square | 257.126 | | | <.001 | | | |
| Cox & Snell $R^2$ | .538 | | | | | 95% CI for AUC | |
| Nagelkerke $R^2$ | .717 | | | | | LL | UL |
| AUC | .891 | 0.014 | | <.001 | | .863 | .919 |

**Table 4.  Police Sexual Misconduct Arrest Cases: Logistic Regression Model Predicting Conviction** ($N = 250$)

| | B | SE | Wald | p | Exp(B) | 95% CI for Exp(B) | |
|---|---|---|---|---|---|---|---|
| | | | | | | LL | UL |
| Age at Time of Arrest (10 categories) | 0.239 | 0.103 | 5.357 | .021 | 1.270 | 1.037 | 1.556 |
| Employing LE Agency Type | -0.796 | 0.302 | 6.972 | .008 | 0.451 | 0.250 | 0.814 |
| - 2 Log Likelihood | 206.537 | | | | | | |
| Model Chi-Square | 16.565 | | | <.001 | | | |
| Cox & Snell $R^2$ | .064 | | | | 95% CI for AUC | | |
| Nagelkerke $R^2$ | .109 | | | | | LL | UL |
| AUC | .618 | 0.036 | | <.001 | | .618 | .760 |

**Table 5. Police Sexual Misconduct Arrest Cases: Logistic Regression Model Predicting Job Loss** ($N = 263$)

| | $B$ | $SE$ | Wald | $p$ | Exp(B) | 95% CI for Exp(B) | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | $LL$ | $UL$ |
| 42 USC §1983 Defendant at Some Point | 0.785 | 0.329 | 5.699 | .017 | 2.193 | 1.151 | 4.179 |
| Urban to Rural County Continuum | -0.217 | 0.099 | 4.803 | .028 | 0.805 | 0.662 | 0.977 |
| Suspended from Job After Arrest | -1.409 | 0.358 | 15.502 | <.001 | 0.244 | 0.121 | 0.493 |
| Agency Scandal / Coverup | 1,871 | 0.653 | 8.201 | .004 | 6.494 | 1.805 | 23.369 |
| Criminal Case Conviction | 0.891 | 0.365 | 5.946 | .015 | 2.438 | 1.191 | 4.990 |
| | | | | | | | |
| - 2 Log Likelihood | 289.302 | | | | | | |
| Model Chi-Square | 40.190 | | | <.001 | | | |
| Cox & Snell $R^2$ | .142 | | | | | 95% CI for AUC | |
| Nagelkerke $R^2$ | .198 | | | | | $LL$ | $UL$ |
| AUC | .518 | 0.026 | | .487 | | .468 | .568 |

POLICE SEXUAL MISCONDUCT                                                         45

**Table 6.  CART Models Predicting Job Loss, Conviction,  and Sex-Related Crime**

| | Splitting Variable | Node 1 Variable(s) | Node 2 Variable(s) | AUC | 95% CI | |
|---|---|---|---|---|---|---|
| | | | | | *LL* | *UL* |
| Sex-related ($N$ = 2149) | Age of Victim | Gender of Victim | Gender of Victim | .922 | .906 | .937 |
| Jobloss ($N$ = 549) | Officer Suspended | 42 USC §1983 Civil Defendant at Some Point | Urban/Rural Continuum | .830 | .796 | .865 |
| Conviction ($N$ = 267) | Years of Service | Agency Type | Age of Officer | .871 | .818 | .925 |