# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

———————————————————— )
RAYNE UPTON, individually and )
on behalf of her minor daughter, G.H. )
                                      )
         Plaintiff,                   )         Docket No. 2:21-cv-407
  v.                                  )
                                      )         JUDGE: CARL BARBIER
RODNEY VICKNAIR, SHAUN FERGUSON, )
THE CITY OF NEW ORLEANS; DOE )
DISTRICT COMMANDER; DOES 1 to 10. )             MAGISTRATE: KAREN
                                      )         WELLS ROBY
         Defendants.                  )
———————————————————— )

## PLAINTIFF'S FIRST AMENDED COMPLAINT

Plaintiff Rayne Upton, individually and on behalf of her minor daughter, G.H., brings this Complaint against Defendants City of New Orleans, Shaun Ferguson, Rodney Vicknair, XYZ Insurance Companies 1-10, Doe District Commander, and Does 1-10, and respectfully alleges as follows:

## I.      INTRODUCTION

1.      In May 2020, 14-year-old Plaintiff G.H. was subject to a sexual assault.

2.      NOPD dispatched Defendant Officer Rodney Vicknair to transport G.H. to the hospital for a rape kit.

3.      Officer Vicknair was a singularly bad choice for this task – he was not a member of NOPD's Special Victims or Child Abuse units, and he had a long list of citizen complaints of unprofessional and illegal conduct.

4.     NOPD had determined that some of these complaints had merit – including at least one where Vicknair had used his police authority to solicit contact with women. But it kept Vicknair on the force and – shockingly – dispatched him to respond to a child who had been subject to sexual abuse.

5.     On the first night that Officer Vicknair met G.H., he began grooming her.

6.     Over the next few months, he repeatedly returned to her house in his uniform and NOPD vehicle.

7.     And during those visits, in uniform and in an NOPD vehicle, Officer Vicknair repeatedly sexually assaulted the minor child G.H. One of those times, he raped her.

8.     Then, days after NOPD was warned of Officer Vicknair's inappropriate behavior, Officer Vicknair raped G.H. a second time.

9.     G.H. and her mother, Rayne Upton, seek accountability for Officer Rodney Vicknair's predatory actions, as well as for the complicit and negligent actions of the City of New Orleans and the New Orleans Police Department.

10.    Plaintiff Rayne Upton, individually and on behalf of her minor daughter, brings this complaint for violation of right secured to G.H. by the Constitution of the United States, including but not limited to, her Fifth and Fourteenth Amendment due process rights to bodily integrity and freedom from sexual abuse and bodily intrusions by state actors, including the right to be free from unjustified and excessive force utilized by police, and her Fourth Amendment right to be free from unlawful seizure her person.

11.    Plaintiff's complaint also raises state law claims of battery, false imprisonment, intentional and negligent infliction of emotional distress, as well as state constitutional claims.

## II.    JURISDICTION AND VENUE

12.    Plaintiff brings this action pursuant to 42 U.S.C. §§ 1983 and 1988. Jurisdiction is based on 28 U.S.C. § 1331 (federal question), § 1343 (civil rights), and the Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution.

13.    Plaintiff further invokes the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367 to hear claims arising under state law, including but not limited to Louisiana Civil Code Articles 2315, 2315.6, and 2315.7.

14.    Venue in this Court is proper pursuant to 28 U.S.C. § 1391 as a substantial part of the events giving rise to Plaintiff's claims arose in the Eastern District of Louisiana, and because Defendants reside in the District.

## III.    PARTIES

### *Plaintiff*

15.    Plaintiff **RAYNE UPTON** is an adult citizen of the State of Louisiana and domiciled in the Eastern District of Louisiana. She is the mother and legal guardian of the minor child **G.H.** She brings this suit individually and on behalf of her minor daughter, **G.H.**

### *Defendants*

16.    Defendant **SHAUN FERGUSON** is an adult resident of the Eastern District of Louisiana and the Superintendent of the New Orleans Police Department. Defendant Ferguson is responsible for the supervision, administration, policies, practices, procedures, and customs of the NOPD. He is responsible for the hiring, training, discipline, and control of the NOPD staff, supervisors, and deputies. He is sued in his official capacity.

17.     Defendant **RODNEY VICKNAIR** was an officer of the NOPD who engaged in inappropriate contact with, groomed, and sexually assaulted the minor child, G.H, using his authority as an NOPD officer. He is sued in his individual and official capacities.

18.     Defendant **CITY OF NEW ORLEANS** is a political subdivision of the State of Louisiana. It operates the New Orleans Police Department, a law enforcement agency operating in the Eastern District of Louisiana which employed and controlled the Officer-Defendants in this case and was responsible for the hiring, training, and discipline of the officers. The City of New Orleans, through the NOPD, also created, instituted, and oversaw enforcing the policies and procedures at issue in this case.

19.     Defendant **DOE DISTRICT COMMANDER** was the NOPD District Commander overseeing Defendant Vicknair during the relevant time.

20.     Defendants **DOES 1-10** are persons presently unknown to Plaintiffs after diligent search and inquiry. They include the Officer-Defendants who witnessed Officer Vicknair's behavior towards G.H., and the dispatcher who initially dispatched Vicknair to the scene of G.H.'s sexual abuse.

21.     Except as otherwise indicated, each defendant is a joint tortfeasor with every other defendant under Louisiana Civil Code Art. 2324.

# IV.    STATEMENT OF FACTS

A. <u>Brief background of the known pattern of police sexual violence towards women and minor children.</u>

22.    Police sexual misconduct is often considered a hidden crime that routinely goes unreported.[1] Victims may not report instances of police sexual misconduct to authorities because they feel humiliated or they may fear retaliation.[2] Victims may also encounter barriers to filing a complaint since that process can be unnecessarily difficult and/or intimidating.[3]

23.    In a national scale study of arrested officers, Bowling Green State University found that police sexual misconduct includes serious forms of sex-related crime and that victims of sex-related police crime are typically younger than 18 years of age.[4]

24.    Police commonly encounter citizens who are vulnerable, usually because they are victims, criminal suspects, or perceived as "suspicious" and subject to the power and coercive authority granted to police.[5]

25.    Findings suggest that police sexual violence is a "pattern prone" offense that often involves recidivist officers who victimize multiple persons and that a striking number of police accused of sex crimes manage to escape appropriate penalties and maintain police certification by moving from one jurisdiction to another.[6]

---

[1] Philip M. Stinson, John Liederbach, Steven L. Brewer, and Brooke E. Mathna, *Police sexual misconduct: A national scale study of arrested officers* (2014). CRIMINAL JUSTICE FACULTY PUBLICATIONS, Paper 30, p. 1, http://scholarworks.bgsu.edu/crim_just_pub/30, attached as Exhibit A.
[2] *Id.* at p. 3.
[3] *Id.*
[4] *Id.* at p. 1.
[5] *Id.* at p. 2.
[6] *Id.* at p. 7. Researchers utilized what has become the preferred method to conduct news-based content analyses to describe cases of sex-related police misconduct that happened in small towns, suburbs, and large cities throughout the United States. *Id.* at 24. The study provides some points of discussion in terms of the nature of sexually violent crimes committed by police, the characteristics of the victims, and the factors that seem to influence the outcome of cases. *Id.*

26.     The Bowling Green study identified an unprecedented 548 cases of police sex-related crime—all of them occurring within a brief three-year window of time (2005-2007).[7]

