UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


RAYNE UPTON, individually and      DOCKET NO.
On behalf of her minor
Daughter, G.H.      2:21-cv-407

         Plaintiff,      JUDGE BARBIER

         MAG. ROBY

VERSUS

RODNEY VICKNAIR, SHAUN FERGUSON,
THE CITY OF NEW ORLEANS; DOE
DISTRICT COMMANDER; DOES 1 TO 10;
and XYZ INSURANCE COMPANIES 1 TO 10,


         Defendants.




         DEPOSITION OF RODNEY PAUL VICKNAIR,

given in the above-entitled cause, pursuant to the

following stipulation, before Sandra P. DiFebbo,

Certified Shorthand Reporter, in and for the State

of Louisiana, at Guste, Barnett, Schlesinger &

Alpaugh, LLP, 639 Loyola Avenue, Suite 2130, New

Orleans, Louisiana, on the 9th day of June, 2023,

commencing at 12:10 PM.


**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

EXHIBIT
2

```
 1    APPEARANCES:

 2

 3              MOST & ASSOCIATES
                BY: WILLIAM MOST,
 4              ATTORNEY AT LAW -and-
                HOPE PHELPS, ATTORNEY AT LAW
 5              201 St. Charles Avenue
                Suite 114, #101
 6              New Orleans,Louisiana  70170
                Representing the Plaintiff
 7

 8              CITY OF NEW ORLEANS
                LAW DEPARTMENT
 9              BY:  JAMES ROQUEMORE,
                ASSISTANT CITY ATTORNEY -and-
10              RENE GOUDEAU, ASSISTANT CITY ATTORNEY
                1300 Perdido Street
11              Suite 5E03
                New Orleans, Louisiana  70112
12              Representing the City of New Orleans AND
                NOPD
13

14              GUSTE, BARNETT, SCHLESINGER & ALPAUGH
                BY:  C. THEODORE ALPAUGH, III,
15              ATTORNEY AT LAW
                639 Loyola Avenue
16              Suite 2130
                New Orleans, Louisiana  70113
17              Representing Rodney Vicknair

18

19

20    Reported By:

21

22              Sandra P. DiFebbo
                Certified Shorthand Reporter
23              State of Louisiana

24

25
```

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

```
1        E X A M I N A T I O N          I N D E X

2

3                                       Page

4    BY MR. MOST:                       6, 139

5    BY MR. ROQUEMORE:                  63

6    BY MR. ALPAUGH:                    144

7

8

9        E X H I B I T           I N D E X

10                       Page

11

12   Exhibit A                         5

13   Exhibit B                         5

14   Exhibit C                         14

15   Exhibit D                         21

16   Exhibit E                         49

17   Exhibit F                         66

18   Exhibit G                         67

19   Exhibit H                         73

20   Exhibit I                         89

21   Exhibit J                         124

22   Exhibit K                         129

23   Exhibit L                         129

24   Exhibit M                         130

25
```

```
 1                  S T I P U L A T I O N

 2

 3                   It is stipulated and agreed by and

 4       among counsel for the parties hereto that the

 5       deposition of RODNEY PAUL VICKNAIR, is hereby being

 6       taken pursuant to the Federal Rules of Civil

 7       Procedure for all purposes and to preserve

 8       testimony in accordance with law;

 9                   That the formalities of reading and

10       signing are specifically waived;

11                   That the formalities of sealing,

12       certification, and filing are hereby specifically

13       waived.

14                   That all objections, save those as to

15       the form of the question and responsiveness of the

16       answer are hereby reserved until such time as this

17       deposition or any part thereof is used or sought to

18       be used in evidence.

19                         *  *  *  *  *

20                   Sandra P. DiFebbo, Certified Shorthand

21       Reporter, in and for the State of Louisiana,

22       officiated in administering the oath to the

23       witness.

24

25
```

1

2      MR. MOST:

3            So before we swear in the witness

4            and get started, Mr. Alpaugh has asked

5            to admit two exhibits to this

6            deposition.  Exhibit A is dated June

7            6th, 2023.  It says, "Koga

8            Neurosurgery" at the top, and then

9            Exhibit B is a medication list.  Is

10           that right, Ted?

