UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| RAYNE UPTON, individually and On behalf of her minor Daughter, G.H. | DOCKET NO. 2:21-cv-407 |
| Plaintiff, | JUDGE BARBIER |
| | MAG. ROBY |
| VERSUS | |
| RODNEY VICKNAIR, SHAUN FERGUSON, THE CITY OF NEW ORLEANS; DOE DISTRICT COMMANDER; DOES 1 TO 10; and XYZ INSURANCE COMPANIES 1 TO 10, | |
| Defendants. | |

DEPOSITION OF RODNEY PAUL VICKNAIR, given in the above-entitled cause, pursuant to the following stipulation, before Sandra P. DiFebbo, Certified Shorthand Reporter, in and for the State of Louisiana, at Guste, Barnett, Schlesinger & Alpaugh, LLP, 639 Loyola Avenue, Suite 2130, New Orleans, Louisiana, on the 9th day of June, 2023, commencing at 12:10 PM.

```
 1   APPEARANCES:
 2
 3             MOST & ASSOCIATES
               BY: WILLIAM MOST,
 4             ATTORNEY AT LAW -and-
               HOPE PHELPS, ATTORNEY AT LAW
 5             201 St. Charles Avenue
               Suite 114, #101
 6             New Orleans, Louisiana  70170
               Representing the Plaintiff
 7
 8             CITY OF NEW ORLEANS
               LAW DEPARTMENT
 9             BY:  JAMES ROQUEMORE,
               ASSISTANT CITY ATTORNEY -and-
10             RENE GOUDEAU, ASSISTANT CITY ATTORNEY
               1300 Perdido Street
11             Suite 5E03
               New Orleans, Louisiana  70112
12             Representing the City of New Orleans AND
               NOPD
13
14             GUSTE, BARNETT, SCHLESINGER & ALPAUGH
               BY:  C. THEODORE ALPAUGH, III,
15             ATTORNEY AT LAW
               639 Loyola Avenue
16             Suite 2130
               New Orleans, Louisiana  70113
17             Representing Rodney Vicknair
18
19
20   Reported By:
21
22             Sandra P. DiFebbo
               Certified Shorthand Reporter
23             State of Louisiana
24
25
```

```
 1              S T I P U L A T I O N
 2
 3              It is stipulated and agreed by and
 4   among counsel for the parties hereto that the
 5   deposition of RODNEY PAUL VICKNAIR, is hereby being
 6   taken pursuant to the Federal Rules of Civil
 7   Procedure for all purposes and to preserve
 8   testimony in accordance with law;
 9              That the formalities of reading and
10   signing are specifically waived;
11              That the formalities of sealing,
12   certification, and filing are hereby specifically
13   waived.
14              That all objections, save those as to
15   the form of the question and responsiveness of the
16   answer are hereby reserved until such time as this
17   deposition or any part thereof is used or sought to
18   be used in evidence.
19                       * * * * *
20              Sandra P. DiFebbo, Certified Shorthand
21   Reporter, in and for the State of Louisiana,
22   officiated in administering the oath to the
23   witness.
24
25
```

1     A.   No.  I told her we're not allowed to do
2 that.
3     Q.   Do you know where Bernice lives now?
4     A.   As far as I know, somewhere in Louisiana.
5 North Louisiana.
6     Q.   Do you know her last name now?
7     A.   Unless she got divorced and went back to
8 her maiden name, Duncan, maybe.  Rene Duncan.  I
9 never called her Bernice.  Her name was always
10 Rene.
11     Q.   What was her maiden name?
12     A.   Moreau.
13     Q.   M-O-R-E-A-U?
14     A.   Yes.
15     Q.   Do you know who Gabby Hainey is?
16     A.   Yes.
17     Q.   You first met Gabby Hainey in your role
18 as an NOPD officer, right?
19     A.   Right.
20     Q.   You first met her and took her to the
21 hospital?
22     A.   Correct.
23     Q.   And after you first met her, in the
24 months thereafter, you would sometimes go to her
25 house in your police vehicle, right?

