## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

_____ )
RAYNE UPTON, individually and                )          Docket No. 2:21-cv-407
on behalf of her minor daughter, G.H.        )
                                             )          JUDGE: CARL BARBIER
              Plaintiff,                     )
       v.                                    )          MAGISTRATE: KAREN
                                             )          WELLS ROBY
RODNEY VICKNAIR, ET AL.,                     )
                                             )
              Defendants.                    )
_____ )

### <u>Opposition to Defendants' Motion for Summary Judgment</u>

This case is about how NOPD officer Rodney Vicknair sexually assaulted Plaintiff G.H. when she was fourteen years old. Vicknair met her while he was on uniformed duty, groomed her while he was on uniformed duty, and then sexually assaulted her four times – at least twice while he was in uniform. Vicknair also locked her in a truck, hit her with his police baton, and solicited sexually explicit photographs from her.

The City has tried to characterize Vicknair as an "officer who chose to become a criminal." But the reality is that Vicknair was <u>a criminal whom the City chose to be an officer</u>. At the time the City hired him, Vicknair had a criminal history including five arrests and/or convictions for:

- two counts criminal damage to property;
- two counts illegal use of a weapon;
- one count of simple burglary;
- one count of simple battery on a juvenile;
- one count of disturbing the peace;
- one count of simple battery; and
- one count of aggravated assault.

By NOPD's own definition, this made Vicknair a "habitual offender." Multiple Defendant 30(b)(6) witnesses conceded that a person with this criminal history should have never been hired. But Defendants chose to hire him anyway and give him a badge, a gun, and a position of trust. Then, predictably, Vicknair did again what he had done before – committed battery on a juvenile.

1

Defendants also failed other obvious opportunities to stop Vicknair. They retained him on the force despite his history of misconduct, including the misuse of his authority to be inappropriate with women. They failed to train other officers to report what Defendants concede were major "red flags," like Vicknair showing modeling photos to a child sex crime victim, talking to her about illicit photos, or giving her his cell phone number.

And finally, Defendants' 30(b)(6) witness testified that Defendants had developed probable cause to arrest Vicknair <u>two days before the final sexual assault</u>. Defendants' 30(b)(6) witness Precious Banks testified that it "would be improper" to leave Vicknair "on the street" once they had probable cause to arrest him. Similarly, Superintendent Anne Kirkpatrick – the Chief of NOPD – testified that Vicknair should have been immediately removed from the street to protect G.H. from harm.[1]

But instead of arresting him, taking him off the street, or even conducting basic monitoring of him, Defendants left Vicknair alone for *days*. And Vicknair used that time to carry out the final penetrative sexual assault of G.H.

Given these facts, Defendants' motion for summary judgment should be denied with regard to Section 1983 liability because Plaintiff has ample evidence to support four *Monell* theories: improper hiring, improper supervision, improper training, and improper retention. And the motion should be denied with regard to Defendants' own negligence, because considering that Defendants' 30(B)(6) witnesses all but conceded negligence, a reasonable jury could conclude that the City's hiring, retention, supervision, or retention were negligent. And the motion should be denied with regard to *respondeat superior* because there is no dispute that Vicknair's opportunity to rape G.H. arose in the course and scope of his employment – which is sufficient for vicarious liability under Louisiana law. Defendants' motion should be denied.

---

[1] Superintendent Kirkpatrick was deposed on the afternoon of January 30, 2024 (the date of this filing), so Plaintiff will file a motion to supplement with her deposition transcript once it is received.

## I.     Legal Standard

"[S]ummary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"[2] Summary judgment is only appropriate when the moving party identifies material facts not in dispute, "and the nonmoving party fails to produce or identify in the record summary judgment evidence sufficient to sustain a finding in its favor respecting such of those facts as to which it bears the trial burden of proof."[3] This Court will view "the evidence and all justifiable inferences in the light most favorable to the non-moving party."[4]

## II.     Analysis

A.    **The Motion should be denied because it relies on a range of clearly disputed facts.**

In order to prevail on summary judgment, the moving party must "demonstrate the absence of any genuine issue of material fact."[5]

Here, Defendants' motion relies on many disputed facts. For example, Defendants contend that "NOPD had no notice that Mr. Vicknair was a risk to sexually assault a minor or a woman" (Fact 12) and that "unbeknownst to NOPD, Mr. Vicknair developed an inappropriate relationship with G.H." (Fact 15). But those contentions are belied by the fact that Defendants were on notice from the very day Vicknair met G.H. that he was beginning an inappropriate relationship. NOPD officers watched as Mr. Vicknair showed "modeling photos" to G.H. and gave her his personal cell phone number,[6] both of which Defendants concede are serious "red flags."[7]

