UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| RAYNE UPTON, individually and on behalf of her minor daughter, G.H.<br><br>    Plaintiff,<br> v.<br><br>RODNEY VICKNAIR, SHAUN FERGUSON, THE CITY OF NEW ORLEANS; DOE DISTRICT COMMANDER; DOES 1 to 10; and XYZ INSURANCE COMPANIES 1 to 10,<br><br>    Defendants. | Docket No. 2:21-cv-407<br><br>JUDGE: CARL BARBIER<br><br>MAGISTRATE: KAREN WELLS ROBY |

**Plaintiff's Response to Defendants' Material Facts**

Plaintiff adds the following material facts to Defendants' material facts:

| No. | Plaintiff's Material Fact | Defendants' Response |
|---|---|---|
| 1 | When the City hired Vicknair, it was aware that Vicknair had a criminal history that included five arrests or convictions for:<br><br>• two counts criminal damage to property;<br>• two counts illegal use of a weapon;<br>• one count of simple burglary;<br>• one count of simple battery on a juvenile;<br>• one count of disturbing the peace;<br>• one count of simple battery; and<br>• one count of aggravated assault.[1] | |
| 2 | When the City hired Vicknair, Vicknair met the NOPD definition of a "habitual offender."[2] | |
| 3 | Officer Rodney Vicknair met G.H. through his role as an NOPD officer.[3] | |

---

[1] Ex. A at 21 ("Even if one of your prior arrests or convictions doesn't show up in the written records, you told NOPD verbally about it during that stress test; is that right? A. Yes.").

[2] NOPD Operations Manual Ch. 41.8 (available online here) (defining "habitual offender" as any "person with a criminal history of two or more felony convictions or five or more felony or misdemeanor arrests for any offense."); see Ex. H (30(B)(6) Witness Barnes Dep.) at 27:9-14 (NOPD def. of "habitual offender")

[3] R. Doc. 125-4 (NOPD Investigatory Report) at 1-5; R. Doc. 125-5 (Vicknair Dep.) at 25:17-22; 57:3-11.

1

| | | |
|---|---|---|
| 4 | Over the next four months, Officer Vicknair's "act[ed] in his capacity as a police officer to facilitate his conduct to gain [G.H.]'s trust."[4] | |
| 5 | NOPD concluded that Sgt. Lawrence Jones "proved that beyond a preponderance of evidence… Officer Rodney Vicknair used his position as a public employee to befriend a 15-year-old victim after transporting her to Children's Hospital to have a sexual assault kit completed."[5] | |
| 6 | Vicknair sexually assaulted G.H. four times.[6] | |
| 7 | Vicknair sexually assaulted G.H. at least two times in uniform.[7] | |
| 8 | NOPD provided no training to officers to report what Defendants concede were major "red flags," like Vicknair showing G.H. modeling photos or giving her his cell phone number.[8] | |
| 9 | On September 18, 2020, the City identified a NOPD officer's conduct towards G.H. as a source of danger.[9] | |
| 10 | NOPD had probable cause to arrest Rodney Vicknair on September 21, 2020.[10] | |
| 11 | NOPD waited until September 25, 2020 to arrest Rodney Vicknair. | |
| 12 | Vicknair's last sexual assault of G.H. occurred on September 23, 2020. | |

---

[4] R. Doc. 87-3, p. 1; R. Doc. 125-5, p. 59:5-15.

[5] R. Doc. 125-4, p. 17.

[6] Ex. C (G.H. Dep.) at 54:18-22 ("Q. And earlier you mentioned that there was four times during the summer of 2020 and September 20 of 2020 that Rodney Vicknair sexually assaulted you. Do you remember all that? A. Yes.")

[7] During the first sexual assault, G.H. could hear Vicknair's police radio. Ex. C at 28:14-29:4. During the second sexual assault, G.H. testified that Vicknair was "dressed in uniform." *Id*. at 18:16-18.

[8] In testimony, Carkum could not identify any training to recognize red flags like this, other than to say it is "frowned upon." Ex. I at 31:12-15 ("Q. Did you receive any training about giving your personal contact information to victims? A. It's frowned upon.")

[9] Ex. G (G.H. and her mother had reported inappropriate behavior by Vicknair to G.H.'s licensed clinical social worker, whose supervisor then contacted a branch of the City government, the Office of the Independent Police Monitor. The City recognized this immediately as a safety issue, given that "IPM expressed wanting to engage in safety planning and address safety for the family.")

[10] Ex. B (30(b)(6) Witness Precious Banks Dep.) at 17:7-13 ("Q. After taking the statement from the child's mother and seeing the photograph, did NOPD have probable cause to arrest Vicknair? . . The Witness: Yes."); *id*. at 13:5-15:18 (the statement and photograph were provided on September 21, 2020).

