UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


RAYNE UPTON, individually and          DOCKET NO.
On behalf of her minor
Daughter, G.H.                         2:21-cv-407

          Plaintiff,                   JUDGE BARBIER

                                       MAG. ROBY

VERSUS

RODNEY VICKNAIR, SHAUN FERGUSON,
THE CITY OF NEW ORLEANS; DOE
DISTRICT COMMANDER; DOES 1 TO 10;
and XYZ INSURANCE COMPANIES 1 TO 10,

          Defendants.




          DEPOSITION OF RODNEY PAUL VICKNAIR,

given in the above-entitled cause, pursuant to the

following stipulation, before Sandra P. DiFebbo,

Certified Shorthand Reporter, in and for the State

of Louisiana, at Guste, Barnett, Schlesinger &

Alpaugh, LLP, 639 Loyola Avenue, Suite 2130, New

Orleans, Louisiana, on the 9th day of June, 2023,

commencing at 12:10 PM.

EXHIBIT A

```
 1    APPEARANCES:

 2

 3              MOST & ASSOCIATES
                BY: WILLIAM MOST,
 4              ATTORNEY AT LAW -and-
                HOPE PHELPS, ATTORNEY AT LAW
 5              201 St. Charles Avenue
                Suite 114, #101
 6              New Orleans,Louisiana  70170
                Representing the Plaintiff
 7

 8              CITY OF NEW ORLEANS
                LAW DEPARTMENT
 9              BY:  JAMES ROQUEMORE,
                ASSISTANT CITY ATTORNEY -and-
10              RENE GOUDEAU, ASSISTANT CITY ATTORNEY
                1300 Perdido Street
11              Suite 5E03
                New Orleans, Louisiana  70112
12              Representing the City of New Orleans AND
                NOPD
13

14              GUSTE, BARNETT, SCHLESINGER & ALPAUGH
                BY:  C. THEODORE ALPAUGH, III,
15              ATTORNEY AT LAW
                639 Loyola Avenue
16              Suite 2130
                New Orleans, Louisiana  70113
17              Representing Rodney Vicknair

18

19

20    Reported By:

21

22              Sandra P. DiFebbo
                Certified Shorthand Reporter
23              State of Louisiana

24

25
```

1          S T I P U L A T I O N

2

3              It is stipulated and agreed by and

4    among counsel for the parties hereto that the

5    deposition of RODNEY PAUL VICKNAIR, is hereby being

6    taken pursuant to the Federal Rules of Civil

7    Procedure for all purposes and to preserve

8    testimony in accordance with law;

9              That the formalities of reading and

10   signing are specifically waived;

11             That the formalities of sealing,

12   certification, and filing are hereby specifically

13   waived.

14             That all objections, save those as to

15   the form of the question and responsiveness of the

16   answer are hereby reserved until such time as this

17   deposition or any part thereof is used or sought to

18   be used in evidence.

19                    * * * * *

20             Sandra P. DiFebbo, Certified Shorthand

21   Reporter, in and for the State of Louisiana,

22   officiated in administering the oath to the

23   witness.

24

25

```
1              MR. ROQUEMORE:
2                   Objection, form.
3              MR. ALPAUGH:
4                   You can go ahead and answer.
5     BY MR. MOST:
6         Q.   Generally, if someone makes an objection,
7     they are doing it for the record, and then you can
8     answer the question, unless your attorney tells you
9     not to, and then that objection will be on the
10    record.  That's how it works.
11             THE WITNESS:
12                  I'm good?
13             MR. ALPAUGH:
14                  Yeah.  Go ahead.
15             THE WITNESS:
16                  Okay.  We received training on how
17                to interact with the public as far as,
18                you know, general interaction but not
19                specifically on, you know, underage
20                people or anything like that.  We had
21                -- you know, we had -- when we had our
22                classes, our inservice on responding to
23                certain type of calls, we had training
24                on that, but that was it.
25    BY MR. MOST:
```

1           but I don't know anybody that has done

2           that, so.

3    BY MR. MOST:

4       Q.   Did you receive any training from NOPD

5    about how to avoid a situation in which an officer

6    might take advantage of their role as an officer

7    with someone of the opposite sex?

