UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


RAYNE UPTON, individually and on
behalf of her minor daughter,
G.H.                        DOCKET NO. 2:21-CV-407
        Plaintiff

V                              JUDGE: CARL BARBIER

RODNEY VICKNAIR, SHAUN FERGUSON
THE CITY OF NEW ORLEANS; DOE          MAGISTRATE: KAREN WELLS ROBY
DISTRICT COMMANDER; DOES 1 TO 10;
And XYZ INSURANCE COMPANIES 1 to 10,
        Defendants


      DEPOSITION OF CURTIS TATE CARKUM,

given in the above-entitled cause, pursuant to

the following stipulation, before Raynel E.

Schule, Certified Shorthand Reporter in and for

the State of Louisiana, at the Office of the

City Attorney, 1300 Perdido Street, City Hall -

Room 5E03, New Orleans, Louisiana, 70112,

commencing at 10:05 o'clock a.m., on Thursday,

the 18th day of January, 2023.

**EXHIBIT I**

3

```
1    APPEARANCES:

2
     For the Plaintiff:
3
     MOST & ASSOCIATES
4    Attorneys at Law
     BY:  HOPE PHELPS, ESQ.
5    201 St. Charles Avenue, Suite 2500  #9685
     New Orleans, Louisiana    70170
6
7    For the Defendants:

8    JIM ROQUEMORE, ESQ.
     Assistant City Attorney
9    1300 Perdido Street
     City Hall - Room 5E03
10   New Orleans, Louisiana  70112

11
12   Also Present:  Lydia Prislovsky

13
     Reported By:  Raynel E. Schule
14                 Certified Shorthand Reporter
                   State of Louisiana
15

16

17

18

19

20

21

22

23

24

25
```

```
 1                  S T I P U L A T I O N
 2              It is stipulated and agreed by and
 3     between Counsel for the parties hereto that the
 4     deposition of CURTIS TATE CARKUM, is hereby
 5     being taken pursuant to the Federal Rules of
 6     Civil Procedure for all purposes in accordance
 7     with law;
 8              That the formalities of reading and
 9     signing are specifically waived;
10              That the formalities of sealing,
11     certification, and filing are hereby
12     specifically waived.
13              That all objections, save those as to
14     the form of the question and responsiveness of
15     the answer, are hereby reserved until such time
16     as this deposition or any part thereof is used
17     or sought to be used in evidence.
18                      * * * * *
19              Raynel E. Schule, Certified
20     Shorthand Reporter in and for the State of
21     Louisiana, officiated in administering the oath
22     to the witness.
23
24
25
```

```
 1          crime detective was present?
 2     A.   That, I don't know.
 3     Q.   You rode with Officer Vicknair, the mother,
 4          and the victim to the hospital.  Is that
 5          right?
 6     A.   Correct.
 7     Q.   Who drove?
 8     A.   I'm pretty sure it was me.
 9     Q.   Okay.  How did you and Officer Vicknair end
10          up being the ones to transport the mother
11          and daughter to the hospital?
12     A.   Mainly because he had built a rapport with
13          the daughter.
14     Q.   So that was a decision between him and the
15          sex crime detective on who would transport?
16     A.   No.  So the sex crime detective was in an
17          unmarked unit, doesn't have a cage or
18          anything in it.  They would never transport
19          anybody.  It would have to been an uniform
20          officer.
21     Q.   What conversations happened during the car
22          ride?
23     A.   I think at this point, Officer Vicknair had
24          realized that he had built this rapport
25          with the girl, but there was also some
```

```
 1            concerning things that he heard.  So at
 2            this point, he started to talk to her about
 3            his daughter and how he didn't allow her to
 4            do certain things.
 5    Q.    And do you recall what those things were?
 6    A.    If I'm not mistaken, I recall it being,
 7            like, having to deal with elicit pictures.
 8    Q.    How did that topic come up?
 9    A.    The young lady was explaining to Officer
10            Vicknair how she would go on Bourbon
11            Street.  At that age, that's a little
12            weird, but also how she had a friend that
13            was older than I was at the time and that
14            they shared pictures with each other.
15    Q.    And what did Officer Vicknair say about
16            that other than mentioning his daughter?
17    A.    He was explaining to her why it wasn't a
18            good thing for her to do.
19    Q.    So do you think he was positioning himself
20            as sort of a father figure?
21                    MR. ROQUEMORE:
22                    Objection, form.
23                    THE WITNESS:
24                    I would say probably.
25    BY MS. PHELPS:
```

1       together?

