**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CIVIL ACTION** |
| **VERSUS** | **NO. 12-1924** |
| **CITY OF NEW ORLEANS** | **SECTION: "E" (2)** |

<u>**OFFICE OF THE CONSENT DECREE MONITOR'S**</u>
<u>**SPECIAL REPORT ON NOPD SEXUAL ASSAULT INVESTIGATIONS**</u>

**EXHIBIT J**



**Special Report On NOPD Sexual Assault Investigations**

**7 July 2023**



## I.        Executive Summary

The Monitoring Team has lauded the progress of NOPD's special victims detectives in prior reports and court hearings. At the January 2019 court proceeding at Loyola New Orleans University School of Law, the Monitoring Team announced the Sexual Assault Investigations section of the Consent Decree was being moved "into the green," signifying that the Monitoring Team would spend less time focusing on that area due to the progress NOPD already had made. Since that time, the Monitoring Team has relied on NOPD's PSAB to conduct ongoing compliance audits, although we have checked in with the detectives periodically and spot checked the validity of the PSAB audits ourselves.

In August 2022, at a public hearing before Judge Morgan, the Monitoring Team and the Court expressed concern that we had seen evidence of backsliding in various areas of NOPD's compliance efforts. The Monitoring Team suggested that some of the backsliding we were seeing might be due to NOPD's ongoing staffing problems.

To assess NOPD's current state of compliance in the area of sexual assault ("SA") investigations, the Monitoring Team undertook several reviews over the past few months. These included an audit of SA investigations, an analysis of NOPD response times and its impact on SA calls, an assessment of SA caseloads, and an analysis of a third-party report critical of NOPD officers called the *Umbrella Report*.

Our analysis generally revealed some backsliding by NOPD as well as some reason to question the durability of the Department's prior achievements in this area. Specifically, as discussed in more detail below, we express concern with the high average caseloads of SA detectives, the declining clearance rates of the unit, and the high number of GOAs (gone on arrivals) on domestic violence calls. NOPD acknowledges it must take immediate actions to turn these negative trends around.

As the Monitoring Team has said frequently in Court and in our prior public reports, we continue to be impressed with the commitment, skill, and compassion of NOPD's SA detectives. But if NOPD continues to pile cases upon them, their investigations will suffer, and the New Orleans community will pay the price.

To NOPD's credit, it is not running away from the concerns identified in this Report. The Department responded to a draft of this report (which we are required to share with the Parties before filing per the terms of the Consent Decree) with a very thoughtful letter written by Lieutenant Sheila Celious of the Special Victims Division detailing NOPD's agreement with many of the Monitoring Team's findings, raising some useful clarifications with respect to others, and sharing elements of the Department's remedial action plan. The Monitoring Team has enjoyed a very constructive working relationship with Lt. Celious over the years, continues to be impressed by her commitment to improving the Special Victims Division, and thanks her for her constructive input. Many of her comments have been incorporated into the final draft of this Special Report.



## II.    Notes

"The Monitor shall be subject to the supervision and orders of the [United States District Court for the Eastern District of Louisiana], consistent with [the Consent Decree.  The Monitoring Team shall only have the duties, responsibilities, and authority conferred by [the Consent Decree.  The Monitoring Team shall not, and is not intended to, replace or assume the role and duties of the City and NOPD, including the Superintendent."

**Consent Decree Paragraph 455**

"NOPD agrees to respond to and investigate reports of sexual assault and domestic violence professionally, effectively, and in a manner free of gender-based bias, in accordance with the rights secured or protected by the Constitution and laws of the United States. NOPD agrees to appropriately classify and investigate reports of sexual assault and domestic violence, collaborate closely with the DA and community partners, including the NOFJC, and apply a victim-centered approach at every stage of its response."

**Consent Decree § IX**



### III.    Table of Contents

# Contents

I.    Executive Summary ................................................................................................ 2

II.    Notes .................................................................................................................... 3

III.    Table of Contents ................................................................................................ 4

IV.    Introduction ......................................................................................................... 5

V.    NOPD Response to Special Report ...................................................................... 9

VI.    Monitoring Team Findings ................................................................................. 10

   A.    SVD Detective Caseloads ............................................................................ 10

   B.    Quality of SVD Investigations ..................................................................... 12

   C.    Analysis of Umbrella Report Allegations .................................................... 13

     1.    Methodology ............................................................................................. 14

     2.    Findings ................................................................................................... 15

     3.    Conclusion ............................................................................................... 19

   D.    Declining NOPD SVD Clearance Rates ...................................................... 19

   E.    Impact of GOAs On Sexual Assault-Related Calls For Service ................... 20

VII.    Conclusion ......................................................................................................... 22

VIII.    Appendix A ....................................................................................................... 23

IX.    Appendix B ......................................................................................................... 25



Case 2:12-cv-01924-SM-DPC Document 735-11 Filed 07/18/24 Page 6 of 26

## IV.     Introduction

The NOPD's Special Victims Division ("SVD") has had a sordid history. In its 2011 investigation of the NOPD leading to the imposition of the Consent Decree, the U.S. DOJ found a troubling failure on the part of the NOPD to investigate crimes against women. Specifically, DOJ found the following:

> Inadequate policies and procedures, deficiencies in training, and extraordinary lapses in supervision have contributed to a systemic breakdown in NOPD handling of sexual assault investigations. NOPD has misclassified large numbers of possible sexual assaults, resulting in a sweeping failure to properly investigate many potential cases of rape, attempted rape, and other sex crimes. Additionally, in situations where the Department pursued sexual assault complaints, the investigations were seriously deficient, marked by poor victim interviewing skills, missing or inadequate documentation, and minimal efforts to contact witnesses or interrogate suspects. . . .[1]

This finding ultimately informed the terms of the Consent Decree, which required NOPD to

> respond to and investigate reports of sexual assault and domestic violence professionally, effectively, and in a manner free of gender-based bias, in accordance with the rights secured or protected by the Constitution and laws of the United States.[2]

NOPD further agreed to "appropriately classify and investigate reports of sexual assault and domestic violence, collaborate closely with the DA and community partners, including the NOFJC, and apply a victim-centered approach at every stage of its response."[3]

Two years after the outset of the Consent Decree, in November 2014, the New Orleans Inspector General issued a report identifying additional serious flaws in the NOPD SVD, including the following:

- Of 1,290 Item Numbers reviewed, only 179 (14%) contained supplemental reports documenting any additional investigative efforts beyond the initial report.

