UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

RAYNE UPTON,
INDIVIDUALLY AND ON
BEHALF OF HER
DAUGHTER, G.H.

                    CIVIL ACTION

                    NO. 2:21-CV-407

VERSUS

                    JUDGE CARL BARBIERE
                    MAG. KAREN W. ROBY

RODNEY VICKNAIR, SHAUN
FERGUSON, THE CITY OF
NEW ORLEANS; DOE
DISTRICT COMMANDER;
DOES 1 TO 10; AND XYZ
INSURANCE COMPANIES 1
TO 10


          Deposition of SUPERINTENDENT ANNE E. KIRKPATRICK , taken on January 30, 2024, in the offices of The Office of the City Attorney, 1300 Perdido Street, New Orleans, Louisiana 70112.

1  say in a moment in time, that once that
2  probable cause is established, the arrest
3  occurs in limited situations. And it would
4  probably be when they're doing a sting
5  operation.
6       Q    I see. So in a context like that, at
7  the very least, you'd want to do some attempts
8  to keep track of that officer?
9       A    That would be correct.
10      Q    Another principle I'd like to ask you
11 about is, NOPD should train its officers to
12 recognize the red flags of officer misconduct?
13      A    Yes.
14      Q    So I'd like to talk about -- going
15 back to how to -- whether to leave an offer on
16 the street or not, which we just discussed.
17 Let's suppose that NOPD has been notified
18 about potential misconduct by one of its
19 officers. On day one of NOPD's investigation
20 into that Officer, NOPD learns that the
21 officer made inappropriate comments and took a
22 very inappropriate picture with a 15-year-old
23 girl. Let's say NOPD sees the photo and
24 considers it to be a seductive photo. Should
25 NOPD leave the officer unmonitored on the

```
 1   streets after that?
 2              MR. ROQUEMORE:
 3                   Objection to form.
 4              THE WITNESS:
 5                   I would not.
 6   BY MR. MOST:
 7        Q    And you would not because that
 8   officer is a potential risk to that girl,
 9   agreed?
10        A    Agree.
11        Q    It would not be acceptable for NOPD
12   to leave that officer on the street
13   unmonitored for four more days, agreed?
14              MR. ROQUEMORE:
15                   Objection to form.
16              THE WITNESS:
17                   The practice, the officer would
18              be put into a nonenforcement
19              position, also for the sake of the
20              investigation.  So the photo would
21              inform me that this is serious
22              misconduct.  The officer would be
23              removed from patrol duties not only
24              for risk assessment, but for the time
25              of the due process of the
```

```
 1              investigation.
 2    BY MR. MOST:
 3         Q    And that's important to ensure the
 4    safety of the girl that he took the photo
 5    with?
 6              MR. ROQUEMORE:
 7                   Objection to form.
 8              THE WITNESS:
 9                   Primarily, it will always be for
10              safety; secondarily, it will be due
11              process.
12    BY MR. MOST:
13         Q    Okay.  So as you mentioned earlier,
14    Officer Vicknair first met the plaintiff,
15    G.H., on a call for service.  And when -- a
16    call for service because she was the minor
17    victim of a sex crime.  Vicknair testified
18    that he went back to her house 12 or 13 times
19    after he first met her.
20              Would you agree that's a major red
21    flag for an officer to be returning to the
22    home of a minor sex crime victim 12 or 13
23    times?
24              MR. ROQUEMORE:
25                   Objection to form.
```

```
1              THE WITNESS:
2                   Yes.
3    BY MR. MOST:
4        Q    Would you agree that NOPD should have
5    a system to try and spot suspicious patterns
6    of an officer returning to a minor sex crime
7    victim's home like that?
8        A    Yes.
9        Q    NOPD should have either some sort of
10   system for monitoring GPS data to catch
11   patterns like that; that would be one thing
12   that NOPD could do, would you agree?
13       A    It could be, yes.
14       Q    And if NOPD has vehicle GPS data, it
15   would be important for them to have a system
16   to look for patterns like that in GPS data;
17   would you agree?
18            MR. ROQUEMORE:
19                  Objection to form.
20            THE WITNESS:
21                  Yes, if they had reason to look,
22            yes.
23   BY MR. MOST:
24       Q    Or generally, if NOPD has GPS data,
25   it should be looking for suspicious patterns
```

