UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


DOCKET NO.:  2:21-cv-407

JUDGE:  CARL BARBIER

MAGISTRATE KAREN WELLS ROBY


RAYNE UPTON, individually and on behalf of her
minor daughter, G.H.

Plaintiff,

v.

RODNEY VICKNAIR, SHAUN FERGUSON, THE CITY OF
NEW ORLEANS, DOE DISTRICT COMMANDER, DOES 1 TO
10 AND XYZ INSURANCE COMPANIES 1 TO 10,

Defendants.


Deposition of DETECTIVE KIMBERLY
WILSON, given the above-entitled cause,
pursuant to the following stipulation, before
Lori L. Marino, Certified Shorthand Reporter,
in and for the State of Louisiana, at the
Office of the City Attorney, 1300 Perdido
Street, City Hall - Room 5E03, New Orleans,
Louisiana  70112 on Thursday, February 8,
2024, commencing at 10:09 AM.


REPORTED BY:

Lori L. Marino
Certified Court Reporter

```
 1    APPEARANCES:

 2

 3    (ALL PARTICIPANTS PRESENT IN PERSON:)

 4

 5    MOST & ASSOCIATES
      201 ST. CHARLES AVENUE, SUITE 2500
 6    NEW ORLEANS, LOUISIANA  70170
      TELEPHONE:  (504) 500-7974
 7
      BY:  HOPE A. PHELPS, ESQ.
 8    hopeaphelps@outlook.com
      REPRESENTING THE PLAINTIFF
 9

10

11    CITY OF NEW ORLEANS LAW DEPARTMENT
      1300 PERDIDO STREET, SUITE 5EO3
12    NEW ORLEANS, LOUISIANA  70112
      TELEPHONE:  (504) 658-9800
13
      BY:  JAMES M. ROQUEMORE, ESQ.
14    james.roquemore@nola.gov
      REPRESENTING THE DEFENDANT
15

16

17

18

19

20

21

22

23

24

25
```

1                     S T I P U L A T I O N

2               It is stipulated and agreed by and

3       between Counsel for the parties hereto that

4       the deposition of DETECTIVE KIMBERLY WILSON is

5       hereby being taken pursuant to the Federal

6       Rules of Civil Procedure for all purposes in

7       accordance with law;

8               That the formalities of

9       certification and filing are specifically

10      waived;

11              That the formalities of reading and

12      signing are specifically not waived.

13              That all objections, save those as

14      to the form of the question and/or

15      responsiveness of the answer, are hereby

16      reserved until such time as this deposition or

17      any part thereof is used or sought to be used

18      in evidence.

19              *   *   *   *   *   *   *   *

20              LORI L. MARINO, Certified Court

21      Reporter, in and for the State of Louisiana,

22      officiated in administering the oath to the

23      witness.

24

25

35

```
 1    the room.
 2         Q     What terminology do you use for the
 3    exams, like a rape kit or a forensic?
 4         A     It's a juvenile sexual assault kit.
 5         Q     Are detectives with the victim
 6    typically while those --
 7         A     No.
 8         Q     How do you prepare your reports?  Are
 9    you doing that contemporaneously?
10         A     What do you mean?
11         Q     From reading the report, it seemed
12    like you had prepared the report while you
13    were still at Children's Hospital.
14         A     Oh, no.  No.
15         Q     When did you leave Children's
16    Hospital?
17         A     Oh, I can't give you the time that I
18    leave, but when I leave Children's, I go
19    straight to the office, and that's when I
20    start typing the report.
21         Q     And you and Detective Augustus would
22    have left together?
23         A     Yes.
24         Q     The next day, did the mother call to
25    let you know that the victim had been admitted
```

1    to the hospital?

2         A    Yes.

3         Q    What did she tell you about that?

4    What did the mother tell you?

5         A    The one thing I do remember her

6    telling me is that the sexual assault exam

7    itself, basically, upset her.  So she was

8    really upset about that, and basically, kind

9    of broke down and couldn't be calmed down, and

10   they admitted her.

