UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


RAYNE UPTON, individually and          DOCKET NO.
On behalf of her minor
Daughter, G.H.                         2:21-cv-407

              Plaintiff,               JUDGE BARBIER

                                       MAG. ROBY

VERSUS

RODNEY VICKNAIR, SHAUN FERGUSON,
THE CITY OF NEW ORLEANS; DOE
DISTRICT COMMANDER; DOES 1 TO 10;
and XYZ INSURANCE COMPANIES 1 TO 10,


              Defendants.




          DEPOSITION OF RODNEY PAUL VICKNAIR,

given in the above-entitled cause, pursuant to the

following stipulation, before Sandra P. DiFebbo,

Certified Shorthand Reporter, in and for the State

of Louisiana, at Guste, Barnett, Schlesinger &

Alpaugh, LLP, 639 Loyola Avenue, Suite 2130, New

Orleans, Louisiana, on the 9th day of June, 2023,

commencing at 12:10 PM.

1          Thank you.  Mr. Vicknair, are you

2             ready to get started?

3          THE WITNESS:

4                Yes, sir.

5             RODNEY PAUL VICKNAIR, 2114 Teal Street,

6             Slidell Louisiana, 70460, having been

7             first duly sworn, was examined and

8             testified on his oath as follows:

9    EXAMINATION BY MR. MOST:

10        Q.   Mr. Vicknair, my name is William Most.

11   I'm an attorney, and I represent Rayne Upton, the

12   plaintiff in this case.

13        A.   Correct.

14        Q.   How are you doing today?

15        A.   Day by day, you know.  That's all you can

16   do with these tumors in your head.

17        Q.   Yeah.  Well, I understand that you have

18   these tumors in your head, so I'm going to ask you

19   some questions that are sort of nonstandard for

20   depositions, but they sort of are to figure out how

21   good your memory is, how good your thinking is

22   today, so that if anyone ever wonders, you know,

23   how reliable is his testimony today, they have a

24   sense of it.  All right?

25        A.   Yes, sir.

```
1    that you are a party to?
2         A.    No.
3         Q.    You understand that you're under oath
4    here today?
5         A.    Yes.
6         Q.    You understand that your answers here
7    today have the same force as if we were in a
8    courtroom with a judge or a jury?
9         A.    Yes, sir.
10        Q.    And you realize that being under oath
11   means you are sworn to tell the truth?
12        A.    Yes, sir.
13        Q.    And you will tell the truth today?
14        A.    Yes, sir.
15        Q.    Does any of your medical conditions
16   affect your ability to understand the difference
17   between a truth and a lie?
18        A.    Not that I'm aware of.
19        Q.    I see that we've got a medication list on
20   the table in front of us.  These are medications
21   your doctor recommended?
22        A.    Yes.
23        Q.    Have you taken any medications today?
24        A.    No, not today.
25        Q.    Are any of the medications necessary for
```

```
 1    you to think clearly?
 2         A.   Do I use any of them to think clearly?
 3         Q.   Yes.
 4         A.   Not that I'm aware of.
 5         Q.   I'm asking because I want to see if not
 6    taking one of these medications might make it hard
 7    to think clearly, but it doesn't sound like that's
 8    the case.
 9         A.   No.
10         Q.   Does your medical condition impair your
11    memory?
12         A.   Yes.
13         Q.   Will you be able to tell me when you are
14    unable to remember something?
15         A.   Yeah.  If I can't remember, I'll tell
16    you.
17         Q.   And does your medical condition cause you
18    to remember things that aren't true?
19         A.   Not that I'm aware of.
20         Q.   Is there anything today that we can do to
21    help you through the process of this deposition,
22    whether it's breaks or water or anything else that
23    we can do for you that will help you?
24         A.   No.  I'm fine.
25         Q.   If I ask you a question that you don't
```

```
 1    BY MR. MOST:
 2         Q.   Other than your attorney and Brandy, did
 3    you talk to anyone to prepare for the deposition?
 4         A.   No.
 5         Q.   Did you take any notes to prepare?
 6         A.   No.
 7         Q.   And so these are some questions to see --
 8    you know, to get a sense of your memory, right,
 9    because we know that you're facing a health issue.
10    So what is your birthday?
11         A.   ██████████.
12         Q.   And what is your mother's name?
13         A.   █████████████.
14         Q.   What is your dad's name?
15         A.   ████████████.
16         Q.   Have you ever had a knee injury?
17         A.   Yes.
18         Q.   Where did you go to high school?
19         A.   St. Amant.
20         Q.   What is your most recent phone number?
21         A.   (225) ████████.
22         Q.   Have you ever been married?
23         A.   Yes.
24         Q.   Where was your wedding?
25         A.   In St. Amant.
```

```
 1          Q.    Can you tell me about a happy memory you
 2    have?
 3          A.    A happy memory? Just any memory?
 4          Q.    Any one.
 5          A.    When I got married.
 6          Q.    I'm going to mark as Exhibit C -- here is
 7    a copy.  Does your health issues make it hard for
 8    you to read?
 9          A.    No.  I wouldn't say so.
10          Q.    So this document that is in front of you,
11    it says -- do you see that it says, "Factual Basis"
12    on it?
13          A.    Right.
14          Q.    And you see on the second page it's got
15    your -- on the back side it's got -- is that your
16    signature?
17          A.    Yes.
18          Q.    Do you remember signing this document?
19          A.    Yes.
20          Q.    And this is a factual basis document from
21    your criminal case, right?
22          A.    Correct.
23          Q.    Did you look at this before you signed
24    it?
25          A.    For the most part, yeah.
```

1        Q.   Are there any parts of it that you didn't

2    read before you signed it?

