UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

G.H.                                                      CIVIL ACTION

VERSUS                                                    NO: 21-407

THE CITY OF NEW ORLEANS, ET AL.                           SECTION: "J" (4)

<u>**Memorandum in Support of Plaintiff's Motion for Reconsideration**</u>

In 2020, Rodney Vicknair, an officer with the New Orleans Police Department ("NOPD"), sexually assaulted Plaintiff G.H., a minor child. The final assault was September 23, 2020.

G.H. brought suit against the City of New Orleans, proffering several theories for the City's *Monell* liability. One theory was improper supervision: that the City did not act quickly enough when put on notice of the red flags of Vicknair's conduct.

The City moved for summary judgment, representing to the Court that there was insufficient "evidence that any policy-maker at NOPD had notice of any inappropriate behavior by Mr. Vicknair." Rec. Doc. 151 at 4. The Court dismissed Plaintiff's improper supervision theory of *Monell* liability, in part because of the lack of a sufficient connection to a final policymaker, which meant that there was insufficient "evidence that the City adopted these policies with deliberate indifference to the obvious consequences that this constitutional violation would occur." Rec. Doc. 157 at 26.

Days before trial, however, new evidence came to light: a text message from the head of the Office of the Independent Police Monitor directly to the final policymaker, then-Chief of Police Shaun Ferguson. The text message said:



The Court postponed the trial and allowed limited additional discovery. That additional discovery has confirmed the following:

- On Friday, September 18, 2020, OIPM-head Susan Hutson sent Chief Ferguson the "potential sexual abuse of a minor by an officer" text message;[1]

- That same day, Hutson and Ferguson spoke by phone. Hutson explained to Ferguson about "possible crimes being committed" by the officer, "as opposed to just . . . administrative misconduct, but actual crimes."[2]

- In that call, Hutson gave Ferguson "information with which he could attempt to identify the officer," including Vicknair's first name.[3]

- Hutson conveyed to Ferguson that the situation was "urgent, you know, danger to this child, something needs to be done."[4]

- Ferguson considered Hutson to be "generally a credible person,"[5] and that that it "was important when she texted" him.[6]

- But Chief Ferguson does not recall telling anyone else at NOPD about the situation;[7]

- Arlinda Westbrook, then head of NOPD's Public Integrity Bureau, says that Ferguson did not tell her or anyone at PIB about the text message;[8]

- Chief Ferguson had the power to "ask PIB to pull an officer off the street" or "engage in surveillance of an officer,"[9] but that he "did not" do so in this situation.[10]

- Chief Ferguson concedes that he is not aware of "any record or any evidence of any kind anywhere indicating [he] took any action in response to receiving this text message."[11]

In short, five days <u>before</u> the final sexual assault, NOPD's chief policymaker had an explicit warning about "potential sexual abuse of a minor by an officer," and had enough information to begin identifying the officer.[12] But the evidence does not show that Ferguson took <u>any action whatsoever</u> to

---

[1] Ex. B at 16:12-18.
[2] Ex. B at 19:13-18.
[3] Ex. B at 19:20-20:9.
[4] Ex. B at 20:10-16.
[5] Ex. A at 23:24-24:1.
[6] Ex. A at 25:9-13.
[7] Ex. A at 25:14-25.
[8] Ex. C at 52:19-22.
[9] Ex. A at 30:15-31:1.
[10] Ex. A at 32:1-7.
[11] Ex. A at 29:1-4.
[12] PIB identified Vicknair as the officer on the first day of its investigation. *See* Rec. Doc. 125-4 ("Sergeant Jones began his investigation on Monday, September 21, 2020 . . . [that same day] Reign identified the Officer as Officer Rodney Vicknair.")

initiate an investigation into the matter. And no one at NOPD took any steps to put Vicknair on desk duty, take him off the streets, surveil him, or any other kind of monitoring prior to the final sexual assault.

Because this new evidence dramatically changes the strength of Plaintiff's improper supervision *Monell* theory, Plaintiff asks this Court to reconsider the dismissal of that theory.

## LEGAL STANDARD

A motion seeking reconsideration or revision of a district court ruling is analyzed under Rule 59(e), if it seeks to alter or amend a final judgment, or Rule 54(b), if it seeks to revise an interlocutory order. *See Cabral v. Brennan*, 853 F.3d 763, 766 (5th Cir. 2017).

