UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


RAYNE UPTON, individually and          DOCKET NO.
On behalf of her minor
Daughter, G.H.                         2:21-cv-407

          Plaintiff,                   JUDGE BARBIER

                                       MAG. ROBY

VERSUS

RODNEY VICKNAIR, SHAUN FERGUSON,
THE CITY OF NEW ORLEANS; DOE
DISTRICT COMMANDER; DOES 1 TO 10;
and XYZ INSURANCE COMPANIES 1 TO 10,

          Defendants.



          DEPOSITION OF SHAUN D. FERGUSON,

given in the above-entitled cause, pursuant to the

following stipulation, before Sandra P. DiFebbo,

Certified Shorthand Reporter, in and for the State

of Louisiana, at the Office of the City Attorney,

1300 Perdido Street, City Hall, Room 5E03, New

Orleans, Louisiana, on the 11th day of April, 2024,

commencing at 10:00 AM.

```
 1    APPEARANCES:

 2

 3              MOST & ASSOCIATES
                BY: WILLIAM MOST,
 4              ATTORNEY AT LAW
                201 St. Charles Avenue
 5              Suite 2500, #9685
                New Orleans,Louisiana  70170
 6              Representing the Plaintiff

 7

 8              CITY OF NEW ORLEANS
                LAW DEPARTMENT
 9              BY:  CORWIN ST. RAYMOND,
                ASSISTANT CITY ATTORNEY -and-
10              JAMES ROQUEMORE,
                ASSISTANT CITY ATTORNEY
11              1300 Perdido Street
                Suite 5E03
12              New Orleans, Louisiana  70112
                Representing Shaun Ferguson, the City of
13              New Orleans, DOE District Commander, DOES
                1 to 10 and XYZ Insurance Companies
14              1 to 10

15

16    Reported By:

17

18              Sandra P. DiFebbo
                Certified Shorthand Reporter
19              State of Louisiana

20

21

22

23

24

25
```

```
 1        E X A M I N A T I O N          I N D E X
 2
 3                                    Page
 4    BY MR. MOST:                    5, 68
 5    BY MR. ST. RAYMOND:            60
 6
 7
 8      E X H I B I T                I N D E X
 9                        Page
10
11    Exhibit A                     22
12    Exhibit B                     44
13    Exhibit C                     45
14    Exhibit D                     48
15    Exhibit E                     53
16    Exhibit F                     64
17
18
19
20
21
22
23
24
25
```

<pre>
 1                 S T I P U L A T I O N

 2

 3                    It is stipulated and agreed by and

 4      among counsel for the parties hereto that the

 5      deposition of SHAUN D. FERGUSON is hereby being

 6      taken pursuant to the Federal Rules of Civil

 7      Procedure for all purposes in accordance with law;

 8                    That the formalities of reading and

 9      signing are specifically waived;

10                    That the formalities of sealing,

11      certification, and filing are hereby specifically

12      waived.

13                    That all objections, save those as to

14      the form of the question and responsiveness of the

15      answer are hereby reserved until such time as this

16      deposition or any part thereof is used or sought to

17      be used in evidence.

18                         *  *  *  *  *

19                    Sandra P. DiFebbo, Certified Shorthand

20      Reporter, in and for the State of Louisiana,

21      officiated in administering the oath to the

22      witness.

23

24

25
</pre>

```
1            SHAUN D. FERGUSON, ███████████████
2    ████████████████████████████, having been first
3       duly sworn, was examined and testified on his
4       oath as follows:
5    EXAMINATION BY MR. MOST:
6         Q.   Good morning, Chief.  My name is William
7    Most.  I'm the lawyer for the plaintiff in the case
8    of Upton v. Vicknair.  How are you doing today?
9         A.   Good.  And yourself?
10        Q.   Doing good.  Thank you.  Will you please
11   state your full name for the record?
12        A.   Shaun Dwayne Ferguson.
13        Q.   Do people still call you Chief Ferguson?
14        A.   Yes.  Sometimes, yes.
15        Q.   Chief, have you ever given a deposition
16   before?
17        A.   Yes, I have.
18        Q.   Approximately how many?
19        A.   About three or four.
20        Q.   So you understand that you're under oath
21   today and that your answers here today have the
22   same force as if we're in a courtroom with a judge
23   and jury?
24        A.   Yes.
25        Q.   Is there anything today, whether it's
```

1    fatigue, illness, emotional distress, medication,

2    substances or anything else that will prevent you

3    from giving truthful and complete answers?

4         A.   No.

5         Q.   As you know from prior depositions, we

6    will be going for a while, but this does not have

7    to be continuous.  If you need to take a break to

8    use the restroom or for any other reason, you can

9    do that, although, I'll tell you now that I may ask

10   you who you talked to and what, if anything, you

11   looked at during breaks.  All right?

12        A.   Yes.

13        Q.   If I ask a question that is unclear or

14   confusing or you don't understand the question,

15   will you agree now to tell me that's the case

16   rather than just trying to answer it anyway?

17        A.   Yes.

18        Q.   And one thing you are already doing well

19   is waiting until I finish my question before

20   answering, and I will try and do the same courtesy

21   to you.  That way we'll have a clean transcript for

22   the court reporter.  All right?

23        A.   Yes.

24        Q.   Have you brought any documents with you

25   today to the deposition?

1    A.    No.

2    Q.    Other than talking to an attorney, did

3  you talk to anyone to prepare for today's

4  deposition?

5    A.    No.

6    Q.    Did you look at any documents in the

7  anticipation or to prepare for today's deposition?

8    A.    No.

9    Q.    Did you take any notes in the

10  anticipation or to prepare for today's deposition?

11    A.    No.

12    Q.    Other than talking to an attorney, did

13  you do anything to prepare for or anticipate this

14  deposition?

15    A.    No.

16    Q.    Do you know what this case that we're

17  here for is about?

18    A.    Somewhat, yes.

19    Q.    What is your general understanding of

20  what this case is about?

21    A.    To my understanding, there are questions

22  raised around the hiring or the practices of our

23  disciplinary action when it comes to Vicknair and

24  his investigation.

25    Q.    And so you understand that this case is

1   about Officer Vicknair, who is an NOPD officer?

2       A.   Yes.

3       Q.   Have you ever met Officer Vicknair?

4       A.   I have seen him around the department,

5   yes.

6       Q.   You understand he was accused of sexually

7   assaulting an underage child?

8       A.   Yes.

9       Q.   And that child is the plaintiff in this

10  case who I represent.  Do you understand that?

11      A.   Yes.

12      Q.   So I want to talk about some basic

13  principles first, and then we'll get into the facts

14  of what happened with Mr. Vicknair particularly.

15  So, Chief, would you agree that NOPD should not

16  hire habitual offenders to be police officers?

17          MR. ST. RAYMOND:

18              Object to form.

19          THE WITNESS:

20              Yes.

21  BY MR. MOST:

22      Q.   Would you agree that NOPD should not

23  leave an officer unmonitored on the street once

24  NOPD is notified that there is a potential child

25  sexual abuse by an officer situation with that

1  officer?

2            MR. ST. RAYMOND:

3                 Object to form.

4            THE WITNESS:

5                 When you say potential, I can't say

6            that I agree if you just saying

7            potential.  The way you use that word.

8  BY MR. MOST:

9       Q.   So you think it would be okay for NOPD to

10 leave an officer on the street unmonitored even if

11 NOPD has been notified there is a potential child

12 sexual abuse by an officer on a child situation

13 with that officer?

14           MR. ST. RAYMOND:

15                Object to form.

16           THE WITNESS:

17                What I'm saying is that I believe

18           that we need evidence to make that

19           decision as to whether or not an

20           officer should be left in their

21           assignment.