27.     Almost half of the cases (48%) in the study involved an arrested officer who was employed by a law enforcement agency in the Southern region of the United States (*i.e.*, Alabama, Arkansas, Florida, Georgia, Kentucky, Louisiana, Maryland, Mississippi, North Carolina, Oklahoma, South Carolina, Tennessee, Texas, Virginia, West Virginia, and the District of Columbia).[8]

28.     In many cases identified by researchers, adults allowed police both access and the opportunity to victimize children under their care. Caregivers in many instances may perceive law enforcement officers as "trustworthy" given the occupational status of police, and caregivers may be more likely to afford police officers a level of trust that exceeds the one typically provided other unrelated adults. That is, caregivers may be prone to "let their guard down" in the presence of police.[9]

29.     According to the national scale study of arrested officers, almost all of the cases involve male officers (99.1%). Most of the cases involved police employed in a patrol or other street-level rank including officers, deputies, troopers, and detectives. There were 73 cases that involved police line and field supervisors including corporals, sergeants, and lieutenants. There were 26 cases that involved police managers and executives including captains, and chiefs, superintendents, and sheriffs.[10]

---

[7] *Id.* at p. 4.
[8] *Id.* at p. 24. 1. Although it is unclear why the incidence of sex-related police crime arrests is so high in the South, researchers suggest it is because of increased police presence – there are more police officers employed in the South than in any other region of the country, there are more municipal law enforcement agencies in the South than in any of the other geographic regions, and the average number of police officers per 1,000 inhabitants in the South is higher than in the other regions. *Id.* at pp. 24-25.
[9] *Id.* at p. 26.
[10] *Id.* at p. 15.

30.     Findings indicate most of the known victims are female. The victims are typically young with most being minors under the age of 18 years.[11]

31.     This study only reflects the reported number of sexually violent crimes committed by police officers. The United States Department of Justice estimates that 80% of rapes and sexual assaults go unreported.[12] Thus, the actual number of sexually violent crimes committed in general, and by police, is drastically higher than the reported number.

B.      <u>In sending Officer Vicknair to transport G.H., New Orleans Police Department violated its policy for responding to reports of child abuse.</u>

32.     In 2017, the NOPD instituted a new policy establishing requirements for NOPD members who respond to reports of child abuse and neglect, which specifies that the "[t]he Child Abuse Unit shall investigate all abuse and sexually related incidents involving victims under the age of 17 years at the time the incident is reported[.]"[13]

---

[11] *Id.* at p. 16.

[12] *See* Rachel E. Morgan and Grace Kena, Criminal Victimization, 2016: Revised, U.S. Department of Justice (October 2018), https://www.bjs.gov/content/pub/pdf/cv16.pdf, attached as Exhibit B.

[13] New Orleans Police Department Operations Manual, Chapter 42.19, *Child Abuse*, effective March 12, 2017, at p. 1, https://www.nola.gov/getattachment/NOPD/Policies/Chapter-42-19-Child-Abuse-EFFECTIVE-3-12-2017.pdf/, [hereinafter, "NOPD Manual"], attached as Exhibit C. Cf., Chapter 42.2, *Sexual Assault*, effective November 15, 2015, https://nola.gov/getattachment/NOPD/NOPD-Consent-Decree/Chapter-42-2-Sexual-Assault.pdf/, attached as Exhibit D.

33.     Per the NOPD Manual, Communication Services must dispatch a trained detective,

who specialize in cases of child abuse or sex crimes, to the scene:[14]

---

**COMMUNICATIONS SERVICES RESPONSIBILITIES**

2.   Communications Services shall dispatch a Child Abuse detective, or a Sex Crimes detective at the direction of a Special Victims Section supervisor, to the location of the victim.

3.   For child abuse calls as defined in this Chapter, Communications Services shall dispatch a patrol officer for Code 2 calls for service. Communications Services shall not dispatch a patrol officer to a Code 1 call for service unless otherwise requested by the detective.

4.   When a complainant reports child abuse, communications personnel shall follow standard emergency response that includes evaluating and properly prioritizing the call, securing medical assistance, inquiring about a suspect's current location, and obtaining detailed information to identify the suspect.  Information about the child's relationship with the victim, weapon use, and history of violence also shall be obtained.

5.   To ensure critical evidence is not lost, Communications Services personnel shall:

(a) Ask whether the victim has bathed, douched, urinated, or made other physical changes and advise against doing so;
(b) Ask the reporting person to use a clean jar to collect urine should the victim have to urinate;
(c) Let the reporting person know that other evidence may still be identified and recovered so the crime should still be reported if the victim has bathed or made other physical changes;
(d) Preserve the communications tape and printout for the investigation; and
(e) Explain to the reporting person that these questions will not delay an officer's response to the caller's location.

---

[14] *Id.* at p. 3.

34.     If a patrol officer is dispatched to the scene they are responsible for requesting a

Child Abuse detective if one is not already on the scene and for communicating observations to

the responding detective.

**RESPONSIBILITY OF THE PATROL OFFICER**

6.      The patrol officer's responsibility is to:

(a) Provide an emergency response, including attending to medical needs;
(b) Inquire about the identity and location of the suspect;
(c) Preserve evidence;
(d) Request a Child Abuse detective if one is not already on scene; and
(e) Communicate observations to the responding detective.

7.      If an officer responds to a scene that may involve child abuse but was not dispatched under a child abuse signal and no Child Abuse Unit detective is on scene, the officer shall immediately notify the Child Abuse Unit.

8.      The following sections of this chapter provide greater detail on the officer's responsibilities when responding to a child abuse incident.

35.     Further, the NOPD Manual purports to limit interactions between patrol officers

and child victims:

**INTERVIEWING CHILDREN**

14.     The officer **shall not** interview the child victim or child witnesses.  In exigent circumstances after consulting a Special Victims Section supervisor, only the minimum information necessary to stabilize the situation and secure evidence may be obtained from a child.

15.     If the victim chooses to tell his or her story, express sympathy and document the statements in the Major Crime Scene Officer Statement.

**SUPPORTING THE CHILD VICTIM**

38.   If the officer encounters the child, the officer should state, "What happened is not your fault.  I'm sorry this happened to you, and none of this is your fault.  I'm going to call a special team to help you."

39.   Officers shall demonstrate support in all interactions with the victim and encourage adults on scene to:
  (a) Support the victim and the investigation;
  (b) Avoid discussing the incident in front of the victim;
  (c) If the child brings up the incident, listen without questioning and document exactly what the child says; and
  (d) Not blame the child or make the child feel guilty with questions such as "why didn't you tell when it happened."

36.    The NOPD Manual suggests Defendants are well aware that victims of child abuse are vulnerable and, therefore, predisposed to bond with the first officer they come into contact with after the incident:

**TRANSFERRING THE CASE TO A DETECTIVE**

45.   A victim of child abuse may bond with the first officer with whom he or she comes into contact after the incident. To help the child victim become comfortable speaking with other members, the officer shall explain the role of the different members of the child abuse response team and help with transitions through introductions to other members involved in the investigation.

37.     NOPD Special Victims Section supervisors are responsible for communicating with NOPD Patrol Supervisors to advise them if any patrol officers are in need of training:

**PATROL SUPERVISOR**

46.     Patrol supervisors shall respond to the scene if requested.

47.     Patrol supervisors **shall not** change the signal or give a disposition for any call for service with a signal covered by this Chapter. Only the Special Victims Section may change the signal or give a disposition in accordance with the **Child Abuse Unit Standard Operating Guidelines**.