11     MR. ALPAUGH:

12           Yeah.  The report is from -- Koga is

13           the neurosurgeon we just saw a couple

14           of days ago, and so I wanted to get

15           that on the record so it gives you an

16           idea, on the record, what his mental

17           capabilities are, his current physical

18           status, and his medication list he is

19           currently taking, although I understand

20           he is not taking anything that is

21           narcotic or would affect his ability to

22           answer, but I wanted to get those on

23           the record just so I don't hold up the

24           deposition.

25     MR. MOST:

1                    Thank you.  Mr. Vicknair, are you
2                ready to get started?
3          THE WITNESS:
4                Yes, sir.
5          RODNEY PAUL VICKNAIR, 2114 Teal Street,
6          Slidell Louisiana, 70460, having been
7          first duly sworn, was examined and
8          testified on his oath as follows:
9    EXAMINATION BY MR. MOST:
10         Q.   Mr. Vicknair, my name is William Most.
11   I'm an attorney, and I represent Rayne Upton, the
12   plaintiff in this case.
13         A.   Correct.
14         Q.   How are you doing today?
15         A.   Day by day, you know.  That's all you can
16   do with these tumors in your head.
17         Q.   Yeah.  Well, I understand that you have
18   these tumors in your head, so I'm going to ask you
19   some questions that are sort of nonstandard for
20   depositions, but they sort of are to figure out how
21   good your memory is, how good your thinking is
22   today, so that if anyone ever wonders, you know,
23   how reliable is his testimony today, they have a
24   sense of it.  All right?
25         A.   Yes, sir.

1  understand, will you agree now to tell me that

2  that's the case?

3        A.   Yes.

4        Q.   And aside from talking to your lawyer,

5  did you do anything to prepare for this deposition?

6        A.   I just went over some documents.  That

7  was it.

8        Q.   Which documents did you go over?

9        A.   (Witness indicating.)

10       MR. ALPAUGH:

11            For the record, he went over the

12         statements, tier of facts, memorandum,

13         and his doctor's report, which is

14         Exhibit A.

15       MR. MOST:

16            Okay.

17  BY MR. MOST:

18       Q.   Did you talk to anyone besides your

19  lawyer to prepare for this deposition?

20       A.   No, sir.

21       Q.   Did you take any notes to prepare for

22  this deposition?

23       MR. ALPAUGH:

24            I want to say that his ex-wife, who

25         has his power of attorney was in here

```
1              as well.
2         MR. MOST:
3              Sure.  Okay.
4    BY MR. MOST:
5         Q.   You gave your ex-wife power of attorney?
6         A.   Yes.
7         Q.   That's Brandy?
8         A.   Yes.
9         Q.   So she has the power to make decisions
10   for you?
11        A.   My medical decisions, yes.
12        Q.   Does she have a general power that allows
13   her to make nonmedical decisions as well?
14        MR. ALPAUGH:
15             For the record, there is a general
16             Power of Attorney.  I'll be happy to
17             send you a copy of it.
18        MR. MOST:
19             Yeah.  That's okay.
20   BY MR. MOST:
21        Q.   Also, if you don't know the answer to any
22   questions, you can say that.
23        MR. ALPAUGH:
24             Don't guess, Rodney, if you don't
25             know.
```

```
 1        Q.   Are there any parts of it that you didn't
 2   read before you signed it?
 3        A.   No.
 4        Q.   So now you've now looked at both the
 5   front and the back page of this and read it, right?
 6        A.   Yes.
 7        Q.   At the very top, in the first sentence,
 8   it says, "The defendant admits that these facts are
 9   true."
10        A.   Okay.  I see it.
11        Q.   Yeah.  So, Mr. Vicknair, are the facts in
12   here true?
13        A.   Okay.  I'm sorry.  Can you say it again?
14        Q.   Are the facts in this document true?
15        A.   Honestly, no.
16        Q.   Okay.  Are most of the facts in here
17   true?
18        A.   No.
19        Q.   Would you agree that these are the facts
20   that form the basis for your criminal conviction?
21        A.   Yes.
22             MR. MOST:
23                  Can we just take a few minutes to --
24                  I am going to talk to Miss Phelps for
25                  just a minute.
```

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

1          {BRIEF RECESS 12:24-12:28}

2    BY MR. MOST:

3         Q.   Mr. Vicknair, until some time ago you

4    were an officer of the New Orleans Police

5    Department?

6         A.   Yes, sir.

7         Q.   Have you ever been a law enforcement

8    officer for any other department?