1    A.   Yes.
2    Q.   And were you doing that in your role as
3 an NOPD officer to check up on a crime victim?
4    A.   I was doing that because her mother asked
5 me to.
6    Q.   You did it in your police vehicle, right?
7    A.   Uh-huh.
8    Q.   On your shift?
9    A.   I was assigned -- we have what we call
10 sectors, and their house was in my sector, so her
11 mom asked me when I'm in the area to stop by and
12 check on them, so that's all I did.
13   Q.   Were you doing -- checking on them
14 because you were a police officer, and that's part
15 of your job?
16   A.   Well, and plus her mom was texting me
17 some concerns that she had.  Like one of the
18 messages her mom sent me was that her daughter,
19 Gabby, was threatening to kill her mom.  She had a
20 knife.  Because her mom wouldn't let her see that
21 guy Jim from Florida.  So I would stop by there.  I
22 put myself like on what we call an area check or a
23 welfare check.  I just stopped by to make sure
24 everything was okay.  That was it.
25   Q.   A welfare check is something you do as a

1   police officer?
2       A.   Yes.
3       Q.   So when you were going over to her house
4   -- when you were going over to Gabby Hainey's
5   house, you were going over to her house as a police
6   officer, right?
7       A.   Correct.
8       Q.   All of the times you went to Gabby
9   Hainey's house, were you doing it as a police
10  officer?
11      A.   Say that again.
12      Q.   Sure.  All of the times you went to Gabby
13  Hainey's house, did you go to her house as a police
14  officer?
15      A.   I would say -- I would have to say as an
16  official capacity, no.  I wasn't doing it as a
17  police officer.  There was one time I did it just
18  as a friend.
19      Q.   Which time was that?
20      A.   The night that Gabby called and said that
21  her and her friends had been out smoking weed, and
22  she was afraid that her mom was going to be able to
23  smell it all over her, and she asked me if I could
24  pull up in front of her house and let her stand
25  there and talk to me and see if I could smell the

1  weed on her.  So I said okay.  So I did, and I told
2  her, I said, "No.  You don't smell like weed.  All
3  I'm smelling is just the outside, and it smells
4  like you've been sweating."  And she said they had
5  been dancing or something, and I said, "If your mom
6  is asleep on the couch, just go in and go take a
7  shower and leave your mom alone.  Don't worry about
8  it," and that was the last time.
9      Q.   So I think you told investigators that
10 you went over to Gabby Hainey's about 12 or 13
11 times; is that right?
12      A.   That is both police-wise -- because I
13 responded to maybe ten, 11 calls over there.
14      Q.   So you went over to her house about 12 or
15 13 times approximately, right?
16      A.   Yeah.
17      Q.   So you're saying that for all of them but
18 one you went over there as a police officer?
19      A.   Correct.
20      Q.   And then you are saying the final time
21 was as a friend?
22      A.   Yes.
23      Q.   The vehicle that you went over to Gabby
24 Hainey's house the final time, which vehicle was
25 that?