---

[2] *Wheat v. Fla. Par. Juvenile Justice Comm'n*, 811 F.3d 702, 705 (5th Cir. 2016) (quoting Fed. R. Civ. P. 56(a)).
[3] *Stearns Airport Equip. Co. v. FMC Corp*., 170 F.3d 518, 521 (5th Cir. 1999).
[4] *Vercher v. Alexander & Alexander Inc.,* 379 F.3d 222, 225 (5th Cir. 2004).
[5] *Celotex Corp. v. Catrett*, 106 S.Ct. 2548, 2552 (1986).
[6] Ex. I (Carkum Dep.) at 26:21-27:13 (witnessed Vicknair showing G.H. modeling photos that he "allowed") 25:11-13 ("Q. And you witnessed Officer Vicknair give the victim his telephone number? A. Yes, ma'am.")
[7] *See* Ex. H (Barnes 30(b)(6) Dep) at 67:11-69:3 ("I would agree that it would definitely be a red flag" for "a patrol officer to give his personal phone number to a minor sex crime victim"); R. Doc. 125-4 (PIB Report) ("it was clearly outside of Officer Vicknair sco[pe] of professionalism to show a teen sexual

Plaintiff also disputes Defendants' Facts 20, 22, and 23, which rely on the idea the last sexual assault occurred in Vicknair's "personal vehicle." Vicknair owned the title to the vehicle, but it was not just his personal vehicle: it had NOPD floor mats[8] and  a NOPD placard in the front window so that Vicknair could use it for police business like parking at the courthouse.[9]

Furthermore, it is anticipated that Defendants will at least dispute Plaintiff's material **Facts 1 and 2** (Defendants were aware that Vicknair was a repeat criminal and "habitual offender" when they hired him), **Facts 6 and 7** (that Vicknair sexually assaulted G.H. multiple times in uniform), and **Fact 10** (NOPD had probable cause to arrest Rodney Vicknair on September 21, 2020).[10] These are core issues of dispute between the parties, and will require a trial to resolve.

Given these significant disputes of material fact, Defendants' motion for summary judgment should be denied.[11]

B.     **The motion should be denied with regard to Defendants' § 1983 liability because Plaintiff has evidence to support four *Monell* theories at trial: improper hiring, improper supervision, deficient training, and improper retention.**

A city is not liable under § 1983 on the theory of *respondeat superior*,[12] but is liable for acts directly attributable to it "through some official action or imprimatur."[13]

To establish municipal liability under § 1983, a plaintiff must show the deprivation of a federally protected right caused by action taken "pursuant to an official municipal policy."[14]  A plaintiff must identify: "(1) an official policy (or custom), of which (2) a policymaker can be

---

assault victim scantily clad photos while sitting in the emergency room waiting to have a sexual assault examination.")

[8] Ex. C (G.H. Dep.) at 227:6-22.

[9] Ex. A (Vicknair Dep.) at 29:8-18.

[10] See attached Statement of Material Facts.

[11] Plaintiff's Motion for Partial Summary Judgment (R. Doc. 125) should still be granted, however. That is because Plaintiff's motion takes Defendants' version of the facts as given, and shows why partial summary judgment should nevertheless issue. By contrast, Defendants' Motion for Summary Judgment relies on *their own* version of the facts – that there was only one sexual assault, that they never had any reason to suspect Vicknair, *etc*.

[12] *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694 (1978).

[13] *Piotrowski v. City of Houston,* 237 F.3d 567, 578 (5th Cir. 2001).

[14] *See Monell,* 436 U.S. at 691.

charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy or custom."[15]

A plaintiff can establish *Monell* liability for constitutional violations by showing any of at least eight different things:

     i.   An express policy;[16]

    ii.   A violation by the final policymaker herself;[17]

   iii.   Deficient hiring practices;[18]

   iv.   Deficient retention practices;[19]

    v.   Deficient supervision and discipline;[20]

   vi.   Deficient training;[21]

  vii.   A pattern of misconduct;[22] or

 viii.   Ratification by the final policymaker.[23]

Here, Plaintiff has evidence to support liability under four *Monell* theories: improper hiring, improper supervision, improper training, and improper retention.

1.   <u>The City engaged in improper hiring when it hired Vicknair, a "habitual offender" criminal.</u>

A municipality will be liable for deficient hiring when it is "likely to result in the violation of constitutional rights, [such] that the policymaker . . . can reasonably be said to have been deliberately indifferent to the [plaintiff's rights]."[24] Regarding an applicant's background, a plaintiff must show that a reasonable jury could conclude that the applicant's background meant they were "highly likely to inflict the particular injury suffered by the plaintiff."[25]

---

[15] *Pineda v. City of Houston,* 291 F.3d 325, 328 (5th Cir. 2002).
[16] *Monell*, 436 U.S. at 660–61.
[17] *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-83 (1986).
[18] The government entity's will be liable when its failure to screen, train, or supervise its employees is inadequate to the point that it is "likely to result in the violation of constitutional rights, [such] that the policymaker ... can reasonably be said to have been deliberately indifferent to the [plaintiff's rights]." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)); *Gomez v. Galman*, 18 F. 4th 769, 778 (5th Cir. 2021).
[19] *Id*.
[20] *Id*.
[21] *Id*.
[22] *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).
[23] *Allen v. Hays*, 21-20337 (5th Cir. 2023) at *15.
[24] *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).
[25] *Bryan Cnty. v. Brown*, 520 U.S. 397, 412 (1997).