Plaintiff offers this response to Defendants' statement of material facts (R. Doc. 126-3):

| No. | Defendants' Material Fact | Plaintiff's Response |
|---|---|---|
| 1 | NOPD has never had a policy that established, condoned, ratified or encouraged sexual violence against women or children. | Undisputed that NOPD has never had a written policy to that effect. |
| 2 | From 2007 to September 25, 2020, Mr. Vicknair worked for the New Orleans Police Department ("NOPD") as a police officer. | Undisputed. |
| 3 | Prior to being employed, Mr. Vicknair submitted an application and underwent a rigorous background check. | Undisputed that he submitted an application and underwent a background check.<br><br>If Defendants mean "rigorous" to mean that the background check revealed Vicknair's five arrests and status as a habitual offender, that is undisputed. |
| 4 | Nothing in Mr. Vicknair's background check indicated that Mr. Vicknair had committed any act of sexual assault upon a child or woman, which would have automatically caused him to be rejected. | Undisputed. |
| 5 | Mr. Vicknair had a previous charge of simple battery on his record, which was expunged; NOPD considered this charge and approved Mr. Vicknair's hire. | Undisputed that that simple battery was one element of Vicknair's criminal history. |
| 6 | During his tenure at NOPD, Mr. Vicknair received annual training on child abuse and child abuse investigations, sexual assault and investigations, and community policing. | Undisputed. |
| 7 | NOPD has policies and regulations concerning response to and investigation of sexual crimes. | Undisputed. |
| 8 | All NOPD officers receive annual training concerning response to and investigation of sexual crimes. | Undisputed. |
| 9 | During his tenure with the NOPD, Mr. Vicknair undertook an additional 40 hour training regarding crisis intervention that resulted in his receiving a certification in crisis intervention | Undisputed. |
| 10 | During his tenure with the NOPD, Mr. Vicknair undertook an additional 40 hour training curriculum and additional supervisory evaluation that resulted in | Undisputed. |

| | | |
|---|---|---|
| | his becoming qualified to be designated as a field training officer. | |
| 11 | Mr. Vicknair's discipline history does not include any allegations of sexual misconduct. | Undisputed. |
| 12 | NOPD had no notice that Mr. Vicknair was a risk to sexually assault a minor or a woman. | **Disputed**. Vicknair disclosed his criminal history to NOPD, which included his conviction for battery on a minor.<br><br>Also, NOPD officers watched as Mr. Vicknair showed "modeling photos" to G.H., talked to her about "[il]icit photos," and gave her his personal cell phone number,[11] both of which Defendants concede are serious "red flags."[12]<br><br>NOPD officers listened as Vicknair asked to "remain in contact with her to assist and to try to lead her down the right direction,"[13] even though patrol deputies are only supposed to have "very limited interaction" with a child sex crime victim after handing off to the child abuse unit.[14] |
| 13 | On May 26, 2020, Mr. Vicknair and two other NOPD officers responded to a call at G.H.'s residence because G.H., a 14 year-old girl, had been sexually assaulted by a 17 year-old male overnight visitor to G.H.'s residence. | Undisputed. |
| 14 | As part of that call, Mr. Vicknair and his partner, also an NOPD officer, transported G.H. and her mother to Children's Hospital for an interview and evaluation. | Undisputed. |
| 15 | Over the next four months, unbeknownst to NOPD, Mr. Vicknair developed an inappropriate relationship with G.H. | **Disputed.** Mr. Vicknair's relationship with G.H. was inappropriate from the very beginning.<br><br>NOPD officers watched as Mr. Vicknair showed "modeling photos" to G.H. and gave her his |

---

[11] Ex. I (Carkum Dep.) at 23:5-7 ("[il]icit photos"), 26:21-27:13 (witnessed Vicknair showing G.H. modeling photos that he "allowed"); 25:11-13 ("Q. And you witnessed Officer Vicknair give the victim his telephone number? A. Yes, ma'am.")

[12] *See* Ex. H (Barnes 30(b)(6) Dep) at 67:11-69:3 ("I would agree that it would definitely be a red flag" for "a patrol officer to give his personal phone number to a minor sex crime victim"); R. Doc. 125-4 (PIB Report) ("it was clearly outside of Officer Vicknair sco[pe] of professionalism to show a teen sexual assault victim scantily clad photos while sitting in the emergency room waiting to have a sexual assault examination.")

[13] Ex. I at 25:20-24.

[14] Ex. H (Barnes Dep.) at 66:13-15.