8       A.   Not that I can remember.  Not specific

9    training on it.

10      Q.   Did you receive any training from NOPD

11   about whether it was permissible or impermissible

12   to date people that you met through your role as an

13   officer?

14            MR. ROQUEMORE:

15               Objection, form.

16            THE WITNESS:

17               No, sir.

18   BY MR. MOST:

19      Q.   Did you receive any training or guidance

20   from NOPD about whether it was permissible to have

21   sex with people you met in your role as an officer?

22      A.   No, sir.

23      Q.   Did you receive any guidance from NOPD

24   about whether that would violate NOPD policies?

25      A.   No, sir.

 1        Q.   By that I mean having sex with someone
 2   you met through your role as an officer.  Is that
 3   what you understood?
 4        A.   Yes.
 5        Q.   Did you receive any training from NOPD
 6   about how to interact with child sexual abuse
 7   victims?
 8        A.   No, sir.
 9        Q.   Did you receive any training or guidance
10   from NOPD about whether it's okay to share your
11   personal contact information with a child sex abuse
12   victim?
13        A.   No, sir.
14        Q.   You've been arrested more than one time,
15   agreed?
16        A.   Yes.
17        Q.   You had been arrested one or more times
18   before you became an NOPD officer, right?
19        A.   Yes.
20        Q.   In the course of applying to be an NOPD
21   officer, did you have to tell NOPD about your prior
22   arrests and convictions?
23        A.   Yes.  As far as I remember I did.
24        Q.   Did you tell NOPD about your prior
25   arrests and convictions when you applied to be an

1    NOPD officer?

2         A.   I'm pretty sure I did, because I knew

3    they would do a background check.

4         Q.   Did you tell them that in writing or

5    verbally or both?

6         A.   I think it was on the -- I think it was

7    verbally, when they did what they call that -- not

8    the lie detector test, the stress test, or

9    whatever.  That one.

10        Q.   Even if one of your prior arrests or

11   convictions doesn't show up in the written records,

12   you told NOPD verbally about it during that stress

13   test; is that right?

14        A.   Yes.

15        Q.   I'm going to mark as Exhibit D this

16   document I'm handing to you, Mr. Vicknair.  Can you

17   read this document?  Can you see it?

18        A.   Yes.

19        Q.   Is this about a -- see on the other side

20   -- do you see that this is about a simple battery

21   on a juvenile in Ascension Parish?

22        A.   Yep.

23        Q.   Was this something you were arrested for?

24        A.   I think I was given like a summons or

25   something.  I don't remember.  I don't think I was

```
 1        A.   No.  I told her we're not allowed to do
 2   that.
 3        Q.   Do you know where Bernice lives now?
 4        A.   As far as I know, somewhere in Louisiana.
 5   North Louisiana.
 6        Q.   Do you know her last name now?
 7        A.   Unless she got divorced and went back to
 8   her maiden name, Duncan, maybe.  Rene Duncan.  I
 9   never called her Bernice.  Her name was always
10   Rene.
11        Q.   What was her maiden name?
12        A.   Moreau.
13        Q.   M-O-R-E-A-U?
14        A.   Yes.
15        Q.   Do you know who ███   H███    is?
16        A.   Yes.
17        Q.   You first met G███  H███    in your role
18   as an NOPD officer, right?
19        A.   Right.
20        Q.   You first met her and took her to the
21   hospital?
22        A.   Correct.
23        Q.   And after you first met her, in the
24   months thereafter, you would sometimes go to her
25   house in your police vehicle, right?
```

 1   weed on her.  So I said okay.  So I did, and I told

 2   her, I said, "No.  You don't smell like weed.  All

 3   I'm smelling is just the outside, and it smells

 4   like you've been sweating."  And she said they had

 5   been dancing or something, and I said, "If your mom

 6   is asleep on the couch, just go in and go take a

 7   shower and leave your mom alone.  Don't worry about

 8   it," and that was the last time.

 9        Q.   So I think you told investigators that

10   you went over to ███  ███ s about 12 or 13

11   times; is that right?

12        A.   That is both police-wise -- because I

13   responded to maybe ten, 11 calls over there.