2   A.    Yes.

3   Q.    Do you remember how they were positioned?

4   A.    No, I don't.

5   Q.    About how far away from them where they

6       were sitting were you?

7   A.    Maybe ten feet.

8   Q.    Could you overhear what -- what they were

9       saying?

10  A.    Some of it.

11  Q.    And you witnessed Officer Vicknair give the

12      victim his telephone number?

13  A.    Yes, ma'am.

14  Q.    And he gave her a card with his contact

15      information on it?

16  A.   I doubt it.  I don't think he had a card.

17      Most patrolman don't have cards.

18  Q.   So how did he give her his phone number?

19  A.   Verbally.

20  Q.    What did you overhear them talking about?

21  A.    From my recollection, I -- I recall him

22      asking the mom permission for him to remain

23      in contact with her to assist and to try to

24      lead her down the right direction.

25  Q.    Did he make reference to his crisis

```
 1          intervention training?
 2   A.    I can't remember.
 3   Q.    Did you see him showing them the pins that
 4          he had on his uniform?
 5   A.    That, I don't remember.
 6   Q.    And what do you mean, "lead her down the
 7          right path"?
 8   A.    So as I already said, she stated that she
 9          was speaking to a gentleman that was twice
10          her -- maybe three times her age at the
11          time.  She frequented Bourbon Street after
12          hours.  So trying to alleviate some of
13          those things.
14   Q.    And did Officer Vicknair represent anything
15          in particular that he was going to do to
16          help her out?
17   A.    Not -- not that I can remember.
18   Q.    But just maintain in contact via telephone.
19          Is that right?
20   A.    Yes.  I'm sorry.  Yes.
21   Q.    Did you see him show the victim or her
22          mother photos that were on his phone?
23   A.    Yes.
24   Q.    What were those photos of?
25   A.    His daughter.
```

1   Q.   Did those include photos of her in a
2        bikini?
3   A.   I didn't see the pictures.
4   Q.   What was he saying while he showed them
5        those photos?
6   A.   Part of the conversation in the car was
7        that his daughter was a model, and any
8        pictures that she took, she had to get his
9        approval before those pictures were
10       published.  So he then in turn was showing
11       them, these are the type of pictures that I
12       allow as opposed to these other pictures
13       that wouldn't be allowed.
14  Q.   So would you say he was positioning himself
15       as someone who could approve what photos
16       were appropriate and which ones weren't.
17                MR. ROQUEMORE:
18                Objection to form.
19                THE WITNESS:
20                No.
21  BY MS. PHELPS:
22  Q.   Does it sound right that you were in the
23       waiting room for close to a hour?
24  A.   I really don't remember.
25  Q.   Do you know what the sex crime detective

```
 1          start getting into the details of the
 2          incident, it's kind of hard to get those
 3          details repeated.  So in order to not have
 4          people repeating and reliving traumatic
 5          experiences, you kind of get the -- the
 6          most -- the least detailed account, and
 7          then you're able to pass it on so that the
 8          person that's actually going to investigate
 9          the case can get a more detailed account
10          without making somebody go through those
11          traumatic experience several times over and
12          over.
13   Q.    Did you receive any training about giving
14          your personal contact information to
15          victims?
16   A.    It's frowned upon.
17   Q.    After you saw Officer Vicknair give his
18          personal information to the victim in this
19          case, did you report that to anyone?
20   A.    No.
21   Q.    And did you not report that because you
22          didn't receive any training that you should
23          report that?
24   A.    It's not against policy to give your phone
25          number out; however, it is ethically not
```