---

[1]       NOPD Findings Letter at 43 (3/16/2011).

[2]       Consent Decree at § IX.

[3]       Consent Decree at ¶54.



- Of 450 Item Numbers reviewed wherein initial reports were written or comments were made by the five detectives, 271 (60%) contained no supplemental reports documenting any investigative effort beyond the initial report.

- Five detectives, in 271 specific instances, either failed to provide documentation of investigative efforts or provided questionable documentation.

- NOPD supervisors failed to identify the problems concerning the documentation of investigative efforts by the five detectives for the three year period.[4]

Based on these findings, and others, the OIG observed that "[t]he widespread failure to submit supplemental reports as well as the discrepancies between reports and other factual documentation means there was no effective supervision of these five detectives over a 3-year period. Nor could there have been any effective supervision of the supervisors, nor any review of the outcome of the cases assigned to these five detectives." *Id.*

Following the publication of the OIG's 2014 report, the NOPD Special Victims Division worked hard to turn itself around. The Monitoring Team, in cooperation with the OIG, audited the SVD's work throughout this process.

In 2015, the *New Orleans Sexual Violence Response Advisory Committee* issued a public report offering a number of thoughtful recommendations to help remedy the shortcomings continuing to exist within NOPD's SVD at that time. These recommendations included, but were not limited to, the following:

- NOPD should provide better equipment to SVD detectives, including cars, phones, cameras, and laptops.[5]

- SVD detectives should maintain a caseload for both Sex Crimes and Child Abuse of approximately 26 cases per year.

- NOPD should hire more civilian investigators.

- NOPD should enhance incentive pay for SVD detectives to reduce turnover. [6]

---

[4]    *See* New Orleans OIG Report 13-0017-I (November 12, 2014).

[5]    According to NOPD, "in 2023, members of the SVD have received several brand-new desktop and laptop computers to use, SVD members have received departmental cell phones upon request via MSB, and SVD members received to Body Worn Cameras for recording purposes. Vehicles are slowly coming in as two detectives received brand new Dodge Chargers as take-Home Vehicles."

[6]    *See* Sexual Violence Response Advisory Committee Report (2022). With respect to incentive pay, NOPD has offered this helpful response: "On June 7, 2023, I [Lt. Celius] met with the *New Orleans Sexual Violence Response Advisory Committee,* among the topics of the agenda, was the status of enhance incentive pay for SVD detectives and supervisors. The committee agreed that movement must be made in this area. In 2022, while assigned



The Committee Report included a number of other recommendations as well, all designed to remedy the multitude of problems that had plagued the SVD for years.

Thanks to the hard work of NOPD officers and leaders, coupled with critical partnerships forged with community and advocacy groups, NOPD implemented a number of meaningful reforms over the next 12 months. While the road was a long and hard one, the Monitoring Team and the OIG announced in 2016 that the SVD had undergone a "remarkable turnaround."[7]

In April 2018, the Monitoring Team continued to applaud the reforms implemented by the SVD, and continued to recognize the professional response of SVD detectives (although, at the same time, we recognized an inconsistent response by patrol officers). As we noted in our public report at that time,

> NOPD continues to make progress toward compliance with Gender-Bias Free policing. The SVS unit continues to perform well. As we have reported previously, however, individual patrol officer response to sexual assault and domestic violence crimes continues to be uneven.[8]

We pointed out that "NOPD responded to our concern by taking prompt action to implement a corrective action plan."[9]

The Monitoring Team conducted additional audits and spot checks of the SVD over the next 12 months, with increasingly positive findings. Accordingly, in 2019, we recommended NOPD be put "into the green" with regard to its sexual assault investigations. *See* Loyola Proceeding PowerPoint (2019). In our January 2021 public proceeding (also hosted by Loyola New Orleans School of Law), we reaffirmed that NOPD still was "in the green" with respect to its sexual assault investigations.[10] Moving this area into the green allowed the Monitoring Team to spend less time auditing this area, instead relying on NOPD to conduct ongoing compliance audits.

---

as the [former] Chief of Detectives, Paul Noel informed the committee that…'it is nearly impossible to recruit district DIU personnel to leave their investigative unit where they receive the same detective's pay as SVD, have a guaranteed take-home car where some SVD detectives don't, investigating shopliftings with nowhere close to the outrageous caseload SVD detectives have. They should not be paid the same.' The committee will bring the incentive pay up to the New Orleans Police Department's Executive Staff and all other necessary departments prior to the upcoming budget hearing."

[7]       *See* New Orleans OIG Final Report (June 22, 2016); Monitoring Team Quarter Report (Sept. 26, 2016).

[8]       Monitoring Team Annual Report at 10 (4/10/18).

[9]       *Id*.

[10]      *See* Loyola Proceeding "Preparing for Sustainment" (March 23, 2001).



In April 2022, the New Orleans Sexual Violence Response Advisory Committee issued a public report expressing new concerns regarding several aspects of NOPD's SVD. Its report was prompted by a

> growing concern among NOPD representatives, advocates, and other stakeholders that the recommendations provided in 2015 had either not been fulfilled, had been implemented but still needed additional attention, or that conditions had reverted back to before the previous intervention.[11]

Among other things, the Committee concluded:

- SVD needs more updated equipment;

- Detectives have too high caseloads;

- The SVD needs to hire additional civilians;

- NOPD must focus on officer retention within SVD;

- New Orleans needs a proper crime lab;

- NOPD should work more closely with advocates;

- NOPD should increase SVD's budget; and

- NOPD should improve training for SVD staff.[12]

Since the Monitoring Team shared many of these concerns, we continued to offer technical assistance to help NOPD implement the Committee's recommendations and audit the impact of these recommendations.