1  in that GPS data?
2      A   Yes.
3      Q   NOPD should also have a policy
4  directing its supervisors to look for patterns
5  of suspicious officer behavior in trip sheets;
6  would you agree?
7      A   Yes.
8      Q   And if NOPD doesn't have any policy
9  or any such system like what we just
10 described, that would be a problem, agreed?
11         MR. ROQUEMORE:
12             Objection to form.
13         THE WITNESS:
14             I thought they did.  But I would
15         have to say, in principle, yes.
16 BY MR. MOST:
17     Q   Okay.  I want to move on to the
18 question of hiring an officer, given the
19 potential criminal history of that applicant.
20 And you talked about how, as a general
21 principle, NOPD should not be hiring habitual
22 offenders, but you'd want to look at the
23 specifics of an officer's criminal history,
24 agreed?
25     A   Yes.

```
1       Q    I'm going to mark as Exhibit B.  Do
2   you see that this is a document that says at
3   the top, "2007 NOPD Applicant Criminal
4   History"?
5       A    I do.
6       Q    And do you see that this shows a
7   criminal history involving five arrests and
8   one conviction by an applicant to NOPD?
9            MR. ROQUEMORE:
10                Objection to form.  We don't
11           know where this document is coming
12           from or what it shows at all, because
13           it doesn't have any kind of
14           provenance.
15  BY MR. MOST:
16      Q    Sure.  Do you see that -- well, let
17  me back up.  Have you read this document,
18  Chief?
19      A    No, sir.
20      Q    Would you please read it?
21      A    It says, "2007 NOPD Applicant
22  Criminal History," is the title.
23      Q    I'm sorry.  You don't have to read it
24  out loud.  Just read it to yourself.
25      A    I'm sorry.  Okay.  I have read it.
```

1     Q   So if this is -- let's suppose that
2 this is the criminal history of an applicant
3 to NOPD in 2007.  Do you see that this
4 hypothetical applicant has a criminal history
5 involving five arrests and one conviction?
6     A   I do see that, yes.
7     Q   And that conviction, do you see here
8 is simple battery against a juvenile?
9     A   I do.
10     Q   Should NOPD hire this officer in
11 2007?
12         MR. ROQUEMORE:
13            Objection to form.
14         THE WITNESS:
15            I could not speak for the
16            decider back then.  I would not.
17 BY MR. MOST:
18     Q   And why would you not?
19     A   These indicate a risk pattern that
20 would not be one I would take on.
21     Q   A risk pattern because an applicant
22 with this criminal history might engage in
23 future misconduct along the lines of this
24 criminal history, agreed?
25     A   Agreed.

```
 1      Q    If you found out that NOPD did hire
 2   an officer with this criminal history, would
 3   you want to conduct an investigation into how
 4   and why that officer was hired?
 5            MR. ROQUEMORE:
 6                 Objection to form.
 7            THE WITNESS:
 8                 Would you be more specific?  Are
 9            you talking today?  What are you
10            talking?
11            MR. MOST:
12                 Sure.
13            THE WITNESS:
14                 Could you be more specific be
15            about that?
16   BY MR. MOST:
17      Q    Let's say you found out today that
18   you had an officer on the force with this
19   criminal history.  Would you want to conduct
20   an investigation into how that officer was
21   hired?
22            MR. ROQUEMORE:
23                 Objection to form.
24            THE WITNESS:
25                 The reason I'm hesitating is,
```

```
 1              what we mean by an investigation?  So
 2              if I have an officer today with this
 3              background, I would want to look at
 4              their background, what was in that
 5              background.  So I don't know if you
 6              call that an investigation.  So
 7              that's the reason I'm hesitant on my
 8              response to you.  I would be looking
 9              into the background.
10   BY MR. MOST:
11       Q    Sure.  You would want to make sure
12   that officers like this were not hired in the
13   future; would you agree?
14              MR. ROQUEMORE:
15                  Objection to form.
16              THE WITNESS:
17                  I would not hire an officer with
18              this background.
19   BY MR. MOST:
20       Q    So moving on to a new topic.  There
21   is an issue in policing, generally, that
22   sometimes officers have sex with people they
23   meet while on duty, agreed?
24       A    Yes.
25       Q    And that could be a problem in
```

```
 1   policing, particularly when people the
 2   officers are having sex with are crime
 3   victims, agreed?
 4        A    Yes.
 5        Q    For that reason, it's important for
 6   the officers to have training about whether it
 7   is permissible or impermissible for them to
 8   have sex with people they meet in their role
 9   as an officer, agreed?
10        A    Agree.
11        Q    They need training -- officers need
12   training on how to avoid a situation in which
13   an officer might take advantage of their role
14   as an officer to have sex with someone of the
15   opposite sex.  Would you agree?
16             MR. ROQUEMORE:
17                  Objection to form.
18             THE WITNESS:
19                  Anyone of any sex.
20             MR. MOST:
21                  Yes.  Thank you.
22   BY MR. MOST:
23        Q    Yeah, I'll rephrase.  Officers need
24   training on how to avoid a situation in which
25   an officer might take advantage of their role
```

```
 1   as an officer to have sex with a person they
 2   met in that role, agreed?
 3              MR. ROQUEMORE:
 4                   Objection to form.
 5              THE WITNESS:
 6                   Agreed.
 7   BY MR. MOST:
 8       Q    And if NOPD has no training on this,
 9   that would be a problem, agreed?
10       A    Agreed.
11       Q    I'm going to move on to another
12   topic.  Let's say a patrol officer is
13   interacting with a juvenile sex crime victim
14   and that officer shows modeling photos to the
15   sex crime victim, that would be a red flag;
16   would you agree?
17              MR. ROQUEMORE:
18                   Objection to form.
19              THE WITNESS:
20                   Yes.
21   BY MR. MOST:
22       Q    It would be a red flag for that
23   officer to give his phone number to that
24   juvenile sex crime victim; would you agree?
25              MR. ROQUEMORE:
```

```
                    Objection to form.
            THE WITNESS:
                    Yes.
BY MR. MOST:
    Q    Both of those acts would be
completely unacceptable for that police
officer to do, agreed?
            MR. ROQUEMORE:
                    Objection to form.
            THE WITNESS:
                    Yes.
BY MR. MOST:
    Q    And if another officer witnessed the
first officer showing modeling photos to the
sex crime victim or giving her his phone
number, you would want the witnessing officer
to report that up the chain of command,
agreed?
    A    Yes.
    Q    And if multiple officers witnessed
these things and didn't know to report it,
that would suggest a serious training
deficiency at NOPD, agreed?
            MR. ROQUEMORE:
                    Objection to form.
```