11        Q    In your experience, do these exams

12   occasionally upset the victims?

13        A    Yes.

14        Q    Is there any type of advocate or a

15   counselor that can be called?

16        A    At Children's Hospital or the Child

17   Advocacy Center, depending on where it is,

18   they have counselors.  So that would be on

19   them to call.

20        Q    Were you aware if there was one

21   present with G▌

22        A    That, I don't know.

23        Q    Did you contact the Children's

24   Advocacy Center to have a forensic exam

25   scheduled for G▌

```
 1        A      Yes.

 2        Q      Was this while she was still in the

 3   Behavioral Health Unit?

 4        A      Yes.

 5        Q      On May 28, 2020, you met the mother

 6   at the residence to get G███ s iPhone 11 from

 7   her?

 8        A      I believe so.

 9        Q      And the mother signed an NOPD consent

10   to search form for the phone?

11        A      Yes.

12        Q      Once a consent to search form like

13   that is signed, what kind of information can

14   NOPD get from the phone?

15        A      Any text messages, phone logs,

16   contact information, social media accounts,

17   email accounts, deleted information.

18        Q      You placed the phone on the books as

19   evidence in NOPD's Central Evidence and

20   Property Room, right?

21        A      Yes.

22        Q      Did you search the phone, or did

23   someone else?

24        A      No.  Our Digital Forensics Unit

25   searched the phone -- or should I say
```

38

1   download.  They put it on the machine to

2   download the contents.

3       Q    Did the Digital Forensics Unit report

4   to you that Officer Vicknair's contact

5   information was saved to G████ s phone?

6       A    They don't give me that type of

7   information.  They just give me the download,

8   and I look at the download myself.

9       Q    What did you see on the download for

10  this phone?

11      A    The only thing I was looking for had

12  to do with the actual reported incident that I

13  was on scene for with the young man who was at

14  the house.

15      Q    While at the residence or hospital,

16  did you see or hear Officer Vicknair give

17  G████  his phone number?

18      A    I believe he gave the number at the

19  hospital, because I remember her getting that

20  number.

21      Q    And what was the reason for that?

22          MR. ROQUEMORE:

23              Objection.  Form.

24          THE WITNESS:

25              I have no idea.

```
1   BY MS. PHELPS:
2       Q    Does NOPD allow patrol officers to
3   give their phone numbers to child victims?
4       A    I don't know.  I don't think I ever
5   read that in the policy or not.
6       Q    So that's not against any policy?
7            MR. ROQUEMORE:
8                 Objection.  Form.
9            THE WITNESS:
10                I haven't read any policy.  So
11           I'm not sure.
12  BY MS. PHELPS:
13      Q    So there's no training for NOPD
14  patrol officers barring them from giving their
15  personal information to child victims?
16           MR. ROQUEMORE:
17                Objection.  Form.
18           THE WITNESS:
19                I can say I haven't been trained
20           on it.
21  BY MS. PHELPS:
22      Q    And you haven't been trained to
23  report to anyone or flag it that a patrol
24  officer, Officer Vicknair, had given his
25  number to a child victim?
```

40

```
1      A    Correct.
2      Q    For this Memorial Day weekend
3  incident, did you request to have the juvenile
4  sexual assault exam kit processed for DNA?
5      A    Yes.
6      Q    Did you get those results back?
7      A    Yes.
8      Q    To date, has NOPD ever arrested
9  anyone in connection with that kit and the
10 assault?
11     A    No.  There's a warrant out for his
12 arrest though.
13     Q    I'm going show you the document.  On
14 Sunday, September 20, 2020, G█████ s social
15 worker with the Children's Bureau, I'll
16 represent to you, submitted a DCFS reporting
17 concerns for child victim's report; and that
18 report mentioned G█████ recently disclosed an
19 NOPD officer making her feel uncomfortable,
20 calling nice ass to her and putting his arm
21 around her waist.  Did you ever receive a copy
22 of that report from DCFS?
23     A    No, I don't believe I did.
24     Q    Would you have expected that someone
25 at DCFS would have alerted you?
```