3        A.   No.

4        Q.   So now you've now looked at both the

5    front and the back page of this and read it, right?

6        A.   Yes.

7        Q.   At the very top, in the first sentence,

8    it says, "The defendant admits that these facts are

9    true."

10        A.   Okay.  I see it.

11        Q.   Yeah.  So, Mr. Vicknair, are the facts in

12    here true?

13        A.   Okay.  I'm sorry.  Can you say it again?

14        Q.   Are the facts in this document true?

15        A.   Honestly, no.

16        Q.   Okay.  Are most of the facts in here

17    true?

18        A.   No.

19        Q.   Would you agree that these are the facts

20    that form the basis for your criminal conviction?

21        A.   Yes.

22             MR. MOST:

23                  Can we just take a few minutes to --

24               I am going to talk to Miss Phelps for

25               just a minute.

1      Q.   By that I mean having sex with someone

2  you met through your role as an officer.  Is that

3  what you understood?

4      A.   Yes.

5      Q.   Did you receive any training from NOPD

6  about how to interact with child sexual abuse

7  victims?

8      A.   No, sir.

9      Q.   Did you receive any training or guidance

10  from NOPD about whether it's okay to share your

11  personal contact information with a child sex abuse

12  victim?

13      A.   No, sir.

14      Q.   You've been arrested more than one time,

15  agreed?

16      A.   Yes.

17      Q.   You had been arrested one or more times

18  before you became an NOPD officer, right?

19      A.   Yes.

20      Q.   In the course of applying to be an NOPD

21  officer, did you have to tell NOPD about your prior

22  arrests and convictions?

23      A.   Yes.  As far as I remember I did.

24      Q.   Did you tell NOPD about your prior

25  arrests and convictions when you applied to be an

1    NOPD officer?

2         A.   I'm pretty sure I did, because I knew

3    they would do a background check.

4         Q.   Did you tell them that in writing or

5    verbally or both?

6         A.   I think it was on the -- I think it was

7    verbally, when they did what they call that -- not

8    the lie detector test, the stress test, or

9    whatever.  That one.

10        Q.   Even if one of your prior arrests or

11   convictions doesn't show up in the written records,

12   you told NOPD verbally about it during that stress

13   test; is that right?

14        A.   Yes.

15        Q.   I'm going to mark as Exhibit D this

16   document I'm handing to you, Mr. Vicknair.  Can you

17   read this document?  Can you see it?

18        A.   Yes.

19        Q.   Is this about a -- see on the other side

20   -- do you see that this is about a simple battery

21   on a juvenile in Ascension Parish?

22        A.   Yep.

23        Q.   Was this something you were arrested for?

24        A.   I think I was given like a summons or

25   something.  I don't remember.  I don't think I was

1    physically taken into custody.

2         Q.   But this was at least about you, right?

3         A.   Yes.

4         Q.   What this criminal case was about, was it

5    about Bernice?

6         A.   I didn't hear the question.

7         Q.   I'm sorry.  Do you remember what you were

8    accused of in this criminal case?

9         A.   It says simple battery.

10        Q.   Right.  Do you recall that you were

11   accused of simple battery against Bernice?

12        A.   No.

13        Q.   Who were you accused of simple battery

14   against?

15        A.   I don't even know -- recall the guy's

16   name.  I remember it was for an altercation at a

17   skating rink where I hit somebody in the head with

18   a pool stick.

19        Q.   Bernice was the name of your stepsister?

20        A.   Yes.

21        Q.   Were you ever accused of inappropriately

22   touching Bernice?

23        A.   Yes.

24        Q.   Did that lead to a criminal case?

25        A.   No.

```
 1    police officer?
 2         A.    Yes.
 3         Q.    So when you were going over to her house
 4    -- when you were going over to ████ H██████'s
 5    house, you were going over to her house as a police
 6    officer, right?
 7         A.    Correct.
 8         Q.    All of the times you went to ████
 9    ██████'s house, were you doing it as a police
10    officer?
11         A.    Say that again.
12         Q.    Sure.   All of the times you went to ████
13    H█████s house, did you go to her house as a police
14    officer?
15         A.    I would say -- I would have to say as an
16    official capacity, no.   I wasn't doing it as a
17    police officer.   There was one time I did it just
18    as a friend.
19         Q.    Which time was that?
20         A.    The night that ██████ called and said that
21    her and her friends had been out smoking weed, and
22    she was afraid that her mom was going to be able to
23    smell it all over her, and she asked me if I could
24    pull up in front of her house and let her stand
25    there and talk to me and see if I could smell the
```

1    weed on her.  So I said okay.  So I did, and I told

2    her, I said, "No.  You don't smell like weed.  All

3    I'm smelling is just the outside, and it smells

4    like you've been sweating."  And she said they had

5    been dancing or something, and I said, "If your mom

6    is asleep on the couch, just go in and go take a

7    shower and leave your mom alone.  Don't worry about

8    it," and that was the last time.

9         Q.   So I think you told investigators that

10   you went over to ███████'s about 12 or 13

11   times; is that right?

12        A.   That is both police-wise -- because I

13   responded to maybe ten, 11 calls over there.

14        Q.   So you went over to her house about 12 or

15   13 times approximately, right?

16        A.   Yeah.

17        Q.   So you're saying that for all of them but

18   one you went over there as a police officer?

19        A.   Correct.

20        Q.   And then you are saying the final time

21   was as a friend?

22        A.   Yes.

23        Q.   The vehicle that you went over to ███████

24   ███████'s house the final time, which vehicle was

25   that?