Rule 54(b) authorizes the district court to "revise[] at any time . . . any order or other decision . . . that does not end the action." Fed. R. Civ. P. 54(b); *Austin v. Kroger Texas, L.P.*, 864 F.3d 326, 336 (5th Cir. 2017). The Court "is free to reconsider and reverse its decision for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of the substantive law." *Austin*, 864 F.3d at 336 (*citing Lavespere v. Niagara Mach. & Tool Works, Inc*., 910 F.2d 167, 185 (5th Cir. 1990), *abrogated on other grounds, Little v. Liquid Air Corp*., 37 F.3d 1069, 1075 n.14 (5th Cir. 1994) (*en banc*)). Compared to Rule 59(e), "Rule 54(b)'s approach to the interlocutory presentation of new arguments as the case evolves [is] more flexible, reflecting the 'inherent power of the rendering district court to afford such relief from interlocutory judgments as justice requires.'" *Id*. at 337 (*quoting Cobell v. Jewell*, 802 F.3d 12, 25-26 (D.C. Cir. 2015) (internal citations omitted)). One basis for granting reconsideration is "the availability of new evidence not previously available." *Cahill v. Faia*, 2023 U.S. Dist. LEXIS 184224, *5 (E.D. La. Oct. 13, 2023).[13]

---

[13] *Cahill* was a case involving Rule 59, but the "general practice of courts in this district has been to evaluate Rule 54(b) motions to reconsider interlocutory orders under the same standards that govern Rule 59(e) motions to alter or amend a final judgment." *Cahill, citing Southern Snow Mfg. Co. v. SnoWizard Holdings, Inc*., 921 F. Supp. 2d 548, 565 (E.D. La. 2013), *Castrillo v. Am. Home Mortg. Servicing, Inc*., No. 09-4369, 2010 U.S. Dist. LEXIS 33179, 2010 WL 1424398, at *3 (E.D.La. Apr. 5, 2010) (Vance, C.J.); *Rosemond v. AIG Ins.*, No. 08-1145, 2009 U.S. Dist. LEXIS 37571, 2009 WL 1211020, at *2 (E.D.La. May 4, 2009) (Barbier, J.).

**DISCUSSION**

**A.     This Court should grant reconsideration because the new documentary and testimonial evidence shows an explicit warning to the City's final policymaker five days before the final sexual assault.**

Plaintiff seeks reconsideration of this Court's ruling that dismissed Plaintiff's improper-supervision *Monell* claim. Rec. Doc. 157 at 26. Since that ruling, the evidentiary landscape has changed: we now have a text message to the final policymaker, Chief Ferguson, and the depositions of Ferguson, Hutson, and Westbrook.

From that new evidence, we now know that on Friday, September 18, 2024, then-head of OIPM Susan Hutson sent a text message to then-Chief of Police Shaun Ferguson warning him of "potential sexual abuse of a minor by an officer."[14] Hutson said that she contacted NOPD because "they would have known what to do at that point, the main thing being to make sure that the girl was okay. . . . [a]nd that nobody else got harmed."[15] She perceived it as a "very urgent" situation[16] and that she "needed to speak to somebody that day, like, quickly."[17] She said that "action needed to be taken" that day, at the very least, that action had to be "hearing the facts and getting a gameplan together."[18]

She texted Ferguson and then spoke to him on the phone. She explained to him on the phone about "possible crimes being committed as opposed to just . . . administrative misconduct, but actual crimes."[19] She gave Ferguson "information with which he could attempt to identify the officer," including Vicknair's first name.[20] She didn't recall the exact language she used, but she conveyed "urgent, you know, danger to this child, something needs to be done."[21] She asked him to ask his "his command structure to take action on this matter urgently."[22] She agreed that "this

---

[14] Ex. B at 16:12-18.
[15] Ex. B at 13:19-25.
[16] Ex. B at 17:2-10; *see also* 15:6-9.
[17] Ex. B at 18:5-6.
[18] Ex. B at 15:9-13.
[19] Ex. B at 19:13-18.
[20] Ex. B at 19:20-20:9.
[21] Ex. B at 20:10-16.
[22] Ex. B at 21:8-9.

was something that needed to be addressed urgently and something that couldn't just wait until Monday."[23] When she texted with her team about Vicknair, she described him as a "predator," because she "understood that the situation with the Officer Rodney was a potential child predator situation."[24] Hutson testified that "absolutely" NOPD should have engaged monitoring Vicknair by the following Monday.[25]

At deposition, Ferguson did not deny receiving, reading, and responding to Hutson's text message.[26] He said that Hutson was "generally a credible person," in his experience,[27] and that given the infrequent nature of her texts, "that it was important when she texted" him.[28] He agreed that Hutson's text message indicated it was urgent,[29] and that "because of the seriousness of the situation, it can't wait."[30] He agreed that "the urgency of a potential sexual abuse of a minor by an officer situation would be that the officer might commit another sexual abuse."[31]

But Chief Ferguson says he has no recollection of the text message, or of taking any action in response to the text message.[32] He agrees that he had the power to "ask PIB to pull an officer off the street" or "engage in surveillance of an officer,"[33] but that he "did not."[34]