22 BY MR. MOST:

23      Q.   Would you agree that NOPD should not

24 leave an officer on the street unmonitored once

25 there is probable cause to arrest the officer?

```
 1              MR. ST. RAYMOND:
 2                   Object to form.
 3              THE WITNESS:
 4                   Do I believe -- can you repeat that
 5         question?
 6   BY MR. MOST:
 7        Q.   Sure.  Would you agree that NOPD should
 8   not leave an officer on the street unmonitored once
 9   NOPD has probable cause to arrest that officer?
10              MR. ST. RAYMOND:
11                   Object to form.
12              THE WITNESS:
13                   Yes.
14   BY MR. MOST:
15        Q.   Would you agree that if NOPD finds out an
16   officer has sexually assaulted a child, NOPD should
17   try and find out if there are other victims?
18        A.   Yes.
19        Q.   Do you recall that in 2020 -- let me back
20   up.  What was your role in 2020?
21        A.   I was the superintendent of the New
22   Orleans Police Department.
23        Q.   It is also called the Chief of Police?
24        A.   Yes.  Also called Chief of Police, yes.
25        Q.   So you were the highest ranking person in
```

```
1    the NOPD chain of command?
2         A.    Yes.
3         Q.    And you had that role in September 2020?
4         A.    Yes.
5         Q.    When did you leave that role?
6         A.    December of 2022.
7         Q.    Did you leave the city's employment after
8    that?
9         A.    Yes.
10        Q.    What have you done since then in terms of
11   professionally?
12        A.    Nothing.
13        Q.    Are you retired?
14        A.    Yes.
15        Q.    Do you recall that in September 2020,
16   NOPD arrested NOPD Officer Rodney Vicknair?
17        A.    Yes.
18        Q.    What do you recall led to his -- what do
19   you recall that Vicknair did that led to his
20   arrest?
21        A.    I recall there being an allegation of
22   sexual assault of a minor.
23        Q.    How did you first learn there might be a
24   problem with Officer Vicknair's conduct?
25        A.    The best that I can recall, I remember
```

```
 1   PIB informing me of that, of this potential case
 2   going on.
 3         Q.   Do you recall if PIB informed you about
 4   Vicknair on the day of his arrest?
 5         A.   I was informed of this case prior to his
 6   -- the day of his arrest. I do recall that.
 7         Q.   Was it the day that PIB opened a criminal
 8   investigation into Vicknair that they informed you
 9   about potential issues of Vicknair's conduct?
10              MR. ST. RAYMOND:
11                   Object to form.
12              THE WITNESS:
13                   I'm not sure if it was the day of
14                the criminal investigation.  I'm not
15                sure of that, no.
16   BY MR. MOST:
17         Q.   And the PIB is the Public Integrity
18   Bureau?
19         A.   Yes.
20         Q.   That is the Internal Affairs Department
21   for NOPD?
22         A.   Yes, it is.
23         Q.   And who at PIB first informed you about
24   an issue with Vicknair?
25         A.   It would have been Chief Arlinda
```

1    Westbrook.  Deputy Chief Arlinda Westbrook.
2         Q.   You say it would have been.  Do you
3    recall that it was her, or you are --
4         A.   Yes.  It was her.  I believe it
5    definitely was her.  That's who would call me.
6         Q.   Did she call you on the telephone, send
7    you an e-mail, come to your office?  How did she
8    talk to you about it?
9         A.   That I do not recall.
10        Q.   What do you recall she told you?
11        A.   Based on my memory, my best recollection,
12   I remember her telling me that there was an
13   allegation of possible misconduct between an
14   officer and a juvenile.  They were looking into it.
15   That was my first notification of it, and they had
16   been informed by the independent monitor.
17        Q.   And was that on a weekday or weekend?
18        A.   I don't know.
19        Q.   Do you recall how many days before
20   Vicknair's arrest it was?
21        A.   No.  I do not.
22        Q.   How did you respond to Deputy Chief
23   Westbrook?
24        A.   My standard protocol is to allow PIB to
25   conduct the investigation to determine what will be

1    the proper path moving forward.

2         Q.   Did you ask her to take any steps?

3         A.   I just let them do their process.  I

4    never intervene into their process.

5         Q.   In that conversation, did you ask

6    Westbrook to do anything at all?

7         A.   Conduct the investigation, yes.

8         Q.   You didn't ask to receive updates about

9    the status of the investigation?

10        A.   I would ask periodically.  I remember

11   asking a couple of times, you know, are there any

12   updates, so she would update me periodically.

13        Q.   So in the first conversation with

14   Westbrook about the Vicknair situation, you didn't

15   ask her to provide you with updates, but you are

16   saying you asked for updates subsequent to that?

17        A.   I normally would ask for them to give me

18   updates as to the investigation, you know, moving

19   forward.

20        Q.   You're saying you would do that.  Do you

21   recall if you asked?

22        A.   I don't recall if I did or did not.

23        Q.   But you recall that you reached out to

24   Westbrook between that initial conversation and the

25   arrest of Vicknair?

```
 1        A.    Yes.
 2        Q.    And how many times did you reach out to
 3   Westbrook between the initial conversation and the
 4   arrest of Vicknair?
 5        A.    I do not know.
 6        Q.    How did you reach out to Westbrook
 7   between the initial conversation when you asked?
 8        A.    That I don't know.  I'm thinking maybe a
 9   meeting we may have already had.  I would ask are
10   there any updates or conversation about something
11   else I would ask if there are any updates.
12        Q.    Are you saying that you would have asked
13   her for updates or you recall asking her for
14   updates?
15        A.    I asked her.  I recall asking her for
16   updates.
17        Q.    What do you recall her telling you?
18        A.    Specifically, initially, there was an
19   administrative investigation going on, and they
20   were waiting to interview the juvenile to determine
21   further actions.
22        Q.    What is the next update you recall
23   receiving?
24        A.    I want to say the arrest.
25        Q.    Westbrook informed you that Vicknair had
```

1    been arrested?

2         A.   That they will be arresting him based on

3    the evidence that they obtained.

4         Q.   So it sounds to me like you had three

5    conversations with PIB about Vicknair.  One initial

6    conversation that there was a potential problem,

7    two, they were intending to interview the victim,

8    and then, three, shortly before the arrest of

9    Vicknair; is that correct?

10        A.   That's what I recall.  The best I can

11   recall.  I can't say if there is just three.

12   That's the three that I recall.

13        Q.   But you can't recall if any of those

14   three were in person or by telephone?

15        A.   No.  I don't recall how they were, no.

16        Q.   Do you recall if they were verbal or by

17   text message?

18        A.   I would think verbal.

19        Q.   But you don't recall?

20        A.   I don't.

21        Q.   Do you recall where you were when you had

22   these conversations with Westbrook?

23        A.   I do not.

24        Q.   Do you recall if you had these

25   conversations during the workday or after the

1    workday when you were at home?

2        A.   I do not recall.

3        Q.   Do you recall if you were in your office

4    or somewhere else in NOPD facilities when you had

5    these conversations?

6        A.   I do not recall.

7        Q.   Do you recall literally anything about

8    these -- any of these three conversations other

9    than the content you described?

10       A.   I do not.

11       Q.   Other than an officer killing someone, is

12   there anything more serious for a chief to hear

13   than that one of his officers may have sexually

14   assaulted a child?

15           MR. ST. RAYMOND:

16               Object to form.

17           THE WITNESS:

18               I believe any misconduct by an

19               officer would be, you know, something

20               that a chief of police would not want

21               to hear.

22   BY MR. MOST:

23       Q.   Certainly some misconduct is more serious

24   than other misconduct, agreed?

25       A.   Yes.

1        Q.   For example, it is more serious if an

2   officer murdered someone.  That's more serious than

3   if an officer shoplifted; would you agree?

4        A.   Yes.

5        Q.   So other than an officer killing someone,

6   is there anything more serious for a chief to hear

7   than that one of his officers may have sexually

8   assaulted a child?

9             MR. ST. RAYMOND:

10                 Object to form.

11             THE WITNESS:

12                 My answer is still the same.  Any

13               misconduct conducted alleged by an

14               officer is not a good thing to hear for

15               a chief of police.

16   BY MR. MOST:

17        Q.   Yeah.  I understand that.  Respectfully,

18   that's not the question I'm asking.  The question

19   I'm asking is given that some things are more

20   serious than others in terms of misconduct, other

21   than an officer killing someone, is there anything

22   more serious than an officer sexually assaulting a

23   child?

24             MR. ST. RAYMOND:

25                 Object to form.

1          THE WITNESS:

2              An officer shooting someone who is

3              unarmed, and they're not killed.

4    BY MR. MOST:

5        Q.   Okay.  Setting aside shooting someone

6    unarmed and killing someone, is there anything more

7    serious than an officer sexually assaulting a

8    child?

9        A.   Again, any misconduct.  Any misconduct. I

10   feel like you are trying to get me to just say yes

11   or you are going to ask the same question over and

12   over.  Any misconduct by an officer, respectfully,

13   is something that a police chief does not want to

14   hear of.  It's not a good thing to hear about any

15   officer.

16       Q.   Can you think of anything more serious in

17   terms of officer misconduct other than killing

18   someone and nonfatally shooting an unarmed person,

19   anything more serious than an officer sexually

20   assaulting a child?

21           MR. ST. RAYMOND:

22              Object to form.

23           THE WITNESS:

24              No.

25   BY MR. MOST:

1      Q.   Once NOPD learns that there is a

2  potential sexual abuse of a child by an officer

3  situation, NOPD should open a criminal

4  investigation that day; would you agree?