48.     Special Victims Section supervisors will communicate to patrol supervisors regarding any training needs for officers under their supervision.

38.     These policies, in sum, require NOPD to minimize contact between non-specially trained officers and children who have been subject to abuse.

39.     Here, when it was reported that 14-year-old Plaintiff G.H. had been subject to a sexual assault, NOPD dispatched Officer Rodney Vicknair to transport G.H. to Children's Hospital for a forensic medical examination.

40.     Officer Vicknair was not a member of NOPD's Special Victims or Child Abuse units. He was a Field Operations Bureau officer assigned to the First District.

41.     Despite Officer Vicknair not being a member of NOPD's Special Victims or Child Abuse units, NOPD dispatched Officer Vicknair to transport G.H.

42.     NOPD dispatched Officer Vicknair to transport G.H despite the studies and common knowledge that male patrol officers are the most likely to sexually assault women and child survivors of sexual assault.

43.     NOPD dispatched Officer Vicknair to transport G.H despite a history of complaints, *specifically including predatory behavior towards women and falsely reporting his location*.

44.     As a result, Officer Vicknair groomed, sexually assaulted, and raped G.H.

C.     The New Orleans Police Department ignored a history of complaints regarding Officer Rodney Vicknair.

45.     Officer Vicknair joined NOPD in 2007.

46.     Soon thereafter, he engaged in actions that caused a series of complaints, including complaints in 2008, 2009, 2010, 2011, 2014, and 2016.

47.     The complaints against Officer Vicknair involved allegations of unauthorized force, professionalism, failure to follow NOPD policy, verbal intimidation, neglect of duty, and failure to adhere to the law.

48.     Some of the complaints were initiated by citizens Vicknair interacted with. Others were initiated by other NOPD officers.

49.     None of the complaints led to Vicknair's termination.

50.     This was true even though Officer Vicknair was found to have abused his authority as a police officer to obtain an interaction with a woman.

51.     On May 19, 2009, at approximately 8:15 at night, Officer Rodney Vicknair sat in his police vehicle watching a woman in a grocery store parking lot.

52.     Officer Vicknair used the woman's vehicle license plate to retrieve her personal information for the purpose of summoning her by name to his police vehicle, as described in the excerpts below from a letter in Officer Vicknair's personnel file:[15]

> This investigation determined that on Tuesday, May 19, 2009, at approximately 8:15p.m., while taking a lunch break in the parking lot of the Ideal Food Market, located at Orleans and Moss Streets, you and several officers encountered a citizen. The citizen's license plate number was checked through NOPD MOTION computer system, which determined she was not wanted.

> You acted inappropriately when you retrieved the citizen's personal information and use it to summon her by name to your police vehicle, which startled her. You should have not used the citizen's personal information in a way to suggest you knew her. The citizen felt the stop was unnecessary and file a complaint with the Public Integrity Bureau. An examination of your Daily Activity Sheet proved that you signed the Daily Activity Sheet indicating your acknowledgement of the documented information on the sheet. You did not continually update the Daily Activity Sheet during your tour of duty with the accurate information. Your Daily Activity Sheet indicated that you were at the First Division Police Station during the incident. It should have reflected you being on a lunch break at the location of Moss and Orleans Streets, nor did it reflect the vehicle or pedestrian check. The investigation determined that you inaccurately recorded information on your Daily Activity Sheet which is a violation of Rule 3: Professional Conduct, paragraph 1 – Professionalism and Rule 4: Performance of Duty, paragraph 2: Instructions from an Authoritative Source, to wit; Chapter 41.1.5 Duties and Responsibilities of District Commanders, Supervisory Personnel, and Patrol District, paragraph (35)a.

53.     As noted in the excerpt from the excepts from the letter above, the only reason this particular incident is public record is because the particular woman Officer Vicknair harassed on that night felt the stop was unnecessary and took the steps to file a complaint with the Public Integrity Bureau.[16]

54.     NOPD's investigation found that Officer Vicknair had acted "inappropriately" with a woman and then covered it up by failing to record the interaction.

---

[15] Letter from Superintendent of Police, Warren J. Riley, to Police Officer Rodney Vicknair, dated February 25, 2010, pp. 1-2, attached as Exhibit E.
[16] *Id.* at p. 2. As stated in Paragraph 14, victims often do not report such incidents because they may feel humiliated, fear retaliation, and because the process for filing a complaint is difficult or intimidating.

55.     But NOPD continued to allow Officer Vicknair to remain on the force.

56.     For this abuse, Officer Vicknair was suspended for only five working days.[17]

57.     On information and belief, in the 2009 incident, Officer Vicknair used his police authority and NOPD-provided tools to seek sexual gratification with a member of the public.

58.     On information and belief, Officer Vicknair engaged in a pattern of using his police authority and NOPD-provided tools to seek sexual gratification with a member of the public.

59.     This was not the only time Officer Vicknair's personnel file shows that he used his power to interact inappropriately with a female member of the public.

60.     On January 10, 2016, Officer Vicknair responded to the scene of a fatal heroin overdose. While responding to questions from the deceased's grieving girlfriend, Officer Vicknair responded, "I didn't put the needle in his arm," and subsequently threatened the woman, who was homeless, "I bet if I checked your name you would have warrants," as described in the Letter of Reprimand:[18]

> On January 15, 2016, a complaint was received in the Public Integrity Bureau office. The complainant stated that on January 10, 2016, her son, [REDACTED] died from a heroin overdose. The complainant stated that her son's girlfriend contacted her to inform her that the officers that responded to the scene were laughing and joking at what had occurred to her son. The complainant stated that her son and his girlfriend are both homeless.
>
> Lt. Anderson reviewed your body worn camera footage for that day of the incident and observed you and the other officers on the scene being questioned by the victim's girlfriend why you were laughing at the victim's condition. Lt. Anderson observed you explaining to Ms. [REDACTED] that you were not laughing at the victim's condition. You could also be heard answering questions asked by Ms. [REDACTED] to which you responded "I didn't put the needle in his arm." Later in your conversation with Ms. [REDACTED] you were heard stating "I bet if I checked your name you would have warrants".

---

[17] *Id.* at p. 5.
[18] Letter from Superintendent of Police, Michael S. Harrison, to Officer Rodney Vicknair, dated August 1, 2016, p. 1, attached as Exhibit F.

61.    As noted in the excerpt from the Letter of Reprimand above, the only reason this particular incident is public record is because the girlfriend contacted the deceased's mother to tell her about it, and the mother took the steps necessarily to file a complaint.[19]

62.    For this abuse, Officer Vicknair received only a Letter of Reprimand.[20]

63.    Prior to this, each time NOPD punished Vicknair, the superintendent warned in a letter to him a similar infraction in the future could result in "more severe disciplinary action." However, this punishment was the lightest: he received only the Letter of Reprimand.[21]

64.    A year after issuing the Letter of Reprimand, NOPD assigned Officer Vicknair to work as a Field Training Officer, making him a mentor for recruits fresh out of the police academy.[22]

65.    In a January 21, 2018 NOPD Annual Performance Evaluation, Officer Vicknair's supervisor commends him for conducting "many minor traffic violation stops" wherein Officer Vicknair made contact "usually with citizens who would have no contact with police officers."[23]



5) Conduct community policing by [for commissioned personnel only]:  [ 4 ]
   a. Engaging and communicating with the community:
      i.   Procedural justice reviewed during random BWC reviews (include item numbers).
      ii.  Officers' and Civilians' participation in community events (giveaways, toy drives, etc.)
      iii. Demonstrates on a regular basis an understanding of current issues, trends and complaints in their assigned areas of responsibility.
      iv.  Any other engagement you wish to document.