9         A.   No, sir.

10        Q.   You were trained by NOPD to be an

11   officer?

12        A.   Yes, sir.

13        Q.   You went through their academy?

14        A.   Yes, sir.

15        Q.   And you got inservice training as well?

16        A.   Yes, sir.

17        Q.   Did you receive training from NOPD about

18   how to use your firearm?

19        A.   Yes.

20        Q.   Did you receive training from NOPD about

21   how to use a taser?

22        A.   Yes.

23        Q.   Did you receive any training from NOPD

24   about how to interact with underage girls?

25        A.   We received training on --

1  weed on her.  So I said okay.  So I did, and I told

2  her, I said, "No.  You don't smell like weed.  All

3  I'm smelling is just the outside, and it smells

4  like you've been sweating."  And she said they had

5  been dancing or something, and I said, "If your mom

6  is asleep on the couch, just go in and go take a

7  shower and leave your mom alone.  Don't worry about

8  it," and that was the last time.

9      Q.   So I think you told investigators that

10  you went over to G████ H██████'s about 12 or 13

11  times; is that right?

12      A.   That is both police-wise -- because I

13  responded to maybe ten, 11 calls over there.

14      Q.   So you went over to her house about 12 or

15  13 times approximately, right?

16      A.   Yeah.

17      Q.   So you're saying that for all of them but

18  one you went over there as a police officer?

19      A.   Correct.

20      Q.   And then you are saying the final time

21  was as a friend?

22      A.   Yes.

23      Q.   The vehicle that you went over to G██████

24  H█████'s house the final time, which vehicle was

25  that?

1      A.    That was my personal vehicle, the gray

2  Tundra.

3      Q.    Do you have any NOPD symbols in that

4  truck, like floor mats or anything else?

5      A.    No.  The only NOPD symbol I had was the

6  placard that we put on our dash to park around the

7  station.  That was it.

8      Q.    So in this truck that you went in the

9  final time, you had an NOPD placard in the front

10 window?

11     A.    Yes.

12     Q.    And that indicates that you can park that

13 car in NOPD officer parking areas?

14     A.    At our station, yeah.

15     Q.    If you need to go to the courthouse in

16 that vehicle, can you park in law enforcement

17 officer parking?

18     A.    Yes.

19     Q.    Did you sometimes use that vehicle to go

20 to the courthouse or to the station?

21     A.    Yeah.  I've used it when I had to go to

22 court.

23     Q.    Any other NOPD symbols or indications on

24 that truck?

25     A.    No.

1          Q.    That's the Toyota Tundra?

2          A.    Yes.

3          Q.    That final time that you met up with

4    G██████ H██████, had you been working that day?

5          A.    Yes.

6          Q.    Were you coming off your shift?

7          A.    Yes.

8          Q.    Were you in uniform?

9          A.    No, no.  I have a locker at the station

10   we change out.

11         Q.    Did you have a firearm with you?

12         A.    When I worked that day.

13         Q.    When you were in the truck at Gabby

14   Hainey's house?

15         A.    No.

16         Q.    Did you have any -- did you have

17   handcuffs in there?

18         A.    No.

19         Q.    Any other NOPD-issued equipment or gear?

20         A.    I had my vest, my bulletproof vest, on

21   the back seat.

22         Q.    Any other NOPD gear or equipment?

23         A.    Nope.

24         Q.    Why did you have the bulletproof vest in

25   the back seat?

1    A.   Because it gets too hot.  It's too bulky

2  to wear all the time.  I just took it off and threw

3  it on the back seat.