1   A.   That was my personal vehicle, the gray
2   Tundra.
3   Q.   Do you have any NOPD symbols in that
4   truck, like floor mats or anything else?
5   A.   No.  The only NOPD symbol I had was the
6   placard that we put on our dash to park around the
7   station.  That was it.
8   Q.   So in this truck that you went in the
9   final time, you had an NOPD placard in the front
10  window?
11  A.   Yes.
12  Q.   And that indicates that you can park that
13  car in NOPD officer parking areas?
14  A.   At our station, yeah.
15  Q.   If you need to go to the courthouse in
16  that vehicle, can you park in law enforcement
17  officer parking?
18  A.   Yes.
19  Q.   Did you sometimes use that vehicle to go
20  to the courthouse or to the station?
21  A.   Yeah.  I've used it when I had to go to
22  court.
23  Q.   Any other NOPD symbols or indications on
24  that truck?
25  A.   No.

```
 1        Q.   That's the Toyota Tundra?
 2        A.   Yes.
 3        Q.   That final time that you met up with
 4   Gabby Hainey, had you been working that day?
 5        A.   Yes.
 6        Q.   Were you coming off your shift?
 7        A.   Yes.
 8        Q.   Were you in uniform?
 9        A.   No, no.  I have a locker at the station
10   we change out.
11        Q.   Did you have a firearm with you?
12        A.   When I worked that day.
13        Q.   When you were in the truck at Gabby
14   Hainey's house?
15        A.   No.
16        Q.   Did you have any -- did you have
17   handcuffs in there?
18        A.   No.
19        Q.   Any other NOPD-issued equipment or gear?
20        A.   I had my vest, my bulletproof vest, on
21   the back seat.
22        Q.   Any other NOPD gear or equipment?
23        A.   Nope.
24        Q.   Why did you have the bulletproof vest in
25   the back seat?
```

```
 1          A.   Because it gets too hot.  It's too bulky
 2   to wear all the time.  I just took it off and threw
 3   it on the back seat.
 4          Q.   Because sometimes you do police work in
 5   that Tundra?
 6          A.   No.  We're not allowed to do police work
 7   in it.
 8          Q.   When did you take off the bulletproof
 9   vest and put it in the Tundra?
10          A.   When I left work that night.  Before I
11   left the station parking lot.
12          Q.   So you left your NOPD vehicle.  You went
13   to your Tundra, and you took off the bulletproof
14   vest?
15          A.   No.  I left the NOPD vehicle.  The NOPD
16   vehicle.  I'm sorry.  Went upstairs and made sure
17   all my paperwork was turned in, cleared it with the
18   supervisor that I could leave, then went to the
19   sallyport and took the vest off, threw it in the
20   back seat, and got in my truck and left.
21          Q.   At what point did you take off your
22   uniform?
23          A.   The what?
24          Q.   So you left your police vehicle.  You
25   went inside, did your paperwork, left through the
```

```
 1   BY MR. MOST:
 2        Q.   Sure.  We've been going a little over an
 3   hour.  Do you need to take a break?
 4        A.   Can I take a nap?
 5        Q.   If you need to.
 6        A.   No.  I'm good.  About how much longer you
 7   think we got?
 8        Q.   I think we've got more than another hour,
 9   probably.  The lawyer for the city may have some
10   questions.  I may not ask questions for that long,
11   but we can take breaks.  If you need to take a 30-
12   minute nap, we can probably accommodate that.
13        A.   No.  I'm okay.
14        Q.   You said that all the prior visits before
15   the final visit with Gabby Hainey you went as an
16   officer.  Did you record trips sheets for those
17   visits?
18        A.   Yes.
19        Q.   Was there any other form that you
20   documented those visits on?
21        A.   Sometimes we had to do what we call a
22   21M.  It's a 21 Miscellaneous report.  If there was
23   something to the -- like let's say her mom called
24   me and said she was acting up, threatening to hurt
25   herself, something like that.  Well, then I would
```

1  have to notify the supervisor, and then, in turn,
2  the crisis unit would have to be notified, you
3  know.  So, yeah, there was a lot of documentation.
4      Q.   Sure.  So if we're looking for documents
5  that document your interaction with Gabby Hainey,
6  we would look for trip sheets to her home address;
7  is that right?
8      A.   Yes.
9      Q.   And we'd look for 21Ms that have Gabby
10 Hainey's name on it?
11     A.   No.  We don't put minors' names.  It
12 would be like an abbreviated code.  Like maybe
13 Victim 1 or however the supervisor would tell us,
14 but we don't put minors' names in reports.
15     Q.   Would her address be on that 21M?
16     A.   Yes.  The address definitely would be,
17 and I believe my unit number was 185 every time I
18 went over there.
19     Q.   In addition to trip sheets and 21Ms, what
20 other paperwork did you fill out for your
21 interactions with Gabby Hainey?
22     A.   Well, they got the body cameras.
23     Q.   What else?
24     A.   That would be it.
25     Q.   Did you ever turn off your body camera or

1     Q. Uh-huh.
2     A. I don't think so.
3     Q. When you first met Gabby Hainey, you went
4 to her house and transported her to the hospital,
5 right?
6     A. Yes, sir.
7     Q. Were you assigned to answer that call for
8 service by NOPD or did you hear it and volunteer to
9 go?
10     A. I believe I was assigned, because it was
11 in my sector.
12     Q. Would we see that in the --
13     A. Dispatch log.
14     Q. Dispatch log. Would they indicate that?
15     A. Yes.
16     Q. Your CIT training, did that involve
17 training for how to deal with victims of sexual
18 assault?
19     A. No. That was critical incident, like
20 suicidal, stuff like that.
21     Q. Did you have special training for dealing
22 with victims of sexual assault?
23     A. In our yearly inservice, we had sexual
24 assault victim training.
25     Q. Did you tell Gabby or her mother that you