NOPD defines a "habitual offender" as any "person with a criminal history of two or more felony convictions or five or more felony or misdemeanor arrests for any offense."[26] The City's own 30(b)(6) witness, Sgt. David Barnes, testified that this "habitual offender" definition would "clearly I think meet the standard of I wouldn't hire."[27] He went on to confirm that the City "shouldn't be hiring someone who meets this definition to be a police officer,"[28] including at the time that Vicknair was hired.[29] But Vicknair met the NOPD definition of a habitual offender, with five arrests and at least one conviction:

| Date | Arrest or Conviction | Counts |
|------|----------------------|--------|
| May 2, 1985 | Arrest | Two counts Criminal Damage to Property<br>Two counts Illegal use of a Weapon.[30] |
| July 1, 1986 | Arrest | One count Attempted Burglary[31] |
| April 16, 1987 | Arrest and Conviction | One count Simple Battery (against a juvenile)[32] |
| Dec. 30, 1990 | Arrest | One count Disturbing the Peace[33] |
| June 6, 2005 | Arrest | One count Simple Battery<br>One count Aggravated Assault[34] |

This background is related to the "particular injury suffered by the plaintiff" in significant part because Vicknair's arrest and conviction for battery against a juvenile is <u>exactly</u> what this Court determined Vicknair did to G.H. when it granted G.H. summary judgment for battery on a

---

[26] NOPD Operations Manual Ch. 41.8 (available online here); Ex. H (Barnes 30(b)(6) Dep.) at 27:9-14 (confirming definition).
[27] Ex. H (Barnes 30(b)(6) Dep.) at 27:19-28:3.
[28] *Id*. at 28:7-14.
[29] *Id*. at 29:25-30:5.
[30] Ex. D (Excerpt of NOPD Hiring File) at 4.
[31] *Id*. at 4.
[32] Ex. E (Bill of Information).
[33] Ex. F (Excerpt of NOPD Hiring File)
[34] Ex. D (Excerpt of NOPD Hiring File) at 4.

juvenile.[35] Superintendent Kirkpatrick testified that an officer with this history <u>should not</u> have been hired, because of the risk that he would commit a similar crime while in uniform.

Vicknair testified that he disclosed his entire criminal history to NOPD during the stress test portion of the hiring process,[36] and Defendants' 30(b)(6) witness testified that everything in NCIC would have been received during the hiring process.[37]

Another of Defendants' 30(b)(6) witnesses testified that a misdemeanor conviction – like the one Vicknair had – would be an "automatic violation" and should be a disqualification to hiring.[38] But Defendants hired Vicknair despite the fact that he tripped an "automatic violation."

Thus, taking the facts in the light most favorable to plaintiff, Defendants knowingly hired a habitual offender with a range of arrests and a conviction for violent offenses to be a police officer, just one of which should have been an automatic disqualification for hiring. A reasonable jury could conclude that this choice was likely to result in the violation of constitutional rights, such that Defendants can reasonably be said to have been deliberately indifferent. The motion should be denied.

2.    <u>The City engaged in improper supervision when it (a) left Vicknair on the street for four days after developing probable cause to arrest him, during which time Vicknair sexually assaulted G.H. a final time; and (b) consistently understaffed its Sex Crimes unit so that specially-trained detectives would have to rely on regular patrol officers to fill in.</u>

A "municipality, with its broad obligation to supervise all of its employees, is liable under § 1983 if it supervises its employees in a manner that manifests deliberate indifference to the constitutional rights of citizens."[39] Courts have interpreted that to require (1) knowledge of facts

---

[35] See R. Doc. 107 at 19 (granting Plaintiff summary judgment against Vicknair on battery).

[36] Ex. A at 21 ("Even if one of your prior arrests or convictions doesn't show up in the written records, you told NOPD verbally about it during that stress test; is that right? A. Yes.") The 1987 arrest also shows up in a NCIC search that can be provided under seal if necessary, which the City concedes it reviewed. Ex. H at 26:8-16

[37] Ex. H (Barnes 30(b)(6) Dep.) at 26:8-16. ("Q. And so at the very least, when NOPD is reviewing an applicant's criminal background history, if it's in NCIC, NOPD will at least have that and perhaps more. Is that correct? A. They should have at least that and more. Q. And as far as you know, they do have that and more? A. As far as I know.")