4

|    |    |    |
|----|----|----|
|    |    | personal cell phone number, both of which Defendants concede are serious "red flags." NOPD officers listened as Vicknair asked to "remain in contact with her to assist and to try to lead her down the right direction," even though patrol deputies are only supposed to have "very limited interaction" with a child sex crime victim after handing off to the child abuse unit. |
| 16 | Mr. Vicknair's relationship with G.H. entailed social media and telephone communications of a sexual nature, G.H.'s transmittal of sexual pictures to Mr. Vicknair's telephone, and visits, both while he was on-duty and off-duty, to G.H.'s residence at various times, while G.H.'s mother was present or nearby. | Undisputed. |
| 17 | On September 21, 2020, G.H.'s counselor relayed to NOPD concerns of G.H.'s mother regarding Mr. Vicknair's relationship with G.H. | Undisputed. |
| 18 | On September 21, 2020, G.H.'s mother met with Lieutenant Lawrence Jones of the NOPD's Public Integrity Bureau, that three incidents regarding Mr. Vicknair concerned her: (1) Mr. Vicknair shouted "nice ass" at G.H. while she was jogging; (2) Mr. Vicknair showed up at G.H.'s residence unannounced at night, entered G.H.'s bedroom with the mother, and stared at G.H.'s breast when G.H. was awakened; and (3) Mr. Vicknair took a picture with G.H in which he was hugging G.H. from behind. | Undisputed. |
| 19 | On September 23, 2020, Mr. Vicknair sexually assaulted Plaintiff. | Undisputed. |
| 20 | The September 23, 2020, assault occurred soon after 11:00 p.m., after Mr. Vicknair's workday ended, while Mr. Vicknair was out of uniform, in Mr. Vicknair's personal vehicle. | **Disputed**. The vehicle was personal in the sense that Vicknair owned the title, but it had the appearance of an official vehicle: it had NOPD floormats[15] and a NOPD placard in the front window so that Vicknair could use it for police business like parking at the courthouse.[16] Vicknair was out of uniform, but had his bulletproof vest hanging on seat.[17] |

---

[15] Ex. C (G.H. Dep.) at 227:6-22.
[16] Ex. A (Vicknair Dep.) at 29:8-18.
[17] Ex. A (Vicknair Dep.) at 31:8-20.

5

| | | |
|---|---|---|
| 21 | On September 23, 2020, when he sexually assaulted Plaintiff, he was not conducting any NOPD business or exercising any NOPD duties | Undisputed. |
| 22 | At the time Mr. Vicknair encountered G.H. on the night of September 23, 2020, Vicknair was off-duty, out of uniform, and had driven his personal vehicle to G.H's residence. | **Disputed**. The vehicle was personal in the sense that Vicknair owned the title, but it had the appearance of an official vehicle: it had NOPD floormats[18] and a NOPD placard in the front window so that Vicknair could use it for police business like parking at the courthouse.[19] Vicknair was out of uniform, but had his bulletproof vest hanging on seat.[20] |
| 23 | G.H. reported Mr. Vicknair's actions to NOPD on Friday September 25, 2020. In a forensic interview at Children's Hospital on that date, G.H. reported that Mr. Vicknair put his finger inside her vagina twice while she was in Mr. Vicknair's truck. | Undisputed. |
| 24 | On September 25, 2020, G.H. reported to law enforcement that Mr. Vicknair sexually assaulted her only once, on September 23, 2020. | Undisputed. On further questioning, however, she disclosed four times that Vicknair had sexually assaulted her.[21] |
| 25 | At the time Mr. Vicknair encountered G.H. on the night of September 23, 2020, Vicknair was off-duty, out of uniform, and had driven his personal vehicle to G.H's residence | **Disputed**. The vehicle was personal in the sense that Vicknair owned the title, but it had the appearance of an official vehicle: it had NOPD floormats[22] and a NOPD placard in the front window so that Vicknair could use it for police business like parking at the courthouse.[23] Vicknair was out of uniform, but had his bulletproof vest hanging on seat.[24] |
| 26 | G.H. reported Mr. Vicknair's actions to NOPD on Friday September 25, 2020. | Undisputed |
| 27 | After NOPD received the report of Mr. Vicknair's alleged sexual assault, on Friday, September 25, 2020, Vicknair was interviewed by NOPD, arrested, and suspended from employment. | Undisputed |
| 28 | Mr. Vicknair resigned from NOPD effective January 13, 2021. | Undisputed |

---

[18] Ex. C (G.H. Dep.) at 227:6-22.
[19] Ex. A (Vicknair Dep.) at 29:8-18.
[20] Ex. A (Vicknair Dep.) at 31:8-20.
[21] Ex. C (G.H. Dep.) at 54:18-22
[22] Ex. C (G.H. Dep.) at 227:6-22.
[23] Ex. A (Vicknair Dep.) at 29:8-18.
[24] Ex. A (Vicknair Dep.) at 31:8-20.

Respectfully submitted,

*/s/ William Most*
**WILLIAM MOST (La. Bar No. 36914)**
**HOPE PHELPS (La. Bar No. 37259)**
201 St. Charles Ave., Ste. 2500, #9685
New Orleans, LA 70170
Tel: (504) 509-5023
Email: williammost@gmail.com

*Counsel for Plaintiff, G.H.*