14        Q.   So you went over to her house about 12 or

15   13 times approximately, right?

16        A.   Yeah.

17        Q.   So you're saying that for all of them but

18   one you went over there as a police officer?

19        A.   Correct.

20        Q.   And then you are saying the final time

21   was as a friend?

22        A.   Yes.

23        Q.   The vehicle that you went over to G███

24   H███ s house the final time, which vehicle was

25   that?

1    A.    That was my personal vehicle, the gray

2    Tundra.

3    Q.    Do you have any NOPD symbols in that

4    truck, like floor mats or anything else?

5    A.    No.  The only NOPD symbol I had was the

6    placard that we put on our dash to park around the

7    station.  That was it.

8    Q.    So in this truck that you went in the

9    final time, you had an NOPD placard in the front

10   window?

11   A.    Yes.

12   Q.    And that indicates that you can park that

13   car in NOPD officer parking areas?

14   A.    At our station, yeah.

15   Q.    If you need to go to the courthouse in

16   that vehicle, can you park in law enforcement

17   officer parking?

18   A.    Yes.

19   Q.    Did you sometimes use that vehicle to go

20   to the courthouse or to the station?

21   A.    Yeah.  I've used it when I had to go to

22   court.

23   Q.    Any other NOPD symbols or indications on

24   that truck?

25   A.    No.

 1          A.    Because it gets too hot.  It's too bulky
 2    to wear all the time.  I just took it off and threw
 3    it on the back seat.
 4          Q.    Because sometimes you do police work in
 5    that Tundra?
 6          A.    No.  We're not allowed to do police work
 7    in it.
 8          Q.    When did you take off the bulletproof
 9    vest and put it in the Tundra?
10          A.    When I left work that night.  Before I
11    left the station parking lot.
12          Q.    So you left your NOPD vehicle.  You went
13    to your Tundra, and you took off the bulletproof
14    vest?
15          A.    No.  I left the NOPD vehicle.  The NOPD
16    vehicle.  I'm sorry.  Went upstairs and made sure
17    all my paperwork was turned in, cleared it with the
18    supervisor that I could leave, then went to the
19    sallyport and took the vest off, threw it in the
20    back seat, and got in my truck and left.
21          Q.    At what point did you take off your
22    uniform?
23          A.    The what?
24          Q.    So you left your police vehicle.  You
25    went inside, did your paperwork, left through the

```
 1    put me in the paper.
 2        Q.   NOPD knew about how you were a community-
 3    oriented officer, right?
 4        A.   Uh-huh.
 5        Q.   And NOPD knew about how you were
 6    interacting with members of the community and
 7    making friends whether they were adults or under-
 8    age girls, right?
 9        A.   Yes.
10        Q.   And NOPD approved of you making
11    friendships with adults and with underage girls,
12    agreed?
13            MR. ROQUEMORE:
14                Objection, form, foundation.
15            THE WITNESS:
16                I'm not going to say they approved.
17            They never -- I was never told anything
18                about it, so.
19    BY MR. MOST:
20        Q.   But they knew about it, and they didn't
21    tell you not to do it, agreed?
22        A.   Correct.
23        Q.   And so you would talk to other officers
24    about your role in making friends with adults and
25    underage girls, right?
```

```
 1        Q.   Uh-huh.
 2        A.   I don't think so.
 3        Q.   When you first met  ████  ████   you went
 4   to her house and transported her to the hospital,
 5   right?
 6        A.   Yes, sir.
 7        Q.   Were you assigned to answer that call for
 8   service by NOPD or did you hear it and volunteer to
 9   go?
10        A.   I believe I was assigned, because it was
11   in my sector.
12        Q.   Would we see that in the --
13        A.   Dispatch log.
14        Q.   Dispatch log.  Would they indicate that?
15        A.   Yes.
16        Q.   Your CIT training, did that involve
17   training for how to deal with victims of sexual
18   assault?
19        A.   No.  That was critical incident, like
20   suicidal, stuff like that.
21        Q.   Did you have special training for dealing
22   with victims of sexual assault?
23        A.   In our yearly inservice, we had sexual
24   assault victim training.
25        Q.   Did you tell G████  or her mother that you
```