In August 17, 2022, Judge Morgan held a public hearing at which the Monitoring Team expressed its own concerns that it was seeing backsliding in several areas of the Consent Decree likely due to NOPD's recruitment/retention problems. In response, the Court ordered the Monitoring Team to conduct additional spot checks, audits, and reviews in areas that may be affected by lack of personnel.[13] The Monitoring Team's efforts included conducting new audits of NOPD's SVD.

---

[11]     Committee Report at 2 (April 2022).

[12]     Committee Recommendations at 4.

[13]     *See* Court Order (8/17/22).



In November 2022, a group called the *Umbrella Coalition* published findings from a review it conducted of sexual assault and domestic violence cases by NOPD officers. According to the *Coalition's* report, there were 236 SA/DV complaints against 189 NOPD officers between 2014 and 2020. Based on this finding, the *Coalition* concluded "These records confirm what many quietly know: police routinely perpetrate a spectrum of sexual harm in our communities."[14] While "complaints," no matter how many, do not demonstrate one way or another whether sexual harm is being perpetrated, the report raised *allegations* that warranted further review.

The Monitoring Team, per the Court's August 2022 order, continued conducting reviews and spot checks of NOPD's SVD through late 2022 and early 2023.

On February 27, 2023, the Monitoring Team shared with NOPD a preliminary analysis of the impact of NOPD's staffing problems and NOPD's ability to respond adequately to calls for service, including sexual assault-related calls for service.[15] Among other things, the Monitoring Team observed a high number of *priority downgrades* (*i.e.*, downgrades from emergency Code 2 calls to non-emergency Code 1 calls), often due to the unavailability of officers to handle the call. We expressed great unease that such downgrades seemed to be disproportionately impacting domestic violence and rape calls for service.

In early March 2023, the Monitoring Team initiated an expanded review of NOPD's SVD. As part of this review, in early April, we met with several local victim advocates to hear their concerns about, among other things, insufficient case follow up in the NOPD's SVD. Additionally, these community advocates wanted to discuss their concerns that SVD detectives were being assigned caseloads well-beyond experts' recommended limits. In previous reports released by advocates, experts indicated detective caseloads should not exceed 26 cases, while NOPD SVD detectives currently can average as many as 89 assigned cases each.[16]

The Monitoring Team followed up on these initial conversations with an audit of randomly selected "Open" cases to determine whether these cases were being satisfactorily investigated and documented after the initial supplement, which normally occurs on the scene or during the initial report of the crime. The results of our audit are shared below.

## V.    NOPD Response to Special Report

As noted above, per the requirements of the Consent Decree, the Monitoring Team shares drafts of its reports with the Parties prior to filing with the Court. The NOPD's response to this Special Report, compiled primarily by NOPD SVD Lieutenant Sheila Celious, was quite

---

14      Umbrella Statement (Nov. 2022).

15      Our report, which was shared with NOPD on February 27, 2023, prompted a follow-on joint audit by the Monitoring Team and NOPD's PSAB. The Monitoring Team will share its findings with the public following completion of the joint audit.

16      Sexual Violence Response Advisory Committee Report at (2022).



constructive and candid. In short, NOPD agrees with many of the findings of the Monitoring Team, especially those relating to the past, current, and future impact of SVD staffing shortages. NOPD candidly concedes that " SVD detectives /supervisors are unfortunately placed in a position where they must constantly triage cases. It's impossible to conduct thorough, victim-centered, aggressive, and complete investigations with a closed disposition for every single case assigned to them without the proper manpower/caseload ratio."[17] The Monitoring Team fully agrees with the Department's recognition, which, frankly, is why we have continued to focus on recruitment, retention, civilianization, alternative police reporting, and other means of reducing the burden on NOPD officers for so long.

To NOPD's credit, recognizing there likely is no short-term fix for the ongoing staffing shortages, the SVD has taken meaningful steps to work through its current obstacles while delivering the best service possible under the circumstances to the New Orleans community. Where relevant, we have incorporated a discussion of these steps in the body of this Special Report.

## VI.    Monitoring Team Findings

### A.    SVD Detective Caseloads

The Monitoring Team met with several local victims advocates to hear their concerns about insufficient case follow-up in the NOPD's Special Victims Division. Among other things, the advocates complained that NOPD SVD detectives were being assigned caseloads well-



beyond experts' recommended limits. Previous reports released by advocates argued that detective caseloads should not exceed 26 cases, a number the Monitoring Team finds reasonable.[18] NOPD SVD detectives, however, can average as many as 89 assigned cases each.[19]

While, according to NOPD, caseloads currently are not as high as 89 cases per detective, the Department readily concedes they are too high. NOPD acknowledges that "this is a departmental wide issue. . . . As Sex Crimes and Child Abuse detectives continue to promote out the unit to the districts, resigned from the job, or transfer out, this unit is headed where the ratio of investigators will outnumber commissioned detectives and continue to place wholesome investigations in a constant triaged state." NOPD goes on to say, "At this time, it's impossible to get the 12-14 assigned Sex Crimes/Child Abuse

---

[17]    NOPD Response at 2

[18]    Sexual Violence Response Advisory Committee Report at (2022).