27

1         THE WITNESS:
2             Yes.
3 BY MR. MOST:
4    Q   Moving on to another topic. Suppose
5 there was a male officer who's in his patrol
6 vehicle and he sees a woman in a parking lot
7 walking to her car. He uses her license plate
8 and his law enforcement authority to run her
9 license plate so that he can get her name so
10 that he could call out her by name so she'll
11 come talk to him. Would you agree that's
12 inappropriate?
13    A   In general, yes.
14    Q   That describes an officer willing to
15 use the authority and power of his office to
16 create the opportunity for inappropriate
17 actions with a member of the opposite sex,
18 agreed?
19         MR. ROQUEMORE:
20             Objection to form.
21         THE WITNESS:
22             Yes.
23 BY MR. MOST:
24    Q   And that would be a major red flag
25 about that officer's conduct, agreed?

```
1              MR. ROQUEMORE:
2                   Objection to form.
3              THE WITNESS:
4                   I'm going to challenge the
5              question of "Major red flag."  It is
6              inappropriate, but your qualifier of
7              "Major," it depends, again.
8     BY MR. MOST:
9         Q    Would you agree that is a red flag?
10             MR. ROQUEMORE:
11                  Objection to form.
12             THE WITNESS:
13                  Yes.
14    BY MR. MOST:
15        Q    Let's say that officer also is found
16    to have falsified paperwork about his physical
17    location at the time he called this woman
18    over, these actions combined would need to be
19    handled with significant discipline, would you
20    agree?
21             MR. ROQUEMORE:
22                  Objection to form.
23             THE WITNESS:
24                  Again, as qualifiers, so we have
25             matrixes, that's why I can't say what
```

```
 1              you would call significant.  This is
 2              the reason I hesitate on that.  But
 3              it is definitely a discipline matter.
 4   BY MR. MOST:
 5       Q   Would you agree it should be handled
 6   with more than just a five-day suspension of
 7   that officer?
 8              MR. ROQUEMORE:
 9                  Objection to form.
10              THE WITNESS:
11                  I have a matrix, but for me,
12              yes.
13   BY MR. MOST:
14       Q   Are you familiar with what a field
15   training officer is?
16       A   Yes.
17       Q   Would you agree that the officer we
18   were just talking about should not be promoted
19   to being a field training officer?
20              MR. ROQUEMORE:
21                  Objection to form.
22              THE WITNESS:
23                  Yes.
24   BY MR. MOST:
25       Q   I'm going to move on to what I
```