41

```
 1        A     No, because it's a police officer.  I
 2   don't investigate police officers.
 3        Q     Not even if it involves a victim that
 4   --
 5        A     That would go up for someone above
 6   me.  I'm not at that rank.
 7        Q     After Officer Vicknair's arrest, are
 8   you aware of anything NOPD did to identify any
 9   other potential victims of his?
10        A     That would have been through the
11   Public Integrity Bureau.  So I don't know.
12        Q     Are you familiar with a Children's
13   Hospital social worker Rebecca Johnson?
14        A     Yes.
15        Q     Did you have any conversations with
16   her about this case with G█████
17        A     That, I don't remember if I had any
18   conversation about a case with Vicknair
19   necessarily.
20        Q     Do you remember on this case if
21   Officer Vicknair also gave any information to
22   Ms. Johnson before you arrived on scene?
23             MR. ROQUEMORE:
24                  Objection.  Form.  Are you
25             talking about in September, or are
```

1              you talking about in --

2              MS. PHELPS:

3                   I'm going back talking about

4              May 2020.

5              THE WITNESS:

6                   No, I don't know.  I don't know

7              if he talked to her before I got

8              there.

9    BY MS. PHELPS:

10        Q    I'll show you a copy of a document.

11   It is Children's Hospital 0977 (handing).

12   Have you ever seen this document before?

13        A    I don't know if I've seen -- oh, yes.

14   This is the part of the medical packet, yeah.

15        Q    And you received that in connection

16   with the May 2020 investigation?

17        A    Yes.

18        Q    Do you see at the bottom where it

19   says author, Rebecca Johnson?

20        A    Yes.

21        Q    Ms. Johnson noted that the mental

22   health tech informed SW, social worker, of

23   statements from patient regarding her

24   communication with older men; is that right?

25        A    Yes.

43

1      Q      Did Ms. Johnson talk with you about

2   that?

3      A      Yes.  She talked about a guy that was

4   from Florida that she met during Mardi Gras

5   that she had been in communication with, and I

6   was investigating that too.

7      Q      Below that, it says, an officer

8   informed social worker of the same

9   information; stated he is aware of patient

10  communicating with a man in his 50s and

11  drinking with men his age on Bourbon Street;

12  is that right?

13     A      Yes.

14     Q      So this is a victim and a patient

15  noted as having concerning interactions with

16  older men; is that right?

17          MR. ROQUEMORE:

18               Objection.  Form.

19          THE WITNESS:

20               Wait.  Say that question again.

21          I'm sorry.

22  BY MS. PHELPS:

23     Q      Based on this record, would you have

24  understood that this victim had some

25  concerning interactions with older men?

44

```
 1        A     Oh, yes.
 2        Q     Would it have been a cause of concern
 3   for NOPD then that an officer the same age as
 4   those men had provided the victim with his
 5   phone number?
 6        A     Well, I can't speak for NOPD.
 7        Q     Was it a cause of concern for you?
 8              MR. ROQUEMORE:
 9                   Objection.  Form.
10              THE WITNESS:
11                   That he gave her the number?  I
12              couldn't tell you what I thought
13              about it at that time.
14   BY MS. PHELPS:
15        Q     What did you think at the time?
16        A     No, I'm saying I don't know.  I
17   couldn't tell you what I thought about it at
18   the time.
19        Q     Is that because you haven't been
20   trained to flag that to anyone at NOPD?
21        A     No.  I'm just saying I don't remember
22   what I felt about it at the time.
23        Q     Were you aware that Officer Vicknair
24   was continuing to have conversations with the
25   victim during your investigation?
```