1      A.   That was my personal vehicle, the gray

2   Tundra.

3      Q.   Do you have any NOPD symbols in that

4   truck, like floor mats or anything else?

5      A.   No.  The only NOPD symbol I had was the

6   placard that we put on our dash to park around the

7   station.  That was it.

8      Q.   So in this truck that you went in the

9   final time, you had an NOPD placard in the front

10   window?

11      A.   Yes.

12      Q.   And that indicates that you can park that

13   car in NOPD officer parking areas?

14      A.   At our station, yeah.

15      Q.   If you need to go to the courthouse in

16   that vehicle, can you park in law enforcement

17   officer parking?

18      A.   Yes.

19      Q.   Did you sometimes use that vehicle to go

20   to the courthouse or to the station?

21      A.   Yeah.  I've used it when I had to go to

22   court.

23      Q.   Any other NOPD symbols or indications on

24   that truck?

25      A.   No.

1    -- you saw ▮▮▮▮▮▮, you went to -- she asked

2    you to see if she smelled like weed?

3         A.   Right.

4         Q.   And police officers are trained in how to

5    smell weed, right?

6         A.   Yes.

7         Q.   So do you think she was asking you, among

8    her friends, because you are a police officer,

9    you've got special training, you know how to smell

10   weed?

11        A.   Yes.  That was my impression.

12        Q.   Your tattoo, My Brother's Keeper, tell me

13   a little bit about that.  Why did you get that?

14        A.   A lot of people at first thought it was

15   for the police, you know, my brothers and all of

16   that, but, honestly, it was for my real brother.

17   His biological father abused, not sexually,

18   physically abused me, my sister, and my mom, and

19   because of that abuse, I was given custody to my

20   grandmother, who gave me everything in the world I

21   could ever want.  So I always said because he

22   suffered, and he continued to suffer, after we

23   left, at the hands of his dad, but because I was

24   given everything because of his father abusing me,

25   I was going to always be his keeper, so that's why

1    I did that.

2        Q.   Did it also, the meaning of that tattoo,

3    also come to encompass your role as an officer as

4    well?

5        A.   Yeah.  When I became the police, it kind

6    of fit in there right with everything.

7        Q.   Yeah.  It's a line from the Bible, right?

8        A.   I honestly don't know.  I saw it on

9    Facebook and I said, "I like that."

10       Q.   Are you a religious person?

11       A.   Yes.

12       Q.   Are your religious beliefs helping you

13   tell the truth here today?

14       A.   I'm sorry?

15       Q.   Are your religious belief -- is your

16   faith helping you tell the truth here today?

17       A.   Yes.

18       Q.   Do you know what Snapchat is?

19       A.   Yes.

20       Q.   Snapchat is an app on a smart phone,

21   right?

22       A.   Correct.

23       Q.   I'm going to mark as -- you have or you

24   had Snapchat on your phone?

25       A.   Yes.

```
 1        Q.   Do you have a phone now?
 2        A.   Yes.
 3        Q.   Do you have a smart phone now?
 4        A.   Yes.
 5        Q.   Is it that same 225 number that we talked
 6   about before?
 7        A.   Yes, sir.
 8        Q.   Do you have it here with you today?
 9        A.   Yes.
10        Q.   I'm going to mark this as Exhibit E. Do
11   you see this here, Mr. Vicknair?
12        A.   Yes.
13        Q.   This Officer Rodney with this caricature,
14   is this you here or does this represent you?
15        A.   That don't look like the one I have.
16        Q.   Did you -- so after your criminal
17   conviction, did you add ██████████ as a
18   connection on Snapchat?
19        A.   No.
20        Q.   Has anyone else had access to your phone
21   besides you since your criminal conviction?
22        A.   Not that I'm aware of.
23        Q.   Your phone that you've got now, can it
24   connect to the Internet?
25        A.   If there is Internet capability, yes.
```

```
 1        Q.   Has the FBI or other federal agents
 2   checked out your phone after your conviction?
 3        A.   No.
 4        Q.   Have you reached out to ███ at all or
 5   communicated with ███ after your conviction?
 6        A.   No.
 7        Q.   So I'll tell you that what this document
 8   is, is Officer Rodney added ████████ as a
 9   friend or as a connection on Snapchat.  Do you know
10   anything about that?
11        A.   No, no.  The only thing I understand is
12   my phone that they took from me has been in police
13   custody ever since my arrest.
14        Q.   But you've got a new phone?
15        A.   Yes.
16        Q.   It's got the same phone number that
17   you've always had?
18        A.   Uh-huh.
19        Q.   Do you have Snapchat on your current
20   phone?
21        A.   Do I have it on there now?
22        Q.   Uh-huh.
23        A.   Yes.
24        Q.   Did you add Snapchat to your phone after
25   -- your new phone after your criminal conviction?
```

```
 1   like your ex-wife or anybody else?
 2        A.   No.
 3        Q.   Do you have any other source of income or
 4   money or assets or anything?
 5        A.   Nope.
 6        Q.   What were you going to do for retirement
 7   if you had not been arrested?
 8        A.   I just planned on keep working.  I was
 9   actually going to go to like truck driving school,
10   because them things come now where you can sleep.
11   It's like an apartment on wheels.
12        Q.   So going back a little bit to your prior
13   arrests, you were arrested for a simple burglary in
14   1986.  Do you remember that?
15        A.   Yes.
16        Q.   Did you disclose that to NOPD?
17        A.   Yes.
18        Q.   And the simple battery that we looked at,
19   did you disclose that to NOPD?
20        A.   Yep.
21        Q.   In 1990, you were arrested for disturbing
22   the peace in Ascension Parish?
23        A.   Yep.
24        Q.   Did you disclose that one to NOPD?
25        A.   Yes.
```

1     Q.   Was that the one with the pool stick in

2  the skate park?