Chief Ferguson conceded at deposition that NOPD should open an investigation the day that "NOPD learns that there is a potential sexual abuse of a child by an officer situation."[35] He agreed that if "it's possible to begin an investigation immediately, NOPD shouldn't wait two or three days to begin the investigation."[36] But NOPD *did* wait three days to open the investigation.[37]

---

[23] Ex. B at 23:2-8.
[24] Ex. B at 24:17-21.
[25] Ex. B at 27:5-12.
[26] Ex. A at 24:2-24.
[27] Ex. A at 23:24-24:1.
[28] Ex. A at 25:9-13.
[29] Ex. A at 27:11-13.
[30] Ex. A at 28:10-15.
[31] Ex. A at 28:17-24.
[32] Ex. A at 25:14-25.
[33] Ex. A at 30:15-31:1.
[34] Ex. A at 32:1-7.
[35] Ex. A (Ferguson Dep.) at 20:1-17.
[36] Ex. A at 21:13-21.
[37] Rec. Doc. 125-4 ("Sergeant Jones began his investigation on Monday, September 21, 2020").

In short, Ferguson received the text message and apparently <u>did nothing at all</u>; he admits he is not aware of "any record or any evidence of any kind anywhere indicating [he] took any action in response to receiving this text message."[38]

Ferguson's inaction is corroborated by then-head of NOPD's Public Integrity Bureau, Arlinda Westbrook.  Westbrook testified that she was not aware of Ferguson "communicating with any member of the PIB team" about the Vicknair matter.[39] Westbrook specifically testified that Chief Ferguson had not called her about it prior to that Monday,[40] and that she did not recall Chief Ferguson ever contacting her about a "potential child sexual abuse by an officer situation."[41] According to Westbrook, the first she learned about Vicknair's conduct was through an in-person meeting with Stella Cziment from the Independent Police Monitor on Monday, September 20, 2020.[42]

She testified that if Chief Ferguson <u>had</u> contacted her about such a situation, PIB would have begun an investigation <u>that day</u>.[43] If Chief Ferguson had contacted her on a Friday, the investigation "would begin on that Friday" – not the next Monday, given that PIB had officers working over weekends.[44] Westbrook also agreed that "NOPD should not leave an officer unmonitored on the street once there's an indication they may be involved in potential child sex abuse."[45]

This new evidence directly connects to the relevant legal standard. Chief Ferguson was the City's "final policymaker vis-à-vis the City police department."[46] And the involvement of a final

---

[38] Ex. A at 29:1-4.
[39] Ex. C at 52:19-22.
[40] Ex. C at 15:22-16:1 ("Q. You didn't, for example, get a call from Chief Ferguson about that situation prior to that meeting with Stella Cziment, did you? A. No.")
[41] Ex.  at 20:13-17.
[42] Ex. C at 13:16-14:4.
[43] Ex. C at 21:23-24:2 ("Q. Sure. And that process would begin the day that Chief Ferguson told you we had a potential child sexual abuse by an officer situation, agreed? A. Yes."
[44] Ex. C at 22:3-14.
[45] Ex. C at 10:15-18.
[46] *Winn v. New Orleans City*, 2014 U.S. Dist. LEXIS 24365 (Feb. 25, 2014) ("The Court finds this conferment of authority sufficient to establish [Superintendent] Serpas as the final policymaker vis-à-vis the City police department."); *see also Beckett v. Serpas*, No. 12-910, 2013 U.S. Dist. LEXIS 82686, 2013 WL 2921639, at *3 (E.D. La. June 12, 2013); *Bean*, 2013 U.S. Dist. LEXIS 156972, 2013 WL 5890573, at *4.

policymaker themselves establishes *Monell* liability, even in the absence of a written policy or pattern of misconduct.[47]

    For that reason, the direct warning to Ferguson changes things substantially. Previously, the Court found insufficient evidence that NOPD policymakers acted "with deliberate indifference to the obvious consequences that this constitutional violation would occur." Rec. Doc. 157 at 26. Now, the evidence now shows (1) an explicit, written warning directly to NOPD's final policymaker about "potential sexual abuse of a minor by an officer"; (2) a complete absence of any action by the policymaker whatsoever to initiate an investigation, surveillance, or pulling the officer off the street; and (3) the final sexual assault of the Plaintiff five days later.

    From this, on top of the evidence previously obtained,[48] a reasonable jury could find the City liable for a *Monell* claim. Plaintiff therefore asks that this Court reverse the dismissal of Plaintiff's improper supervision *Monell* theory.