5            MR. ST. RAYMOND:

6                 Object to form.

7            THE WITNESS:

8                 No, I would not agree.  I think all

9              investigations of the level, meaning

10             administrative versus criminal, is

11             based on evidence that is presented to

12             PIB or NOPD at that time.

13  BY MR. MOST:

14     Q.   At least some kind of investigation

15  should be opened that day; would you agree?

16     A.   I would say that you have to at least

17  look into it, yes.

18     Q.   That day?

19            MR. ST. RAYMOND:

20                 Objection.

21            THE WITNESS:

22                 I'm sorry.  If possible.

23  BY MR. MOST:

24     Q.   If NOPD learns that there is a potential

25  child sex abuse by an officer situation, it

```
 1   wouldn't be okay for NOPD to, say, wait two or
 2   three days to even begin an investigation; would
 3   you agree?
 4              MR. ST. RAYMOND:
 5                   Object to form.
 6              THE WITNESS:
 7                   I would say that if they can
 8              interview or talk to someone to
 9              confirm.  Everything is, again, based
10              on the evidence that is presented to
11              them at that time.
12   BY MR. MOST:
13       Q.   But if it's possible to begin an
14   investigation immediately, NOPD shouldn't wait two
15   or three days to begin the investigation; would you
16   agree?
17              MR. ST. RAYMOND:
18                   Object to form.
19              THE WITNESS:
20                   I would agree, because we have a 24-
21              hour call-out, yes.
22   BY MR. MOST:
23       Q.   Right.  NOPD doesn't take the weekends
24   off, correct?
25       A.   We have a 24-hour call-out, yes.
```

1        Q.    And that's true for PIB as well, correct?

2        A.    Yes.

3        Q.    I am going to mark as Exhibit A -- you

4   see, Chief, that this is a photo of some text

5   messages on a telephone?

6        A.    Yes.

7        Q.    You see that the top one is dated

8   September 18th, 2020, 5:13 PM, and it begins Hey

9   Shaun?

10       A.    Yes.

11       Q.    Have you seen these text messages before?

12       A.    Through my attorney, yes.

13       Q.    Who is your attorney?

14       A.    City Attorney St. Raymond.

15       Q.    So the first time you saw these text

16  messages, to your recollection, is being provided

17  them by your attorney?

18       A.    Yes.

19       Q.    You see at the top it indicates that

20  these are text messages going to Shaun D. Fer dot,

21  dot, dot?

22       A.    Yes.

23       Q.    That's the beginning of your name,

24  correct?

25       A.    Yes.

```
 1        Q.   You see that the first text message says,
 2   "Hey Shaun.  I need to reach Arlinda urgently, if
 3   she's near you can your all her to call me?  It's
 4   about potential sexual abuse of a minor by an
 5   officer."  Do you see that?
 6        A.   Yes, I do.
 7        Q.   Do you have any recollection of receiving
 8   that text message in 2020?
 9        A.   I do not.
10        Q.   Do you know Susan Hutson?
11        A.   Yes, I do.
12        Q.   She is currently the sheriff of Orleans?
13        A.   Yes, she is.
14        Q.   And in 2020, she was the independent
15   police monitor?
16        A.   Yes.
17        Q.   Did you sometimes text message with Susan
18   Hutson?
19        A.   Yes.
20        Q.   If she said that these are text messages
21   between you and her, would you have any reason to
22   dispute that?
23        A.   I would not.
24        Q.   She is generally a credible person, in
25   your experience?
```

1        A.    Yes.

2        Q.    So if Susan says she had this text

3   exchange with you on September 18th, 2020, would

4   you believe that and just think you had forgotten

5   about that text?

6        A.    Yes, yes.

7        Q.    Did you take any steps to try and figure

8   out, look at these on a phone to figure out if they

9   are authentic?

10       A.    No.   I don't have that phone.

11       Q.    When you say that phone, you mean your

12  work phone?

13       A.    The department work phone, yes.

14       Q.    Do you see that these text messages show

15  someone responding, "Hi, I tried calling you back?"

16       A.    Yes.

17       Q.    Do you have any reason to think that's

18  not you sending that text message?

19       A.    I do not.

20       Q.    Did anyone else have access to your work

21  phone in September of 2020?

22       A.    No.

23       Q.    So if this was your phone responding,

24  would it have been you?

25       A.    Yes.

1          Q.   It looks like there are no text messages

2     between you and Susan Hutson from September 18th,

3     2020 to February 6th, 2021.  Does that look right

4     to you?

5          A.   Yes.

6          Q.   So it was a fairly infrequent thing for

7     Independent Police Monitor Hutson to text with you?

8          A.   Yes.  It appeared to be so.

9          Q.   If she was texting you -- well, let me

10    back up.  Because it was infrequent that you would

11    text message with the monitor, Hutson, did that

12    indicate that it was important when she texted you?

13         A.   Yes.

14         Q.   Do you recall taking any steps in

15    response to this text message?

16         A.   I don't recall the text message, but

17    based on what I'm reading in front of me, I would

18    have to believe I would have referred her to PIB.

19         Q.   That same day?

20         A.   Yes.

21         Q.   And who would you have contacted at PIB?

22         A.   Chief Westbrook.

23         Q.   But you don't have any recollection of

24    doing that, correct?

25         A.   I do not.

```
 1        Q.    You are thinking it is what you would
 2   have done?
 3        A.    Yes.
 4        Q.    So you are speculating about what you
 5   would have acted on had you received this text
 6   message?
 7             MR. ST. RAYMOND:
 8                  Object to form.
 9             THE WITNESS:
10                  I wouldn't call it speculation.
11              That's what I would do.
12   BY MR. MOST:
13        Q.    In your experience, is Chief Westbrook
14   credible?
15        A.    Yes.
16        Q.    So if she says that she did not receive
17   any communication with you that Friday, you don't
18   have any reason to disagree?
19             MR. ST. RAYMOND:
20                  Object to form.
21             THE WITNESS:
22                  I would not.
23   BY MR. MOST:
24        Q.    Do you have any recollection about
25   talking to anybody about this text message?
```

1      A.   If I did not reach out to Chief

2   Westbrook, I would then reach out -- try to contact

3   the captain.  Those are the only two people I would

4   speak to.

5      Q.   Captain Sabrina Richardson?

6      A.   I believe it was Captain Sabrina

7   Richardson at that time, yes.

8      Q.   But you don't have any recollection of

9   reaching out to her?

10      A.   I do not.

11      Q.   In this text message, Susan Hutson says

12   that it is urgent, correct?

13      A.   Yes.

14      Q.   She says that it's about potential sexual

15   abuse of a minor by an officer, correct?

16      A.   Yes.

17      Q.   In your experience, when Susan Hutson had

18   raised issues with you when you were the chief of

19   police -- well, let me back up.  Other than this

20   situation, did Susan Hutson sometimes reach out to

21   you about potential issues with an officer?

22      A.   No.  Rarely.  She would reach out to PIB.

23   She had that established relationship with PIB.

24      Q.   So if she was escalating something to

25   you, it would mean that it was particularly urgent,

```
 1   serious, and potentially dangerous; would you
 2   agree?
 3               MR. ST. RAYMOND:
 4                   Object to form.
 5               THE WITNESS:
 6                   If she is reaching out to me, it's
 7               only because she is unable to contact
 8               someone at PIB.
 9   BY MR. MOST:
10       Q.   And because of the seriousness of the
11   situation, it can't wait; would you agree?
12               MR. ST. RAYMOND:
13                   Object to form.
14               THE WITNESS:
15                   Yes.
16   BY MR. MOST:
17       Q.   And the urgency of a potential sexual
18   abuse of a minor by an officer situation would be
19   that the officer might commit another sexual abuse;
20   would you agree?
21               MR. ST. RAYMOND:
22                   Object to form.
23               THE WITNESS:
24                   Yes.
25   BY MR. MOST:
```

 1      Q.   Are you aware of any record or any
 2   evidence of any kind anywhere indicating you took
 3   any action in response to receiving this text
 4   message?
 5           MR. ST. RAYMOND:
 6                Object to form.
 7           THE WITNESS:
 8                Not that I can recall.
 9   BY MR. MOST:
10      Q.   Do you recall talking at any point with
11   the mayor about the Vicknair situation?
12      A.   Not that I can recall, no.
13      Q.   Do you recall talking to John Thomas
14   about the Vicknair situation?
15      A.   Not that I can recall.  Not initially.
16   John Thomas, if he was over field operations, I
17   would say I would gather that there was a
18   conversation what was going on, but I can't -- I
19   don't recall talking to him.
20      Q.   So you imagine you would have talked to
21   John Thomas, but you don't recall doing so?
22      A.   Right.  Yes.
23      Q.   Do you recall talking to city council
24   members about the Vicknair situation?
25      A.   No.

1      Q.   What about the office of the consent

2   decree monitor?