Specific Examples:  Officer Vicknair conducts Terry Stops in a professional manner and follows departmental guidelines when dealing with citizens.   Officer Vicknair conducts many minor traffic violation stops.  During these stops he uses the opportunity to make a positive police contact usually with citizens who would have no contact with police officers. L-11244-17 and J-30131-17

---

[19] *Id.*

[20] *Id.* at p. 3.

[21] *See* Emily Lane and Greg LaRose, *WDSU Investigates: NOPD officer disciplined 4 times before he was charged with sexual battery,* WDSU (Updated: 6:35 PM CDT Oct 27, 2020), https://www.wdsu.com/article/wdsu-investigates-nopd-officer-disciplined-4-times-before-he-was-charged-with-sexual-battery/34497589.

[22] *Id.*

[23] NOPD Annual Evaluation of Officer Rodney Vicknair, dated January 21, 2018, p. 3, attached as Exhibit G.

66.     In a July 23, 2018 NOPD Semi-Annual Performance Evaluation, Defendant Vicknair's supervisor commends Officer Vicknair for being "very proactive" and doing "a lot of vehicle stops," as follows:[24]



67.     On information and belief, a large number of these frequent traffic and pedestrian stops were used by Officer Vicknair to attempt to meet women for the purpose of sexual gratification.

68.     The authors of the Bowling Green study also discuss the national problem of "driving while female," wherein police use the pretext of alleged traffic violations to sexually harass or abuse female drivers. They note that past studies identified 183 cases over a twelve-year period; almost 40% of the cases involved teenage victims, and 34% occurred within the context of a traffic stop—all of the cases involved police who abuse their authority to "take advantage of vulnerable people."[25]

69.     In the same July 23, 2018 NOPD evaluation, wherein Defendant Vicknair's supervisor commended him for doing "a lot of vehicle stops,", Defendant Vicknair is also recognized for his work as a Field Training Officer entrusted by NOPD to train recruits.[26]

---

[24] NOPD Semi-Annual Evaluation of Officer Rodney Vicknair, dated July 23, 2018, p. 3, attached as Exhibit H.
[25] Exhibit A, Philip M. Stinson, John Liederbach, Steven L. Brewer, and Brooke E. Mathna, *Police sexual misconduct: A national scale study of arrested officers* (2014). CRIMINAL JUSTICE FACULTY PUBLICATIONS, Paper 30, pp. 5-6, http://scholarworks.bgsu.edu/crim_just_pub/30.
[26] Exhibit G, NOPD Semi-Annual Evaluation of Officer Rodney Vicknair, dated July 23, 2018, p. 6.

D.   The New Orleans Police Department was aware that G.H. was uniquely vulnerable as a minor child and survivor of past sexual abuse.

70.   G.H. is a survivor of childhood sexual abuse and lives with her mother, Plaintiff Rayne Upton.

71.   G.H. was 14-years-old at the time of the reported May 2020 rape and initial interaction with Officer Rodney Vicknair.

72.   G.H. turned 15-years-old in June 2020.

73.   Officer Vicknair was aware of the history of sexual abuse and trauma that made G.H. uniquely vulnerable to manipulation, exploitation, and abuse by older men in positions of authority.

E.   Officer Rodney Vicknair's interactions with G.H. were inappropriate, indicative of a sexual predator, and furthered by NOPD's deliberate indifference, willful ignorance, and neglect.

74.   On or about Memorial Day weekend, May 23-25, 2020, the New Orleans Police Department (NOPD) dispatched Officer Rodney Vicknair to the scene of a reported rape.

75.   Officer Vicknair transported the rape survivor, 14-year-old G.H, to Children's Hospital.

76.   While in the waiting area of the Emergency Room of Children's Hospital, Officer Vicknair showed G.H. pictures on his phone of a girl he claimed was his 16-year-old daughter. The photographs showed the girl posing in bikinis, lingerie, and holding cloth up over herself. Officer Vicknair explained that his daughter is a model and these were her modelling photos.

77.   After G.H. was released from Children's Hospital, Officer Vicknair went to G.H. and Plaintiff's home. Later that night, Officer Vicknair called Plaintiff's phone to speak with G.H, as G.H.'s phone had been taken into evidence. Officer Vicknair asked personal questions and shared his personal information during this phone call.

78.     Over the next four months, June through September 2020, Officer Vicknair's contact with G.H. escalated from grooming to rape. He presented himself as a "mentor" to G.H., and due to his status as a police officer, indicated that he could be trusted. Officer Vicknair contacted Plaintiff nearly every day during this time period, either by phone call or text messages, and frequently invited himself into her home or requested she join him outside in his police vehicle.[27]

79.     On several occasions, Officer Vicknair invited himself into Plaintiff and G.H.'s home while an NOPD trainee waited for him in the vehicle outside.

80.     On at least one occasion, Officer Vicknair took G.H.'s phone, scrolled through it, and inquired about intimate information she saved on it.

81.     Officer Vicknair encouraged G.H. to "roughhouse" with him and engage in physical contact. For example, Officer Vicknair gave G.H. his police baton and suggested she strike him with it. Officer Vicknair then took the police baton back and forcefully struck G.H. with it on the arm.

82.     On at least one occasion, Officer Vicknair forcefully twisted G.H.'s arm until she was in pain, while telling her how easily he could break her arm.

83.     Officer Vicknair frequently described how he could easily commit acts of physical violence, such as breaking peoples' necks, and joked about how he could kill G.H.'s loved ones.

84.     Officer Vicknair would park his police vehicle along routes he knew G.H. would take to spy on her, and on one occasion startled her when he leaned out the vehicle to shout "nice ass!" at her.

---

[27] All of these in-person interactions occurred during the Covid-19 pandemic.

85.     Officer Vicknair told G.H. about how he allowed his 16-year-old daughter to engage in sexual acts with older men and suggested Plaintiff was acting unreasonable in refusing to allow G.H. to do the same.

86.     Officer Vicknair repeatedly described sexual acts he would like to engage in with G.H. and suggested the fact that she was a minor would not stop him.

87.     Officer Vicknair asked G.H. if she owned "lacy thongs" and instructed G.H. to wear loose fitting clothing so that he could more easily put his hands under her clothes.

88.     Officer Vicknair instructed G.H. to lie to her mother, Plaintiff Rayne Upton, and he would contradict things G.H. was told by her mother. This caused disagreements and a loss of trust and affection between G.H. and her mother.

89.     While in Plaintiff and G.H.'s home, Officer Vicknair would come up with pretexts to cause Plaintiff to leave the room or turn away so that he could interact with G.H. alone. For example, on one occasion, Officer Vicknair asked Plaintiff to get him a glass of water. While Plaintiff was filling the glass of water, Officer Vicknair leered at G.H. in a sexually suggestive manner. After leaving the home, Officer Vicknair texted G.H. and described the sex act he was imagining during the time he leered at her.

90.     Officer Vicknair verbally solicited sexual acts from G.H., who declined.

91.     Officer Vicknair requested that G.H. send him sexual pictures of herself. Officer Vicknair displayed sexually suggestive photographs of G.H. as the lock screen on his phone.

92.     On two occasions, Officer Vicknair exposed his penis to G.H. over Facetime, a video communication system, and told her, "this is how hard you make me."