4    Q.   Because sometimes you do police work in

5  that Tundra?

6    A.   No.  We're not allowed to do police work

7  in it.

8    Q.   When did you take off the bulletproof

9  vest and put it in the Tundra?

10   A.   When I left work that night.  Before I

11  left the station parking lot.

12   Q.   So you left your NOPD vehicle.  You went

13  to your Tundra, and you took off the bulletproof

14  vest?

15   A.   No.  I left the NOPD vehicle.  The NOPD

16  vehicle.  I'm sorry.  Went upstairs and made sure

17  all my paperwork was turned in, cleared it with the

18  supervisor that I could leave, then went to the

19  sallyport and took the vest off, threw it in the

20  back seat, and got in my truck and left.

21   Q.   At what point did you take off your

22  uniform?

23   A.   The what?

24   Q.   So you left your police vehicle.  You

25  went inside, did your paperwork, left through the

1  sallyport.  Did you stop and take off your uniform?

2      A.   No, no.  The uniform is -- consists of

3  our NOPD shirt and our pants.  We always wear

4  T-shirts underneath our bulletproof vest and our

5  other shirts.  So when I took off my blue NOPD

6  shirt, I hang that in the locker, and I still have

7  the T-shirt with the vest on.  So that's when I

8  took off the vest.

9      Q.   So you left the station in your T-shirt

10  and bulletproof vest?

11      A.   Yes.

12      Q.   And then took off the bulletproof vest

13  and put it in the car?

14      A.   Yes.

15      Q.   Why don't you leave the bulletproof vest

16  in your locker?

17      A.   Well, because we have a -- they have to

18  be cleaned a certain way, and it's got to be

19  cleaned every day or them things start to smell, so

20  I take them home and clean them.

21      Q.   What indicated to you that this final

22  time was as a friend and not as an officer?

23      A.   The what?

24      Q.   What indicated to you that this final

25  time that you met with G████ H█████ was as a friend

1    and not as an officer?

2         A.    Because I wasn't responding over there as

3    a call for service.   It was just something she

4    asked me to do, so I thought I was just one friend

5    helping another friend.

6         Q.    Besides that evening, were all of your

7    interactions with her before that as an officer?

8         A.    Yes.

9         Q.    So you became friends with G██████ H██████

10   in your role as an officer and then had a final

11   friend-only interaction; is that correct?

12        A.    Uh-huh.

13        Q.    Was that a yes?

14        A.    Yes.

15        Q.    Saying uh-hum sometimes is hard for our

16   court reporter.

17        A.    I'm sorry.  I keep forgetting.  I'm

18   sorry.

19        Q.    So when you were an NOPD officer, you

20   were given equipment and a vehicle and given some

21   general direction, but you had freedom during your

22   day to choose what to do as an officer; is that

23   right?   To a certain extent.

24        A.    Yeah.  We had sectors to patrol, and we

25   were told what type of calls we had to respond to,

1   had training in dealing with sexual assault?

2        A.   No.

3        Q.   Do you need to take a break?

4        A.   No.  I'm okay.

5        Q.   Do you need any more water?

6        A.   No.

7        Q.   So the final time you met Gabby, she got

8   into your car, correct?

9        A.   I'm sorry.  What?

10       Q.   The final time you met Gabby, she got

11  into your car?

12       A.   Negative.

13       Q.   Negative.  Where did you smell her for

14  weed?

15       A.   When I drove up on the street, she walked

16  up to the driver's side door, and she was standing

17  there, and I was like, "You don't smell like weed

18  to me," so that was it.

19       Q.   Did she ever get into your Toyota Tundra

20  at any time?

21       A.   No.

22       Q.   Did she ever get into your NOPD vehicle

23  at any time?

24       A.   When I transported her to the hospital,

25  yeah.

64

1    is a Factual Basis in your criminal case?

2         A.    Yes, sir.

3         Q.    You've seen this before.  You looked at

4    it today, right?

5         A.    Yes.

6         Q.    I remember your testimony being that you

7    disagreed with some or all of it; is that right?