1    Q.   Any times after that?
2    A.   Yes.  She wanted to blow the siren, so I
3  let her get in the driver's seat, and she hit the
4  siren button, and she got out.  That was it.
5    Q.   So part of building your friendship with
6  Gabby Hainey was sort of letting her check out your
7  police stuff?  Is that fair to say?
8    A.   I mean, they ask questions, you know.
9  It's just like a kid with a fire truck.  Can I blow
10 the siren?  You know.
11   Q.   Yeah.  And, you know, letting her get in
12 your car and blow the siren, that was part of your
13 process of becoming friends with Gabby Hainey;
14 would you agree?
15   A.   I guess you could say that.
16        MR. MOST:
17             Why don't we take a five-minute
18          break, and then we'll come back.
19             {OFF-THE-RECORD DISCUSSION}
20        MR. ALPAUGH:
21             Rodney, why don't you repeat what
22          you just said.
23        THE WITNESS:
24             Which part?
25        MR. ALPAUGH:

1  and you left?
2      A.  Yes, sir.
3      Q.  Is that right? The next time that you saw
4  Gabby was when?
5      A.  It may have been four or five days later.
6      Q.  Let's look at Exhibit C again, this
7  Factual Basis, just to walk through and keep this
8  in order.  The second paragraph, second sentence
9  then.  In May 2020, Vicknair, while working in his
10 capacity as a police officer, escorted a 14 year
11 old girl, who was a victim of sexual assault, to
12 the hospital to undergo forensic exam, i.e, a rape
13 kit.  Is that something you disagree with?
14     A.  No.  I agree with it.
15     Q.  You agree with that.  The next sentence.
16 Vicknair gave the victim his cell phone number and
17 offered to be her friend and mentor.  You agree
18 with that?
19     A.  Yes.
20     Q.  Was this what was reflected in the body-
21 worn camera that we just -- the video that we just
22 --
23     A.  Yes.
24     Q.  Was there anything in addition on that
25 night -- you had some conversations at the

```
 1                any responsive questions to
 2             Mr. Alpaugh's, I'll leave it there.
 3             THE WITNESS:
 4                Okay.
 5   EXAMINATION BY MR. ALPAUGH:
 6        Q.   Rodney, I just have a couple of questions
 7   for you.  You were asked questions about the fact
 8   that you had business cards printed up?
 9        A.   Yes.
10        Q.   Were you the only police officer that had
11   business cards?
12        A.   No.  My training officer, the one that
13   trained me, that's how I got the idea, because he
14   gave his business cards out to everybody.
15        Q.   Do most NOPD officers have business cards
16   with their contact information on them?
17        A.   Yeah, because a lot of people these days
18   are asking for the officers' cards.  So when you
19   print these cards out, you know, of course, the
20   more stuff on it, e-mail, gmail, phone numbers, the
21   more professional it looks.  So everybody puts all
22   their information on these cards, and they just
23   giving them out, because every time we went on a
24   call for service at like McDonald's, the manager
25   was like, "You got a business card on you so I can
```

1  remember to hook you up next time?"  And we know we
2  are not supposed to accept food for free and all of
3  that, but that's what they do.  Yeah.  "Here is my
4  business card.  If you ever got a problem, and you
5  call 911, and nobody comes here right away, I'm
6  working Mid City security detail.  Call me.  I'm
7  right around the corner.  I'll be here in a
8  second," you know.
9      Q.  Is it unusual for officers to give
10 business cards to victims of crimes?
11     A.  I'm not going to say it's unusual, but
12 it's not unheard of.  I've given my business cards
13 out to a lot of victims.  When I was a robbery
14 detective in the First, they asked, "How can we get
15 in touch with you, because, you know, if we call
16 the station, we know what is going to happen.
17 You're not going to be on duty or we going to get
18 put on hold or transferred," or yada, yada.  "Okay.
19 Here is my business card with my phone number and
20 my e-mail.  If you got any questions about your
21 case, give me a call."
22     Q.  Now, was it unusual in the NOPD for
23 officers to have relationships, and I'm talking
24 about like friend relationships or CI relationships
25 with underaged children, underaged kids, like