[38] R. Doc. 126-7 (Dep. of 30(b)(6) witness Powell) at 27:11-21.

[39] *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 453 (5th Cir. 1994) (en banc).

indicating inappropriate behavior, (2) deliberate indifference by failing to take action that was obviously necessary to prevent or stop abuse; (3) that such failure caused injury.[40]

Here, Defendants had awareness of Vicknair's inappropriate behavior from the beginning. Vicknair also testified that NOPD knew generally of him "making friendships . . . with underage girls" and did not tell him to stop.[41] Then, on the day that Vicknair met G.H., Officer Carkum witnessed Vicknair show "modeling photos" to G.H. on his phone, talk to her about "[il]icit pictures, and give his phone number to G.H.[42] Defendants' witnesses agreed that these were "red flags."[43]

Several months later, on September 18, 2020, the City specifically identified Vicknair's conduct towards G.H. as a source of danger. G.H. and her mother had reported inappropriate behavior by Vicknair to G.H.'s licensed clinical social worker, whose supervisor then contacted a branch of the City government, the Office of the Independent Police Monitor.[44] The City recognized this immediately as a safety issue, given that "IPM expressed wanting to engage in safety planning and address safety for the family."[45]

By September 21, 2020, NOPD's Public Integrity Bureau had opened an investigation into Vicknair.[46] On that day, G.H.'s counselor reported to PIB's Sgt. Jones that Vicknair had "made inappropriate comments and took a very inappropriate picture with her 15-year old daughter."[47] That same day, G.H's mother reported to Sgt. Jones that Vicknair had stared at G.H.'s exposed

---

[40] *Id.* at 454.
[41] Ex. A (Vicknair Dep.) at 39:20-21.
[42] Ex. I (Carkum Dep.) at 23:5-7, 26:21-27:13; 25:11-13.
[43] *See* Ex. H (Barnes 30(b)(6) Dep) at 67:11-69:3 ("I would agree that it would definitely be a red flag" for "a patrol officer to give his personal phone number to a minor sex crime victim"); R. Doc. 125-4 (PIB Report) ("it was clearly outside of Officer Vicknair sco[pe] of professionalism to show a teen sexual assault victim scantily clad photos while sitting in the emergency room waiting to have a sexual assault examination.")
[44] Ex. G at 2.
[45] *Id.* at 2.
[46] R. Doc. 125-4 (PIB Investigatory Report) at 1.
[47] *Id.* at 2.

breast,[48] and had touched G.H's body in a way that made her "very uncomfortable."[49] Sgt. Jones viewed a photo that Vicknair took with G.H. that Jones' characterized as a "seductive photo."[50] According to Defendants' 30(b)(6) witness, Defendants had probable cause to arrest Vicknair at this point:

> Q.   After taking the statement from the
> child's mother and seeing the photograph, did NOPD
> have probable cause to arrest Vicknair?
>         MR. ROQUEMORE:
>             Objection.  Form.
>         THE WITNESS:
>             Yes.                                    [51]

Defendants' 30(b)(6) witness testified that after September 21st, "to leave him on the street with allegations of this sort would be improper, so he was removed."[52]

But Vicknair was not "removed" on that day. Defendants did not arrest Vicknair. Nor did they remove him from the street. Nor did they even assign "someone to ride along with Rodney Vicknair while he was investigated," even they "could have."[53] They left him alone.

The next day, on September 22, 2020, Sgt. Jones reviewed camera footage of the initial meeting of Vicknair and G.H. The video showed Vicknair telling G.H. she "could tell him things that she would not tell her mother" and exposing her to photos of a "scantily clad" woman.[54] Defendants still did not arrest Vicknair, take him off the street, or assign someone to ride along with him.

---

[48] *Id*. at 3.
[49] *Id*. at 3.
[50] *Id*. at 4.
[51] Ex. B (Banks 30(b)(6) Dep.) at 17:7-13.
[52] *Id*. at 44:21-45:2.
[53] *Id*. at 44:17-22.
[54] R. Doc. 125-4 at 5.