[19]    *Id*.



detectives to a 26 caseload per year. The current caseload range is (26-64) per each detective in the second week of June, with six months remaining."[20]

The excessive caseload problem has been an issue for the SVD since it initially was reported by the *New Orleans Sexual Assault Response Advisory Committee* in 2015.[21] Caseloads have remained consistently high over the many years of Monitoring Team reviews, a problem we have raised in multiple audit reports and meetings with NOPD leadership. While our audits and reviews have revealed that SVD detectives, on the whole, are professional, committed, empathetic, and hard-working, their ability to conduct follow-up work and keep regular contact with victims often suffers due to their caseloads.[22]

The Monitoring Team has discussed the dangers of heavy caseloads with NOPD leadership on multiple occasions since the release of the *Committee's* 2015 report. NOPD leadership consistently has conceded the need for additional personnel. Due to competing needs across the Department, however, we consistently have been told NOPD is unable to add personnel to the SVD. As personnel shortages continue to be a concern within the Department, NOPD still has not sufficiently staffed the SVD. In recent months, however, with significant pressure from the Monitoring Team and advocacy groups, the SVD has enhanced its civilian staffing with an additional twelve trained and certified Social Service Workers, who many believe will have a positive impact on the Unit's ability to maintain contact with victims and witnesses of crimes.[23]

The Monitoring Team continues to believe NOPD's current SVD staffing is not workable, and renders it highly likely the Unit's prior compliance achievements will not be sustainable.[24]

---

[20]     NOPD Response at 6.

[21]     *Id.*

[22]     NOPD acknowledges "SVD detectives /supervisors are unfortunately placed in a position where they must constantly triage cases. It's impossible to conduct thorough, victim-centered, aggressive, and complete investigations with a closed disposition for every single case assigned to them without the proper manpower/caseload ratio." NOPD Response at 2. This reality obviously is no good for officers, SVD detectives, or community members.

[23]     According to NOPD, in 2022, SVD was approved for a total of 25 Police Investigative Specialists to be assigned to various units within the Division to supplement its current roster of detectives. NOPD explains the Special Victims Division currently is staffed as follows: 3 Police Investigative Supervisors, 11 Police Investigative Specialists, and 4 Police Investigative Specialists (in background checks). NOPD Response at 6. SVD currently has 10 positions still unfilled. Filling these positions should be a priority for NOPD.

[24]     NOPD provided another reason for its caseload problems in its response to the Monitoring Team's draft Special Report. According to NOPD, "Unlike other surrounding jurisdiction, SVD takes in any and all allegations or hints of sexual assault or child abuse, even if it didn't occur in Orleans Parish. This practice unfortunately increases our caseload dramatically; however, to deter away from this protocol will cause an assumption of "killing cases" and downgrading sexual assaults reported to NOPD. Until all stakeholders buy-in on a revised policy that will allow sex crimes to divert Out of  Parish crimes to the correct jurisdiction or refer mentally ill persons who report multiple and



### B. Quality of SVD Investigations

The Monitoring Team reviewed a randomly selected number of "Open" cases to determine whether these cases were being satisfactorily investigated and documented notwithstanding ongoing NOPD staffing shortages.

At the time of our audit request, in March 2023, the SVD reported 728 "Open and Unsolved" cases during the period January 2022 – March 2023. The list of these "Open" cases was shared with the Monitoring Team, and the Monitoring Team randomly selected 80 cases for review, just over 10% of the total open cases.

The Monitoring Team utilized an 18-point checklist to determine whether the information included in the investigation files was sufficient, thorough, and otherwise compliant with the Consent Decree. During our previous audits, we regularly utilized a 35-point checklist. Because this review focused primarily on follow-up activities, we were able to employ an abbreviated audit protocol.

The Monitoring Team identified 20 of 80 cases (25%) that were in need of additional investigation and/or supplemental documentation. *This is a troubling rate of noncompliance.*



Several of the deficiencies we noted related to the absence of a supplement report or notation confirming whether the case should be closed or more work remained to be done. Other cases were left open-ended, and we were unable to determine next steps of the investigation, or even if anyone was actively working on the case. Some cases left unidentified who would complete the investigation following the reassignment of the initial detective.

Our audit strongly suggests that additional personnel, whether sworn detectives or civilian professionals, not only would help SVD conduct more thorough investigations and meet its obligations to sexual assault victims, but would help SVD meet its obligations under the Consent Decree.

---

non-existence sexual assaults to the proper mental facility, hospital and/or counselors, Sex Crimes and Child Abuse Units will continue to be inundated with a very heavy and unmanageable caseload." NOPD Response at 3. The Monitoring Team appreciates this context and looks forward to working with NOPD to explore solutions to the concern NOPD raises.



Following our audit, we brought to the attention of NOPD leadership the 20 cases we found lacking. [25] NOPD committed to provide (and did provide) an explanation of what has been done with each case. [26] The Monitoring Team is satisfied with the Department's plan to remedy the shortcomings identified in our audit.

### C.     Analysis of Umbrella Report Allegations

In November 2022, a group called the *Umbrella Coalition* published a report titled "Police Sexual Violence in New Orleans" (the "Umbrella Report"). [27] Among other things, the Umbrella Report alleged that publicly available data and public records revealed at least 236 complaints of sexual and/or intimate violence by 189 NOPD officers between 2014-2020. [28] The Umbrella Report further suggested that NOPD does not conduct adequate investigations into these complaints and that it "routinely ignore(s), conceal(s), and under-investigate(s) police sexual violence." [29]

The *Umbrella Report* does not provide the methodology used to conduct its analysis or reach its conclusions, nor does it provide a definition of "sexual and/or intimate violence." As such, it was difficult to determine how the *Umbrella Coalition* decided whether a specific complaint would be categorized as "sexual and/or intimate violence." Nonetheless, the Monitoring Team was troubled by the allegations reflected in the report. Accordingly, the Monitoring Team performed its own review of complaints of sexual and/or intimate violence by NOPD officers.