3     A.   No.  I think that one -- this one -- I

4  think that one was just for general fighting.

5     Q.   The field training officers -- I'm sorry.

6  When you were a field training officer, the

7  trainees that you had -- who did you have as

8  trainees during the time you were interacting with

9  G██████████?

10     A.   I don't know their names.  I can tell you

11  one of them.  Atkin, Levi Atkin.

12     Q.   Did you talk to him about your

13  interactions with ████████████?

14     A.   No. I only had him for a short time.

15     Q.   You have a daughter, Sasha, right?

16     A.   That's one of them, yes.

17     Q.   And she's been -- it seems like she has

18  done some modeling?

19     A.   Yes.

20     Q.   Did she live with you for some period of

21  time?

22     A.   No.  She's always been with her mother.

23     Q.   Did you ever take any of the modeling

24  photos with her?

25     A.   With my daughter?

1      Q.    Uh-huh.

2      A.    I don't think so.

3      Q.    When you first met G████████, you went

4  to her house and transported her to the hospital,

5  right?

6      A.    Yes, sir.

7      Q.    Were you assigned to answer that call for

8  service by NOPD or did you hear it and volunteer to

9  go?

10      A.    I believe I was assigned, because it was

11  in my sector.

12      Q.    Would we see that in the --

13      A.    Dispatch log.

14      Q.    Dispatch log.  Would they indicate that?

15      A.    Yes.

16      Q.    Your CIT training, did that involve

17  training for how to deal with victims of sexual

18  assault?

19      A.    No.  That was critical incident, like

20  suicidal, stuff like that.

21      Q.    Did you have special training for dealing

22  with victims of sexual assault?

23      A.    In our yearly inservice, we had sexual

24  assault victim training.

25      Q.    Did you tell G████ or her mother that you

```
1    had training in dealing with sexual assault?
2         A.   No.
3         Q.   Do you need to take a break?
4         A.   No.  I'm okay.
5         Q.   Do you need any more water?
6         A.   No.
7         Q.   So the final time you met G████, she got
8    into your car, correct?
9         A.   I'm sorry.  What?
10        Q.   The final time you met G████, she got
11   into your car?
12        A.   Negative.
13        Q.   Negative.  Where did you smell her for
14   weed?
15        A.   When I drove up on the street, she walked
16   up to the driver's side door, and she was standing
17   there, and I was like, "You don't smell like weed
18   to me," so that was it.
19        Q.   Did she ever get into your Toyota Tundra
20   at any time?
21        A.   No.
22        Q.   Did she ever get into your NOPD vehicle
23   at any time?
24        A.   When I transported her to the hospital,
25   yeah.
```

```
1          Q.   Any times after that?
2          A.   Yes.  She wanted to blow the siren, so I
3    let her get in the driver's seat, and she hit the
4    siren button, and she got out.  That was it.
5          Q.   So part of building your friendship with
6    G█████████ was sort of letting her check out your
7    police stuff?  Is that fair to say?
8          A.   I mean, they ask questions, you know.
9    It's just like a kid with a fire truck.  Can I blow
10   the siren?  You know.
11         Q.   Yeah.  And, you know, letting her get in
12   your car and blow the siren, that was part of your
13   process of becoming friends with G███████████;
14   would you agree?
15         A.   I guess you could say that.
16              MR. MOST:
17                   Why don't we take a five-minute
18                 break, and then we'll come back.
19                   {OFF-THE-RECORD DISCUSSION}
20              MR. ALPAUGH:
21                   Rodney, why don't you repeat what
22                 you just said.
23              THE WITNESS:
24                   Which part?
25              MR. ALPAUGH:
```

```
 1                    Everything.
 2              THE WITNESS:
 3                    Oh.  I said I feel like my heart is
 4              fluttering, and because of these
 5              tremors I'm having, I don't have any of
 6              my anxiety meds, and I think that's
 7              what is making me feel so bad.
 8    BY MR. MOST:
 9         Q.   So the conversation that we've had so far
10    it's felt to me like a pretty normal back and forth
11    where you answered my questions fairly normally and
12    rapidly.  Would you agree with that?
13         A.   Yes, sir.
14         Q.   Has your medical condition or anxiety
15    made any of the answers you've given to me so far
16    not reliable or not truthful?
17         A.   No.
18         Q.   Did you let G███████████ play with or use
19    or touch any of your other NOPD equipment or stuff?
20         A.   Yeah.  She wanted to know how our batons
21    work, those ASP batons, so I let her -- I showed it
22    to her.  She would like sling it, make it come out
23    a couple of times.  Other than that, that was it,
24    but never nothing like the weapons or the taser or
25    none of that.
```

1      Q.   Did you ever let her use the handcuffs?

2      A.   No.

3      Q.   Did you one time take your flashlight and

4   go into her bedroom and shine it in her bedroom?

5      A.   Yes.  When her mom asked me to stop by, I

6   stopped by.  It was a couple of hours later, and I

7   said, "So what is going on?"  She said, "Nothing.

8   She just won't get out of bed."  I said, "Well, go

9   wake her up."  She said, "Come with me."  So we

10   went into the room, and she said, "Shine your light

11   in her eyes," because, you know, those police

12   lights are so bright.  So when I shined my light

13   like this, in her face, her mom grabbed the covers

14   and tried to pull her up, and when she pulled her

15   up, I didn't realize until her mom pulled the

16   covers up that the girl didn't have a top on, and

17   that was it.