**C.**    **In the alternative, this Court should grant the motion as a sanction for the City's sanctionable discovery misconduct.**

    The evidence described above is new, but it *should not* be new. In discovery requests sent to the City Attorney in October 2021, Plaintiff requested all text messages of NOPD employees regarding Rodney Vicknair,[49] and particularly asked for communications with the Office of the

---

[47] *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-83 (1986); *see also Anderson v. Larpenter*, 16-13733 (E.D. La. July 18, 2017) (local governments can be liable under *Monell* when "the action of the policymaker itself violated a constitutional right.")

[48] The new evidence is buttressed by the other evidence already provided, as described by the Court in Rec. Doc. 157 at 15-16:

> As to the improper supervision theory, G.H. points to deposition testimony that Defendants had probable cause to arrest Vicknair four days before his actual arrest, during which time he committed a final sexual assault of G.H. *Id*. at 7-10. G.H. also points to deposition testimony that NOPD had no system to monitor (automatic or otherwise) when an officer repeatedly returns to the scene of a sexual assault victim's home. *Id*. at 10. She also cites a report by the Office of the Consent Decree Monitor regarding NOPD Sexual Assault Investigations stating that the NOPD had an excessive caseload for Sex Crimes and Child Abuse detectives, resulting in patrol officers transporting and communicating with G.H. rather than a Child Abuse detective. *Id*. at 11.

[49] See RFP 4 ("Any correspondence between any NOPD or City of New Orleans employee regarding Defendant Rodney Vicknair, including but not limited to emails, text messages, letters, memoranda, etc.,

Independent Police Monitor.[50] Plaintiff also sent a public records request and subpoena to the Office of the Independent Police Monitor for all records related to the Vicknair matter. The "potential sexual abuse of a minor by an officer" text message was not produced by either entity – both of which are part of the City of New Orleans.[51]

Thus, the City had two copies of Hutson's text message to Ferguson: it had Hutson's copy sending the text message, and Fergsuon's copy receiving it. But the City failed to produce either copy despite Plaintiff's requests for production, subpoena, and public records request.

There is no excuse for that. Chief Ferguson's text messages should have been searched, given that he was listed in the City's August 25, 2021 initial disclosures as an individual "likely to have discoverable information."[52]

But despite designating him as a person likely to have discoverable information, the City never asked Ferguson whether he had any such information. Chief Ferguson testified that he could not recall anyone asking him for "for text messages or documents related to Vicknair."[53] He did not recall anyone asking him to "preserve or save any documents or text messages."[54] Chief Ferguson did not step down as chief until December 2022[55] – long after this case was filed, and more than a year after he was identified as "likely to have discoverable information."

Similarly, Westbrook testified that at no "point prior to 2024" did anyone "come and ask [her] for text messages or documents related to the Vicknair case," or ask her to preserve any documents.[56]

---

which are in your possession.") and RFP 5 ("Any correspondence between any NOPD or City of New Orleans employee and any non-NOPD or City employee regarding Defendant Rodney Vicknair, including but not limited to emails, text messages, letters, memoranda, etc., which are in your possession.")
[50] RFP 14 ("All documents sent to and from, and communications with, the Office of the Independent Police Monitor or the Office of the Consent Decree Monitor regarding Defendant Rodney Vicknair, Plaintiff, or G.H.")
[51] The City Attorney at a recent status conference suggested that OIPM is not a part of the City of New Orleans. They are wrong. *See USA v. City of New Orleans*, 12-cv-01924-SM-DPC, Rec. Doc. 102 at 8-10 ("It is uncontested that OIPM is a division of a City agency – the OIG. . . . The OIPM division of OIG is not a juridical person separate and distinct from other government entities.")
[52] Ex. D at 1-2 (listing the "Superintendent of NOPD or his designee" among individuals "likely to have discoverable information.")
[53] Ex. A at 36:10-13.
[54] Ex. A at 36:14-16.
[55] Ex. A at 11:5-6.
[56] Ex. C at 62:23-63.9.

As a result, Plaintiff missed out on the opportunity to depose witnesses and conduct discovery while the evidence was fresher. The City failed to preserve the text messages on Ferguson's phone, resulting in the destruction of potential evidence. It is only because OIPM conducted a more thorough search of Hutson's records when the Washington Post submitted a public records request that we have the text messages at all.

Plaintiff asks this court, in the alternative, to reverse the improper-supervision dismissal as a sanction for the City's discovery misconduct.

## CONCLUSION

For that reason, Plaintiff asks the Court to reconsider its summary judgment order only so far as to reverse the decision dismissing Plaintiff's improper supervision theory of *Monell* liability.

Respectfully submitted:

**MOST & ASSOCIATES**

*/s/ William Most*
**WILLIAM MOST (La. Bar No. 36914)**
**HOPE PHELPS (La. Bar No. 37259)**
201 St. Charles Ave., Ste. 2500, #9685
New Orleans, LA 70170
Tel: (504) 509-5023
Email: williammost@gmail.com
***Counsel for Plaintiff, G.H.***