3      A.   I don't recall talking to anyone.

4      Q.   Do you recall following up with Susan

5   Hutson or Stella Cziment about the Vicknair

6   situation?

7      A.   I do not.

8      Q.   Did you ask anyone to pull Vicknair off

9   the street?

10      A.   That would not be my position.  There is

11   a process that the citizen has due process,

12   officers would have due process, and that would

13   have been through the vetting process of PIB's

14   investigation.

15      Q.   You had the power to ask PIB to pull an

16   officer off the street; would you agree?

17           MR. ST. RAYMOND:

18                Object to form.

19           THE WITNESS:

20                I have the power, yes.  I have the

21           power. Yes, I do.

22   BY MR. MOST:

23      Q.   As chief, you had the power to ask that

24   PIB engage in surveillance of an officer; would you

25   agree?

1      A.   Yes.

2      Q.   There are no due process issues with

3  engaging in surveillance of an officer; would you

4  agree?

5           MR. ST. RAYMOND:

6                Object to form.

7           THE WITNESS:

8                So the best I can answer this

9                question is that, one, the process, in

10               itself, is a process established by

11               PIB.  I never interfere into that

12               process, meaning I have never ordered a

13               surveillance.  I have never

14               specifically ordered anyone removed

15               from the streets until an investigation

16               has been conducted by PIB that evidence

17               has been warranted to take such steps.

18  BY MR. MOST:

19     Q.   But if you were concerned that an officer

20  might hurt someone, you had the power to ask that

21  they be taken off the street or subjected to

22  surveillance; would you agree?

23     A.   Again, based on evidence provided.

24     Q.   Yes. Based on evidence provided, you have

25  that power?

1      A.   Yes.

2      Q.   You did not ask PIB to pull Vicknair off

3   the streets or subject him to surveillance, agreed?

4           MR. ST. RAYMOND:

5                Object to form.

6           THE WITNESS:

7                I did not.

8   BY MR. MOST:

9      Q.   Did you ask PIB to identify any other

10   victims that Vicknair may have had?

11      A.   Again --

12           MR. ST. RAYMOND:

13                Object to form.

14           THE WITNESS:

15                Again, I do not insert myself into

16            PIB's process.

17   BY MR. MOST:

18      Q.   Does PIB answer to anyone in the chain

19   command other than the chief of police?

20      A.   They do not.

21      Q.   The chief of police of NOPD is

22   responsible, as the head of chain of command, for

23   the actions of PIB; would you agree?

24      A.   Yes.

25           MR. ST. RAYMOND:

```
 1                   Object to form.
 2    BY MR. MOST:
 3         Q.   Are you aware that there was a Washington
 4    Post article about Vicknair in March 2024?
 5         A.   Yes.
 6         Q.   Did you read the article?
 7         A.   I did not.
 8         Q.   Are you aware it mentioned your name?
 9         A.   Yes.
10         Q.   How did you learn that it mentioned your
11    name?
12         A.   The reporter actually attempted to
13    contact me.
14         Q.   Once the article came out, did someone
15    describe it to you?
16         A.   Based on what the news said.
17         Q.   So you read or watched news about the
18    Washington Post story but did not read the Post
19    story itself?
20         A.   Yes.
21         Q.   Have you talked to anybody about the Post
22    story since it came out?
23         A.   My family and my attorney.
24         Q.   Anybody else?
25         A.   Not that I can recall, no.
```

1    Q.   Other than your family and your attorney,
2  have you talked to anybody about the Vicknair
3  situation since the Washington Post story came out?
4    A.   No.
5    Q.   Have you texted or e-mailed with anybody
6  about it?
7    A.   No.  Not that I can recall, no.  The
8  reporter sent me the article, but I didn't mess
9  with it.
10    Q.   The reporter e-mailed you the Washington
11  Post article?
12    A.   No.  She text it to me.  I don't even
13  know her name.
14    Q.   The Washington Post reporter texted you a
15  copy of the story, and you didn't read it?
16    A.   I did not, because I know how media can
17  be, so I'm not bothered to consume myself with that
18  when I have more important things to do in my
19  personal life.
20    Q.   So you haven't texted or communicated
21  with Susan Hutson about the Vicknair situation
22  since the story came out?
23    A.   Well, i did.  I asked her was she aware
24  of this text message.  I did ask her.  I called and
25  asked her about that, yes.

1      Q.    This text message being the one that we

2   looked at, Exhibit A?

3      A.    Yes, because I didn't recall.  I was

4   asking her if she recalled it, because I didn't

5   recall it.

6      Q.    How did you know about the text message?

7      A.    The news.  When I saw it on the news,

8   that triggered me to ask her what was this about,

9   because I didn't recall it.  The reporter -- before

10  the report -- before the article came out contacted

11  me to ask me about it.  I told them I didn't recall

12  the text message.  So when this came out, I was

13  like, what is this about?  So I asked Susan Hutson

14  what was this about, did she recall it.

15     Q.    And what did she say?

16     A.    She said she vaguely recalled it.  She

17  remembered trying to get in touch with PIB about

18  this incident but couldn't, to my recollection,

19  remember specifically what was done after this

20  text.

21     Q.    So she confirmed to you that this was a

22  text message exchange that you and her had?

23     A.    Yes.

24     Q.    And you don't have any reason to doubt

25  the truth of that, correct?

1          A.     No.

2          Q.     Have you communicated about this with

3    Arlinda Westbrook since this story came out?

4          A.     Arlinda.  Not that I can recall.  Not

5    that I can recall, no.

6          Q.     When you were chief of police, were you

7    aware that there was a civil lawsuit about

8    Vicknair?

9          A.     Not that I can recall.

10         Q.     While you were chief, did anyone come and

11   ask you for text messages or documents related to

12   Vicknair?

13         A.     Not that I can recall.

14         Q.     Did anyone ask you to preserve or save

15   any documents or text messages?

16         A.     Not that I can recall.

17         Q.     So you're aware that PIB conducted an

18   investigation into Vicknair, correct?

19         A.     Yes.

20         Q.     Are you familiar with the specifics of

21   what PIB learned in the course of that

22   investigation?

23         A.     That there was a sexual assault committed

24   by the officer and an arrest was made.

25         Q.     So let's suppose that on day one of the

1    investigation, PIB learned that the officer had

2    taken a very inappropriate picture with a 15-year-

3    old girl and described it as a seductive photo.

4    Should PIB have left the officer unmonitored on the

5    streets after that?

6              MR. ST. RAYMOND:

7                  Object to form.

8              THE WITNESS:

9                  Again, I do not insert myself into

10                 their process.  Every officer has a

11                 right to due process.  Taking a

12                 picture, to me, I mean, who classified

13                 it as sexual?  I don't know the

14                 specific words you just used, but how

15                 was it presumed to be that way?

16   BY MR. MOST:

17        Q.   Yeah.  You know who Sergeant Lawrence

18   Jones is?

19        A.   Yes.

20        Q.   Let's say Sergeant Jones saw a picture of

21   the officer and a 15 year old girl he considered to

22   be a seductive photo.  In your opinion, should NOPD

23   have left the officer on the street unmonitored

24   after that?

25              MR. ST. RAYMOND:

```
 1                   Object to form.
 2             THE WITNESS:
 3                   And he concluded that it was
 4             seductive in nature? Ah, nah.
 5   BY MR. MOST:
 6        Q.   Ah, na like --
 7        A.   No.  They should not have left him on the
 8   street, but, again, more evidence is needed.
 9        Q.   When you say they should not have left
10   him on the street, you think the officer should
11   have been removed from the street to protect the
12   safety of the girl?  Would you agree?
13        A.   Let me say this.  I can't say that they
14   should have removed him, because a picture is a
15   picture.  I can't speak for the investigator in
16   saying it was seductive in nature, but, again, the
17   officer, as well as all officers and citizens has a
18   right to due process, so I think, again, no
19   determination can be made as to whether or not an
20   individual, and officer specifically, should be
21   removed from their assignment until the evidence
22   presents itself to do so.
23        Q.   All right.  At the very least, once PIB
24   has seen a seductive photo of an officer with a
25   girl, PIB should begin surveillance of that
```

```
 1   officer; would you agree?
 2               MR. ST. RAYMOND:
 3                   Object to form.
 4               THE WITNESS:
 5                   I can't say surveillance.  I cannot
 6               speak to what prompts a surveillance
 7               investigation, portion of
 8               investigation.
 9   BY MR. MOST:
10        Q.   So you think it would be okay for PIB to
11   leave the officer on the street unmonitored after
12   that?
13               MR. ST. RAYMOND:
14                   Object to form.
15               THE WITNESS:
16                   Again, due process.  I will say that
17               that officer has to go through their
18               due process.  Once the evidence has
19               been provided or gained or learned to
20               remove that officer, that is when the
21               officer should be removed from their
22               assignment.
23   BY MR. MOST:
24        Q.   Does an officer have a due process right
25   to not be under surveillance?
```

```
 1              MR. ST. RAYMOND:
 2                   Object to form.
 3              THE WITNESS:
 4                   No, sir.  No.
 5   BY MR. MOST:
 6        Q.   So there is no due process concerning
 7   surveilling an officer, agreed?
 8        A.   When I say due process, sir, I'm speaking
 9   to PIB's process as well.  They have a process
10   that, in my thoughts, that would trigger a
11   surveillance.  I do not speak to when.  I cannot
12   speak to when and how that should be done.
13        Q.   Do you know what PIB's process was for
14   deciding whether to surveil an officer?
15        A.   I do not.
16        Q.   Do you know if they had such a process?
17        A.   I do not know.
18        Q.   So you're imaging that they had such a
19   process?
20        A.   I'm not imaging anything.  I'm telling
21   you that there is a process for them to take steps
22   to conduct the investigation.  I cannot speak to
23   those, because I was not in PIB.  That is their
24   assignment.  That is their job.
25        Q.   Okay.  Officer Vicknair testified that he
```