93.     One night, Officer Vicknair invited himself over while G.H. was sleeping. He pointed his police flashlight at G.H., shining it on her until she awakened. When G.H. sat up, Officer Vicknair put his hand on her breast and groped her.

94.     On approximately six or seven occasions, Officer Vicknair groped G.H.'s buttocks while hugging her.

95.     On two occasions, Officer Vicknair attacked and raped G.H. by inserting his fingers into her vagina while in his police vehicle. On one occasion, Officer Vicknair locked the doors of the police vehicle. After the attack, Officer Vicknair took G.H.'s underwear, and told her she could not have them back because he was keeping them. After letting G.H. out of the police vehicle, Officer Vicknair followed G.H. back into her home where he asked Plaintiff to take a picture of him and G.H. together. While the picture was taken, Officer Vicknair touched G.H.'s shoulders and body.

96.     Officer Vicknair was armed with a deadly weapon, his NOPD-issued service firearm, during these sexual assaults.

97.     Days <u>before</u> the second rape occurred, the Office of the Independent Police Monitor (OIPM) was alerted that Officer Vicknair's conduct toward G.H. was inappropriate. OIPM notified NOPD and NOPD investigated.

98.     During and after this investigation, Officer Vicknair remained on the streets and had the opportunity to rape G.H. a second time.

99.     On September 25, 2020, the Public Integrity Bureau received a public complaint regarding Officer Vicknair's sexual misconduct with G.H. NOPD Chief Shaun Ferguson responded to the complaint: "Allegations against one of our own involving a juvenile is reprehensible[.]"

100.    The NOPD Public Integrity Bureau conducted a preliminary investigation and charged senior officer Rodney Vicknair with sexual battery, indecent behavior with a juvenile and malfeasance in office.

101.    Officer Vicknair was arrested while in possession of G.H.'s underwear.

102.    Officer Vicknair was fired from NOPD.

F.    Rape includes all forms of penetration, no matter how slight.

103.    Under Louisiana's statutory criminal law, Officer Vicknair's use of his fingers instead of his penis to penetrate G.H. is the difference between charges of sexual battery and charges of rape.  In 2015, Louisiana lawmakers changed the name of Aggravated Rape, Forcible Rape and Simple Rape to First Degree Rape, Second Degree Rape and Third Degree Rape, respectively. These varying "degrees" of rape all require "sexual intercourse" that is or is deemed to be "without the lawful consent of the victim." This archaic definition does not reflect rape as a crime against bodily integrity – it reflects a culture that blames survivors for the crimes that are committed against them and finds any excuse to be lenient with rapists.[28]

104.    Historically, rape was considered a crime against a man's property rather than one against the person assaulted.[29]  Over the years, individual states have made changes to reflect rape as a crime against bodily integrity, but these changes have not happened uniformly across the nation.[30]  It took the FBI until 2013 to alter its 1929 definition of "the carnal knowledge of a female, forcibly, and against her will" to "penetration, no matter how slight, of the vagina or

---

[28] S*ee* Samantha Cowan, See How Your State Legally Defines Rape (or Doesn't), TakePart (June 29, 2016), http://www.takepart.com/article/2016/06/29/state-rape-laws/, attached as Exhibit I. See also, Katie J.M. Baker, Here's the Powerful Letter the Stanford Victim Read to Her Attacker, BuzzFeed (June 3, 2016), https://www.buzzfeednews.com/article/katiejmbaker/heres-the-powerful-letter-the-stanford-victim-read-to-her-ra#.oww7x7B2W, attached as Exhibit J.
[29] *Id.*
[30] *Id.*

anus with any body part or object, or oral penetration by a sex organ of another person, without the consent of the victim."[31]

105.    As defined by the U.S. Department of Justice, FBI, and advocates of human rights around the world, Officer Vicknair raped G.H. on at least two occasions.

F.    NOPD has a demonstrated pattern of police sexual violence towards women and minor children.

106.    Despite federal and local oversight, publicly available data reveals that at least 236 formal complaints of sexual or intimate violence were submitted against 189 NOPD officers between 2014-2020.[32]

107.    At least 189 NOPD officers have at least one formal complaint of sexual or intimate violence. The department currently employs 944 officers.[33]

108.    Of the 189 NOPD officers identified, 26 of them have two or more complaints of sexual or intimate violence, and 5 have three or more complaint of sexual or intimate violence.[34]

109.    On average, of the 189 NOPD officers identified, each has 18 total misconduct complaints (not including use of force allegations), and one in four of them have 25 or more misconduct complaints (the highest number of formal complaints against one officers is 64 formal complaints).[35]

---

[31] Uniform Crime Report Definition of Rape,  https://ucr.fbi.gov/crime-in-the-u.s/2013/crime-in-the-u.s.-2013/violent-crime/rape/rapemain_final.pdf, attached as Exhibit K. *See also,* An Updated Definition of Rape, United States Department of Justice Archives (January 6, 2012), https://www.justice.gov/archives/opa/blog/updated-definition-rape, attached as Exhibit L.
[32] *See* Report on Police Sexual Violence in New Orleans (November 2022), https://copwatchnola.wordpress.com/data/, attached as Exhibit M. *See also,* "Nearly 1 in 5 NOPD Officers Reported for Sexual and/or Intimate Partner Violence," Big Easy Magazine (December 19, 2022), https://www.bigeasymagazine.com/2022/12/19/report-nearly-1-in-5-nopd-officers-reported-for-sexual-and-or-intimate-partner-violence/, attached as Exhibit N.
[33] Exhibit M, p. 2.
[34] *Id.*
[35] *Id.*

110.    Publicly available complaint data represents only a fraction of police sexual violence by NOPD officers because many survivors do not feel safe reporting sexual violence committed by the police to the police.[36]

111.    Despite significant structural barriers, there are 73 publicly available formal reports of physical sexual harm by an NOPD officer against a community member, including 35 formal reports of rape and sexual assault.[37]

112.    There are 71 publicly available formal reports of non-physical sexual harm by an NOPD officer against a community member.[38]

113.    There are 39 publicly available formal reports of sexual harm by NOPD officers against other NOPD officers.[39]

114.    There are 53 publicly available formal reports of intimate harm, including rape, molestation, and physical assault by NOPD officers against their partners and children.[40]

115.    Of the publicly available formal complaint data with demographic information available, 84% of reported victims of sexual violence by NOPD officers are female children and women.[41]

116.    Of the publicly available formal complaint data with demographic information available, one-fourth of reported victims of sexual violence by NOPD officers are children and young people under the age of 26.[42]

117.    Of publicly available formal complaint data, multiple complaints report officers

---

[36] Id.
[37] Id.
[38] Id.
[39] Id.
[40] Id.
[41] Id.
[42] Id.

harassing or assaulting survivors who had called 911.[43]

118.    NOPD sustained 22% of all formal complaints of sexual harm or intimate violence, and only 14% of complaints describing rape and sexual assault.[44]

119.    NOPD regularly dismisses complaints where officers have multiple previous (and sustained) complaints or multiple sexual harm related complaints.[45]

120.    NOPD officers reported for misconduct, including formal complaints of sexual harm, are usually allowed to resign without investigation or consequence.[46]

121.    Of the 189 NOPD officers identified in formal complaints of police sexual violence, 38 have resigned since 2016; and only 6 were terminated or resigned under investigation. NOPD allowed most to resign for other stated reasons.[47]

122.    There is a demonstrated pattern of NOPD officers retiring or resigning after being reported for misconduct: between 2019 and 2021, 254 NOPD officers left the department; only 31 were terminated or resigned under investigation.[48]

123.    Of the 254 NOPD officers with publicly available misconduct records who left the department between 2019 and 2021, 90% were reported for misconduct or use of force within the previous calendar year of their resignation. 97% had a misconduct complaint within the previous 2 calendar years.[49]

---

[43] *Id.*
[44] *Id.* at p. 3.
[45] *Id.*
[46] *Id.*
[47] *Id.*
[48] *Id.*
[49] *Id.*

124.   In an August 15, 2017 "Officer Profile" interview, Defendant Vicknair described his recruits following his lead as, "they're doing what you do[.]"[50]





**NOPD** @NOPDNews · Aug 15, 2017

It seems like #NOPD 1st District Officer **Rodney Vicknair** was born to be a first responder.