8         A.    Correct.

9         Q.    Is that fair?

10        A.    Correct.

11        Q.    Let's go through this and find out what

12   you have to say about it.  The second full

13   paragraph starts, "Rodney Vicknair was a Police

14   Officer with the New Orleans Police Department."

15   You see that?

16        A.    Yes, sir.

17        Q.    Is that a true statement?

18        A.    Yes.

19        Q.    Is it also true that you applied to

20   become a police officer on or about June 21st,

21   2007?  Is that your remembrance?

22        A.    Yes.

23        Q.    Is that correct? And before that, what

24   were you doing?

25        A.    I was working at Baptist Hospital with

1  Tenet Healthcare.

2      Q.   You were about 20 years old at that time?

3      A.   In 2007?

4      Q.   Yes, sir.

5      A.   I was 40.

6      Q.   To jump forward, you resigned from the

7  police department effective January 13th, 2021.  Is

8  that also right?

9      A.   Correct.

10     Q.   You resigned -- the reason why you gave

11 for your resignation was because you had been

12 arrested; is that correct?

13     A.   Correct.

14     Q.   Is there any other reason why you

15 resigned? How did that decision come about?

16     A.   From Sergeant Jones, I think it was, with

17 PIB.

18     Q.   Tell me what happened. How did that

19 decision come about with regard to Jones?

20     A.   He said that he wanted to meet me in

21 Laplace to sign the resignation paperwork, and we

22 met at the St. John Parish Sheriff's Office, and I

23 asked him -- you know, he said just write why

24 you're resigning.  Just say you got arrested or

25 whatever you want, so that's what I wrote.

1    Q.   Did you agree with this?  Is there any

2    reason why this is not correct?

3         A.   What are you talking --

4         Q.   I'm going to go ahead and mark this

5    Exhibit F.

6         A.   I don't see an Exhibit F.

7         Q.   This is Exhibit F.

8         A.   Oh, okay.

9         Q.   You see Exhibit F there?

10        A.   Yes.

11        Q.   This is a true and accurate copy of your

12   letter of resignation that you submitted?

13        A.   Yes.

14        Q.   You have your signature on there?

15        A.   Yes.

16        Q.   Is there anything else you want to say

17   about this document?

18        A.   No.

19        Q.   During this time, you had been under

20   emergency suspension from the New Orleans Police

21   Department; is that right?

22        A.   Yes.

23        Q.   That emergency suspension started

24   September 25th, 2020; is that right? That was the

25   night you were arrested or the --

1      A.   No.   I thought I was arrested in August.

2  I don't know.   I don't remember.   It could have

3  been September.

4      Q.   Did you receive a copy of your Notice of

5  Suspension?

6      A.   I may have.   I wouldn't know where it's

7  at.

8      Q.   Let me show you Exhibit G, if you would.

9  It says, "Notice of Suspension" there.

10     A.   Friday, September 25th. Yeah, I see it.

11     Q.   Have you seen this letter before?

12     A.   Yeah.

13     Q.   Does this refresh your memory about when

14  you received this?

15     A.   Yes.

16     Q.   You received it on or about September

17  25th, 2020?

18     A.   Yes, sir.

19     Q.   And the last page, "Suspended Member's

20  Signature."  Is that your signature?

21     A.   I'm sorry.

22     Q.   Is that your signature or is that -- I

23  see it says Brandy Vicknair.

24     A.   Yeah.  No, that's not my signature. Maybe

25  Brandy signed it for me.

1       Q.   But you have seen this, and you received

2  this letter?

3       A.   Yes.

4       Q.   And it is correct?

5       A.   Yes.

6       Q.   Let me ask you, when you first started

7  with the NOPD, you were a Police Officer 3?

8       A.   Yes.

9       Q.   And then sometime later you were a Police

10  Officer 4; is that right?

11       A.   Uh-huh.  Yes.

12       Q.   And until 2020, you were a Police Officer

13  4?

14       A.   Yes.

15       Q.   As a police officer -- well, I mean, it's

16  fair to say as a police officer you understand that

17  it is illegal for a police officer to have sex with

18  an underage male or female; is that right?