Defendants waited until September 25, 2020 – four days after they had developed probable cause – to seek a warrant and effect the arrest of Vicknair.[55] In the four days between Defendants developing probable cause to arrest and the actual arrest, Vicknair engaged in a final penetrative sexual assault of G.H.[56]

NOPD's supervision failed in other ways as well. NOPD had no system whatsoever for spotting when an officer repeatedly returns to the scene of a sex victim's home. Here, Vicknair went to G.H.'s house "about 12 or 13 times."[57] And NOPD had a GPS device tracking the location of Vicknair's vehicle.[58] But NOPD had no automatic system for spotting suspicious patterns of officer behavior like this.[59] NOPD does not even ask supervisors to look for such patterns when reviewing officer trip sheet forms, or have any system to do so.[60] This is comparable to *S.M. v. Lincoln County*, in which the Eighth Circuit found that "the jury could reasonably infer that even a modest level of active supervision would have successfully deterred Edwards's repeated misuse of his authority for the purpose of sexual abuse," and therefore that "a reasonable jury could find that the County's inadequate supervision was the moving force that enabled Edwards to sexually assault the plaintiffs."[61] Superintendent Kirkpatrick conceded under oath that NOPD should have a system for tracking patterns in officer movements. But NOPD does not.

Furthermore, NOPD has consistently understaffed its Sex Crimes and Child Abuse units. This is detailed in a special report by the Office of the Consent Decree Monitor regarding NOPD

---

[55] R. Doc. 125-4 at 9.
[56] R. Doc. 125-4 at 5.
[57] Ex. A (Vicknair Dep.) at 28:14-16.
[58] Ex. H (Barnes 30(b)(6) Dep.) at 14:6-9 ("NOPD vehicles have a GPS device called an Automatic Vehicle Locator").
[59] *Id*. at 23:18-24:6 ("Q. And so far as you know, NOPD has no system for picking that up other than hoping that supervisors spot that on trip sheets, agreed? A. Not that I'm aware of.")
[60] *Id*. at 23:1-10 ("Q. Okay. So sitting here today, you don't know of any particular policy requiring supervisors to look for patterns in trip sheets, agreed? A. Agreed, not specifically patterns. Q. And you don't know of any system that would conduct periodic reviews of trip sheets to look for patterns in locations? A. I don't know of any system that would conduct periodic reviews of trip sheets.")
[61] 874 F. 3d 581, 589 (8th Cir. 2017).

Sexual Assault Investigations.[62] That report walks through the history of NOPD's Special Victims Division (SVD), including the United States DOJ's 2011 conclusion that there was a "systemic breakdown in NOPD handling of sexual assault investigations."[63] In 2015, the New Orleans Sexual Violence Response Advisory Committee identified shortcomings including an excessive caseload for Sex Crimes and Child Abuse detectives.[64] The caseload problem was not resolved by 2020, when Vicknair interacted with G.H. That is evident from the fact that in April 2022, the New Orleans Sexual Violence Response Advisory Committee reported that still "Detectives have too high caseloads."[65] The fact that the Child Abuse detectives were severely overloaded could help explain why the Child Abuse detective in G.H.'s case allowed patrol officers to transport G.H., and continue to interact with her even though patrol officers are not supposed to have continued "interactions with the child, except in exigent circumstances."[66]

On these facts, a reasonable jury could conclude that Defendants engaged in improper supervision, whether generally in their failure to staff the Special Victims Division, or in their failure to have any system to catch patterns of officers returning a dozen times to a sex crime victim's home, or at the initial time of Vicknair's meeting G.H., or in days between the development of probable cause and Vicknair's actual arrest. The motion should be denied.

3. Defendants' training was deficient because they provided no training whatsoever about how to spot and report the admitted "red flags" of Vicknair's behavior.

According to the Fifth Circuit, a "failure-to-train action is a type of *Monell* claim."[67] To prevail on a failure-to-train theory, a plaintiff must prove that: (1) the municipality's training

---

[62] Ex. J, also available at *United States v. City of New Orleans*, 12-cv-01924-SM-DPC, R. Doc. 727 (July 7, 2023).
[63] *Id*. at 6.
[64] *Id*. at 7.
[65] *Id*. at 9.
[66] Ex. H (Barnes 30(b)(6) Dep) at 66:10-15.
[67] *Henderson v. Harris Cty., Texas*, 51 F.4th 125, 130 (5th Cir. 2022) (*quoting Hutcheson v. Dallas Cty*., 994 F.3d 477, 482 (5th Cir. 2021)) (internal quotation marks omitted).

procedures were inadequate; (2) the municipality was deliberately indifferent in adopting its training policy; and (3) the inadequate training policy directly caused the violations in question.[68]

Defendants argue in their motion that the City could not have trained Vicknair not to rape minors.[69] But that is not Plaintiff's primary training theory. Plaintiff's primary training theory is that the City failed to train the officers *around Vicknair* about how to pick up on and report the red flags of Vicknair's behavior.