---

[25]     NOPD has explained that, of the 20 cases the Monitoring Team identified as in need of additional investigation, 11 belonged to one detective. According to NOPD, "this detective had shown signs of (and later expressed) burnout by calling in sick monthly and declining in productivity. Counseling, mentoring, and eventually progressive discipline were implemented (SFL) but to no avail. That detective was recently transferred out of the unit (with no replacement). Her caseload must now be reassigned out to other detectives and investigators; this is the trend. All 20 cases have since been reassigned and/or corrected with the appropriate follow-up action." This is a helpful explanation that puts some of Monitoring Team's findings in context. The explanation, however, also drives home the Monitoring Team's comments at the conclusion of this Report that "Working sexual assault cases is no easy task. It is physically and emotionally draining. Low staffing and high caseloads not only impact the quality of investigations, they increase the risk of burnout among detectives."

[26]     It is worth noting here that the Monitoring Team has learned from prior SVD audits that, sometimes, SVD detectives have performed follow-up activities that have not yet been documented in their case files. Accordingly, we asked SVD leadership to provide details on the 20 cases where we determined additional investigation or documentation was required. We consistently have pushed SVD leadership to *require* documentation of follow-up activities.

[27]     Umbrella Coalition, "Police Sexual Violence in New Orleans," Nov. 2022, *available at* https://copwatchnola.files.wordpress.com/2022/11/police-sexual-violence-in-new-orleans-2022.pdf (hereinafter, the "Umbrella Report").

[28]     *Id*. at 1.

[29]     *Id*. at 3.



We included two categories of cases in our review. The first category included complaints that did not result in a sustained finding. The second category included complaints that were sustained during the initial investigation, but then later were overturned by a supervisor. The main focus of our review was to determine whether NOPD conducted a thorough investigation that supported the investigator's ultimate finding (*i.e.*, to ensure NOPD is not under-investigating or ignoring complaints); and to ensure supervisors' decisions to overturn an initial investigation disposition was objective and supported by the evidence (*i.e.*, to ensure there is no concealment or favoritism).

### 1.    *Methodology*

The Monitoring Team obtained data of adjudicated PIB cases involving sexual assault and domestic violence from 2014-2020 (the same timeframe as the data reported in the *Umbrella Report*). PIB initially provided a list of 98 unique complaints against NOPD officers. Because this number was much lower than the 236 complaints identified by the *Umbrella Report*, the Monitoring Team reviewed the data from the *Umbrella Report* and added an additional 58 complaints that (a) were included in the *Umbrella Report* but not in the initially-produced NOPD data, and (b) appeared to be related to sexual or domestic violence, based on the narrative descriptions included in the *Umbrella Report*.[30] In all, there were 156 unique complaints included in our review.

Because a major concern identified in the *Umbrella Report* was the perception that NOPD "routinely ignore(s), conceal(s), and under-investigate(s) police sexual violence," the Monitoring Team focused its review on the complaints that did <u>not</u> result in a disposition of "sustained." These included 114 unique complaints falling into one of the following categories:[31]

- **Exonerated** – The investigation determines by a preponderance of the evidence that the alleged conduct did occur but did not violate NOPD policies, procedures, or training.

- **No formal investigation merited** – A complaint action in which the allegation, on its face, does not constitute a violation by an employee of any Department Rule, Policy, Procedure, verbal, or written instruction, or criminal or civil law.

- **Not sustained** – The investigation is unable to determine by a preponderance of the evidence whether the alleged misconduct occurred.

---

[30]      *See* Umbrella Report, Appendix 1: Complaints of Sexual and Intimate Violence by NOPD Officers (2014-2020), available at https://copwatchnola.files.wordpress.com/2022/11/appendix_police-sexual-violence-in-new-orleans-2022-1.pdf

[31]      *See* NOPD Operations Manual, Chapter 52.1.1, Misconduct Complaint Intake and Investigation (6/27/2021), *available at* https://nola.gov/getattachment/NOPD/Policies/Chapter-52-1-1-Misconduct-Intake-and-Complaint-Investigation-EFFECTIVE-6-27-21.pdf/?lang=en-US.



- **Unfounded** - The investigation determines by a preponderance of the evidence that the alleged misconduct did not occur or did not involve the accused officer.

For the purposes of this audit, the Monitoring Team grouped the 114 complaints by year, and then randomly selected approximately 50% (by selecting every other case on the list) for review:

| Year of Complaint | Count | Proposed Sample |
|---|---|---|
| 2014 | 8 | 4 |
| 2015 | 10 | 5 |
| 2016 | 22 | 10 |
| 2017 | 25 | 14 |
| 2018 | 16 | 9 |
| 2019 | 18 | 9 |
| 2020 | 15 | 8 |
| **TOTAL** | **114** | **59** |

The Monitoring Team also reviewed eight additional cases with an initial disposition of "sustained" but where that initial disposition later was reversed by a supervisor. Those eight specific cases are:

| PIB Control Number | Disposition | Action Taken |
|---|---|---|
| 2014-0518-R | Sustained | None - Not Sustained |
| 2014-0524-C | Sustained | None - Not Sustained |
| 2016-0085-P | Sustained | None - Not Sustained |
| 2016-0648-P | Sustained | None - Unfounded |
| 2017-0646-P | Sustained | None - Not Sustained |
| 2018-0289-P | Sustained | None - Not Sustained |
| 2018-0369-P | Sustained | None - Exonerated |
| 2018-0508-R | Sustained | None - Exonerated |

2. *Findings*

The Monitoring Team reviewed each case file in our sample to answer the following questions:

| Question | YES/NO/NA |
|---|---|
| 1. Does the investigation and stated violation of policy being investigated characterize the facts represented in the complainant's initial documented statement? | |
| 2. Do the complainant's assertions appear to be supported or unsupported by the evidence? | |



| Question | YES/NO/NA |
|---|---|
| | |
| 3. Does the investigation and stated violation of policy being investigated characterize the facts represented in the complainant's initial documented statement? | |
| 4. Was all relevant evidence considered by the investigator? (circumstantial, direct, and physical?) | |
| 5. Were findings of Unfounded, Exonerated and/or Not-Sustained free of any misconduct? | |
| 6. Were additional charges found and investigated as a result of the investigation (unrelated to SA and/or DV)? | |
| 7. Was the final resolution based upon the preponderance of the evidence? | |
| 8. Did the investigator document a credibility statement based on the available evidence? | |
| 9. Did the Investigator give more preference to the officer's statement? | |
| 10. Did the Investigator make efforts to resolve any material inconsistencies between witness statements? | |
| 11. Does the investigation appear to be thorough? | |
| 12. Was the investigation "covered" by a supervisor and were any investigator's conclusions changed? If so, were they accurate and note details of deficiencies stated by the Cover letter. | |
| 13. Does the Monitoring Team agree with the final determination of the case based on available evidence presented in the file? | |

The Monitoring Team found the majority of cases (61 of 67, or approximately 91%) *to be in good order*, thoroughly and appropriately documented, and properly approved through the Department's Chain of Command.