18      Q.   So you saw her breasts that one time?

19      A.   Yes.

20      Q.   Did you see her breasts any other times?

21      A.   No.

22      Q.   That was your NOPD flashlight that you

23   shined in her room?

24      A.   Yes.

25      Q.   And so some of the trainees you had

```
 1    around that time when you were interacting with
 2    G███████████, that included Casey; is that right?
 3         A.   Who?
 4         Q.   Officer Casey.
 5         A.   I don't recognize that name, Casey.
 6         Q.   What about Officer Carkum?
 7         A.   I don't recognize that one either.
 8         Q.   Any other trainees?
 9         A.   I remember Levi Atkin.  The last guy was
10    fairly new to me.  He had only been with me for a
11    few days.  I don't remember his name, but on all of
12    my run reports, on my trip sheets that we keep
13    daily, their names are on those, also.  It would
14    have who all was with me every time.
15         Q.   Your phone now.  Do you have the ability
16    to search your text messages for certain words?
17         A.   For what?
18         Q.   Do you know how to search your text
19    messages in the phone you have now for certain
20    words?
21         A.   Yes.
22         Q.   Can you search your e-mail from that
23    phone as well?
24         A.   Yes.
25         Q.   Have you done any searches of your
```

1    e-mails or text messages for this case?

2         A.   No.  I haven't.

3         Q.   If you go in for surgery on Monday, will

4    Brandy have access to your phone?  Does she know

5    the password to it?

6         A.   Yes.

7         Q.   So she could search it if you were unable

8    to?

9         A.   Yes.

10             MR. MOST:

11                  That's the questions I've got,

12               although I might ask some questions

13               following the city's questioning.

14    EXAMINATION BY MR. ROQUEMORE:

15         Q.   Mr. Vicknair, my name is James Roquemore.

16    I am the attorney representing the City of New

17    Orleans, and, therefore, also the New Orleans

18    Police Department.  I'm going to ask you some

19    questions.  If you don't understand any questions,

20    please let me know.  If you are having a hard time

21    about anything, also, let me know.

22         A.   Okay.

23         Q.   Mr. Most asked you a question about

24    Exhibit C, so I would ask you to pull that in front

25    of you.  We'll start off with that.  You see that

1   is a Factual Basis in your criminal case?

2         A.   Yes, sir.

3         Q.   You've seen this before.  You looked at

4   it today, right?

5         A.   Yes.

6         Q.   I remember your testimony being that you

7   disagreed with some or all of it; is that right?

8         A.   Correct.

9         Q.   Is that fair?

10         A.   Correct.

11         Q.   Let's go through this and find out what

12   you have to say about it.  The second full

13   paragraph starts, "Rodney Vicknair was a Police

14   Officer with the New Orleans Police Department."

15   You see that?

16         A.   Yes, sir.

17         Q.   Is that a true statement?

18         A.   Yes.

19         Q.   Is it also true that you applied to

20   become a police officer on or about June 21st,

21   2007?  Is that your remembrance?

22         A.   Yes.

23         Q.   Is that correct? And before that, what

24   were you doing?

25         A.   I was working at Baptist Hospital with

```
 1    Tenet Healthcare.
 2         Q.    You were about 20 years old at that time?
 3         A.    In 2007?
 4         Q.    Yes, sir.
 5         A.    I was 40.
 6         Q.    To jump forward, you resigned from the
 7    police department effective January 13th, 2021.  Is
 8    that also right?
 9         A.    Correct.
10         Q.    You resigned -- the reason why you gave
11    for your resignation was because you had been
12    arrested; is that correct?
13         A.    Correct.
14         Q.    Is there any other reason why you
15    resigned? How did that decision come about?
16         A.    From Sergeant Jones, I think it was, with
17    PIB.
18         Q.    Tell me what happened. How did that
19    decision come about with regard to Jones?
20         A.    He said that he wanted to meet me in
21    Laplace to sign the resignation paperwork, and we
22    met at the St. John Parish Sheriff's Office, and I
23    asked him -- you know, he said just write why
24    you're resigning.  Just say you got arrested or
25    whatever you want, so that's what I wrote.
```

1      Q.   But you have seen this, and you received

2   this letter?

3      A.   Yes.

4      Q.   And it is correct?

5      A.   Yes.

6      Q.   Let me ask you, when you first started

7   with the NOPD, you were a Police Officer 3?

8      A.   Yes.

9      Q.   And then sometime later you were a Police

10   Officer 4; is that right?

11      A.   Uh-huh.  Yes.

12      Q.   And until 2020, you were a Police Officer

13   4?

14      A.   Yes.

15      Q.   As a police officer -- well, I mean, it's

16   fair to say as a police officer you understand that

17   it is illegal for a police officer to have sex with

18   an underage male or female; is that right?

19      A.   Of course, yes.

20      Q.   You also understand that it is not NOPD

21   policy to have a sexual relationship with an

22   underage person as a police officer?

23      A.   Yes, sir.

24      Q.   You mentioned -- we talked a little bit

25   about inservice training and training that you

1      A.   Gotcha.

2      Q.   But you were not necessarily familiar

3   with that at the time that you were talking to

4   ███ in May of 2020; is that fair?

5      A.   Yeah.  I wasn't.  I wasn't familiar with

6   this.  I didn't even think about this.

7      Q.   At some point in time, you gave G███

8   your telephone number; is that right?

9      A.   No.  I gave her mom my business card.

10     Q.   Did you put that in any report to NOPD

11  that you gave the mom your business card?