1    went to the minor's house 12 or 13 times.  Would

2    you agree that's a major red flag?

3                MR. ST. RAYMOND:

4                     Object to form.

5                THE WITNESS:

6                     I cannot say that it is or is not.

7                I mean, something that we kind of

8                pushed our officers to do was community

9                engagement, community policing.  I know

10               some officers have taken some kids or

11               some even adults underneath their wings

12               as a mentor to them.

13   BY MR. MOST:

14       Q.   Would it be appropriate for an officer to

15   begin mentoring -- a male officer to begin

16   mentoring a 15 year old girl that he met after she

17   was sexually assaulted?

18               MR. ST. RAYMOND:

19                     Object to form.

20               THE WITNESS:

21                     I don't think so.  I don't think so.

22   BY MR. MOST:

23       Q.   So if such an officer was returning to

24   such a girl's house 12 or 15 times, that would be a

25   red flag; would you agree?

```
 1                MR. ST. RAYMOND:
 2                     Object to form.
 3                THE WITNESS:
 4                     Yes.
 5      BY MR. MOST:
 6           Q.   Do you agree that NOPD should have a
 7      system to spot patterns like that in vehicle GPS
 8      data?
 9                MR. ST. RAYMOND:
10                     Object to form.
11                THE WITNESS:
12                     I have to kind of correlate some of
13                  these questions that you're asking.
14                  You said 12 to 13 times, but I don't
15                  know.  Was he in uniform?  Was he in a
16                  police vehicle?  Because we cannot just
17                  be responsible for an officer when
18                  they're off duty.  It's kind of hard
19                  for me to answer your question.
20      BY MR. MOST:
21           Q.   Sure.  Would you agree that NOPD should
22      have a system, at least to monitor vehicle GPS
23      data, to look for officers making suspicious
24      patterns of returning to a minor's home?
25                MR. ST. RAYMOND:
```

```
 1                    Object to form.
 2           THE WITNESS:
 3                    Again, while on duty?
 4           MR. MOST:
 5                    Yes.
 6           THE WITNESS:
 7                    Yes.
 8   BY MR. MOST:
 9       Q.   Would you agree that NOPD should have a
10   policy and training practices to direct supervisors
11   to look for patterns, suspicious patterns, on the
12   officer trip sheets?
13           MR. ST. RAYMOND:
14                    Object to form.
15           THE WITNESS:
16                    Yes.
17   BY MR. MOST:
18       Q.   And if NOPD doesn't have any policy,
19   training, or system like what we discussed, that
20   would be a problem, agreed?
21           MR. ST. RAYMOND:
22                    Object to form.
23           THE WITNESS:
24                    So I think the supervisors do a heck
25                of a job of monitoring these officers
```

```
 1              and their behaviors.  I mean, they're
 2              spot checking body-worn camera footage.
 3              They're spot checking in-car camera
 4              footage.  So that is part of their
 5              supervisory duties.  So GPS, I would
 6              think, would be a part of that as well.
 7    BY MR. MOST:
 8         Q.   I'm going to mark as Exhibit B -- you see
 9    that this is a document that starts CNO-114 at the
10    bottom?
11         A.   Yes.
12         Q.   And at the top it says, "Department of
13    Police Interoffice Correspondence," and it is dated
14    December 12th, 2006?
15         A.   Yes.
16         Q.   And it's to the superintendent of police
17    from Investigator Christopher Harris?
18         A.   Yes.
19         Q.   It is about a background investigation of
20    a potential applicant to the NOPD police
21    department?
22         A.   Yes.
23         Q.   So at least in 2006, memos went from
24    officers conducting background checks of potential
25    applicants to the superintendent of police,
```

1    correct?

2         A.   Yes.

3         Q.   Was that true when you were chief as

4    well?

5         A.   No.  I didn't read them specifically, no.

6         Q.   But did the memo --

7         A.   The memo was addressed to me, but there

8    were, you know, steps and police to address it,

9    yes.

10         Q.   I'm going to mark as Exhibit C another

11   document.  This is a document that I've created. Do

12   you see that it is a chart, and it says, "Rodney

13   Vicknair Pre-NOPD Criminal History?"

14         A.   Yes.

15         Q.   Do you see that it lists seven arrests

16   and/or convictions on here of different crimes?

17         A.   Yes.

18         Q.   So I want to look at some documents with

19   you to figure out if this is a correct list of

20   Rodney Vicknair's pre-NOPD criminal history.  All

21   right?

22         A.   Okay.

23         Q.   So looking at Exhibit B, which you have

24   in your hand, which is the CNO-114 document, if you

25   turn to where it says Page CNO-117 at the bottom.

```
 1        A.   Yes.
 2        Q.   It is towards the back.  You see that
 3   there is a paragraph that says, "Arrest History
 4   Information?"
 5        A.   Yes.
 6        Q.   Do you see that this is for Rodney
 7   Vicknair?
 8        A.   Yes.
 9        Q.   Do you see that it says that Rodney
10   Vicknair was arrested for disturbing the peace in
11   Gramercy, Louisiana, in March 1982 and paid the
12   fine?
13        A.   Yes.
14        Q.   So that would be an arrest and conviction
15   of Rodney Vicknair for disturbing the peace in
16   1982?
17             MR. ST. RAYMOND:
18                  Object to form.
19             THE WITNESS:
20                  I don't know if that's a conviction.
21                He paid the fine, but I don't know if
22                that was a conviction of that specific
23                charge or something else.
24   BY MR. MOST:
25        Q.   It says, "Arrested for disturbing the
```

1   peace in Gramercy, Louisiana."

2        A.   And paid the fine.

3        Q.   And paid the fine.  You think that's

4   referring to a different --

5        A.   I don't know. I know in courts sometimes

6   they will reduce the charges to another charge and

7   not specifically that charge that they were

8   arrested for initially.

9        Q.   So at least Vicknair was arrested for

10  disturbing the peace in March 1982; would you

11  agree?

12       A.   Based on this document, yes.

13       Q.   If you turn to the next page, it talks

14  about applicant was cited for disturbing the peace

15  in June 1986.  Applicant pled guilty and paid the

16  fine. Do you see that?

17       A.   Yes.

18       Q.   So that would be a June 1986 arrest and

19  conviction for disturbing the peace, correct?

20       A.   Seems as though, yes.  Maybe, again, if

21  they didn't plead guilty to a lesser charge.

22       Q.   NOPD, when it is hiring officers, can

23  consider expunged arrests; would you agree?

24       A.   If they could see them based on evidence

25  that is presented to them.