OFFICER PROFILE: Rodney Vicknair, First District - NOPD News
Officer Rodney Vicknair, 50, joined NOPD 12 years ago after spending 19 years working EMS on the West Bank. He was assigne...
🔗 nopdnews.com

---

[50] *See* Officer Profile: Rodney Vicknair, First District, by Dawn Massey (August 15, 2017), attached as Exhibit O.

## V.    CAUSES OF ACTION

### *First Cause of Action* - Civil Rights Violations
*Against all Defendants*

125.    Plaintiff incorporates the allegations in each preceding and following paragraph.

126.    The Defendants, acting individually and together, under color of law, engaged in a course of conduct that deprived G.H. of her Fifth and Fourteenth Amendment due process rights, specifically her protected liberty interest to be free from sexual abuse and bodily intrusions by state actors, and including the right to be free from unjustified and excessive force utilized by police; and her Fourth Amendment right to be free from unlawful seizure of her person– all as provided for by the United States Constitution and 42 U.S.C. §1983.

127.    At all relevant times, the Defendants, individually and collectively, acted unreasonably, recklessly, and with deliberate indifference and disregard for the constitutional civil rights and personal needs of G.H.

128.    The Defendants' actions were reckless, willful, wanton, and malicious.

129.    The acts alleged herein were the proximate cause and cause in fact of G.H.'s damages and injuries.

### *Second Cause of Action* – Municipal Liability for Police Misconduct (*Monell* Claim)
*Against Defendants Ferguson and City of New Orleans*

130.    Plaintiff incorporates the allegations in each preceding and following paragraph.

131.    A municipality, such as the City of New Orleans, may be held liable under § 1983 when its official policies or customs violate the Constitution. *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

132.     Defendant Ferguson and the City of New Orleans, established, condoned, ratified, and encouraged customs, policies, patterns and practices that directly and proximately caused the deprivation of the civil and constitutional rights of G.H., and the damages and injuries described herein. They did so with deliberate indifference to the rights of G.H. *See Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 405, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).

133.     The police sexual misconduct described above was caused by the policies, practices, and customs of Defendants, because their employees and agents regularly engage in a pattern of police sexual violence. As demonstrated by the publicly available formal complaint data, one in five NOPD officers have a publicly available formal complaint alleging police sexual violence on their record.

134.     NOPD routinely fails to supervise and investigate reported complaints of police sexual violence. NOPD sustained 22% of all formal complaints of sexual harm or intimate violence, and only 14% of complaints describing rape and sexual assault. NOPD regularly dismisses complaints where officers have multiple previous (and sustained) complaints or multiple sexual harm related complaints. NOPD officers reported for misconduct, including formal complaints of sexual harm, are usually allowed to resign without investigation or consequence.

135.     NOPD routinely fails to impose consequences and fire officers who commit acts of sexual violence. Of the 189 NOPD officers identified in formal complaints of police sexual violence, 38 have resigned since 2016; and only 6 were terminated or resigned under investigation. NOPD allowed most to resign for other stated reasons. There is a demonstrated pattern of NOPD officers retiring or resigning after being reported for misconduct: between 2019 and 2021, 254 NOPD officers left the department; only 31 were terminated or resigned under investigation. Of the 254 NOPD officers with publicly available misconduct records who left the department

between 2019 and 2021, 90% were reported for misconduct or use of force within the previous calendar year of their resignation. 97% had a misconduct complaint within the previous 2 calendar years.

136.     NOPD officers are allowed to engage in a pattern and practice of sexual violence upon members of the community because Defendants have declined to implement sufficient training or any legitimate mechanism for oversight or punishment of officers and agents. Despite significant structural barriers, there are 73 publicly available formal reports of physical sexual harm by an NOPD officer against a community member, including 35 formal reports of rape and sexual assault. Of the publicly available formal complaint data with demographic information available, 84% of reported victims of sexual violence by NOPD officers are female children and women, one-fourth of reported victims of sexual violence by NOPD officers are children and young people under the age of 26, and multiple complaints report officers harassing or assaulting survivors who had called 911.

137.     Supervisor-Defendants and the City of New Orleans were both aware Defendant Vicknair used his position as a police officer to harass at least one woman and inaccurately reported his location to conceal the act, and that Officer Vicknair was notably, unusually "proactive" in engaging in an above average number of vehicle stops.

138.     Even if there was some response to complaints of sexual violence, it is clearly insufficient considering the repetitive misconduct, particularly by the same officers.

139.     At least 189 NOPD officers have at least one formal complaint of sexual or intimate violence (The department currently employs 944 officers).

140.     Of the 189 NOPD officers identified, 26 of them have two or more complaints of sexual or intimate violence, and 5 have three or more complaint of sexual or intimate violence.

141.    On average, of the 189 NOPD officers identified, each has 18 total misconduct complaints (not including use of force allegations), and one in four of them have 25 or more misconduct complaints (the highest number of formal complaints against one officers is 64 formal complaints).

142.    Supervisor-Defendants and the City of New Orleans were both aware of the poor supervision and retention policies, which allow NOPD officers to commit acts of police sexual violence, and failed to take appropriate action to stop the misconduct.

143.    The failure to properly supervise and discipline officers was directly linked to the violation of G.H.'s constitutional rights. Had there been more adequate supervision, training, and discipline of misconduct, Defendant Vicknair's grooming (which occurred over a period of months while Defendant Vicknair was actively on duty) would have been discovered and the sexual assault of G.H. would have been prevented.

144.    The failure to supervise and discipline by Supervisor-Defendants as well as City of New Orleans, after being put on notice by the shocking number of formal complaints made against NOPD officers for acts of sexual violence, can only demonstrate a deliberate indifference to the constitutional rights of G.H., Plaintiff, and the people of New Orleans.

### *Third Cause of Action* – **State Torts of Assault and Battery**
*Against all Defendants*

145.    Plaintiffs incorporate and reassert the allegations in each preceding and following paragraphs of this Complaint.

146.    Defendant Vicknair attempted by an intentional act, or by a show of force or violence, to cause an offensive or harmful physical contact with G.H., including but not limited to harmful, offensive and illegal sexual contact, which injured G.H.

147.    G.H. was legally incapable of consenting to the sexual contact.

148.    G.H. was placed in reasonable apprehension of an imminent threat of physical injury.

149.    Defendant Vicknair had the present ability to cause the offensive or harmful contact with G.H.

150.    Defendant Vicknair committed sexual battery by digitally penetrating G.H. when she was 15-years-old.

151.    Defendant Vicknair committed sexual battery by fondling G.H.'s buttocks, breasts, and other parts of her body when she was 14 or 15 years old.