19       A.   Of course, yes.

20       Q.   You also understand that it is not NOPD

21  policy to have a sexual relationship with an

22  underage person as a police officer?

23       A.   Yes, sir.

24       Q.   You mentioned -- we talked a little bit

25  about inservice training and training that you

1       Q.    What was the -- were they made in person,
2   face-to-face?
3       A.    No.
4       Q.    How were they made then?
5       A.    If they were made, it had to have been on
6   a text message.
7       Q.    Exhibit C, again, Factual Basis.
8   Vicknair requested and received sexually explicit
9   photographs of the victim and kept them on his cell
10  phone.  You see that statement?
11      A.    Yes.
12      Q.    Is that a statement that you agree with?
13      A.    Yeah.
14      Q.    When did these photographs -- well, how
15  did you come by obtaining these photographs?
16      A.    If they were sent to me you mean?
17      Q.    Yes.  Well, were they sent to you?
18      A.    Well, if they were on my phone, they must
19  have been sent to me.
20      Q.    It says that Vicknair requested and
21  received, so is it requested from Gabby?
22      A.    I don't know.
23            MR. ROQUEMORE:
24                  I think we're going to take a break,
25               and we'll start back.

1          MR. MOST:

2                Sure.

3          MR. ROQUEMORE:

4                Just five minutes.

5                {BRIEF RECESS, 2:50-2:55}

6   BY MR. ROQUEMORE:

7          Q.   Mr. Vicknair, we are still on Exhibit C.

8   Pull it in front of you right there.  Flip it over

9   to the front page.  There you go.  Second -- third

10  full paragraph.  Last sentence.  "On one occasion

11  he touched V1's breast under her shirt, and on

12  another occasion he touched V1's buttocks over her

13  clothes."  Is this a statement you disagree with or

14  do you agree with it?

15         A.   I disagree with it.

16         Q.   Do you have any comment about it?  Is it

17  true in part?

18         A.   No.

19         Q.   Not true in any part?

20         A.   No.

21         Q.   Next paragraph.  On the night of

22  September 23rd, Vicknair arrived at the Victim's

23  house.  Is that a true statement?

24         A.   I don't remember the date.  Let me see.

25  Was it on a call for service?

1    the scene at that time?

2         A.    No.

3         Q.    Why, according to you, why were you

4    there?

5         A.    Just to do a favor for a friend.

6         Q.    Last sentence in this paragraph.  "He

7    knew his actions were wrong and against the law,

8    but he engaged in such conduct anyway."  Is that

9    something you agree with or not?

10        A.    Where are you at?

11        Q.    The last sentence of the second to last

12   paragraph on Page 2.

13        A.    Okay.  What about it?

14        Q.    He knew his actions were wrong and

15   against the law but engaged in such conduct anyway.

16   Agree or disagree?

17        A.    Agree.

18        Q.    You agree? Okay.  Explain --

19        A.    Are you talking about --

20        Q.    It says he knew his actions were wrong.

21   You are agreeing with that statement?

22        A.    You're talking about the -- what actions?

23   The touching?

24        Q.    It's in context, but it --

25        A.    I know, but it's confusing me.

```
 1        Q.    You signed this.  When you signed this,
 2   what actions were you thinking that you were saying
 3   were wrong and against the law?
 4        A.    When I signed this, I was just signing it
 5   to hurry up and get all this over with.
 6        Q.    You do recall you pled -- you don't
 7   disagree that you pled guilty to the charges in
 8   criminal court?
 9        A.    Correct.  I recall that.
10        Q.    You pled guilty to what charges, to your
11   understanding?
12        A.    To whatever they asked me.
13        Q.    Do you remember what charges those were?
14        A.    No.  I don't remember all of those
15   charges, man.
16        Q.    Do you remember what they said that you
17   did that was wrong?
18             MR. MOST:
19                  Objection as to form.
20             THE WITNESS:
21                  Do what?
22   BY MR. ROQUEMORE:
23        Q.    You mentioned trip logs a little bit
24   earlier?
25        A.    I mentioned what?
```