For example, Officer Carkum witnessed Vicknair showing G.H. "modeling photos", talking to her about "[il]licit photos," and giving her his phone number, but Carkum did not report it to anyone.[70] In testimony, Carkum could not identify any training to recognize red flags like this, other than to say it is "frowned upon."[71] And Defendants' 30(b)(6) witness conceded that if officers saw behavior like this and did not report it, that would implicate a training problem.[72]

Vicknair's training also was inadequate. He received little or no training on how to avoid situations where he might feel impulses to engage in inappropriate behavior. For example, he testified that he received:

- No training about how to interact with "underage people"[73];

- No training about whether it "was permissible or impermissible to date people" that he met through his "role as an officer"[74];

- No training about how to "avoid a situation in which an officer might take advantage of their role as an officer with someone of the opposite sex"[75];

---

[68] *Ratliff v. Arkansas Cty., Texas*, 948 F.3d 281, 285 (5th Cir. 2020) (*quoting Zarnow v. City of Wichita Falls*, 614 F.3d 161, 170 (5th Cir. 2010)) (internal quotation marks omitted).
[69] R. Doc. 126-1 at 8-10
[70] Ex. I (Carkum Dep.) at 23:5-7 ("[il]licit photos"), 26:21-27:13 (modeling photos); 25:11-13 (phone number); 31:16-19 (did not report Vicknair giving G.H. phone number).
[71] Ex. I at 31:12-15 ("Q. Did you receive any training about giving your personal contact information to victims? A. It's frowned upon.")
[72] Ex. H (Barnes 30(b)(6) Dep.) at 68:8-22 ("Q. If officers don't know that that's a red flag, that would be a training issue, agreed? . . .  The Witness: I don't necessarily know if it would be a training issue. I mean, I guess it could be. It certainly could be a training issue. It could be a whole host of other issues, but I think a training issue would definitely -- would definitely come into play.")
[73] Ex. A (Vicknair Dep.) at 17:16-24.
[74] *Id*. at 19:10-17.
[75] *Id*. at 19:4-7.

- No training about "whether it was permissible to have sex with people you met in your role as an officer"[76];

- No training about "how to interact with child sexual abuse victims"[77]; and

- No training about "whether it's okay to share your personal contact information with a child sex abuse victim."[78]

Superintendent Kirkpatrick agreed in testimony that it is important for NOPD to have training on these items, both to train officers how to avoid scenarios in which an officer might take advantage of their role as an officer with someone for sex, and also training for officers to identify and report the red flags they see in other officers.

On these facts, a reasonable jury could conclude that Defendants' training procedures were inadequate; that Defendants were deliberately indifferent in adopting their training; and that some or all of Vicknair's conduct towards G.H. could have been prevented if officers were trained to spot and report the obvious red flags from the beginning.

4. <u>Defendants' retention of Vicknair was improper when they kept him on the force even after he used his authority to act "inappropriately" with a woman.</u>

A municipality can be "held liable for decisions about hiring and retention if [the plaintiff] can demonstrate 'deliberate indifference' to the 'known or obvious consequence[s]' of such decisions."[79] To show deliberate indifference, the connection between the background of the individual and the specific violation must be sufficiently strong to show that the retained officer was highly likely to inflict the particular type of injury the plaintiff suffered.[80]

Here, Vicknair joined NOPD in 2007. Soon thereafter, he engaged in actions that caused a series of complaints, including complaints in 2008, 2009, 2010, 2011, 2014, and 2016. The 2009 incident was particularly relevant here. On May 19, 2009, at approximately 8:15 p.m., Officer

---

[76] *Id*. at 19:19-21.
[77] *Id*. at 20:5-7.
[78] *Id*. at 20:9-13.
[79] *Gomez v. Galman*, 18 F.4th 769, 778 (5th Cir. 2021)
[80] *Id.*

Rodney Vicknair sat in his police vehicle watching a woman in a grocery store parking lot.[81] Vicknair used his authority as an officer to look up the woman's vehicle license plate to retrieve her personal information, so that he could summon her by name to his police vehicle.[82]

NOPD concluded that Vicknair had "acted inappropriately" towards the woman,[83] and that he had falsified paperwork regarding his physical location during incident.[84]  But NOPD's discipline was extremely light – just a five-day suspension.[85] Instead of taking the issue seriously, NOPD promoted Vicknair to be a Field Training Officer, part of a small cadre of officers who are specially selected to be "role models" for new recruits.[86]

A reasonable jury could see the incident for the warning light it was: an officer who was willing to use the authority and power of his office to create the opportunity for inappropriate actions with members of the opposite sex. And that reasonable jury could conclude that Defendants choices to retain Vicknair on the force and promote him as a role model would make it highly likely that Vicknair would repeat the conduct in the future. The motion should be denied.