Although the Monitoring Team regularly audits PIB investigations into officer complaints (which randomly include complaints related to sexual and domestic violence), it is



uncommon for the Monitoring Team to review cases spanning such a large time period (*i.e.*, 2014 through 2020). As a result of reviewing similar cases over a seven-year period during this review, we were able to observe a positive trend in the quality of PIB investigations. For example, the number of investigations with which we disagreed generally decreased over time.

### a. Cases That Were Not Sustained

Overall, the Monitoring Team agreed with the initial disposition of 54 of the 59 (approximately 92%)[32] of the cases that were not sustained during the initial investigation, and the Monitoring Team found those cases to be thoroughly and appropriately documented. There were, however, five cases (approximately 8%) where the Monitoring Team found the initial investigation to be insufficient and disagreed with the disposition. The shortcomings we identified varied, and included things like a failure to interview a material witness, a failure to document key elements of the investigation, giving undue weight to the officer testimony, among other things. While we have made available to the NOPD the details behind our review, since the cases include personal private information, we have not included that level of detail in this report.



---

32      During our review of one of the "Overturned" cases, we took issue with the initial investigation rather than with the supervisor's decision to overturn the charge(s). While we did not include this case in the overall numbers for this section, so as not to skew the data, we believe it is worth noting here.



Without downplaying the importance of getting every case right, we are comforted by the high rate of compliance we saw in our review as it strongly suggests there is no pattern of non-compliance here. Moreover, it is worth noting that the percentage of insufficient investigations (based on our review sample) generally trends downward, as demonstrated in the chart below:



This further supports our general finding of no pattern of under-investigating and/or ignoring or concealing cases by NOPD.

### b. *Cases That Were Overturned*

The Monitoring Team reviewed eight cases where the disposition from the initial investigation was "sustained," but then the decision was reversed/overturned upon review by a supervisor. Our review focused on whether, in overturning the initial decision, supervisors were treating cases fairly, impartially, and consistently. In all cases we reviewed, the Monitoring Team found the supervisor decisions were consistent and had a solid basis for overturning the initial decision. Here again, while we have provided the details of our analysis to the NOPD, we are not able to share those details here because they contain personal private information.

### c. *Cases Warranting an Additional Finding*

Notwithstanding the generally positive findings noted above, the Monitoring Team observed two cases that raised a particular concern. Specifically, we noted two cases where, because the officers believed they had insufficient evidence to sustain the domestic violence related charge, the suspect officer received no discipline or counseling even though the suspect officer was involved in multiple domestic violence related incidents. In such instances (where police are responding to multiple domestic violence related calls at an officer's home), PIB should consider a Professionalism charge even it cannot sustain the domestic violence charge.



To understand why a Professionalism charge may be useful in appropriate cases, consider this actual example. During a particular domestic violence investigation against an NOPD officer in 2019, the investigator included a charge of Professionalism. The investigator explained the decision to charge Professionalism by noting "the officer continuously displayed actions unbecoming of a NOPD officer embarrassing and discrediting the NOPD and its employees." The investigator further wrote, the "officer has allowed his personal situation to interfere with his professional career by being involved in a situation deeming it necessary for police action." The evidence of the domestic violence ultimately was Not Sustained and no arrest was made, *but the Professionalism charge was sustained*. Without the Professionalism charge, the officer would have incurred no accountability for repetitive similar actions.

### 3.    *Conclusion*

Notwithstanding some room for improvement on some individual cases, which the Monitoring Team has discussed with PIB so the Department can take any corrective actions necessary, our review did not reveal a pattern of under-investigation, neglect, or concealment with regard to sexual assault and domestic violence cases involving NOPD officers. While one can argue there are more *complaints* against NOPD officers than there should be (an assessment that would necessitate a comparison of (a) SA/DV complaints in the population generally and/or (b) SA/DV complaints against officers in other departments compared to (c) complaints against NOPD officers[33]), our review strongly suggests the complaints are being taken seriously by the Department, generally investigated fully, and resulting in reasonable dispositions. Our review likewise identified a high number of false accusations.

### D.    **Declining NOPD SVD Clearance Rates**

In the Monitoring Team's in-court status presentation to Judge Morgan on April 27, 2023, we expressed concern over a precipitous decline in NOPD SVD's clearance rates. Specifically, we noted the already low clearance rate of 11% in 2019 had dropped to 3% in 2022. We also noted that this troubling decline likely was caused, in part at least, by the Department's recruitment and retention problems.

As an initial matter, it is important to keep in mind that some of the problem here may be caused



---

[33]     We recommend that PSAB consider undertaking such an analysis. IF NOPD officers are committing sexual assaults more frequently than the community generally and/or more frequently than officers in other departments, it raises critical questions concerning NOPD's recruiting practices, Early Warning System, and Officer Assistance Program.



by NOPD's practice of keeping cases "open" in its system that perhaps should be closed as unfounded or identified as "open/inactive." NOPD's practice deflates its clearance rates, making them look worse than they are. If one were to adjust for these open cases, NOPD's SA clearance rates would look significantly better – perhaps not great, but significantly better.[34]

Of the 54 cases the Monitoring Team reviewed as part of its most recent SA audit, the facts of 30 raised issues requiring very little investigation (for example, clear signs the victim was in mental health crisis and was not actually sexually assaulted). Rather than closing such cases, after an appropriate (if minimal) investigation, NOPD leaves them open in its system. Consequently, these open cases count against NOPD's clearance rate.