12     A.   No.

13     Q.   Did you tell any of your fellow officers

14  at the scene, the detective, for example, that you

15  were giving your business card to G███'s mother?

16     A.   The only person other than -- the only

17  person that knew was the mental health counselor

18  that came in, because she was -- and the doctor

19  that was talking to her, because they were in the

20  room when I did it.

21     Q.   Who does the mental health counselor work

22  for?

23     A.   Children's Hospital.

24     Q.   And the doctor.  Who does the doctor work

25  for?

1          A.    Children's.

2          Q.    Do you know whether or not they told

3     anybody?

4          A.    I have no idea.

5          Q.    Is it your testimony that you did not

6     give G███ your personal telephone number at all?

7          A.    No.  Just her mom.

8          Q.    How did G███ get your personal phone

9     number?

10          A.    I guess from her mom. When I handed her

11     mom my business card, she was sitting right next to

12     us.

13               MR. ROQUEMORE:

14                    We are going to go off the record

15                    real quick.  I want to show you -- get

16                    the body cam video shown and ask him a

17                    couple of questions.

18               MR. MOST:

19                    Sure.

20                    {BRIEF RECESS, 2:15-2:20}.

21     BY MR. ROQUEMORE:

22          Q.    Mr. Vicknair, I'm going to be showing you

23     what is going to be marked as the next exhibit for

24     this deposition.  This will be Exhibit I.  This is

25     your body-worn camera video.  It is labeled -- the

1    and you left?

2            A.    Yes, sir.

3            Q.    Is that right? The next time that you saw

4    G█████ was when?

5            A.    It may have been four or five days later.

6            Q.    Let's look at Exhibit C again, this

7    Factual Basis, just to walk through and keep this

8    in order.  The second paragraph, second sentence

9    then.  In May 2020, Vicknair, while working in his

10    capacity as a police officer, escorted a 14 year

11    old girl, who was a victim of sexual assault, to

12    the hospital to undergo forensic exam, i.e, a rape

13    kit.  Is that something you disagree with?

14            A.    No.  I agree with it.

15            Q.    You agree with that.  The next sentence.

16    Vicknair gave the victim his cell phone number and

17    offered to be her friend and mentor.  You agree

18    with that?

19            A.    Yes.

20            Q.    Was this what was reflected in the body-

21    worn camera that we just -- the video that we just

22    --

23            A.    Yes.

24            Q.    Was there anything in addition on that

25    night -- you had some conversations at the

```
 1    anyone in authority at NOPD about your
 2    conversations and the information that was
 3    exchanged, your efforts to become a mentor or
 4    friend, at the hospital?
 5         A.   No.
 6         Q.   The last sentence in that paragraph.  "At
 7    the time, Vicknair was 53 years old.  Is that
 8    something you agree with?
 9         A.   Yes.
10         Q.   Next paragraph, next sentence.  During
11    the four months thereafter, all while acting in his
12    capacity as a police officer to facilitate his
13    conduct to gain the victim's trust, Vicknair and
14    the victim spoke on the phone and exchanged
15    messages on Snapchat.  So we are talking about the
16    next four months.  Do you agree with that sentence?
17    Is there any part of that sentence you disagree
18    with?
19              MR. MOST:
20                   Object as to form.
21              THE WITNESS:
22                   No.
23    BY MR. ROQUEMORE:
24         Q.   You agree with that sentence?
25         A.   Yes.
```

```
 1        Q.   You exchanged messages on Snapchat?

 2        A.   Yes.

 3        Q.   Were these exchange of pictures between

 4    G███giving you pictures of herself?

 5        A.   Not that I recall.  It was just messages.

 6        Q.   Messages.  Were they messages of a sexual

 7    nature?

 8        A.   Yes.

 9        Q.   These were messages -- sexual messages

10    she sent to you?

11        A.   Yes.

12        Q.   Sexual messages you sent to her?

13        A.   No.

14        Q.   What kind of sexual messages did she send

15    to you?

16        A.   Unless you got the chat log or the -- I

17    wouldn't know what was said.

18        Q.   What do you remember about them other

19    than they were just sexual?

20        A.   I remember she made a comment about she

21    made a video for that guy Jim, and I told her that

22    she needed to stop and that would get her in

23    trouble, because if she is doing that kind of

24    stuff, she is basically producing child porn.

25        Q.   A video of a sexual nature?
```

 1         A.    Of herself.
 2              Q.    Herself without clothes on?
 3         A.    I just know what she said.  It was a
 4    video that she made of herself that she sent to
 5    Jim.
 6              Q.    You interpreted that as being a video
 7    that was of an illegal nature because she was
 8    underage?
 9         A.    Right.
10              Q.    Given the knowledge that you had
11    regarding the potential illegal video, did you tell
12    anybody at NOPD, anybody in super -- your sergeant
13    or anybody who was on the Sex Crimes or Child Abuse
14    sections this information?
15         A.    No, because when I confronted her momma
16    about it, her mom said that she knew what was going
17    on, so the fact that her mom knew what her daughter
18    was doing and wasn't doing anything about it, I was
19    like, okay, well, fine, I said, but when I -- no.
20    I remember.  This was a Thursday.  I said -- I was
21    off the next couple of days.  It might have been a
22    Wednesday, because I told mom, I said, "When I come
23    back to work, I'm going to notify my supervisor and
24    Sexual -- and Child Abuse people about what is
25    going on with your daughter, and we're going to all

1    sit down and have a talk." Well, two days later

2    not even two days later, they went filed a

3    complaint against me, and I got arrested, so.

4         Q.   So you did not have a chance to report

5    this video?