1    Q.   So just because an arrest is expunged
2  doesn't mean the NOPD cannot consider it in
3  deciding whether or not to hire an officer, agreed?
4    A.   Again, based on if they see it, because
5  sometimes expungements you do not see them.
6    Q.   Sure, but just because it is expunged
7  doesn't mean NOPD is somehow prohibited from
8  considering it, agreed?
9    A.   I would say if they can see it.  Again,
10  if they could see it.  Expunged, to me, seems to be
11  as though it has been removed from their record, so
12  they may not see it.
13    Q.   I'm going to mark this as Exhibit D. You
14  see that this is a document that says CNO-0229 at
15  the bottom?
16    A.   Yes.
17    Q.   You see that this is a NCIC -- do you see
18  that this is a criminal history search for
19  Vicknair?
20    A.   Yes.  Criminal history record, yes.
21    Q.   And NOPD has access to criminal history
22  databases like this, correct?
23    A.   Yes.
24    Q.   And these can be used to look up a
25  potential applicant's criminal history?

```
 1          A.    Yes.
 2          Q.    You know how to read one of these
 3     reports; is that correct?
 4          A.    I'm trying to read it now.
 5          Q.    You've looked at NCIC or NLETS searches
 6     like this before?
 7          A.    Yes.
 8          Q.    So if you go to CNO-231 at the bottom.
 9          A.    Yes.
10          Q.    You see that this shows a May 1985 arrest
11     for two counts of illegal use of a weapon and two
12     counts of criminal damage to property?
13          A.    Yes.
14          Q.    It also shows a July 1986 arrest for
15     attempted burglary?
16          A.    Yes.
17          Q.    And a June 2005 arrest for simple battery
18     and aggravated assault?
19          A.    Yes.
20          Q.    So far we have seen in these documents
21     the 1982 arrest, the 1985 arrest, the July 1986
22     arrest, and the June 2005 arrest.  Would you agree?
23          A.    Yes.
24          Q.    Looking at Exhibit B, CNO-118.
25          A.    Yes.
```

1      Q.    We've also got a citation for disturbing
2  the peace in June 1986.
3      A.    Yes.
4      Q.    That the applicant pled guilty to?
5      A.    Yes.
6      Q.    So now we've got -- we've seen all of the
7  crimes on this document except the 1987 and 1990
8  crimes, agreed?
9      A.    Based on what I'm seeing before me, yes.
10      Q.    So based on the crimes we've seen,
11  disturbing -- multiple disturbing the peace crimes,
12  illegal use of a weapon, damage to property,
13  aggravated assault, simple battery, and attempted
14  burglary, an officer with that criminal history,
15  should they have been hired by NOPD?
16          MR. ST. RAYMOND:
17              Object to form.
18          THE WITNESS:
19              I think everything is based on what
20          the recruiter was able to determine
21          through their background investigation,
22          because as I read his report, all of
23          these arrests are not listed in his
24          report to the superintendent of police.
25  BY MR. MOST:

1         Q.    So they should have been included in the

2    memo to the superintendent of police?

3         A.    If they had that information.

4         Q.    Right.  Because the superintendent of

5    police would want to know if a potential applicant

6    has been cited or arrested five different times

7    prior to being considered for hiring by NOPD,

8    agreed?

9              MR. ST. RAYMOND:

10                  Object to form.

11             THE WITNESS:

12                  Yes.

13   BY MR. MOST:

14        Q.    And these crimes that we've looked at are

15   serious ones.  Aggravated assault, simple battery,

16   burglary.  These are serious crimes, agreed?

17             MR. ST. RAYMOND:

18                  Object to form.

19             THE WITNESS:

20                  Yes.

21   BY MR. MOST:

22        Q.    Same with illegal use of a weapon, damage

23   to property?

24        A.    Yes.

25        Q.    If NOPD knew about these arrests, should

```
 1    they have hired Rodney Vicknair?
 2              MR. ST. RAYMOND:
 3                   Object to form.
 4              THE WITNESS:
 5                   Again, I think it's based on the
 6                   evidence that was obtained by the
 7                   investigator.  Once he or she looked
 8                   into these arrests and determined what
 9                   was what with those arrests.  Again,
10                   that's a process.  It is also based on
11                   the process at that time of this
12                   applicant.
13    BY MR. MOST:
14         Q.   Would you hire an officer who had a
15    history of arrests or citations for illegal use of
16    a weapon, damage to property, attempted burglary,
17    aggravated assault, and simple battery?
18              MR. ST. RAYMOND:
19                   Object to form.
20              THE WITNESS:
21                   Again, if I have the information.
22                   All of this is based on the background
23                   investigation that is presented to me
24                   at that time.  If I have that
25                   information, probably not.
```

1    BY MR. MOST:

2        Q.   Because you'd be worried that that

3    applicant might hurt someone if they became an

4    officer, agreed?

5            MR. ST. RAYMOND:

6                Object to form.

7            THE WITNESS:

8                I'd just be concerned about that

9              applicant's background.  Again, some of

10             this stuff is kind of old. 1982.

11             People do change over time.

12   BY MR. MOST:

13       Q.   The June 2005 arrest was from the year

14   before Vicknair was applying to be an officer,

15   correct?

16       A.   Yes.

17       Q.   I'll mark this as Exhibit E, a document.

18   Do you see that this is a St. Tammany Parish

19   Sheriff's Office report about the June 2005 arrest

20   of Rodney Vicknair?

21       A.   Yes.

22       Q.   Do you see that this was for aggravated

23   assault and simple battery?

24       A.   Yes.

25       Q.   So if you turn to the page that says

```
1    CNO-198 at the bottom.
2         A.   Yes.
3         Q.   You see that this is a narrative of what
4    happened from the officer's perspective?
5         A.   Yes.
6         Q.   Do you see that this describes an
7    incident between Mr. Vicknair and a man and a
8    woman?
9         A.   Yes.
10        Q.   And that the officers observed injuries
11   to the man who was not Vicknair?
12        A.   Yes.
13        Q.   And that there was discussion of Vicknair
14   brandishing a knife?
15        A.   I'm trying to see was he brandishing a
16   knife.  Yes.  Pulled a knife out, out of his
17   pocket.  Yes.
18        Q.   And do you see that there is a discussion
19   that Mr. Vicknair was making threats in the
20   presence of deputies?
21        A.   Yes.
22        Q.   So this describes Mr. Vicknair continuing
23   to make threats even after the police arrive?
24        A.   Yes.
25        Q.   And the police take his gun away from
```

 1   Vicknair, correct?

 2              MR. ST. RAYMOND:

 3                   Object to form.

 4   BY MR. MOST:

 5        Q.   If you go on to the next page, CNO-199 at

 6   the bottom.

 7        A.   Yes, I see.  He advised he had a firearm.

 8        Q.   So the sheriff's deputies take Vicknair's

 9   gun away from him, correct? According to this?

10        A.   Yes.

11        Q.   And Vicknair tells the police he'd feel

12   better if they took his gun away?

13        A.   Yes.

14        Q.   So this narrative describes Vicknair as

15   someone who lacks self-control if he's continuing

16   to make threats in the presence of officers; would

17   you agree?

18              MR. ST. RAYMOND:

19                   Object to form.

20              THE WITNESS:

21                   Yes.

22   BY MR. MOST:

23        Q.   And someone who is admitting that they

24   lack self-control, specifically with regard to a

25   gun; would you agree?

1      A.    Yes.

2      Q.    If this information was in NOPD's

3 possession, NOPD should not have hired this person

4 to be an officer; would you agree?

5           MR. ST. RAYMOND:

6                 Object to form.

7           THE WITNESS:

8                 Yes.

9           MR. MOST:

10                So I think we will ask the clerk for

11                permission to designate Chief Ferguson

12                as a non-retained expert witness.

13 BY MR. MOST:

14     Q.    I'm going to ask you some questions about

15 your qualifications and work history to that end.

16 For context, a party can ask someone to give

17 opinion testimony if the judge allows them to be

18 qualified as an expert, and we may do that in this

19 case with you.  So, Chief Ferguson, how long did

20 you work in law enforcement?

21     A.    24 years.

22     Q.    What sort of academies or training did

23 you go through to become an officer?

24     A.    New Orleans Police Department Academy.

25     Q.    Were you part of the NOPD for the

```
 1    entirety of your law enforcement career?
 2         A.   Yes.
 3         Q.   Did you receive further training when you
 4    became an officer or a ranking officer?
 5         A.   Yes.  Throughout my career.
 6         Q.   So you had ongoing training in each of
 7    your 24 years as a law enforcement officer?
 8         A.   Not every year.  I mean, we had
 9    recertifications, yes, but not every year of my
10    career I did not have like additional training.
11         Q.   So you went through periodic
12    recertifications and periodic retraining?
13         A.   Yes.
14         Q.   What ranks did you hold as a law
15    enforcement officer?
16         A.   Patrolman, sergeant, lieutenant,
17    commander, chief of police.
18         Q.   What division were you commander over?
19         A.   Fourth District, Second District, and the
20    academy.
21         Q.   So for a period of time you were the
22    commander in charge of the NOPD Academy?
23         A.   Yes.  Six months.
24         Q.   And in that role, you were responsible
25    for the curriculum and training practices for new
```

1    NOPD trainees?

2         A.    Yes.

3         Q.    And, also, the academy handles ongoing

4    in-service training of officers?

5         A.    Yes.

6         Q.    So as part of that responsibility, you

7    had to stay abreast of best practices and

8    development in the literature of police training?

9         A.    Yes.

10         Q.    Did you also do those things as chief of

11    police?

12         A.    Do what?

13         Q.    Stay abreast of developments in police

14    training, practices, and the literature of

15    policing?