152.    Defendant Vicknair committed battery by twisting G.H.'s arm and hitting her with his baton.

153.    G.H. was injured as a result of the assaults and batteries.

154.    Defendant Vicknair's assault and battery of G.H. was made possible by the apparent authority of the position he held as an officer with NOPD.

***Fourth Cause of Action* – State Torts of Negligence<br>and Negligent Infliction of Emotional Distress**<br>*Against all Defendants*

155.    Plaintiffs incorporate and reassert the allegations in each preceding and following paragraphs of this Complaint.

156.    Under duty-risk analysis for determining liability, a plaintiff must prove (1) the conduct in question was the cause-in-fact of the resulting harm; (2) the defendant owed a duty of care to plaintiff; (3) the requisite duty was breached by the defendant; and (4) the risk of harm was within the scope of protection afforded by the duty breached. *Stroik v. Ponseti*, 699 So.2d 1072, 1078 (La. 1997).

157.    Defendant Vicknair's actions were the cause-in-fact of G.H.'s injury and emotional

distress, and the risk of injuring G.H. was within the scope of duty that was breached by the Officer Vicknair's excessive force.

158.    Police officers owe the public the duty of maintaining peace and order, preventing and detecting crime, and enforcing laws. *Zeagler v. Town of Jena,* 556 So.2d 978 (La.App. 3 Cir.).

159.    Defendants Ferguson and City of New Orleans assumed a particular duty to take care with regard to G.H. by dispatching Officer Vicknair to handle her sexual abuse.

160.    Defendant Vicknair also had a duty to victims of child abuse defined by the NOPD Manual.

161.    Defendants breached the duty owed to G.H. by violating their own policy by allowing an untrained patrol officer such as Defendant Vicknair to interact with and transport G.H. with no supervision from a trained child abuse or sex crime detective.

162.    No officer intervened or attempted to stop the breach of duty.

163.    Defendant Ferguson and the City of New Orleans were vicariously liable for the acts of Defendant Vicknair and all officers involved in responding to the May 2020 sexual assault, and independently negligent for failing to adequately train its officers and effectively supervise officers who respond to complaints of child abuse and sexual assault.

164.    Supervisor-Defendants were negligent for the lack of supervision during the investigation that resulted in Defendant Vicknair being entrusted with a vulnerable minor child. Supervisor-Defendants also were also negligent by failing to take appropriate action in response to the prior complaints against Defendant Vicknair.

165.    Defendants' conduct was extreme and outrageous; knowing that the emotional distress suffered by Plaintiff Rayne Upton and her daughter G.H. was severe and ongoing; and Defendants desired or acted with recklessness to inflict severe emotional distress or knew that

severe emotional distress would be certain or substantially certain to result from their conduct.

166.    Defendants' decision to entrust a patrol officer with a history of complaints related to abuse of power towards women and sexually predatory behavior, with a minor child who was the victim of a sexual assault, was substantially certain to result in harm.

167.    Defendants' actions were the cause-in-fact of Plaintiff Rayne Upton and her minor daughter G.H.'s injuries.

### Fifth Cause of Action – State Tort of Intentional Infliction of Emotional Distress
*Against Defendant Vicknair*

168.    Plaintiffs incorporate and reassert the allegations in each preceding and following paragraphs of this Complaint.

169.    In abusing his position of power as an NOPD officer to groom and rape G.H. when she was only 14-15 years old, Defendant Vicknair desired to inflict severe emotional distress or was substantially certain that severe emotional distress would occur.

170.    Defendant Vicknair's conduct, grooming and raping a child, is extreme and outrageous behavior beyond the toleration of reasonable members of society.

171.    Defendant Vicknair's actions, establishing a bond with G.H., gaining her trust, and then sexually abusing and raping her, caused and continue to cause G.H. severe emotional distress.

172.    Defendant Vicknair's infliction of emotional distress on G.H. was made possible by the apparent authority of the position he held as an officer with NOPD.

### Sixth Cause of Action – State Tort of False Imprisonment
*Against Defendant Vicknair*

173.    Plaintiffs incorporate and reassert the allegations in each preceding and following paragraphs of this Complaint.

174.   Defendant Vicknair intended to confine G.H. or was substantially certain G.H. would be confined when he locked her inside his NOPD-issued vehicle.

175.   Defendant Vicknair locked the doors of his NOPD-issued vehicle for the purpose of confining G.H. inside with him.

176.   G.H. had no reasonable means of escape from the locked NOPD-issued vehicle.

177.   Defendant Vicknair's false imprisonment of G.H. was made possible by the apparent authority of the position he held as an officer with NOPD.

### *Seventh Cause of Action* – **Negligent Hiring and Failure to Train**
*Against all Supervisor-Defendants and City of New Orleans*

178.   Plaintiffs incorporate and reassert the allegations in each preceding and following paragraphs of this Complaint.

179.   Municipal employers have a duty to exercise reasonable care in the hiring, training, and supervision of its employees.[51] Failure to do so is a cognizable tort under Louisiana Civil Code art. 2315.[52]

180.   The misconduct described above was caused by the policies, practices, and customs of Defendants, because their employees and agents, who are not part of a trained Sexual Assault or Child Abuse Response Team, regularly respond to the scene of child abuse or sexual assaults cases and interact with no trained victim advocates or detectives present.

181.   Without enforcement of the policy, the practice of sending officers with a history of sexually predatory behavior to the scene of sexual assaults and allowing them to interact with sexual assault survivors unsupervised and with no victim advocate or trained detective present,

---

[51] *Roberts v. Benoit*, 605 So.2d 1032, 1038 (La. 1991); see also *Cote v. City of Shreveport*, 73 So.3d 435 (La. App. 2011) ("When an employer hires an employee who in the performance of his duties will have a unique opportunity to commit a tort against a third party, he has a duty to exercise reasonable care in the selection of that employee.")
[52] *Id.* at 1044 ("We now expressly recognize the tort of negligent hiring as cognizable under Louisiana fault principles embodied in LSA-C.C. Art. 2315.")

constitutes the *de facto* policy of Defendants as the policymakers with authority acted with deliberate indifference to the problem, effectively ratifying further sexual abuse of sexual assault survivors at the hands of NOPD officers.

182.    Furthermore, the practice of allowing untrained and predatory male officers to interact with vulnerable sexual assault and child abuse survivors was allowed to flourish despite the written policy because Defendants declined to implement sufficient training or any legitimate mechanism for oversight or punishment of officers and agents. Even if there was some response to sexual assault and child abuse policy violations, it clearly was insufficient.

183.    NOPD Policy Chapter 42.19 requires that:

> The Child Abuse Unit shall investigate all abuse and sexually related incidents involving victims under the age of 17 years at the time the incident is reported[.]
> …
> If a Child Abuse detective is not available to respond to the incident, a Special Victims Section supervisor shall direct a Sex Crimes detective to respond to the incident. All detectices shall handle child abuse investigations according to the **Child Abuse Unit Standard Operating Guidelines**.
> …
> Communications Services shall dispatch a Child Abuse detective, or a Sex Crimes detective at the direction of a Special Victims Section supervisor, to the location of the victim.
> …
> The patrol officer's responsibility is to… (d) Request a Child Abuse detective if one is not already on scene[.]
> …
> The officer **<u>shall not</u>** interview the child victim or child witness. In exigent circumstances after consulting a Special Victims Section supervisor, only the minimum information necessary to stabilize the situation and secure evidence may be obtained from a child.