C. **Defendants' motion should be denied with regard to their own negligence because their 30(b)(6) witnesses admitted that Defendants did what they should not have done with regard to hiring, training, and supervision.**

As Defendants note, a "claim against an employer for the torts of an employee based on the employer's alleged direct negligence in hiring, retaining, or supervising the employee generally is governed by the same duty-risk analysis" used in Louisiana for negligence claims.[87] That analysis is: (1) duty; (2) breach of duty; (3) cause-in-fact; (4) scope of liability or scope of protection; and (5) damages.[88]

---

[81] R. Doc. 1-6.
[82] *Id.*
[83] *Id.* at 2.
[84] *Id.* at 2.
[85] *Id.* at 5.
[86] Ex. H (Barnes 30(b)(6) Dep.) at 46:8-47:14 (agreeing that FTOs are "a role model police officer that NOPD has selected to train recruits").
[87] R. Doc. 126-1 at 16, *citing Kelley v. Dyson*, 10 So. 3d 283, 287 (La. App. 5 Cir. 2009).
[88] *Id.*

Here, a reasonable jury could conclude that Defendants were negligent given that Defendants' 30(b)(6) representatives all but admitted negligence. 30(b)(6) witness Sgt. Barnes testified that NOPD should not hire "habitual offenders," but Defendants did hire Vicknair even though he met their definition of a habitual offender. 30(b)(6) witness Lt. Powell said that a misdemeanor conviction like Vicknair's would be an "automatic exclusion" and disqualifying for hiring[89] – but Defendants hired Vicknair anyway. A jury could easily find that to be negligent.

So too with training. Defendants' 30(b)(6) witness Sgt. Barnes testified that it "certainly could be a training issue" if officers were failing to report obvious red flags like an officer showing an underage sex crime victim "modeling photos" or giving her his number.[90] But that is exactly what happened.[91] Given Barnes' testimony, a jury could easily find that to be negligent.

So too with the final days before Vicknair's arrest.  Defendants' 30(b)(6) witness Capt. Banks testified that once NOPD had developed probable cause to arrest Vicknair, "to leave him on the street with allegations of this sort would be improper."[92] But Defendants left Vicknair on the street for four days after they had probable cause for malfeasance in office, during which time Vicknair raped G.H. a final time. They did not even assign "someone to ride along with Rodney Vicknair while he was investigated," even though they "could have."[93] A jury could easily find that to be negligent. The motion should be denied.

[89] R. Doc. 126-7 (Dep. of 30(b)(6) witness Powell) at 27:11-21.
[90] Ex. H (Barnes 30(b)(6) Dep.) at 68:8-22 ("Q. If officers don't know that that's a red flag, that would be a training issue, agreed? . . .  The Witness: I don't necessarily know if it would be a training issue. I mean, I guess it could be. It certainly could be a training issue. It could be a whole host of other issues, but I think a training issue would definitely -- would definitely come into play.")
[91] Ex. I (Carkum Dep.) at 31:16-19.
[92] Ex. B (Banks 30(B)(6)) at 44:21-45:2.
[93] *Id*. at 44:17-22.

D. **Defendants' motion should be denied with regard to *respondeat superior* because Defendants ignore the well-developed case law regarding law enforcement vicarious liability.**

Defendants argue that *respondeat superior* for state law torts should not apply here because Vicknair's acts were "undertaken for his personal pleasure" and because one of the four sexual assaults was "after work, out of uniform, in his private vehicle." R. Doc. 126-1 at 17.

Neither argument holds any water. Defendants' "personal pleasure" argument completely fails to engage with Louisiana's law regarding *respondeat superior* for law enforcement torts, which has squarely rejected the "personal pleasure" theory. (It is notable that Defendants do not cite any cases regarding law enforcement at all.) For example, in *Latullas v. State*, the Louisiana First Circuit Court of Appeal held the State of Louisiana liable for a prison guard's rape of a prisoner while the guard was in charge of a prisoner work crew.[94] The court acknowledged that the rape was totally unauthorized and motivated by "personal desires."[95] The court nevertheless found vicarious liability because the rape occurred while the guard was "acting for his employer in the control and supervision of inmates, and it was through these duties that this opportunity arose."[96]

Similarly, in *Applewhite v. City of Baton Rouge*, the court held the City of Baton Rouge vicariously liable for a police officer's rape of a woman while he was performing duties for the city.[97] The key in *Applewhite* was that the officer "was able to separate the plaintiff from her companions because of the force and authority of the position which he held."[98] The *Applewhite* court summarized law as follows:

> In short, ... where it is found that a law enforcement officer has abused the "apparent authority" given such persons to act in the public interest, their employers have

---

[94] 658 So. 2d 800 (La. App.1st Cir. 1995).
[95] *Id*. at 804.
[96] *Id*. at 804-05.
[97] 380 So. 2d 119 (La. App. 1st Cir. 1979)
[98] *Id*.

been required to respond in damages.[99]