But even if one were to adjust for NOPD's practice of keeping such cases open in its system, the Department's clearance rates still will have been trending in the wrong direction since 2019. It is important to remember the Consent Decree obligates NOPD to do certain specific things outlined in the Decree (*e.g.*, new policies, better training, etc.), but also obligates NOPD to conduct investigations professionally, *effectively*, and in a manner free from bias. While NOPD has accomplished most of the specific requirements spelled out in the Consent Decree, it is hard to argue the Department's efforts are "effective" with its current clearance rate trend.

As in so many areas of NOPD's ongoing compliance efforts, here again effectiveness may be the victim of inadequate staffing. NOPD has implemented excellent policies, expanded its training,[35] increased its supervision, and enhanced its record keeping. It has hired excellent detectives who work hard, show great empathy, and exhibit an impressive victim-centered commitment to their jobs. But even the best detectives in the world can only do so much with a caseload of 89 cases.

### E.    Impact of GOAs On Sexual Assault-Related Calls For Service

In February 2023, the Monitoring Team performed an audit of NOPD response times, specifically focusing on (a) the impact of slow response times on increasing "gone on arrival" designations (*i.e.*, situations where the victim and/or perpetrator is no longer on the scene by the time the police arrive) and (b) the impact of NOPD de-prioritizing calls from Code 2 to Code 1 due to the unavailability of officers. The initial concern prompting our audit was the possibility that the frequent de-prioritizing of calls was causing NOPD's published emergency (*i.e.*, Code 2) response time data to be deceptively low. In other words, if NOPD is frequently re-designating emergency calls as Code 1 because no officers are available, then the *reported* average time to

---

[34]    NOPD offers several other reasons to explain its low clearance rates, several of which likely DO offer a credible explanation for at least some of the facially troubling data discussed in this Special Report. For convenience and in the interest of full transparency, we have attached this portion of NOPD's response as Appendix B.

[35]    *See* appendix A for a list of SVD-required training.



respond to emergency (Code 2) calls would be deceptively reduced, but the *actual* time to respond to such calls would not be any different.

As an initial matter, it is clear to us NOPD has a lot of priority downgrades. Our preliminary audit confirmed this. There were 78,042 total calls for service from January 1st through the end of November 2022 that began as a Code 2 priority call; 34,230 of these calls subsequently were de-prioritized. This equates to 43% of calls.[36]

Certainly, some of these de-prioritizations are perfectly appropriate. If the 911 dispatcher mistakenly designates a call that happened 2 days ago as Priority 2, it may be appropriate for the NOPD supervisor to downgrade that call to a Priority 1. But scenarios like this do not explain the high number of priority changes shown in the data.

Our initial audit also revealed a high correlation between downgrades and the unavailability of officers. More than 26% of calls in our initial audit with no officers available ended up being downgraded from a Code 2 to a Code 1. The absence of an officer, however, does not mean the call is not a priority. It simply means NOPD was not able to get to the call in a timely fashion. [37]

The Monitoring Team recognizes that often there are legitimate reasons to downgrade a call. For example, our initial analysis found justified downgrades where (1) the crime occurred days, months, or years prior; 2) the location of the crime could not be determined; or (3) the call came from a complainant who was out of state. These cases very well may warrant a priority downgrade, especially where limited officers are available to respond to calls. But situations like this do not explain the bulk of the downgrades we saw in our initial analysis, especially in the area of Domestic Violence calls.

After sharing an initial draft of our findings with the NOPD, the Monitoring Team and NOPD's PSAB agreed it was worthwhile to collectively dig deeper into the data in an effort to better understand the reasons for the many priority downgrades we were seeing, and to evaluate

---

[36]     It should be noted that NOPD statistics do show that during this same time frame 7% of all calls for service were *upgraded* from a non-priority call to a priority call, suggesting that some supervisors seem to be making Code 1 or Code 2 decisions based on factors other than the availability of officers at least some of the time.

[37]     Our review is not the only review to note the de-prioritizing of NOPD cases. A 2022 analysis by Jeff Asher found a troubling trend from 2018 through 2022 of rape calls being changed from emergencies to non-emergencies. *See* https://www.nola.com/news/crime_police/rape-reports-in-new-orleans-often-considered-non-emergencies-leaving-survivors-waiting/article_57094a48-2576-11ed-a14f-f7ac840cb626.html.



whether such downgrades were reasonable. [38] That joint audit is ongoing, and we will publish the results at a later time. [39]

In the meantime, however, our initial audit did raise concerns that warrant being shared without further delay. Specifically, our in-person observations and our preliminary data analysis strongly suggest that NOPD's slow response times are leading to increases in GOAs, that GOAs are often the result of insufficient police personnel to respond to calls, and that sexual assault-related investigations – among other investigations – are being negatively impacted thereby.

## VII. Conclusion

The Monitoring Team continues to be impressed with the commitment and compassion of the detectives assigned to the NOPD's sexual assault investigations unit. But even the best detectives in the world will not be able to meet the needs of the New Orleans community (or the requirements of the Consent Decree) with declining staff and increasing caseloads. Working sexual assault cases is no easy task. It is physically and emotionally draining. Low staffing and high caseloads not only impact the quality of investigations, they increase the risk of burnout among detectives. The Monitoring Team looks forward to continuing to work with NOPD's SVD to devise a meaningful corrective actions plan that will bring the Department back into compliance with the Consent Decree and back to providing the level of services victims of sexual violence have come to expect from the NOPD since the outset of the Department's reform efforts.