6         A.   To the supervisors or anybody? Nope.

7         Q.   Was it your intention to report the

8    video?

9         A.   When I went back to work, yeah.

10        Q.   Why didn't you report it before, before

11   you went back to work?

12        A.   I had been working a lot of overtime, and

13   I had not spent a lot of time with my family, and I

14   didn't, honestly, want to stay after work for

15   another hour waiting on detectives and writing more

16   reports. So I just figured, when I go back to

17   work, I'll let everybody know what was happening.

18        Q.   This was dealing with the video to Jim;

19   is that right?

20        A.   Yes.

21        Q.   Speaking of Jim, isn't it true that on

22   the first car ride to the hospital, the mom and

23   G███ were talking about Jim? Is that right?

24        A.   Yes.

25        Q.   And there were discussions about G█████s

1    relationship with Jim?

2         A.   Correct.

3         Q.   Was there anything about the relationship

4    that gave you pause?  Did you think there was

5    anything inappropriate about it?

6              MR. MOST:

7                   Object to the form.

8    BY MR. ROQUEMORE:

9         Q.   What did you think about Jim's

10   relationship with G████?

11        A.   Well, I didn't think it was something

12   that should be happening, but mom also kept

13   changing her story, saying that she didn't believe

14   her daughter, that she was just fantasizing.  So

15   with mom one minute saying, yeah, she believes her

16   daughter is involved with this man, and then the

17   next minute saying she is just fantasizing and

18   acting out, I didn't give much credit to either one

19   of them.

20        Q.   If it was true -- if the stories were

21   true about Jim and G████it would have meant that

22   G████was having sex with Jim; is that fair?

23        A.   Correct.

24        Q.   That would have been a crime, correct?

25        A.   Yep.

1     Q.   And you didn't report that potential

2  crime to anybody in the New Orleans Police

3  Department?

4     A.   No.

5     Q.   And this is something that happened

6  during Mardi Gras in the City of New Orleans in

7  2020; is that right?

8     A.   Yes.

9     Q.   After the first night, you had

10  conversations with G████████ Snapchat and in a

11  personal private situation; is that fair to say?

12     A.   Yes.

13     Q.   Did you have occasions to talk about Jim

14  on other -- on those occasions?

15     A.   Yeah.  We talked about him, and, you

16  know, I tried to tell her, because all she wanted

17  to do was talk about how mad she was at her mom for

18  not allowing her to have a free rein relationship

19  with him.  She is making, you know, threats all the

20  time about hurting herself or hurting her mom, and

21  I told her she couldn't say that kind of stuff, and

22  it was just back and forth, back and forth, until I

23  finally confronted her mom about it, and when mom

24  told me what mom told me about her, just being

25  adolescent fantasizing, I just kind of gave up on

1   the whole situation, you know.

2        Q.   You used the phrase "free rein."  What do

3   you mean by having a free rein with her

4   relationship?

5        A.   Because when mom first told me about her

6   daughter and Jim, she said Jim would drive in from

7   Florida, pick her up on the weekend, take her to

8   his house and then bring her back.  She never like

9   put her foot down.  G█████ wanted to do it without

10  her mom's knowledge.  She just wanted him to come

11  pick her up, sneak out in the middle of the night,

12  and go, and mom wasn't having it, so she didn't

13  have free rein.  That's the word I was looking for,

14  free rein.

15       Q.   Without restrictions from mom?

16       A.   Right.

17       Q.   Ability to have sexual relationships with

18  this man, also; is that right?

19            MR. MOST:

20                 Object as to form.

21            THE WITNESS:

22                 Right.

23  BY MR. ROQUEMORE:

24       Q.   To your knowledge, was she having sex

25  with his man?

```
 1        A.   They both said they -- she admitted she
 2   was and mom admitted that she talked to him on the
 3   phone and that he confessed to her that he was.
 4        Q.   This was during the four months after you
 5   first met her; is that right?
 6        A.   This was during the first few months
 7   after I met her, yes.
 8        Q.   With that knowledge about the potential
 9   sexual relationship with the underaged female by
10   this 50 something year old Jim, did you provide any
11   of that information to anybody at NOPD?
12        A.   Nope, because, like I said in the
13   beginning, it was I am, I'm not, I am, I'm not. Mom
14   even went as far as getting Jim on the phone to
15   talk to me, and I told Jim who I was and that it
16   needed to stop, and he agreed that it would, but a
17   couple of weeks later mom said, "She is back at it.
18   She just got back from Jim's house.  She was gone
19   with him all weekend."  And then that's when I
20   said, "Well, when I come back to work, we all going
21   to sit down and talk, the detectives and
22   everybody," and then the next -- she said, "I'm not
23   letting my daughter testify about this in court,"
24   and then the next day they went and filed a
25   complaint against me.
```