16         A.    To the best of my ability.  To the best

17    that I could, but you have officers and assignments

18    to do that for me.

19         Q.    Did you receive any training from

20    entities outside of NOPD like the FBI Academy or

21    anything else?

22         A.    PERF, Police Executive Research Forum.

23         Q.    Were you a member of the International

24    Association of Chiefs of Police?

25         A.    Yes.

 1     Q.   And would you receive IACP bulletins and
 2  materials?
 3     A.   Yes.
 4     Q.   Would you read some of those materials
 5  and bulletins?
 6     A.   Sometimes.
 7     Q.   Did you have any other awards,
 8  commendations, certifications, external to NOPD?
 9     A.   SPI.  Southern Police Institute executive
10  training.
11     Q.   Anything else?
12     A.   National Organization of Black Law
13  Enforcement Executives, NOBLEE, and Major Cities
14  Chiefs of Police Association.
15     Q.   So in your 24 years as a law enforcement
16  officer, with the benefit of this training and your
17  on-the-job experience, you learned about the proper
18  training and supervision of police officers; would
19  you agree?
20     A.   Yes. Do you have a few more questions?  I
21  need to use the restroom.
22     Q.   We can take a break.
23              {BRIEF RECESS 11:00-11:03}
24          MR. MOST:
25              I'll turn it over to Mr. St.

```
 1              Raymond.  I may have follow-up
 2              questions based on his questioning, if
 3              he has any.
 4    EXAMINATION BY MR. ST. RAYMOND:
 5         Q.   Chief Ferguson, I want you to look at
 6    Exhibit A again.  That's the text message.  There
 7    was some testimony earlier that I just want to
 8    clarify, that you don't recall taking any action in
 9    reference to this text message.  Do you recall that
10    testimony?
11         A.   Yes.
12         Q.   Now, you don't dispute that this --
13         A.   He said documented.  He said do I recall
14    taking any -- is there any record of me taking any
15    action.
16         Q.   Sure, yeah.  Record of taking any action.
17    You would agree that this text message is a written
18    record?
19         A.   Yes.
20         Q.   You'd agree that in this text message
21    you, in fact, tried to call Susan Hutson back?
22         A.   Yes.
23         Q.   And that's documented here?
24         A.   Yes.
25         Q.   And she indicated that she got on a call
```

```
 1    on that same issue, and she said she would holler
 2    after?
 3         A.   Yes.
 4         Q.   And you said okay?
 5         A.   Yes.
 6         Q.   So in reference to her first initial
 7    contact with you, you did take action, right?
 8         A.   Yes.
 9              MR. MOST:
10                   Object to the form.
11    BY MR. ST. RAYMOND:
12         Q.   It's documented here?
13         A.   Yes.
14         Q.   I want to ask you about this first text
15    message.  She indicated to you in this message that
16    she is trying to get in touch with Arlinda, and she
17    wants you to have her call her, correct?
18         A.   Yes.
19         Q.   She notes that it's about potential
20    sexual abuse of a minor by an officer?
21         A.   Yes.
22         Q.   I want to talk about that second
23    sentence.  Is an officer identified in this
24    message?
25         A.   No.
```

1      Q.    What does potential sexual abuse mean to
2  you?
3      A.    That someone is telling them that they
4  may have heard of something, that an officer did
5  it, as it relates to possible sexual abuse.
6      Q.    So would that --
7      A.    Possibly.  It's a possibility is what I'm
8  saying.
9      Q.    Right.  So a possibility doesn't mean
10 something actually occurred, correct?
11     A.    Yes.
12     Q.    Let's look at what has been previously
13 marked as Exhibit D.  That's the NCIC report.  I
14 want to point you to Page CNO-231 of that document.
15 You went through this document with counsel.  It
16 indicates that there is three arrests on this
17 document; is that fair?
18     A.    Yes.
19     Q.    Does an arrest correlate with a
20 conviction?
21     A.    No.
22     Q.    I want to point you to Page CNO-230.
23 That's the page before that.  Now, I am looking at
24 this paragraph at the top.  If you want to take a
25 minute and read that really quickly.

1    A.    (Witness peruses document.)  Okay.

2    Q.    Chief Ferguson, this is a document that

3  comes from the -- it says an FBI database?

4    A.    Yes.

5    Q.    So the words on this document are words

6  that were placed there by FBI, the Federal

7  Government?

8    A.    Yes.

9    Q.    In the paragraph that I asked you to look

10  at on Page 2 -- CNO-230, it notes that an

11  individual should be presumed not guilty of any

12  charge/arrest for which there is no final

13  disposition stated on the record or otherwise

14  determined.  Is that a fair reading of that

15  statement?

16    A.    Yes.

17    Q.    And it's fair that, no, there is no

18  convictions listed in this document?

19    A.    Yes.

20    Q.    So would Mr. Vicknair, according to this

21  document, he should be presumed not guilty of the

22  arrests that are contained herein?

23    A.    Yes.

24    Q.    Now, I want to show you a document that

25  was previously marked Exhibit B that starts with

1    CNO-114.  I'm going to provide you with the

2    complete copy of that document, and I'm going to

3    mark this as Exhibit F.  So Exhibit D contains five

4    of ten pages.  I've provided you with the complete

5    copy, which is all ten pages.  Now I want to go

6    through the information that's contained on this

7    document that concerns Exhibit E.  Exhibit E is

8    previously marked.  That is this document, which is

9    the St. Tammany Sheriff's Office document.

10            Now, Chief, you previously testified that

11   you didn't believe it would be appropriate to hire

12   Mr. Vicknair based upon the information that is

13   contained in Exhibit E.  That's the St. Tammany

14   Sheriff's Office document.

15        A.   Yes.

16        Q.   Is that fair?

17        A.   Yes.

18        Q.   But you didn't make the decision to hire

19   Mr. Vicknair, did you?

20        A.   I did not.

21        Q.   Would you expect that the decision to

22   hire Vicknair was based upon an investigation?

23        A.   Yes.

24        Q.   And part of that investigation is what I

25   have now marked as Exhibit F and handed a copy to

1    you.  I want you to look at CNO-117.  Now, I am in
2    the paragraph that is labeled, "Arrest History
3    Information."  You see that?
4          A.   Yes.
5          Q.   It looks like Mr. Vicknair noted to the
6    investigator that he was arrested for battery in
7    Mandeville in March of 2005.
8          A.   Yes.
9          Q.   Now, the document from St. Tammany
10   Sheriff's Office is dated June 30th, 2005, which I
11   would suggest is, I believe, is a typo.  But, in
12   any case, you can tell me if this information
13   corresponds with the St. Tammany investigation
14   document.  Mr. Vicknair noted that he was arrested
15   for a battery in 2005 in Mandeville, Louisiana.  Is
16   Mandeville part of St. Tammany?
17         A.   Yes, it is.
18         Q.   In this paragraph, he says, "Mr. Vicknair
19   added he learned an unknown man was at his house
20   with his girlfriend.  Upon returning home, he
21   ordered the man to leave.  Mr. Vicknair stated the
22   man struck him and a fight began."  Does that
23   correspond with the St. Tammany document?
24         A.   Yes.
25         Q.   Now, it notes that when the St. Tammany

1   Sheriff's Office deputies arrived, the applicant

2   was arrested for battery because the man was

3   invited by the roommate, and the applicant had no

4   sign of violence on his person, but the unknown man

5   did.

6       A.   Yes.

7       Q.   Is that ordinarily, in the course of an

8   investigation, in this type of situation, that

9   that's how y'all would make a decision as to who

10  was arrested, whether or not the person has --

11  there is a fight.  Who has -- somebody says I got

12  in a fight, and one person is injured, and the

13  other person is not.  Would --

14      A.   No.  That is not.

15      Q.   That's not how it works?

16      A.   No.  Who is the aggressor.

17      Q.   So in this instance, St. Tammany

18  determined that Mr. Vicknair was the aggressor?

19      A.   They made the arrest, yes.

20      Q.   I'm going to switch to the next page,

21  CNO-118.  This is the continuation.  "Mr. Vicknair

22  added the man later dropped the charges against

23  him."

24      A.   Yes.

25      Q.   Is that fair?

1          A.   Yes.

2          Q.   I want to bring you down to the bottom of

3    this page, the second to last paragraph.   It

4    indicates Investigator Harris received a copy of

5    the police report indicating the victim sustained

6    minor bruises and scratches to his face and left

7    shoulder.

8          A.   Yes.

9          Q.   "A checked with the Slidell Criminal

10   Court Clerk, Miss Deborah, who confirmed the Saint

11   Tammany Parish arrest was nolle prosequi by the

12   district attorney."