184.    Supervisor-Defendants and the City of New Orleans were both aware Defendant Vicknair used his position as a police officer to harass at least one woman and inaccurately reported his location to conceal the act, and that Officer Vicknair was notably, unusually "proactive" in

engaging in an above average number of vehicle stops.

185.    The failure to properly train and discipline officers was directly linked to the sexual assault and rape of G.H. Defendants were aware of Defendant Vicknair's predatory behavior and did not adequately discipline him for the misconduct, nor provide any further supervision or training before instructing him to interact with G.H. According to their own NOPD Manual, Supervisor-Defendants and the City of New Orleans knew G.H. would bond with the first officer to establish contact with her. They knowingly selected Officer Vicknair to establish a relationship with G.H., failed to follow their own protocol which requires they ensure the patrol officer's contact, bond, and relationship with a child abuse victim is ended and appropriately transitioned to a trained child abuse or sex crime detective.

186.    The failure to train and discipline by Supervisor-Defendants as well as City of New Orleans, especially after being put on notice of Defendant Vicknair's misconduct, is a clear breach of Defendants' duty.

### *Eighth Cause of Action* – **Vicarious Liability**
*Against Defendants Ferguson and City of New Orleans*

187.    Plaintiffs incorporate and reassert the allegations in each preceding and following paragraphs of this Complaint.

188.    Under Louisiana Civil Code article 2320, employers are liable for damages caused by their employees who are "in the exercise of the functions in which they are employed."

189.    An employee acts within the scope of their employment when their conduct is "so closely connected in time, place, and causation to his employment-related duties as to be regarded as a risk of harm fairly attributable to the employer's business, as compared with conduct instituted by purely personal considerations entirely extraneous to the employer's interests."[53]

---

[53] *LeBrane v. Lewis*, 292 So.2d 216 (La.1974).

190.    At all times relevant to this Complaint, the Officer-Defendants were acting within the scope of their employment with the New Orleans Police Department.

191.    Officer Vicknair was on active patrol when he was dispatched to the scene following the May 2020 sexual assault. and initiated contact with G.H. for the purpose of collecting evidence and securing medical assistance.

192.    The sexual abuse of G.H. by Officer Vicknair occurred while Vicknair was in uniform, in a NOPD issued vehicle, on NOPD duty, and facilitated by his possession of a NOPD-issued deadly weapon.

193.    Addressing medical needs and supporting child victims, falls within the scope of NOPD employment as it is a function specifically within the scope of employment[54] and in furtherance of NOPD's goals.[55]

194.    All Supervisor-Defendants and the City of New Orleans are liable to Plaintiff Rayne Upton and her minor daughter G.H. for the constitutional violations as well as the negligent and intentional acts and omissions of those under their direction and control pursuant to Louisiana Civil Code article 2320 and the doctrine of *respondeat superior*.

### *Ninth Cause of Action* – **Indemnity**
*Against the City of New Orleans*

195.    Plaintiff incorporates and reasserts the allegations in each preceding and following paragraphs of this Complaint.

---

[54] NOPD Operations Manual Chapter 41.19.
[55] *Brasseaux v. Town of Mamou*, 99–1584 (La.1/19/00), 752 So.2d 815 ("we have stated that an employee's conduct is generally within the course and scope of his employment if the conduct is of the character and nature that he is employed to perform, occurs substantially within the authorized limits of time and space, and is activated at least in part by a purpose to serve the employer.").

196.     Louisiana law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable for actions taken in the discharge of their duties that are within the scope of their employment activities.

197.     The City of New Orleans operates the New Orleans Police Department, a law enforcement agency which employed and controlled the Officer-Defendants in this case, and was responsible for the hiring, training, and discipline of the officers.

198.     While committing the misconduct alleged herein, some Defendants were employees, members, and agents of the City of New Orleans within the scope of their employment.

199.     The City of New Orleans is therefore obligated by Louisiana statute to pay any judgment entered against their employees, Officer-Defendants and Supervisor-Defendants.

### Tenth Cause of Action - Punitive Damages Pursuant to La. Civ. Code Art. 2315.7
*Against Defendant Vicknair*

200.     Plaintiffs incorporates and reasserts the allegations in each preceding and following paragraphs of this Complaint.

201.     Through his criminal sexual activity, Defendant Vicknair evinced wanton and reckless disregard for the rights and safety of G.H. when she was 14-15-years-old.

202.     Plaintiff is entitled to exemplary damages regardless of whether or not Defendant Vicknair is successfully prosecuted for his criminal acts.

### Eleventh Cause of Action - Punitive Damages Pursuant to La. Civ. Code Art. 2315.3
*Against All Defendants*

203.     Plaintiffs incorporates and reasserts the allegations in each preceding and following paragraphs of this Complaint.

204.     Through an act of pornography involving G.H. when she was 14-15 years old, Defendant Vicknair evinced wanton and reckless disregard for the rights and safety of G.H.

*Twelfth Cause of Action* - Liquidated and Punitive Damages Pursuant to
18 U.S.C. § 2255 (Civil Remedy for Personal Injuries)
*Against Defendant Vicknair*

205.    While a minor, G.H. was a victim of a violations of  18 U.S. Code §§ 2422,
2243, 2251,  2252, and 2252A.

206.    As a result of violations of 18 U.S. Code §§ 2422,  2243, 2251,  2252, and 2252A,
G.H. suffered personal injury

207.    Plaintiff is entitled liquidated damages in the amount of $150,000, and the cost of
the action, including reasonable attorney's fees and other litigation costs reasonably incurred.

208.    In this case, punitive damages are also appropriate.

## VI.    RELIEF REQUESTED

209.    Wherefore RAYNE UPTON prays for judgment against Defendants as follows:

(a) For an order finding Defendants liable for violations of G.H.'s civil and
constitutional rights;

(b) For a judgment against Defendants for all asserted causes of action;

(c) For a judgment awarding compensatory damages;

(d) For a judgment awarding special damages;

(e) For a judgment awarding RAYNE UPTON her costs and attorney's fees;

(f) For a judgment awarding pre- and post-judgment interest at the highest rates
allowed by law; and

(g) For all other and further relief as may be necessary and appropriate.

210.    Plaintiff states any and all other causes of action that may become known through
a trial of this matter on its merits against any and all other parties which are herein
named or which may be added later, and request any and all other damages or remedies

which this Court may deem equitable.

211.    Plaintiff reserves the right to notice of defect to this pleading and reserve the right to amend or supplement this Petition after discovery of any additional fact, law, or claim, the amendment of which to be performed by the filing of any subsequent pleading.

## JURY DEMAND

Plaintiffs respectfully request a trial by jury on all issues so triable.

Respectfully Submitted:

**MOST & ASSOCIATES**                 **THE HITE LAW GROUP**

*/s/ Hope A. Phelps*
**HOPE PHELPS (La. Bar No. 37259)**          **NICHOLAS HITE (La. Bar No. 34305)**
**WILLIAM MOST (La. Bar No. 36914)**         701 Loyola Ave., #403
**DAVID LANSER (La. Bar No. 37764)**         New Orleans, LA 70113
**CAROLINE GABRIEL (La. Bar. No. 38224)**    Tel: 504.252.0678
201 St. Charles Ave., Ste. 114, # 101        Email: nicholas@hitelawgroup.com
New Orleans, LA 70170
Tel: 504.256.4615
Email: hopeaphelps@outlook.com

***Counsel for Plaintiff, Rayne Upton,***
***individually and on behalf of***
***her minor daughter, G.H.***