In sum: Louisiana courts hold law enforcement employees liable for officer torts when the opportunity for the torts arose from the course of employment, or when the officer abused their "apparent authority." The law on this is so clear that the Eastern District of Louisiana has granted summary judgment <u>to plaintiffs</u> against law enforcement employers when these criteria are met.[100] That is in part because "[t]he scope of risks attributable to an employer increases with the amount of authority and freedom of action granted to the servant in performing his assigned tasks," and law enforcement officers are given particular authority and freedom of action.[101]

Here, it is undisputed that the opportunity for Vicknair's torts against G.H. arose because of his role as an officer, and that he abused his authority in doing so. Defendants' own investigation concluded that it was "proved beyond a preponderance of evidence" that Vicknair "used his position as a public employee to befriend a 15-year-old victim after transporting her to Children's Hospital to have a sexual assault kit completed" and that Vicknair used that friendship to "sexually assault[] the victim."[102] Similarly, the City arrested and disciplined Vicknair for "malfeasance in office," which specifically "requires the offender to be acting in his official capacity and engaged in the performance of a duty, which is required by law, in order to support conviction."[103]

Furthermore, Defendants' argument that the last of the sexual assaults was "after work, out of uniform, in his private vehicle" ignores the fact that Vicknair assaulted G.H. <u>four times</u>.[104] In the first assault, which occurred in G.H.'s bedroom, G.H. recalled that Vicknair was carrying his police radio and that it was activated[105] – from which a jury could infer that he was in uniform and on duty. For the second assault, which involved penetration in G.H.'s living room, G.H. recalled

---

[99] *Applewhite*, *supra*, 380 So. 2d at 122.
[100] *See Doe v. Morris*, 2013 U.S. Dist. LEXIS 106545 (E.D. La. July 30, 2013).
[101] *Id*. (*quoting Richard v. Hall*, 874 So.2d at 139).
[102] R. Doc. 125-4 at 17.
[103] *State v. Hendry*, 996 So. 2d 352, 362 (La. App. 2nd 2008).
[104] Ex. C (G.H. Dep.) at 54:18-22.
[105] *Id*. at 25, 28-29.

that Vicknair was in uniform.[106] Vicknair similarly testified that for every time he visited G.H.'s

house, except the last time, he went "there as a police officer."[107]

Defendants' motion for summary judgment regarding *respondeat superior* should be

denied, and Plaintiff's granted.[108]

### E. Defendants' motion should be denied with regard to La. Civ. Code. 2315.3 because Vicknair solicited and obtained child pornography through his role as a NOPD officer.

Defendants argue that they should not be liable for punitive damages under La. Civ. Code

Art. 2315.3. That statute provides that:

> exemplary damages may be awarded upon proof that the injuries on which the
> action is based were caused by a wanton and reckless disregard for the rights and
> safety of the person through an act of pornography involving juveniles, as defined
> by R.S. 14:81.1, regardless of whether the defendant was prosecuted for his acts.

Defendants argue that "Plaintiff fails to offer any evidence that Defendants, themselves,

possessed pornography involving juveniles," and so should not be liable.[109] But of course a

corporate entity like the City of New Orleans cannot act on its own – it acts through its employees

and officers. And as described above, Vicknair's opportunity to solicit and possess child

pornography of G.H. occurred entirely through his role as an officer. While on duty he met G.H.,

gave her his phone number, told her she "could tell him things that she would not tell her mother,"

and showed her photos of a "scantily clad" woman.[110] He visited her approximately a dozen times

"as a police officer."[111] And Defendants themselves concluded that he "used his position as a

public employee to befriend" G.H. and commit the acts he did with her.[112] As a result, a reasonable

---

[106] *Id*. at 18, 24.
[107] Ex. A (Vicknair Dep.) at 28:17-9 ("Q. So you went over to her house about 12 or 13 times approximately, right? A. Yeah. Q. So you're saying that for all of them but one you went over there as a police officer? A. Correct.")
[108] Analysis of each of the *LeBrane* factors for vicarious liability is found in Plaintiff's Memorandum in Support of Partial Summary Judgment (R. Doc. 125-1) and incorporated by reference herein.
[109] R. Doc. 126-1 at 19.
[110] R. Doc. 125-4 at 5.
[111] Ex. A (Vicknair Dep.) at 28:17-9
[112] R. Doc. 125-4 at 17.

jury could conclude that Vicknair's solicitation and possession of child pornography was within the scope of his role as an officer – and therefore attributable to the City for Art. 2315.3 purposes.

The motion should be denied.

### III.    Conclusion

For the reasons detailed above, Defendants' Motion for Summary Judgment should be denied.

Respectfully submitted,

*/s/ William Most*
**WILLIAM MOST (La. Bar No. 36914)**
**HOPE PHELPS (La. Bar No. 37259)**
201 St. Charles Ave., Ste. 2500, #9685
New Orleans, LA 70170
Tel: (504) 509-5023
Email: williammost@gmail.com

***Counsel for Plaintiff, G.H.***