---

[38]     In its response to the Monitoring Team's Special Report, NOPD explained that "As of July 2022, the Special Victims Division has put protocols in place to address all sexual assault and child abuse calls (CFS) for service designated as Gone On Arrival. An investigator has been assigned to follow-up on all sexual assaults and child abuse CFS marked-up GOA from January 2019- July 2022. Investigators and detectives have been assigned several of those cases for follow-up investigations and documentation. All sexual assault and child abuse GOA's from July 2022 to current, are tracked by Sex Crimes and are immediately followed-up. . . ." NOPD Response at 3. The Monitoring Team commends NOPD on its efforts to look into all GOAs from January 2019 through July 2022. Obviously, though, NOPD needs a durable solution to prevent GOAs in SVD cases going forward.

[39]     While we will await the result of the joint audit before making any definitive statement on the matter, our preliminary audit and our first-hand observations strongly suggest NOPD is de-prioritizing calls from Code 2 to Code 1 based on the availability of officers. This is not to say, NOPD supervisors are doing so cavalierly, or even happily. It is quite likely supervisors simply are making difficult "triage" decision based on officer availability, which results in emergency calls being de-prioritized simply because they *appear* to present less of an emergency than another competing emergency call.



## VIII.   Appendix A

According to NOPD, upon being assigned to the Special Victims Division, detectives, supervisors, and investigators are required to complete the following training:

**End Violence Against Women** **https://evawintl.org/**
1. (Dynamics of Sexual Assault: What does sexual assault really look like: (5-hour module)
2. Victim Impact: How victims are affected by sexual assault and how law enforcement can respond: (11-hour module)
3. False Reports: Moving beyond the issues to successfully investigate and prosecute non-stranger sexual assault: (5-hour module)
4. Law and Investigative Strategy: What kind of sexual assault is this? (5-hour module)
5. Preliminary Investigation: Guidelines for First Responders (8 - hour module)

**The New Orleans Family Justice Center**
This is trauma-informed interview and investigation training. The training also reinforces New Orleans Police Department policy and procedures.
•       • **https://nofjc-training.thinkific.com/courses/take/sex-crimes-detective-training/pdfs/20880262-nopd-sex-crimes-unit-standard-operating-guidelines**

**National Criminal Justice Training Center**
Part 1: The Five B's of Child Physical Abuse: Bruises, Burns, Bones, Bellies, and Brains
Part 2: The Five B's of Child Physical Abuse: Bruises, Burns, Bones, Bellies, and Brains.

**For ongoing training, Sex Crimes and Child Abuse detectives have completed the below listed training in 2022 and 2023:**
January 12, 2022: National Criminal Justice Training Center -Responding to an Unexplained Child Death
May 31, 2022: New Orleans Child Advocacy Center – Psychological Coercion & Sex Trafficking: Dynamics of Exploitation
June 14-16, 2023: David A. Newman – Inside the Tape Crime Scene Management & Homicide
June 16, 23, & 30, 2022: IACP on trauma-informed sexual assault investigation training **(Every Thursday for three weeks 4-hour block of instruction)**
July 13, 2022: Louisiana State Police – Investigative Genealogy Training
July 19, 2022: SAKI TTA Webinar – Enhancing Conviction Integrity through Forensics Webinar – Achieving Justice at Trial: Crime Scene Analysis and Expert Testimony Confirmation
August 16-18, 2022: National Criminal Justice Training Center-Homicide Investigation & Crime Scene Management Training
September 12-16, 2022: RADAR Child Forensic Interview Model
October 20, 2022: National Criminal Justice Training Center – Protecting Children in a Digital Age
November 1-3, 2022: JUST Conference – Juvenile Sex Trafficking Conference
November 16, 2022: SAKI TTA Webinar – The Case of Cleophus Ward: How to Investigate and Prosecute SAKI Cases with Significant Challenges
December 20-21, 2022: National Criminal Justice Training Center- Child Homicide Investigations



February 28, 2023: SAKI TTA Webinar – Familial DNA Searching: Developing a Sustainable Process
May 3, 2023: ATF – Strategic Suspect Interview Techniques "Making Cases Stronger for Prosecution"
June 21-23, 2023: Accurint – LexisNexis Searching and Mapping **(Scheduled)**
August 22-25, 2023: Reid Training for Interview & Interrogation **(Scheduled)**

**Social Service Unit Training for Social Workers in the Special Victims Division**
Healthcare for the Homeless
Orleans Parish Sheriff Office -Crime Victims Reparations
Covenant House-Human Trafficking
Department of Children and Family Services- Legal Processes
Silence is Violence-Victim Services
New Orleans Family Justice Center-Victim Services



IX.     **Appendix B**

**NOPD Response To The Declining Clearance Rate of the SVD**
**(NOPD Response at 5)**

On Page 17, in Section D, The Monitoring Team mentions the "precipitous decline" of an already low clearance rate of 11% in 2019 that dropped to 3% in 2022. It was noted that this troubling decline was likely caused, in part at least, by the Department's recruitment and retention problems.

I would like to add these variables to factor in:

O     The reason the clearance rate was reported at low clearance rate of 11% is due to taking on cases that cannot be solved or occurred out of parish (but we still take the number hit).

O     In 2019, SVD was still reporting under UCR (Uniformed Crime Reporting) guidelines where CBW (Cleared by Warrant) was counted as a clearance.

O     In 2022, SVD began reporting under the new guidelines of NIBRS (National Incident- Based Reporting System) where Cleared by Warrants are not counted as a clearance, but as solved.

O     This in turn affected the clearance rate because we no longer included our cases that were cleared by an arrest warrant, those cases are placed in the solve rate.

O     Consideration should be taken and wholistically factor in SVD's clearance rate, solved rate, "D" cases (Cases that cannot be solved due to lack of evidence or not acceptable by DA's office) and those cases that are designated or categorized as UNFOUNDED.

O     UNFOUNDED cases or those that occurred in another jurisdiction but reported in Orleans Parish or those that have been properly investigated but determined and proven not to have happened or occurred by evidence or a lack of evidence.

\*\*\*