PLTF_000205

1          Q.    So you are kind of suggesting that it was
2    in retaliation to your threats to turn in the
3    relationship with Jim that they turned on you?
4          A.    Oh, absolutely.
5                MR. MOST:
6                      Object to form.
7    BY MR. ROQUEMORE:
8          Q.    Is that what you are telling me?
9    Absolutely?
10         A.    Yes.
11         Q.    Mr. Vicknair, Jim -- did you ever do any
12   investigation into who Jim was?
13         A.    No.
14         Q.    Did you ever learn what Jim's last name
15   was?
16         A.    No.
17         Q.    Did you ever ask what his last name was?
18         A.    Nope.  I was trying to explain all of
19   that to the detective when I was told to turn the
20   body camera off.  I thought it would have been on
21   the body camera, but since I was told to cut the
22   body camera off, it's not even on there.
23         Q.    Back to the Factual Basis, Exhibit C.
24   Look in front of it.  The next sentence is over
25   time, Vicknair made comments to the victim that

```
 1              MR. MOST:
 2                  Sure.
 3              MR. ROQUEMORE:
 4                  Just five minutes.
 5                  {BRIEF RECESS, 2:50-2:55}
 6      BY MR. ROQUEMORE:
 7          Q.   Mr. Vicknair, we are still on Exhibit C.
 8      Pull it in front of you right there.  Flip it over
 9      to the front page.  There you go.  Second -- third
10      full paragraph.  Last sentence.  "On one occasion
11      he touched V1's breast under her shirt, and on
12      another occasion he touched V1's buttocks over her
13      clothes."  Is this a statement you disagree with or
14      do you agree with it?
15          A.   I disagree with it.
16          Q.   Do you have any comment about it?  Is it
17      true in part?
18          A.   No.
19          Q.   Not true in any part?
20          A.   No.
21          Q.   Next paragraph.  On the night of
22      September 23rd, Vicknair arrived at the Victim's
23      house.  Is that a true statement?
24          A.   I don't remember the date.  Let me see.
25      Was it on a call for service?
```

1    Q.   This would be about two days before you

2  were arrested.

3    A.   Oh, okay.

4    Q.   Do you remember going to her house a

5  couple of days before you were arrested?

6    A.   Yes, yes.  That's when I made the comment

7  --

8    Q.   I believe your testimony was that you

9  were driving your gray truck.  Is that right?

10   A.   (Witness nods head.)

11   Q.   And you didn't have your police uniform

12  on?

13   A.   No.

14   Q.   And you were off duty?

15   A.   Yes.

16   Q.   At that time, you knew that G███ was 15

17  years old; is that right?

18   A.   Yes.

19   Q.   It says -- the next sentence, at the very

20  -- the last sentence that starts on the bottom of

21  the page, and it continues to the next page.  He

22  asked her to come outside and get in his vehicle.

23  Is that true?

24   A.   No.  I asked her to come outside and

25  stand next to the vehicle.  She wanted me to see if

1    I could smell weed on her.

2         Q.    Did anybody at New Orleans Police

3    Department know that you were going to G███████

4    house on this night?

5         A.    No.

6         Q.    Did you tell anybody, any of your

7    cohorts, your friends on the force, that you were

8    going?

9         A.    No.

10        Q.    Did you ever tell any of your friends on

11   the force that you were having a friendly

12   relationship with ████████

13        A.    No, sir.

14        Q.    Did you tell them that you had a -- you

15   were exchanging any kind of messages with --

16        A.    No, sir.

17        Q.    -- an underage girl?

18        A.    No, sir.

19        Q.    To your knowledge, was there any reason

20   why the New Orleans Police Department should have

21   known that you were having a relationship with an

22   underage girl?

23        A.    No.

24        Q.    The statement on the second page

25   continues.   The victim got into the passenger seat

113

1    while Vicknair remained in the driver's seat.  I'm

2    assuming you are saying that that is not correct?

3         A.   I'm sorry?

4         Q.   Is that not correct?  That's not correct?

5    She got into the passenger seat --

6         A.   No.

7         Q.   And you remained in the driver's seat. Is

8    that true or false?

9         A.   I was in the driver's seat.

10        Q.   Did she get in the passenger seat?

11        A.   No.

12        Q.   That's a no?

13        A.   No.

14        Q.   The next sentence says, "Vicknair locked

15   the doors so V1 could not leave."  Is that true or

16   false?

17        A.   False.

18        Q.   Vicknair leaned over towards the victim

19   causing her to fear for her physical safety,

20   confining her against her will, all of which

21   constituted kidnapping.  Is that something you

22   agree or disagree with?

23        A.   Disagree with.

24        Q.   Does it have any truth at all?

25        A.   No.

114

1        Q.    Then Vicknair engaged in a sexual act

2   with the victim without her consent.  Is that true

3   or false?

4        A.    False.

5        Q.    False?

6        A.    Yes.

7        Q.    Any truth at all?

8        A.    No.

9        Q.    You're not claiming that she consented?

10       A.    No.

11       Q.    Are you claiming that there was no sexual

12   act at all?

13       A.    Correct.

14       Q.    Did you touch her under her shirt?

15       A.    No.

16       Q.    Did you ask -- did you have sexual

17   conversation at all during this time?

18       A.    No.

19       Q.    Intentionally touched her genitals under

20   her clothing.  True or false --

21       A.    False.

22       Q.    -- statement?  He was acting -- Vicknair

23   was acting under color of law, and his conduct did

24   not have a legitimate law enforcement purpose.  Was

25   there any law enforcement purpose for you being at

PLTF_000213

1        Q.    You signed this.  When you signed this,

2    what actions were you thinking that you were saying

3    were wrong and against the law?

4        A.    When I signed this, I was just signing it

5    to hurry up and get all this over with.

6        Q.    You do recall you pled -- you don't

7    disagree that you pled guilty to the charges in

8    criminal court?

9        A.    Correct.  I recall that.

10       Q.    You pled guilty to what charges, to your

11   understanding?

12       A.    To whatever they asked me.

13       Q.    Do you remember what charges those were?

14       A.    No.  I don't remember all of those

15   charges, man.

16       Q.    Do you remember what they said that you

17   did that was wrong?

18            MR. MOST:

19                Objection as to form.

20            THE WITNESS:

21                Do what?

22   BY MR. ROQUEMORE:

23       Q.    You mentioned trip logs a little bit

24   earlier?

25       A.    I mentioned what?