13         A.   Yes.

14         Q.   Is that fair?

15         A.   Yes.

16         Q.   So when a charge is nolle pros'd, is that

17   -- that is just like an arrest, right?   I mean,

18   it's not a conviction?

19         A.   It's not a conviction.

20         Q.   So Mr. Vicknair is presumed not guilty of

21   that charge?

22         A.   Yes.

23         Q.   In light of the fact that Mr. Vicknair --

24   that this investigation was completed, and you know

25   the NOPD had more information than just contained

1 in this report, would you still take the position
2 that Mr. Vicknair should not have been hired?
3      A.   No.  I would not take that position that
4 he should not be hired.
5      Q.   Why is that?
6      A.   Based on, one, it appears as though the
7 other individual was really the aggressor in this
8 who attacked Mr. Vicknair, and the charges were
9 dropped against him, so he is still innocent.
10            MR. ST. RAYMOND:
11                That's all the questions I have.
12 BY MR. MOST:
13      Q.   Okay.  Couple of questions, Chief.  You
14 just said that you concluded that the man other
15 than Vicknair was the aggressor?
16      A.   Yes.
17      Q.   Where do you see that?
18      A.   I concluded that based on what I read in
19 the report.  What I read in the report was that
20 after Vicknair asked him to leave, the man slapped
21 Vicknair.
22      Q.   So that's what Mr. Vicknair said, right?
23      A.   Yes.
24      Q.   But what the sheriff's deputies report is
25 that the man other than Vicknair was the one

1    injured, and that Mr. Vicknair was continuing to

2    make threats even after the deputies arrived,

3    right?

4         A.   Yes.

5         Q.   And you still conclude that Mr. Vicknair

6    was the victim, not the aggressor?

7         A.   I believe the other guy was the

8    aggressor.  If he slapped him first, yes, he is the

9    aggressor.

10        Q.   If that's what Mr. Vicknair said?

11        A.   Based on this report, yes.

12        Q.   So what Mr. Vicknair's description of it

13   is, is more important to you in determining who is

14   the aggressor than the officers who said

15   Mr. Vicknair was continuing to make threats even

16   after they arrived?

17        A.   So my experience as a police officer,

18   I've seen the aggressor be just that, the

19   aggressor, but have the worst injuries as a result

20   of the interaction and engagement, although they

21   were the aggressor.

22        Q.   Even if the other guy was the aggressor,

23   as we discussed, the narrative of the sheriff's

24   deputies shows that Vicknair was out of control

25   with regard to continuing to make threats and out

1  of control with regard to his firearm, agreed?

2              MR. ST. RAYMOND:

3                   Object to the form.

4              THE WITNESS:

5                   He was out of control? I didn't see

6              the word "out of control."

7  BY MR. MOST:

8       Q.   We had talked about that before.  He had

9  -- his gun was taken away from him, and he said he

10 would feel safer if the deputies took his gun away

11 from him, indicating someone who was out of control

12 with regard to a firearm.  Do you recall talking

13 about that?

14             MR. ST. RAYMOND:

15                  Object to form.

16             THE WITNESS:

17                  I recall talking about that, but I

18             don't believe he was out of control.

19             He told the officers to take it.  I

20             didn't see where he said he was out of

21             control.

22 BY MR. MOST:

23      Q.   He said he would feel safer if the

24 officers took his gun away from him, right?

25      A.   But that means out of control?

```
1          Q.   What is your conclusion?
2          A.   I don't think that means he is out of
3    control.
4          Q.   What is the other explanation for why
5    someone might say they would feel better if the
6    police took their gun away from them?
7          A.   I'm not that individual, sir.  I cannot
8    explain.  I can't give you an explanation.
9          Q.   So you are okay with NOPD hiring this
10   person described in this narrative?
11         A.   Based on the evidence that is provided to
12   the superintendent of the police at that time by
13   the investigator, yes.
14         Q.   You said that Mr. Vicknair's description
15   was consistent with the sheriff's deputies'
16   description; is that right?
17              MR. ST. RAYMOND:
18                   Object to form.
19              THE WITNESS:
20                   I believe what the officer wrote in
21              his report was similar to what
22              Mr. Vicknair said to the investigator
23              during his investigation.
24   BY MR. MOST:
25         Q.   Right.  Vicknair said that it was an
```

1    unknown man at Vicknair's house with Vicknair's

2    girlfriend, right?

3         A.   Yes.

4         Q.   But the sheriff's narrative shows that it

5    was the girlfriend's house and that it was

6    Vicknair's ex-girlfriend, right?

7         A.   Yes.

8         Q.   So the story that Vicknair is telling is

9    different than the one reflected in the sheriff's

10   narrative, agreed?

11        A.   On that perspective, but we talking about

12   the interaction.  It is similar.

13        Q.   Right.  Why should Vicknair be believed?

14   If he said this man came into my house where my

15   girlfriend was and hit me, and the sheriff's

16   deputies show that it was not Vicknair's house, not

17   Vicknair's girlfriend, and the other guy was

18   injured, and Vicknair was still making threats when

19   the deputies showed up, you still think that

20   Vicknair should be believed?

21             MR. ST. RAYMOND:

22                  Object to form.

23             THE WITNESS:

24                  I believe this is a question for the

25               investigator, not for me.

BY MR. MOST:

Q.   But you would still hire this person?

A.   Based on the nolle pros, yes.  He is innocent, yes.

Q.   Does nolle pros mean that someone is innocent?

A.   He is not -- he does not have a conviction, so based on that, he could be hired. He is qualified to be hired.

Q.   So you endorse and ratify the hiring of Rodney Vicknair?

A.   What I am saying is at that point in time, he qualifies to be hired.

Q.   Based on this criminal history, you would have hired him?

A.   I am saying based on the policies that were in place at that time, based on what I'm seeing before me with a nolle pros, he qualifies to be hired.  I can't say anything different.

Q.   So his hiring, based on his information, was consistent with the policies of NOPD at that time, agreed?

A.   Yes.

Q.   Mr. Corwin had you look at the NCIC report and pointed out that these were about

1    arrests, not convictions, correct?

2        A.    Yes.

3        Q.    You said that someone -- I forget.  He

4    said or you said someone who is not convicted is

5    presumed not guilty?

6        A.    Innocent until proven guilty.

7        Q.    That's the rule for criminal process,

8    correct?

9        A.    Yes.

10       Q.    But if someone has been repeatedly

11   arrested for serious crimes, NOPD can decline to

12   hire that person, agreed?

13       A.    Again, if they have no convictions, based

14   on the policies at that time, they qualify to be

15   hired.

16       Q.    So even someone with five or seven

17   arrests, including some for serious crimes, would

18   have been eligible to be hired by NOPD at that

19   time?

20       A.    Yes.

21       Q.    Do you have any health issues or any

22   other issues that affect your memory?

23       A.    No.

24       Q.    Do you have a recollection of things that

25   happened in 2020 when you were chief of police?

1      A.    Some things.   Now, the reason I can't
2  recall everything is because my tenure as chief was
3  -- there was a lot going on from a global pandemic
4  to civil, social unrest.   It was a lot, so I don't
5  recall every moment.
6              MR. MOST:
7                  Okay.   I think that's all we've got.
8               Any re-redirect?
9              MR. ST. RAYMOND:
10                  No.
11              MR. MOST:
12                  Chief, thank you very much for your
13               time here today.
14              THE WITNESS:
15                  Yes, sir.   Thank you.
16                  [End of deposition, 11:20]
17
18
19
20
21
22
23
24
25

```
 1              C E R T I F I C A T E
 2
 3              This certification is valid only for
    a transcript accompanied by my original signature
 4  and original required seal on this page.
 5              I, SANDRA P. DIFEBBO, Certified
    Court Reporter, in and for the State of Louisiana,
 6  as the officer before whom this testimony was
    taken, do hereby certify that SHAUN D. FERGUSON,
 7  after having been duly sworn by me upon authority
    of R.S. 37:2554, did testify as hereinbefore set
 8  forth in the foregoing 75 pages;
 9              That the testimony was reported by
    me in stenotype, was prepared and transcribed by me
10  or under my personal direction and supervision, and
    is a true and correct transcript to the best of my
11  ability and understanding;
12              That the transcript has been
    prepared in compliance with transcript format
13  guidelines required by statute or by rules of the
    board, that I have acted in compliance with the
14  prohibition on contractual relationships as defined
    by Louisiana Code of Civil Procedure Article 1434
15  and in rules and advisory opinions of the board;
16              That I am not related to Counsel or
    to the parties herein, nor am I otherwise
17  interested in the outcome of this matter.
18
19
20
21  _____
    Sandra P. DiFebbo,
22  Certified Shorthand Reporter
23  Date:  4/22/24
24
25
```

