UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


RAYNE UPTON, individually and on
behalf of her minor daughter,
G.H.                            DOCKET NO. 2:21-CV-407
          Plaintiff

V                               JUDGE: CARL BARBIER

RODNEY VICKNAIR, SHAUN FERGUSON
THE CITY OF NEW ORLEANS; DOE          MAGISTRATE: KAREN WELLS ROBY
DISTRICT COMMANDER; DOES 1 TO 10;
And XYZ INSURANCE COMPANIES 1 to 10,
          Defendants


DEPOSITION OF SHERIFF SUSAN AMELE

HUTSON, given in the above-entitled cause,

pursuant to the following stipulation, before

Raynel E. Schule, Certified Shorthand Reporter

in and for the State of Louisiana, at Orleans

Justice Center, 2800 Perdido Street, Building A,

New Orleans, Louisiana, 70112, commencing at

10:45 o'clock a.m., on Monday, the 8th day of

May, 2024.

```
 1              I N D E X

 2                                    Page

 3    Caption                          1

 4    Appearances                      3

 5    Agreement of Counsel             4

 6    Examination

 7        MR. MOST                   5, 84

 8        MR. ROQUEMORE             36, 87

 9    Reporter's Certificate          89

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1    APPEARANCES:

 2
      For the Plaintiff:
 3
      MOST & ASSOCIATES
 4    Attorneys at Law
      BY:  WILLIAM MOST, ESQ.
 5    201 St. Charles Avenue, Suite 2500  #9685
      New Orleans, Louisiana    70170
 6
 7    For the Defendants:

 8    JIM ROQUEMORE, ESQ.
      Assistant City Attorney
 9    1300 Perdido Street
      City Hall - Room 5E03
10    New Orleans, Louisiana  70112

11
      For Sheriff Susan Hutson:
12
      JOHN S. WILLIAMS, ESQ.
13    Chief of Staff
      Office of the Sheriff
14    Parish of Orleans
      2800 Perdido Street,
15    New Orleans, Louisiana

16    Reported By:  Raynel E. Schule
                    Certified Shorthand Reporter
17                  State of Louisiana

18

19

20

21

22

23

24

25
```

```
 1            S T I P U L A T I O N
 2            It is stipulated and agreed by and
 3   among Counsel for the parties hereto that the
 4   deposition of SHERIFF AMELE SUSAN HUTSON, is
 5   hereby being taken pursuant to the Federal Rules
 6   of Civil Procedure for all purposes in
 7   accordance with law;
 8            That the formalities of reading and
 9   signing are specifically waived;
10            That the formalities of sealing,
11   certification, and filing are hereby
12   specifically waived.
13            That all objections, save those as to
14   the form of the question and responsiveness of
15   the answer, are hereby reserved until such time
16   as this deposition or any part thereof is used
17   or sought to be used in evidence.
18                    *  *  *  *  *
19            Raynel E. Schule, Certified
20   Shorthand Reporter in and for the State of
21   Louisiana, officiated in administering the oath
22   to the witness.
23
24
25
```

```
 1        SHERIFF SUSAN AMELE HUTSON, having
 2        been first duly sworn by Raynel E. Schule,
 3        was examined and testified on her oath as
 4        follows:
 5                         EXAMINATION
 6   BY MR. MOST:
 7   Q.   Good morning, Sheriff Hutson.  Could you
 8        give us your full name and title for the
 9        record.
10   A.   Susan Amele Hutson.  That's A-m-e-l-e,
11        Hutson, H-u-t as in Tom, s-o-n, and I'm
12        Orleans -- the Orleans Parish Sheriff.
13   Q.   And because you're the Sheriff, if you need
14        to take a break at any time to deal with
15        Sheriff's business, that's fine, and we'll
16        just keep going as we need to.
17   A.   Thank you.
18   Q.   Sheriff, have you ever given a deposition
19        before?
20   A.   I'm trying to remember that.  I don't think
21        I've ever been a deponent before.  I don't
22        think I have.
23   Q.   Okay, but you're familiar with what a
24        deposition is?
25   A.   Yes.  It has been a long time since I've
```

```
 1        done one, but way back in the day.
 2   Q.   Huh-huh.  So you understand that your
 3        answers here today are under oath and have
 4        the same force as if we're in a courtroom
 5        with a Judge and Jury?
 6   A.   I do.
 7   Q.   Is there anything, whether it's illness,
 8        fatigue, medication, or anything else that
 9        would prevent you from giving us truthful
10        and complete answers?
11   A.   No.
12   Q.   And have you brought any documents with you
13        today to the deposition?
14   A.   I have not.
15   Q.   And did you do anything to prepare for this
16        deposition?
17   A.   I did not.
18   Q.   Okay.  Did you read or look at any
19        documents or talk to anybody in
20        anticipation of this deposition?
21   A.   Not in anticipation of the deposition, no.
22   Q.   Okay, and if I ask a question that is
23        unclear or you don't understand the
24        question, will you agree now to tell me
25        that that's the case rather than try to
```

1    answer it?

2  A.    Yes.

3  Q.    Thank you.  So you're currently Sheriff,

4        but what was your role in 2020?

5  A.    In 2020, I was the Independent Police

6        Monitor for the City of New Orleans.

7  Q.    Okay, and the Independent Police Monitor is

8        also referred to as the OIPM?

9  A.    Yes.

10  Q.    And OIPM is a branch of the City of New

11        Orleans government; is that correct?

12                MR. ROQUEMORE:

13                Object to form.

14                You can answer.

15                THE WITNESS:

16                Yes, it is.

17  BY MR. MOST:

18  Q.    Great.  And, are you generally familiar

19        with what case this deposition today is

20        about?

21  A.    In general, yeah.  The -- I cannot think of

22        his first name, but former Officer

23        Vicknair.

24  Q.    Huh-huh.  And I represent the Plaintiff in

25        the case, who we'll refer to by G.H., who

```
 1        is suing the City of New Orleans about it.
 2        Do you recall -- do you recall learning
 3        that -- that there was a potential issue
 4        with Officer Vicknair?
 5   A.   Yes.
 6   Q.   Okay, and do you recall if that was in
 7        2020?
 8   A.   You know, I don't remember the exact
 9        timeframe, but around there.
10   Q.   Sure.
11   A.   Yeah.
12   Q.   So, you know, you can look at documents.
13        So I'll ask you to take a look at this
14        document, which we'll mark it as "Exhibit
15        A."  (Counsel hands document to witness.)
16        Do you see that it's an email dated
17        September 17th, 2020?
18   A.   September, yeah, yeah, I see that, yeah.
19   Q.   And that looks like perhaps it was an email
20        sent from your phone to Stella Cziment?
21   A.   Yes.
22   Q.   Okay, and Stella Cziment at the time was
23        the Deputy Police --
24   A.   Deputy Police Monitor, that's right.
25   Q.   Okay, and do you -- is this email familiar
```

```
 1        to you?  Do you recall that?
 2   A.   I don't recall this one, no.
 3   Q.   Okay.  Having looked at it, does -- do you
 4        recall if this email was about the Rodney
 5        Vicknair situation?
 6   A.   I can't tell that from this.  I can't tell
 7        that from this, but --
 8   Q.   Okay.
 9   A.   Yeah.
10   Q.   I'm going to mark another document as
11        "Exhibit B."  Do you see that this a
12        document that says at the top, "9-18-2020
13        Phone Call with Dr. Birch re Teenager
14        Incident"?  (Counsel hands document to
15        witness.)
16   A.   Yes.
17   Q.   Okay.  Take a look at this and see if you
18        recall this document.
19   A.   I remember this information.  I don't know
20        what this document is, though.
21   Q.   Okay, and do you see it has got a water
22        mark that says, "OIPM Notes" across it?
23   A.   Yeah, yeah, but I'm not sure what that
24        comes from.  Was that out of our -- our
25        OIPM complaint intake database?  I'm not
```

```
 1        sure -- I'm not sure.
 2   Q.    Yeah.
 3   A.    I just don't recognize this particular
 4        document, but some of the facts here, I --
 5        I do remember, yes.
 6   Q.    Okay.  So does this -- does this reflect a
 7        phone call that you were a participant to
 8        with Dr. Birch?
 9   A.    I do not remember whether it was in person
10        or a phone call.
11   Q.    Okay.
12   A.    But I do remember some contact.
13   Q.    But you remember talking to Dr. Birch about
14        some of these facts?
15   A.    I believe so.  I believe I do.  Just trying
16        to remember some things about Dr. Birch,
17        but very little remembrance about that, but
18        I do remember there was a caregiver and
19        that person helping us.
20   Q.    Huh-huh.  And that caregiver was reporting
21        to OIPM that there was a potential issue
22        involving inappropriate conduct with an
23        officer and then a minor?
24                  MR. ROQUEMORE:
25                  Objection, form.
```

```
 1              THE WITNESS:
 2                   Yes, she reached us -- Dr. Birch
 3              reached us some kind of way, but I
 4              feel like there was an intermediary
 5              or maybe Stella spoke with her more
 6              than me, but I feel that there was
 7              an inter -- intermediary.  Cecile
 8              Tebo I believe was the intermediary.
 9    BY MR. MOST:
10    Q.   Huh-huh, yeah, that's -- that's right.
11         Okay, and -- and so this reflects OIPM's
12         knowledge as of September 18th, 2020?
13    A.   Yes.
14    Q.   Okay, and I'll represent to you that was a
15         Friday.
16    A.   Yes, I remember that.  We were -- it was
17         coming to the weekend when we actually had
18         information that we needed to reach out to
19         the police department about.  You know, it
20         doesn't always work that way.  Sometimes
21         people are reluctant at first to talk to us
22         or tell us facts, and I believe we didn't
23         have enough information, and then by this
24         date we did.
25    Q.   Huh-huh, and some of the information that's
```

1      in here is that the first name of the
2      officer Rodney, and that he's in his 50s.
3      Is that correct?
4   A.   That's right.  We did not even have a last
5      name I remember, yeah.
6   Q.   And the fact that it was an officer named
7      Rodney in his 50s, is that part of what you
8      conveyed -- well, I'll come back to that.
9      So OIPM had this information, and I think
10      you said you needed to contact the police
11      department at that point.  Is that correct?
12   A.   That's right.
13   Q.   And what did you feel like you needed to
14      contact the police department about?
15   A.   Whenever there was kind of a -- a sensitive
16      investigation like this involving some type
17      of harm to somebody sexual, physical
18      threat, something like that where we were
19      concerned about somebody -- somebody's
20      well-being, I would have called Deputy
21      Chief Arlinda Westbrook, because they have
22      an -- an investigatory team, and I think
23      they're the special -- Special
24      Investigations -- special something squad
25      within the Public Integrity Bureau that

```
1        does either stings on officers, does
2        undercover investigations, does those
3        really sensitive investigations.  So I
4        wouldn't -- we wouldn't have gone and just
5        tried to put that in the system right away.
6        We would have gone to her and said, hey,
7        you know, this -- this is an investigation
8        going on, you know, and let her take it and
9        handle it from there.
10   Q.   Sure.  So at this point by this Friday, you
11        understood there was a threat of harm by an
12        officer, and you wanted to contact NOPD so
13        that they could potentially set up
14        surveillance of that officer?
15                 MR. ROQUEMORE:
16                 Objection to form.
17                 THE WITNESS:
18                 It could have been surveillance,
19            but it would have been -- they would
20            have known what to do at that point,
21            but the main thing being to make
22            sure that the girl was okay.
23   BY MR. MOST:
24   Q.   Okay.
25   A.   And that nobody else got harmed.  So, but
```

```
 1              it may have been a sting.  It may have been
 2              relieving him of duty.  It could have been
 3              a number of things.
 4     Q.   Sure.  So "Exhibit C" here (counsel hands
 5              document to witness,) do you see that these
 6              are text messages to an Arlinda?
 7     A.   Yeah.
 8     Q.  Is this the phone that you used at this
 9              time?
10     A.   I don't see a number on there, but I -- it
11              definitely would have been me.  Is there
12              some -- I don't see anything that shows
13              what the phone number is.
14     Q.   Yeah.  Do you recall these -- these text
15              messages to Arlinda?
16     A.   I remember reaching out, yes.  The
17              specifics of them, I don't remember -- you
18              know, remember that specifically, but yeah,
19              reaching out.
20     Q.  Okay, and so this Arlinda is Arlinda
21              Westbrook?
22     A.   That's right.
23     Q.   Who was the head of the Public Integrity
24              Bureau at the time?
25     A.   That's right, she was Deputy
```

```
 1        Superintendent.
 2   Q.   And so if these texts are from you, it
 3        says, "Hey Arlinda.  This is an urgent
 4        call.  Please call me"?
 5   A.   Yes.
 6   Q.   And so you perceived this to be an urgent
 7        situation?
 8   A.   Yes.
 9   Q.   One that needed to -- action needed to be
10        taken that day of?
11   A.   Yeah, at the very least, that action had to
12        be hearing the facts and getting a gameplan
13        together.
14   Q.   Okay.  Do you -- this text message said,
15        "Please call me."  Do you recall if Chief
16        Westbrook called you?
17   A.   She did not.
18   Q.   So now I'll mark this as "Exhibit D."
19        (Counsel hands document to witness.)  You
20        see these are text messages to a Shaun D.
21        Fer something?
22   A.   Yes.
23   Q.   And do you recall sending these text
24        messages to Shaun Ferguson?
25   A.   I remember reaching out to him, yes.
```

```
 1   Q.   And do you remember reaching out to him in
 2        the form of these text messages?
 3   A.   Again, I don't remember the -- the content
 4        specifically, but I remember reaching out
 5        to -- I remember calling and texting both
 6        of them.
 7   Q.   Okay.  Do you have any reason to think this
 8        is not the text message you sent to him on
 9        that Friday?
10   A.   No.  That's the kind of verbiage I would
11        have used.
12   Q.   Okay, and so this text message is, "Hey
13        Shaun, I need to reach Arlinda urgently, if
14        she's near" can you -- can you -- "you can
15        your all her to call me?  It's about
16        potential sexual abuse of a minor by an
17        officer."  Is that right?
18   A.   Yes.
19   Q.   And this text message comes just 23 minutes
20        after you texted Arlinda.  Is that correct?
21   A.   That's right.
22   Q.   And so you had texted Arlinda, and she
23        didn't call you, so you texted Chief -- the
24        Chief of Police, Shaun Ferguson 23 minutes
25        later?
```

```
 1   A.   That's right.
 2   Q.    And that was -- and the reason why you
 3        contacted the Chief of Police shortly after
 4        Deputy Chief Westbrook is because you
 5        understood this was a very urgent
 6        situation?
 7                   MR. ROQUEMORE:
 8                   Objection to form.
 9                   THE WITNESS:
10                   Very urgent, and while I was
11              doing that, the Deputy Police
12              Monitor, I -- I had her to reach out
13              to -- I've might have also tried to
14              call her as well, the second in
15              command at PIB, who was -- I don't
16              remember if they were captains or
17              commanders at the time, but Sabrina
18              Richardson.
19   BY MR. MOST:
20   Q.   Okay.
21   A.    But and I know asked Stella Cziment to
22        continue to contact her because they worked
23        together every day on complaints and
24        whatnot, so they have a, you know, tight
25        relationship.  I more worked with Arlinda.
```

```
 1    Q.   Huh-huh.  And in this text message you were
 2         communicating to Chief Ferguson that there
 3         was a potential sexual abuse of a minor by
 4         an officer situation?
 5    A.   Yeah.  I needed to speak to somebody that
 6         day, like, quickly.
 7    Q.   And Chief Ferguson responds by text, "Hi, I
 8         tried calling you back," and you said, "Got
 9         a call on that same issue.  Well holla
10         after."  Do you recall what was the call
11         you got on that same issue?
12    A.   I don't.
13    Q.   Okay, and did -- did Chief Ferguson try to
14         follow up with you after this text
15         exchange?
16    A.   My recollection, the best of my
17         recollection, I spoke with him because I
18         could not reach Arlinda, and I think he
19         told me she was out of town or she was
20         unavailable for some reason because
21         otherwise I -- normally I would be able to
22         get ahold of her right away unless
23         something was going on, you know, she's out
24         of the town or something, and I forget, but
25         that's my recollection.  That's what he
```

```
 1          told me.
 2   Q.   So you were able to speak to Chief Ferguson
 3          on that Friday?
 4   A.    Best of my recollection, I did speak to
 5          him.
 6   Q.    Okay, and what did you tell him on that
 7          phone call?
 8   A.   We've got this issue and what we did know
 9          at that time, because I think at this
10          point, we had -- in looking back at the
11          notes, we had to figure out who he was, and
12          there weren't that many Rodneys, so we
13          figured it out, and then we got more detail
14          about, you know, that there was actual --
15          possible crimes being committed as opposed
16          to just, you know, internal mis -- or
17          administrative misconduct, but actual
18          crime.  So at that point, yeah, we were
19          ready to -- we had to move.
20   Q.    Okay.  So on that Friday in your phone call
21          with Shaun Ferguson, you communicated
22          information you had about the officer, that
23          his name was Rodney and his approximate
24          age.  Is that right?
25   A.    I don't remember all the details of it, but
```

```
 1          it would definitely have involved his name.
 2   Q.    Huh-huh.
 3   A.    But what else besides that, you know,
 4          probably some of these same facts.
 5   Q.   Okay.  So you gave Chief Ferguson on that
 6          Friday information with which he could
 7          attempt to identify the officer.  Is that
 8          correct?
 9   A.    Yes.
10   Q.    Okay, and you told him that this was a
11          potentially criminal matter?
12   A.    Well, it looks like I said sexual abuse, so
13          yeah.  So, you know, again I don't remember
14          the exact language I used, but urgent, you
15          know, danger to this child, something needs
16          to be done.
17   Q.    Okay.  Did you ask him to take any specific
18          steps?
19   A.    Yeah, the -- the -- we needed to reach
20          somebody in command.  So I know if the
21          Chief of Police calls, you're going to
22          answer the phone.  So getting -- and not a
23          lower level person.  You need somebody
24          upper level to handle something of this.
25          So reached out to the top of the
```

```
 1         department.  She's right -- right under him
 2         or right next to the Chief of Operations at
 3         least in terms of leadership in the
 4         department.  It has to be somebody at a
 5         high level.  You cannot put it at a lower
 6         level or it will be spread before they can
 7         do anything.
 8   Q.    So you -- you asked Chief Ferguson to take
 9         action, to ask his -- his command structure
10         to take action on this matter urgently?
11   A.    Yeah, I needed him to get ahold of PIB and
12         probably Westbrook or Richardson so they
13         can take it and -- and handle it.
14   Q.    Okay.  Did you ask him to do anything else?
15   A.    If I did, I don't - I don't recall.
16   Q.    Okay.  Did you ask him to follow up with
17         you about what steps he took?
18   A.    Again, I don't recall, but what we do in
19         these particular -- or what we did in those
20         particular types of cases is we then
21         monitor them.  So I had already told Deputy
22         Police Monitor Stella Cziment, you know, be
23         with Richardson, stay on this.  Whatever
24         happens, be there.  And because of what we
25         were hearing, we knew that the family was
```

```
 1        now -- now didn't trust the police
 2        department, and so one of the things we
 3        always did was sit in between, right.
 4        We're a conduit so they could feel a little
 5        bit more, you know, relaxed and understand
 6        -- or not relaxed, but trusting and know
 7        that we're watching, but we work with PIB
 8        closely so that they could kind of form
 9        that -- understand, PIB is going to be
10        investigating --
11   Q.   Huh-huh.
12   A.   -- for them.
13   Q.   And when you were asking Chief Ferguson to
14        take action that day, is part of what you
15        were asking for that a criminal
16        investigation would be opened that day?
17   A.   Maybe not in those specific words, but our
18        job is to give them the facts and for them
19        to take those and then shape an appropriate
20        action.  If we don't agree with whatever it
21        is they're doing, then we might say, okay,
22        do something else.
23   Q.   Huh-huh.  And did Chief Ferguson indicate
24        to you what he was going to do?
25   A.   If I recall, it would be to get ahold of
```

```
 1        either Westbrook or Richardson.
 2   Q.   Okay, and you were texting and calling on a
 3        Friday, late afternoon because you thought
 4        that this was something that needed to be
 5        addressed urgently and something that
 6        couldn't just wait until Monday.  Would you
 7        agree?
 8   A.   Yes.
 9   Q.   And do you recall if you had any
10        communications with -- about this matter
11        over that weekend with anybody?
12   A.   I do not remember.
13   Q.   Okay.  I'm going to mark two documents as
14        Exhibits E and F.  (Counsel hands document
15        to witness.)  These are text messages that
16        appear to me to be sort of a continuation
17        of a chain of text messages.
18   A.   Okay.
19   Q.   Are these text messages that you sent --
20        are some of these text messages that you
21        sent on the next Monday, September 21st,
22        2020?
23   A.   It appears to be that, yes.
24   Q.   And Stella would be Stella Cziment, the
25        Deputy at OIPM?
```

```
 1   A.   Yes.

 2   Q.   And Bonycle was another staff member at

 3        OIPM?

 4   A.   Yes, she was the -- she was -- usually

 5        Stella was over complaints, and Bonycle was

 6        over use of force.

 7   Q.   Okay, and on Monday morning just before

 8        8:00 a.m., the 21st, you texted Bonycle and

 9        Stella, "Good morning.  Good luck with

10        those.  Please keep me posted on the

11        predator situation"?

12   A.   Yes.

13   Q.   And regarding the predator situation, is

14        that the Officer Rodney that you had been

15        texting with --

16   A.   Yes, Ferguson about, yes.

17   Q.   Yeah.  Okay, and -- and you understood that

18        the situation with the Officer Rodney was a

19        potential child predator situation.  Is

20        that right?

21   A.   That's right.

22   Q.   Okay, and is the reason why you wanted to

23        be kept posted on the predator situation

24        because you thought that there was a -- a

25        risk of harm to a child at this point?
```

```
 1   A.    Yes.
 2   Q.    And you wanted to make sure that NOPD was
 3         taking steps to protect the child from
 4         harm?
 5   A.    That's right, and that my team was watching
 6         it really close because we -- that's our
 7         job.
 8   Q.    Huh-huh.  I'm going to mark as "Exhibit G"
 9         so these are text messages that were
10         provided by OIPM, and it appears to me that
11         these are from Stella Cziment to you, Susan
12         Hutson.  So you're the recipient of these
13         text messages.  Is that what it looks like
14         to you?  (Counsel hands document to
15         witness.)
16   A.    Yes.
17   Q.    Okay, and you see that this refers to a
18         Rodney in -- in a particular district?
19   A.    Yes.
20   Q.    And there's a discussion of how to proceed
21         and keep the family safe?
22   A.    That's right.
23   Q.    And it says, "Sergeant Garcia found the
24         transporting officer"?
25   A.    That's right.
```

```
 1   Q.   So by September 21st, 2020, is it your
 2        understanding that the officer had been
 3        identified and -- and your office was
 4        having discussions about how to keep the
 5        family safe?
 6   A.   Correct.
 7   Q.   Because at this point, the highest priority
 8        should be keeping people safe from this
 9        potential predator officer, correct?
10                  MR. ROQUEMORE:
11                  Objection, form.
12                  THE WITNESS:
13                  Yes.
14   BY MR. MOST:
15   Q.   And so did you expect by this Monday that
16        the officer would be arrested that day or
17        at least taken off the streets or
18        monitored?
19   A.   It doesn't look like it.  It looks like
20        that the family was cooperating, but there
21        was -- information was being gathered at
22        that point.  Remember, all this was just
23        things we were hearing.  So it -- it looks
24        like they were still nailing down all the
25        facts.  So I'm not sure if that would have
```

```
 1          been the appropriate -- arrest would have
 2          been appropriate or what would have been
 3          appropriate given, you know, without seeing
 4          the whole file.
 5     Q.   Huh-huh.  Would you agree that something
 6          would need to be done to monitor, though,
 7          this officer at this point?
 8     A.   Yes.
 9     Q.   Whether it's surveillance or taking him off
10          the streets or something else, but some
11          form of monitoring?
12     A.   Absolutely.
13     Q.   If NOPD waited five more days to take any
14          steps to get Mr. Vicknair off the streets,
15          would that acceptable?
16                    MR. ROQUEMORE:
17                    Objection, form.
18                    THE WITNESS:
19                    Again, I would need to see what
20               that -- what the file looked like in
21               front of them, what information they
22               had in front of them.  I would need
23               to see that.
24     BY MR. MOST:
25     Q.   After your Friday text messages and phone
```

```
 1        calls with Chief Ferguson, did you talk to
 2        him anymore about this issue prior to Mr.
 3        Vicknair being arrested?
 4   A.   I don't think so.
 5   Q.   Did Deputy Chief Westbrook ever talk to you
 6        in the time before Mr. Vicknair's arrest
 7        about this issue?
 8   A.   I probably would have spoken to her.  We
 9        spoke all day just about every day it
10        seemed like.  So I probably would have
11        spoken to her.
12   Q.   Do you have any recollection of her
13        contacting you in that time period?
14   A.   No, not the specifics, no.
15   Q.   And from what we saw of your text messages
16        with Chief Ferguson, it looks like there
17        were no text messages between you and him
18        from that September until the next February
19        several months later.  Is that right?
20   A.   Yeah.
21   Q.   So it was a fairly rare thing for you to
22        directly text the Chief of Police; would
23        you agree?
24   A.   Very rare.
25   Q.   And part of -- and the fact that you took
```

```
1          the rare step of directly texting the Chief
2          of Police, that reflects how urgent you
3          thought the situation was?
4    A.    Yes.
5    Q.    Are you familiar with the Washington Post
6          article that came out about this officer a
7          couple of weeks ago?
8    A.    I am.
9    Q.    Has Chief Ferguson contacted you after that
10         article came out?
11   A.    He didn't contact me.
12   Q.    Okay.  Have you contacted him?
13   A.    I did contact him.
14   Q.    Did you have a discussion with him about
15         Vicknair or this lawsuit?
16   A.    We talked about the article if I recall and
17         just wanted to, you know, touch base with
18         him because I think one of the questions
19         was, you know, why so -- why now?  Why is
20         this going on now, and I was, like, you
21         know, just we talked to this person -- I
22         can't remember her name now, for a while
23         before this came out, and then the whole
24         article was about this one case as opposed
25         to what happens all over the country.  So I
```

```
 1            had some kind of feelings about that.
 2   Q.    Huh-huh.  So what did Chief Ferguson say?
 3   A.    He didn't have much recollection of the
 4         incident or the -- you know, our
 5         interactions, so, you know, he didn't -- he
 6         didn't have too much recollection of it.
 7   Q.    Huh-huh.
 8   A.    But his -- from his recollection, you know,
 9         it was handled.
10   Q.    Okay.  Have you communicated with Arlinda
11         Westbrook after the Washington Post story
12         came out about this?
13   A.    Yes.
14   Q.    And what did she say about it?
15   A.    She's, like, what's going on here, and what
16         is -- kind of what's the whole text message
17         thing, and I was kind of, like, a little
18         bit confused about the text messages too,
19         and so because I left my phone at the IPM.
20         I didn't have the phone, so, you know, I
21         wasn't giving out text messages or anything
22         like that.  I was just, like, just letting
23         her know if these text messages were given
24         out, it would have been pursuant to either
25         a records request or some of type subpoena.
```

```
 1   Q.   Huh-huh.  Was she upset that these text
 2        messages came out?
 3   A.   No, I don't -- no, I think the more thing
 4        was just like it seemed like NOPD -- the
 5        article made it seem like NOPD was
 6        indifferent when they were not.
 7   Q.   Okay.  That's what Ms. Westbrook said?
 8   A.   That's kind of the -- the tenor of it.
 9   Q.   Okay.  I want to ask you about some -- some
10        basic principles, but before we go there,
11        is there anything else you would like to
12        say about these communications with NOPD
13        related to this officer?
14   A.   It seems like, you know, we were working
15        together with them, which is exactly what
16        we were designed to do.  We were pushing
17        it, and they were -- saw it as it was
18        important, and they were working it.  Now,
19        again, Stella was over complaints, so she
20        would have been in the -- the details of
21        what was in the investigation, but I don't
22        remember her saying to me, hey, there's a
23        problem or anything wrong with what was
24        going on.
25   Q.   Okay.  So moving on to basic principles.
```

```
1          Would you agree that NOPD should not hire
2       habitual offenders to be a police officer?
3                    MR. ROQUEMORE:
4                    All right.  I'm going to object.
5              The objection is this is going
6              beyond the scope that -- of the
7              limited discovery issues that were
8              opened up for -- for this witness.
9                    So I will instruct you not to
10             answer, because it's outside the
11             Court's Order which allowed in the
12             discovery.
13                   If you want to take it up with
14             Judge Roby, we can do that, but I am
15             going to instruct her not to -- not
16             to answer anything dealing with
17             employment and hiring issue.
18                  MR. MOST:
19                   Mr. Roquemore, you can't instruct
20             Sheriff Hutson to do anything.  Her
21             lawyer may provide her with
22             guidance.  Do you have a particular
23             Court Order that you're referring
24             to?
25                  MR. ROQUEMORE:
```

```
 1                    Whatever Court Order that -- that
 2              permitted discovery after the
 3              discovery deadline.
 4                   MR. MOST:
 5                   I'm looking at our Doc 207, which
 6              is the Court Order of March 19,
 7              2024.  "The Court orders as follows:
 8              Within 30 days of this Order, the
 9              parties will cooperate to take the
10              depositions of Shaun Ferguson,
11              Arlinda Westbrook, and Susan
12              Hutson."  I do not see any
13              limitations on the scope.
14                   MR. ROQUEMORE:
15                   Are we -- are we opening
16              discovery up to all these -- all
17              these issues?
18                   MR. MOST:
19                   Are you familiar with any Court
20              ordered limitations on the scope of
21              tis deposition, Mr. Roquemore?
22                   MR. ROQUEMORE:
23                   Yes, it's dealing with the text
24              issue.
25                   MR. MOST:
```

```
 1                    Is there any Order --
 2                    MR. ROQUEMORE:
 3                    I don't bring -- I didn't bring
 4               the document with me.
 5                    MR. MOST:
 6                    Are you familiar with any Order
 7               that indicates a limited scope of
 8               this deposition?
 9                    MR. ROQUEMORE:
10                    That was the reason why we opened
11               up the discovery in the first place.
12                    MR. MOST:
13                    Okay.  Well, objection noted, but
14               do you want to suspend this to
15               contact the Court?
16                    MR. ROQUEMORE:
17                    I do.
18                    MR. MOST:
19                    Okay.  So let's stay on the
20               record for a moment.
21     BY MR. MOST:
22     Q.   Sheriff, we're going to contact the Court
23          because some objections about the scope of
24          this deposition.  I don't think you need to
25          be here.  You're welcome to be here for
```

```
 1          this discussion.  It may take sometimes
 2          ten, 15, 20 minutes to get the Court on the
 3          line.
 4    A.    Okay.  Quick break.
 5                    (Break in proceedings.)
 6    BY MR. MOST:
 7    Q.    So Sheriff, what we're going to do is, we
 8          tried to contact the Judge, and the Judge
 9          wasn't immediately available --
10    A.    Okay.
11    Q.    -- so we're going to put a pin in the
12          questions that I was going to ask you.
13    A.    Okay.
14    Q.    And then hearing from the Judge about the
15          exact scope of the deposition, and Mr.
16          Roquemore is going to ask his questions
17          about we've already discussed --
18    A.    Okay.
19    Q.    -- whatever questions he has, and then we
20          may revisit -- we may come back together or
21          maybe try to reach you on Zoom or something
22          later.
23    A.    Sounds good.
24                          EXAMINATION
25    BY MR. ROQUEMORE:
```

```
 1   Q.   Okay.  So Sheriff Hutson, my name is James
 2        Roquemore.  I represent the City of New
 3        Orleans in this matter, and I appreciate
 4        you're taking the time.  I'm going to -- to
 5        ask a few questions about these -- the text
 6        message issue.  So first -- so first of
 7        all, you -- you -- I think it's safe to say
 8        if you as a -- the head of OIPM knew that
 9        there was a sexual assault being
10        perpetrated by a NOPD officer, it would be
11        -- it's very important to report that,
12        right?
13   A.   Yes.
14   Q.   And the person to report that to would be
15        NO -- NOPD, right?
16   A.   That's right.
17   Q.   Okay, and the -- what -- what power did
18        OIPM have to investigate officers and to
19        take actions against officers who may have
20        been doing stuff illegal?
21   A.   We didn't have the power to investigate
22        them.  We could take complaints and refer
23        that over to -- to PIB for investigation,
24        but we didn't have the power to investigate
25        them at that time.  I'm not sure if
```

```
 1          anything has changed since then.
 2   Q.    Okay, and the -- and the person that you
 3          would -- or the part of the NOPD that you
 4          refer to -- refer those complaints to, that
 5          was the Public Integrity Bureau, right --
 6   A.    Right.
 7   Q.    -- otherwise known as PIB?
 8   A.    Yes.
 9   Q.    Okay, and in September of 2020, the person
10          who was in charge of the PIB was who?
11   A.    Deputy Superintendent Arlinda Westbrook.
12   Q.    Okay, that's why in one of the texts you
13          reach out to -- to Deputy Superintendent
14          Westbrook, right?
15   A.    Yes.
16   Q.    Okay, and Sabrina Richardson was one of the
17          Captains at -- at PIB also?
18   A.    Sure.  I believe she was No. 2 in command
19          at PIB if I'm remembering correctly.
20   Q.    And so she would also be an appropriate
21          person to report a complaint about an
22          officer?
23   A.    That's right.
24   Q.    Now, just -- just stepping back as a -- as
25          a background, tell me the -- the OIPM and
```

```
1          the City of New Orleans, they're exactly
2          the same?
3    A.    Not exactly.
4    Q.    Okay.  What is -- what is the -- what are
5          the distinctions; what are the differences
6          between the OIPM and the City of New
7          Orleans?
8                    MR. MOST:
9                    Objection to form.
10                   THE WITNESS:
11                   The OIPM sits outside of the City
12              Hall.  It's not -- City Hall is not
13              in their chain of command.  So the
14              OIPM is one of the three ethics
15              entities that were created as part
16              of the Charter.  So they are
17              governed -- there's a chain of
18              command there.  I -- the Independent
19              Police Monitor and the Inspector
20              General report to the Ethics Review
21              Board.  So we sit outside of the
22              chain of command of City Hall.  So I
23              -- the Police Monitor reports to the
24              Mayor and City Council.
25   BY MR. ROQUEMORE:
```

```
 1   Q.   Okay.  What -- what control over the OIPM
 2        does the -- the Mayor's Office or the City
 3        Council have?
 4   A.   Very little.  The -- because the funding
 5        for all of the ethics entities was put into
 6        the charter as well, the funding -- you
 7        know, the City Council didn't put out a
 8        budget; the Mayor didn't put out a budget
 9        for it.  It came right off the top, the
10        percentage that the ethics entities got.
11        So not -- there wasn't a lot.  There wasn't
12        a lot.
13   Q.   Not a lot of control?
14   A.   No.
15   Q.   Okay, and the -- the operating functions of
16        the OIPM, were they defined in the
17        Memorandum of Understanding?
18   A.   That's right.
19   Q.   Okay, and that Memorandum of Understanding
20        was between what entities?
21   A.   Between the Independent Police Monitor, I
22        believe I signed it, and the Superintendent
23        at the time.  So it was signed in 2010, and
24        the Superintendent was Ronald Serpas I
25        believe.
```

```
 1   Q.   Okay.  Is there other -- any other
 2        documents that control the operations of
 3        the OIPM?
 4   A.   Not really control.  The Consent Judgement
 5        talks a little bit about the IPM, but we
 6        weren't a party to that.  So it does talk
 7        about some of our duties I believe, but I
 8        -- I think that's the main one.
 9   Q.   Okay.  Tell me about --
10   A.   And --
11   Q.   Oh.
12   A.   -- and the -- the charter.
13   Q.   Tell me about the records keeping functions
14        of the OIPM.
15   A.   What do you mean like?
16   Q.   Who controls the records of the OIPM?
17   A.   The Independent Police Monitor does.
18   Q.   What control does the City of New Orleans
19        have over the records of the OIPM?
20                  MR. MOST:
21                  Objection to the form.
22                  THE WITNESS:
23                  No control.
24   BY MR. ROQUEMORE:
25   Q.   If the City of New Orleans Law Department
```

```
 1            needed to get records that were in the
 2            possession of OIPM, how would they go about
 3            doing that?
 4    A.    They probably would have asked and or we
 5            would have been -- sometimes the City would
 6            get served with a subpoena for us, and then
 7            they would just give it to us because I
 8            have -- I had counsel then who would have
 9            then managed that for us.
10    Q.    Okay.  So the City Law Department can ask,
11            but it would still -- would it be voluntary
12            or would it be a required production?
13    A.    A little bit of both.  You know, if they
14            just asked for something, we'd probably
15            give it to them, but, you know, sometimes
16            it would be subpoenaed as well.
17    Q.    So under certain circumstances, a subpoena
18            from the Law Department was required, and
19            in certain circumstances an open records
20            request would be required also?
21    A.    That's right.
22    Q.    But when it came time to producing
23            documents, those -- what documents were
24            being produced was decided by the OIPM, not
25            -- not the City of New Orleans.  Is that
```

```
 1        right?
 2   A.    That's right.
 3   Q.    All right.  We're here to talk about what
 4        information was being -- was provided to
 5        the NOPD.  The chain of information from
 6        what you understand, it came from -- where
 7        -- where did the OIPM first learn about --
 8        get the information about the potential --
 9        potential problems with Rodney Vicknair?
10   A.    I'm trying -- if I -- if I recall
11        correctly, it came from Cecil Tebo if I
12        remember correctly.
13   Q.    I'm going to show you -- I'm going to show
14        you what I'm marking as "Exhibit H."
15        (Counsel hands document to witness.)
16        "Exhibit H" is one page.
17   A.    Yes.
18   Q.    And it's -- it's an email dated September
19        17th, and "Exhibit I" is another page,
20        which is also an email dated September
21        17th.  Now, if you look at "Exhibit H," it
22        will -- it looks like it's the same email
23        as "Exhibit A."  Is that correct?
24   A.    Yes.
25   Q.    Okay.  Except for the fact that there's
```

```
 1        portions of "Exhibit A" that are redacted
 2        that aren't redacted in "Exhibit H," right?
 3   A.   That's right.
 4   Q.   Okay, and the portion that's not redacted
 5        -- redacted in "Exhibit H is the name
 6        Cecile Tebo?
 7   A.   Correct.
 8   Q.   Okay, and from my understanding Cecile Tebo
 9        is the one who initially approached OIPM
10        about the potential problems with Vicknair.
11        Is that right?
12   A.   That's right.
13   Q.   Okay, and does this -- are you able to say
14        that this email memorializes that
15        communication?
16   A.   Yeah, this one, yes.
17   Q.   Yes.
18   A.   Yes.
19   Q.   Okay, and Stella Cziment is the -- is the
20        recipient of this -- of this email?
21   A.   That's right.
22   Q.   Thank you.  And why would you be sending
23        this email to Stella?
24   A.   Stella was the Deputy Police Monitor, and
25        she was the supervisor in our office over
```

```
 1        complaint intake.  So, you know, especially
 2        a complaint like this, I would have sent it
 3        to her instead of our complaint intake
 4        specialist to handle.
 5                  (Break in proceedings.)
 6                  THE COURT:
 7                  Okay.  This is Judge Barbier.
 8             How are you doing?
 9                  MR. MOST:
10                  Good.
11                  MR. ROQUEMORE:
12                  Good doing good, thank you.
13                  THE COURT:
14                  Okay.  So you-all -- as I
15             understand it, you-all are in the
16             middle of the deposition of Sheriff
17             Hutson?
18                  MR. ROQUEMORE:
19                  Yes, sir.
20                  THE COURT:
21                  Okay.  So what's the -- what's
22             the issue?
23                  MR. ROQUEMORE:
24                  The issue is that the Plaintiff
25             proposes to ask Sheriff Hutson
```

```
 1                    questions that are wholly irrelevant
 2                    to the text message issue and what
 3                    NOPD knew on September 18th, 21st
 4                    prior to the -- to the assault at
 5                    issue, and based on our
 6                    understanding of the Court's ruling
 7                    the Court was allowing Mr. Most to
 8                    have depositions of Sheriff Hutson,
 9                    Shaun Ferguson, and the third one,
10                    and we were going to -- Arlinda
11                    Westbrook, we were going -- and
12                    those were all going to be related
13                    to the text message issue, and so we
14                    objected to reopening this -- these
15                    depositions are at the City's
16                    expense --
17                         THE COURT:
18                         Okay.  Okay.  Let me -- let me --
19                    I -- that's very general --
20                    generalized, a generalized
21                    objection.  I don't know the
22                    specific question or questions that
23                    they're trying to ask.
24                         Mr. Most.
25                         MR. MOST:
```

```
 1              Yeah, Your Honor, this is William
 2         Most for Plaintiff.  So Mr.
 3         Roquemore is correct that, you know,
 4         I intend -- intend to ask the
 5         Sheriff similar questions that I've
 6         asked of other witnesses in this
 7         case such as should NOPD hire
 8         habitual offenders to be police
 9         officers, should --
10              THE COURT:
11              Why would you ask -- why would
12         you ask the Sheriff that?  She
13         doesn't work for the NOPD.
14              MR. MOST:
15              She doesn't, but like with the
16         other witnesses, we might designate
17         her as a non-retained expert.
18              THE COURT REPORTER:
19              I'm going -- I'm going -- I'm
20         going to rule that you can't go into
21         that.
22              MR. MOST:
23              Okay.
24              THE COURT:
25              So what else -- what else do you
```

```
1            want to ask them?
2                 MR. MOST:
3                 If that's the ruling of the Court
4       --
5                 THE COURT:
6                 By the way -- by the way, I
7            should have asked in the beginning,
8            is there a court reporter there?  Is
9            this on the record?
10                MR. MOST:
11                Yes, the court reporter is here
12           and is taking it down.
13                THE COURT:
14                Okay, okay, okay, good.  Yeah, go
15           ahead.
16                MR. MOST:
17                Your Honor, I think that
18           thoroughly resolves it.  I asked all
19           of my questions other than sort of
20           opinion questions of the Sheriff.
21                THE COURT:
22                I don't -- no, I don't think -- I
23           don't think that's proper to ask
24           this witness, okay?
25                MR. MOST:
```

```
1              Okay.  Thank you, Judge.
2         THE COURT:
3              All right.  Any -- any other
4         problems right now?
5         MR. ROQUEMORE:
6              Judge, so we have two other
7         witnesses coming up, and we would
8         ask for the same rules to be applied
9         to those -- those witnesses just so
10        we don't have to revisit this.
11        MR. MOST:
12             Your Honor, this is William Most.
13        Those would be different.  Those are
14        two NOPD -- former NOPD officers,
15        the Chief and the Deputy
16        Superintendent.  So we think those
17        questions about --
18        THE COURT:
19             Yeah, yeah, I think that -- that
20        -- I mean, again, I don't know the
21        specific questions, but the general
22        thrust of what Mr. Most just said I
23        think is accurate.  I think it would
24        be appropriate to ask former
25        Superintendent Ferguson.  Arlinda
```

```
 1              Westbrook, what was her exact job
 2              again?
 3                   MR. MOST:
 4                   She was Deputy Superintendent at
 5              the time in charge of the Public
 6              Integrity Bureau.
 7                   THE COURT:
 8                   Okay.  You can ask -- you can ask
 9              each of them those questions, okay,
10              but not -- but not Sheriff Hutson.
11                   MR. MOST:
12                   Okay.
13                   THE COURT:
14                   Okay, all right.  Have a good
15              day.
16                   MR. ROQUEMORE:
17                   All right.
18                   MR. MOST:
19                   Thank you Judge.
20                   MR. ROQUEMORE:
21                   Thank you.
22                   MR. WILLIAMS:
23                   You're ready to roll?
24                   MR. MOST:
25                   Yes, please.
```

```
 1              MR. WILLIAMS:

 2              We talked to Judge Barbier, and

 3         he ruled that I won't be asking you

 4         opinion questions I was going to ask

 5         so we will continue with Mr.

 6         Roquemore's questions.

 7              THE WITNESS:

 8              Okay.

 9   BY MR. ROQUEMORE:

10   Q.   Are you ready?

11   A.   Yes.

12   Q.   All right.  So "Exhibit A" -- or "Exhibit

13        H," which we're looking at "Exhibit H," and

14        the question is that we were asking why you

15        were communicating with Ms. Cziment --

16   A.   Yes.

17   Q.   -- and your -- and why were you

18        communicating this -- this information to

19        Ms. Cziment?

20   A.   She's the head of our Complaint Intake

21        Section and reviewing complaints, so I

22        referred it over to her so that she could

23        make sure that it was managed.

24   Q.   Okay, and the -- do you remember the

25        information that you were given from Ms.
```

```
 1        Tebo at this time?
 2   A.   I don't remember it being great detail.
 3   Q.   It was -- you wrote, "She has a complaint,"
 4        and that's in "Exhibit H."  You see that?
 5   A.   Yes.
 6   Q.   Okay.  If you had known it was a complaint
 7        about sexual assault, is that something you
 8        would have put in there?
 9   A.   Yeah, probably -- I would probably say,
10        "really important" or "highly sensitive" or
11        maybe even said that, yes.
12   Q.   But you didn't say anything like that in --
13        in this email, right?
14   A.   No.
15   Q.   Okay.  And -- and then "Exhibit I," which
16        is this one right here (indicating),
17        "Exhibit I," this is an email that you sent
18        to Stella Cziment on September 17th.  Do
19        you recognize that?
20   A.   I recognize the number.  That -- that was
21        definitely my OIPM number.  "And this is
22        the complainant's supervisor" -- okay, yes,
23        yes, I do, yes.
24   Q.   Okay, and that that information would have
25        been -- the complainant's supervisor, was
```

1      that Berry Birch?

2   A.   Yes, that would have been her.

3   Q.   Okay, and I'm going to refer you to

4        "Exhibit G."

5   A.   Yes.

6   Q.   All right, and I'm going to show you what

7        has been marked as "Exhibit J."  (Counsel

8        hands document to witness.)  "Exhibit J"

9        again is the same thing as "Exhibit B"

10       except it does not have the redactions in

11       "Exhibit B."  Is that right?

12  A.   Yes.

13  Q.   Okay, and the difference -- the redacted

14       names at the top for "Exhibit J," Andrea

15       Wright and Dr. Berry Birch, you see that at

16       the top of "Exhibit J"?

17  A.   Yes.

18  Q.   And those refer to who?

19  A.   Wait, I'm sorry.  What's the question?

20  Q.   All right.  Who -- who are -- who's Andrea

21       Wright and Berry Birch?

22  A.   I -- I believe Wright must be the -- the

23       counsellor or clinician for -- for the

24       victim, but I don't actually remember that

25       name, but given that's she's, you know,

```
 1        part of this, that must have been who that
 2        was.
 3   Q.   Okay, and the -- this -- this document is
 4        not something you created, though, right?
 5   A.   I don't recall making anything like that,
 6        no, but I'm not absolutely sure.  I don't
 7        know where it came from.
 8   Q.   All right.  Well, if you look on the -- on
 9        the second page, the fourth paragraph, the
10        first -- the fourth line, it says, "Susan
11        is going to look out the Rodney's."  Do you
12        see that?
13   A.   Oh, yes, yeah.
14   Q.   Okay, and "Susan" is referring to you?
15   A.   Yes.
16   Q.   And that would be -- that was something on
17        -- on or about September 18th of 2020, that
18        you were -- that you had on your list of
19        things to do?
20   A.   Yes.
21   Q.   Okay, and that means you're looking at the
22        Rodneys, there was more than one Rodney?
23   A.   We only had the name Rodney.  We didn't
24        have a last name, so we were going to
25        search our database for all Rodneys I
```

```
 1        believe is what we were going to do or
 2        maybe we had a roster.  We had access to
 3        information from the NOPD.  So we would
 4        have searched by Rodney to see if we can
 5        see -- find last names.
 6   Q.   But at the time that this summary was being
 7        written on September 18th, the OIPM did not
 8        know the last name of -- of the Rodney?
 9   A.   That's right.
10   Q.    Right?  And you'll agree that this
11        statement written by -- written up in
12        "Exhibit J" summarizes the full extent of
13        the information that was known to OIPM at
14        that stage, right?
15   A.    It looks like it, yes.
16   Q.    And there's nothing in exhibit -- nothing
17        that you knew related to a sexual -- that
18        OIPM knew about sexual assault that
19        wouldn't have been put into this -- this
20        "Exhibit J"?
21                  MR. MOST:
22                  Objection to form.
23                  THE WITNESS:
24                  We would have put it in there if
25              we had had it, that's for sure.
```

```
 1   BY MR. ROQUEMORE:
 2   Q.   Okay, and I want you to take a close look
 3        at "Exhibit J" and show me exactly where or
 4        show me where it describes a sexual assault
 5        having been made by a NOPD officer.
 6   A.   I don't see that in there.
 7   Q.   So you don't see any mention of a sexual
 8        assault in this one, in this document?
 9   A.   Not by Officer Vicknair or the officer, but
10        there's -- you know, it mentions that she
11        had some other assaults; she has had some
12        other assaults, but not Vicknair.
13   Q.   In fact, Vicknair's name isn't mention in
14        "Exhibit J" at all?
15   A.   Right, right, or the officer they're
16        talking about in here does not mention him
17        doing that, no, and no, his name is not --
18        last name is not mentioned.
19   Q.   And it's true in order for an officer to be
20        -- to have a complaint made, a formal
21        complaint made to the PIB, you have to have
22        the full name of the officer.  Would you
23        agree with that?
24                  MR. MOST:
25                  Objection to the form.
```

```
 1                    THE WITNESS:
 2                No, we didn't always have that.
 3            Like, say, you know, somebody would
 4            say, I was -- I don't know who
 5            arrested me, but he beat me up on --
 6            it was this day and this time, you
 7            don't have to give a name or
 8            anything, and you can even file it
 9            anonymously, and then at that point,
10            we would put as much information as
11            we had.  I don't remember if we had
12            access to police reports at this
13            time, but we would have looked up a
14            police report for it; we would have
15            looked, you know, in the police
16            report database.  We would have been
17            probably able to identify them, but
18            if not, we still would have filed it
19            without the name.
20    BY MR. ROQUEMORE:
21    Q.   Okay, and at this -- at this point in time,
22         was a complaint opened up with the PIB?
23    A.   On the 18th?
24    Q.   Yes.
25    A.   I don't believe so.
```

```
1    Q.   Do you know why not?
2    A.   Well, we don't have -- we did not have
3         enough information at this point in time,
4         but we -- we also didn't have the girl's
5         permission to move forward, and we didn't
6         hear -- like, if they -- if they had told
7         us specifically he beat her up or he
8         sexually assaulted her or something
9         physical, it was a physical danger to her,
10        then we would have called them right away,
11        but without any of that detail, we would
12        have -- and -- and with their -- the
13        caregivers, their reluctance, we would have
14        waited for more information and the
15        mother's help.
16   Q.   Okay.  Explain a little bit more about the
17        -- the -- the permission not being given by
18        the -- by the complainants.
19   A.   Yeah, so one of the things we -- you know,
20        when they come to talk to us, we -- we
21        don't share anything outside that process
22        without their permission, unless they came
23        and told us an officer is hurting somebody,
24        you know, somebody is in danger of being
25        hurt, something like that.
```

```
 1   Q.   Like actively child molesting, child sexual
 2        assaulting, correct?
 3   A.   That's right.  That's right.
 4   Q.   Okay, but in this case that was not -- that
 5        was not the situation, right?
 6   A.   It did -- that's not -- but it walked right
 7        up to the line here.  We were a little
 8        nervous definitely about it, but we also
 9        knew because of the trust issues and all
10        that was going on with the child that --
11        and her mother that we needed to, like, you
12        know, move carefully.
13   Q.   Okay.  Given the lack of permission at this
14        stage, what was OIPM authorized to do?
15   A.   At this stage we're trying to get -- we had
16        to come up with a gameplan to try to get
17        the family on board.  So you've got the
18        caregivers there who --
19   Q.   Caregiver being mom?
20   A.   I'm sorry.  The professionals.
21   Q.   Counselors?
22   A.   Yeah, the counselors.  So I don't even
23        think we had the girl's name.  I'm pretty
24        sure we didn't even have her name.  Yeah,
25        they didn't even give it to us.  So we
```

```
 1            didn't have anybody to reach out to or
 2            contact, although we were -- you know, we
 3            could have -- we did look in here about
 4            trying to see if we could research the --
 5            where he transported her I think and then
 6            try -- and, of course, looking for the
 7            database to figure out how many Rodneys
 8            were in there, and who -- you know, see
 9            what we could do from there, but no, we
10            didn't -- we didn't have enough to do
11            anything at that point.
12     Q.    Did you check to see if there was a -- a
13            mandatory reporting made by any of the
14            counselors?
15     A.    I don't think -- I don't know if I'd have a
16            place -- oh, you mean, like, in -- in the
17            police report?  I -- I don't know that we
18            have access to a database to look at that.
19     Q.    Okay, but this would be something that if
20            the counselors believed that a child sexual
21            assault had occurred, that would be
22            something that a Licensed Clinical Social
23            Worker would be mandatory -- be required by
24            law to report to law enforcement?
25     A.    I believe that's -- that's -- yeah.
```

```
1    Q.    Okay.  To your understanding had that been
2          done?
3    A.    To my understanding, no.
4    Q.    Would that have been a part of the
5          information that would have been asked by
6          Stella or whoever interviewed the Licensed
7          Clinical Social Worker at the time?
8    A.    Yeah, they would have asked.
9    Q.    And that would have been recorded -- that
10         would have been memorialized in "Exhibit J"
11         you would expect?
12   A.    That's right.
13   Q.    But it's not there?
14   A.    It's not there.  They specifically came to
15         us because they were just -- they wanted --
16         they didn't want to go to the police.  They
17         wanted to come to us.
18   Q.    Okay.  So let's look at the exhibit or the
19         text messages that were -- so we're looking
20         at -- if you would, pull up Exhibit C and D
21         out.  These are the -- the text messages
22         that Mr. Most showed you.
23   A.    Which ones again?
24   Q.    C and D.
25   A.    Okay.  Ferguson and Chief Westbrook.  Okay.
```

```
 1        Got them.
 2   Q.   And I would like -- I want to show you what
 3        has been marked as "Exhibit K."  (Counsel
 4        hands document to witness.)  And compare
 5        that to "C," and it looks to me the same
 6        image; is that right?
 7   A.   Yes.
 8   Q.   Except for this -- this image is a little
 9        -- is a little bit --
10   A.   Lighter.
11   Q.   This is lighter, and a little bit bigger,
12        right?
13   A.   Yes.
14   Q.   But at the top right, it has the same
15        battery percentage, right?
16   A.   Yes.
17   Q.   And it says, 12:46 is the time that this
18        picture was taken?
19   A.   Yes.
20   Q.   Okay.  This picture -- this -- this
21        picture, is this a picture of your phone?
22   A.   I believe it is my phone, although I can't
23        see anything that identifies it so but --
24   Q.   It looks like your phone?
25   A.   Yeah, that looks like the language I would
```

```
 1        have used and -- and sent.
 2   Q.   No.  I'm talking about the actual physical
 3        phone.  The borders are -- look to be
 4        black.
 5   A.   Yeah.
 6   Q.   And does that look like it was your actual
 7        phone?
 8   A.   Yeah.
 9   Q.   Was this phone your personal phone or was
10        it a work phone?
11   A.   It's a work phone.
12   Q.   It was a work phone, and you left the OP --
13        OPI -- OIPM when?
14   A.   June 11th, 2021.
15   Q.   Okay.  June 11th, 2021, and at that time
16        did you turn the phone in?
17   A.   Yes.
18   Q.   Okay.  So after -- after that point in
19        time, it was in the possession of the OIPM?
20   A.   That's right.
21   Q.   And do you know whether or not there was
22        any deleting of messages or anything like
23        that?
24   A.   No, I didn't -- I didn't wipe it or -- you
25        know, or anything.  I just left it there,
```

```
 1        because I didn't know if they'd need it.
 2        Stella might need to answer it.
 3   Q.   All right.  I'm going -- if you would pull
 4        out "Exhibit D."
 5   A.   "D."  Chief Ferguson, yes.
 6   Q.   Okay, and I'm going to show you what has
 7        been marked as "Exhibit L."  (Counsel hands
 8        document to witness.)  And -- and you'll
 9        agree that "Exhibit L" looks to be the same
10        text as "Exhibit D"?
11   A.   Yes.
12   Q.   "Hey Shaun.  I need to reach Arlinda
13        urgently."  You see that?
14   A.   Yes.
15   Q.   And you see where it says, "It's about
16        potential sexual abuse of a minor by an
17        officer"?
18   A.   Yes.
19   Q.   And the information that -- that you had
20        when this email is written, you'll agree is
21        the same information that's in "Exhibit J,"
22        the document that Stella submitted, right?
23   A.   Well, I'm not sure what you mean.  Say that
24        -- can you say that again.  I'm not --
25   Q.   Okay.  Well, did you get any other
```

```
 1        additional information from anybody else
 2        besides Stella Cziment?
 3   A.   Yeah, I believe we met with them, either
 4        Birch and Cecile I think maybe together.
 5   Q.   There -- there was a meeting -- I'm going
 6        to show you some notes of the meeting --
 7   A.   Okay.
 8   Q.   -- on -- on the next Monday.  We're talking
 9        about Friday, September 18th.
10   A.   Something happened that caused the urgency
11        at that point.  So something happened.
12        Something happened.  I'm not sure exactly
13        what it was.
14   Q.   Okay.  Are you -- you're not sure whether
15        or not information came from Stella, Stella
16        talking to Berry Birch and then passing the
17        information to you, which caused you to
18        re-contact the NOPD?
19   A.   Right.
20   Q.   Is that -- is that right or is that not
21        right?
22   A.   Well, so I had a relationship with Cecile,
23        and I -- I think I noted in one of these
24        text messages I was going to contact her as
25        well.  So I probably had a conver -- well,
```

```
 1        I'm not sure exactly all the conversations
 2        I had during that time period.
 3   Q.   Okay.  So but on the 18th, September 18th
 4        when you wrote this message, I just want to
 5        know what information you had regarding a
 6        sexual abuse of a minor by an officer?
 7   A.   Right, and I -- other than these notes, I
 8        don't have any other notes here with me so
 9        I don't know if I wrote any notes anywhere.
10        I'm not sure.  I'm not sure exactly while
11        it went -- why it went to urgent at that
12        point.
13   Q.   Okay.  At this stage when you wrote this
14        email to Shaun Ferguson that's shown in
15        "Exhibit L" --
16                  MR. MOST:
17                  Text message.
18   BY MR. ROQUEMORE:
19   Q.   -- this text message that's shown in
20        "Exhibit L," can you say whether or not you
21        knew the name Rodney Vicknair?
22   A.   I cannot.
23   Q.   Okay, and can you say whether you knew an
24        actual sexual assault had happened at that
25        time?
```

```
1    A.    I can't say that either.
2    Q.    Okay, and as we're sitting here today, on
3          September 18th, are you able to say whether
4          or not before September 18th a sexual
5          assault had ever occurred?
6    A.    Sorry.  Say that -- ask that again.
7    Q.    As we're sitting here today, are you able
8          to say whether Rodney Vicknair assaulted
9          G.H. at any time before September 18th?
10   A.    Am I able to say that?  Yeah, no, I'm not.
11         I'm not able to say that without more
12         notes.
13   Q.    Okay, and so when you said, "potential
14         sexual abuse," why did you use that term?
15   A.    I'd always say potential or alleged.  You
16         know, we didn't assume because one thing
17         officers will always say, "You just assume
18         everything is true," which we don't do.  We
19         just say, you know, it's alleged or
20         potential, and this is what we've learned.
21         So -- I -- I -- you know, we -- it has not
22         been proven.
23   Q.    Okay.  So "it has not been proven," what do
24         you mean by -- what -- what importance does
25         that mean -- does that have?
```

```
 1  A.   Well, it's -- it's just an allegation at
 2       that point, which is what we take.  We take
 3       allegations, and then PIB investigates them
 4       to see if they're true, but.  You know,
 5       when you, you know, hear something -- like
 6       we talked about a little earlier, if I hear
 7       something that I think there's potential
 8       physical or sexual danger, then I would,
 9       you know, elevate that up.  We wouldn't
10       just write -- give that to our complaint
11       specialist, have them write it up, and send
12       it to the sergeant over there.  We would
13       have -- we would go up the chain.
14  Q.   You would take it seriously, make sure it
15       has been addressed --
16  A.   That's right.
17  Q.   -- correct?  Having an allegation of a
18       potential sexual abuse, is it legal to
19       arrest an officer based upon that?
20                  MR. MOST:
21                  Objection as to form.
22  BY MR. ROQUEMORE:
23  Q.   Well, let's back up.  Do you remember the
24       next step that happened after this -- this
25       text message on September 18th?
```

```
1    A.    I think I spoke to Chief Ferguson.  So
2          after he had reached back out -- I forgot
3          where he was out.  I think he was out at an
4          event, called, like, hey, I can't get ahold
5          of Arlinda, I really need to speak to her
6          about this, here's what's going on.  We
7          need to get it to somebody, and we couldn't
8          reach Richardson either.  So it was really
9          -- we just wanted to make sure we got it to
10         the leadership, and again, you don't send
11         that to lower level officers.
12   Q.   So you contacted Ferguson, and Ferguson you
13        were expecting to do what with the
14        information?
15   A.    Get -- to contact Richardson and Westbrook
16         and be able to get ahold of -- I'm pretty
17         sure, you know, even if you're on vacation,
18         if the Chief calls, you're going to answer.
19   Q.    Okay.
20   A.    Yeah.
21   Q.    Sure, sure.  You were contacting the top
22         person in order to get the PIB involved?
23   A.    That's right.
24   Q.    And -- and why were you wanting to get the
25         PIB involved?
```

```
1    A.    Well, that's their job to investigate their
2          own, and if necessary, to, you know, make
3          -- you know, do investigations,
4          surveillance, get people removed from duty,
5          whatever.  That's their job to do that.
6    Q.    Okay, and do you remember what PIB did
7          next?
8    A.    Just from what we're seeing here, I see
9          that we had some things set up for that
10         Monday for us to -- to kind of monitor
11         their dealings with I think the girl and
12         her mother.
13   Q.    And was there any -- anything inappropriate
14         about setting up meetings with the mother
15         and the counselor and PIB on Monday rather
16         than doing it Friday night or Saturday or
17         Sunday?
18   A.    I don't know what happened between -- at --
19         at NOPD between Friday and Monday, but from
20         the tenor of my messages with Stella, it
21         doesn't look like there was anything
22         alarming going on.  So I -- I don't -- I
23         don't think there was anything wrong with
24         that from what I've seen so far.
25   Q.    There was nothing wrong with waiting 'til
```

```
 1        Monday to get the investigation going and
 2        take the next steps if I'm understanding?
 3   A.   Well, to -- to have those interviews, and I
 4        don't know what else they did again, but
 5        somebody would need to be, you know,
 6        looking into it immediately, like, is he on
 7        duty, where will he be at, so on and so
 8        forth.
 9   Q.   Okay, but to your knowledge you don't know
10        --
11   A.   I don't know --
12   Q.   -- what was going on?  And at -- there were
13        meetings and telephone calls that were done
14        on Monday, right?
15   A.   Yes, there were some type of meeting, yes.
16        Interviews or something.
17   Q.   I'm going to show you some meeting notes.
18        This is "Exhibit N."  (Counsel hands
19        document to witness.)
20                  THE COURT REPORTER:
21                  "N" or "M"?
22                  THE WITNESS:
23                  "N" as in Nancy.
24                  MR. MOST:
25                  We were on "L" before.
```

```
 1                    THE WITNESS:
 2                    Holy cow.  Yeah, this is hard to
 3             read.
 4  BY MR. ROQUEMORE:
 5  Q.   So these look to be handwritten notes?
 6  A.   Yes.
 7  Q.   And the date of 9-21-2020 at the top,
 8       "MEETING C PIB RE TEENAGER SITUATION."  You
 9       see that?
10  A.   Yes.
11  Q.   Have you ever seen this document before?
12  A.   No.
13  Q.   And does this look like a document that was
14       made or kept by the OIPM?
15  A.   Yeah, these are the type of notebooks we
16       had to keep our notes on, and that's what
17       it appears to be.
18  Q.   Do you recognize the handwriting?
19  A.   I do not.
20  Q.   Okay.  Could it have been a -- a
21       handwriting of Stella Cziment?
22  A.   It could.
23  Q.   Does it look familiar to that or you're not
24       able to testify to that?
25  A.   I'm not able to testify to that.
```

```
1   Q.   All right.  Let me ask you a couple of -- a
2        couple of questions about the contents of
3        this --
4   A.   Okay.
5   Q.   -- of this -- these notes.  If you look on
6        the -- where it says, "D-1 Get Done," what
7        does that refer to?
8   A.   D-1.
9   Q.   Is that referring to the formal complaint
10       process of the -- of the PIB?
11  A.   Is it DI 1?
12  Q.   DI-1.
13  A.   I think it was called DI-1 I think.  Could
14       be.
15  Q.   Could be.  And then there's a line, the
16       next line, "No subpoena if she is
17       participating"?
18  A.   Yes -- yes.
19  Q.   Okay, and what would that to your knowledge
20       be referring to?
21            MR. MOST:
22            Objection to form.  This is all
23          speculating about what someone who
24            she doesn't know wrote about.
25  BY MR. ROQUEMORE:
```

```
1   Q.   Was -- at this -- I'll -- I'll rephrase it.
2   A.   Yes.
3   Q.   On September 21st, do you know whether or
4        not G.H. was participating with the
5        complaint process of the NOPD officer?
6   A.   That's the child's name?
7   Q.   G -- G.H. is how we're referring to the
8        child.
9   A.   Okay.  Yeah, I -- I'm not sure.  I'm not
10       sure.  I -- I think her mother and -- her
11       and her mother were at that point
12       cooperating, but I'm not absolutely sure
13       about it.
14  Q.   Okay, and you -- do you have any memory of,
15       like, how the cooperation progressed over
16       time?
17  A.   Conversations, building some trust.  That's
18       why Stella was there to help with that.
19  Q.   Tell me about the conversations and the
20       trust and the steps that had to be done.
21  A.   Really we had to rely on the counselors to
22       help with that, but also just letting them
23       know that, you know, who we are, what we
24       do, that we're separate from the police;
25       we're independent, and you know, we're
```

```
 1            there to help.  Those were -- those are the
 2            types of -- of things we would do to get
 3            people, you know, to -- to trust us.
 4       Q.   And in this case, is that what you had to
 5            do?
 6       A.   It was primarily Stella who was in those
 7            meetings.  I -- if I recall I -- I met with
 8            or spoke to Birch and Tebo.  I don't
 9            remember ever meeting the child or her
10            mother.
11       Q.   Would -- would Stella have taken notes if
12            -- of -- of those kind of conversations?
13       A.   Oh, absolutely.
14       Q.   Okay, and that would be -- according, like,
15            "Exhibit M," for example, would be -- would
16            be the type of note that Stella would have
17            taken if she had a meeting with PIB
18            regarding the teenager situation.  Is that
19            fair?
20       A.   Typically, yeah.
21       Q.   Okay.  Let me show you what has been marked
22            as "Exhibit N."  (Counsel hands document to
23            witness.)  "Exhibit N" purports to be --
24            these are handwritten notes dated September
25            21st, 2020.  At the top it's titled, "Notes
```

```
 1        - Phone call with PIB + caseworker, mom,"
 2        and another person that I can't -- that I
 3        can't make out.  You see that?
 4   A.   Yes.
 5   Q.   And it looks to be the same handwriting as
 6        "Exhibit M"?
 7   A.   Yes.
 8   Q.   And but you still aren't exactly positive
 9        who wrote these notes?
10   A.   Yes.  I guess I'm trying to figure out how
11        to say it.  Can I confirm that?  You know,
12        no, but, I mean, she would have been --
13        Stella would have been the one who was in
14        that meeting.
15   Q.   On September 21st to your knowledge Stella
16        was in a meeting with PIB and the
17        caseworker and mom; Is that right?
18   A.   Yes, sir.
19   Q.   Okay, and do you -- are you familiar with a
20        Kim who would have done, the first line,
21        "Kim - Do forensic interview."  Are you
22        familiar with Kim?
23   A.   No.
24   Q.   Okay.  "Jones supervised work."  Are you
25        familiar with Jones?
```

```
 1   A.   Lawrence Jones, yes.
 2   Q.   Okay, and he's a PIB investigator?
 3   A.   That's right.
 4   Q.   Okay, and the second actually -- second --
 5        the next paragraph says, "Sergeant Lawrence
 6        Jones."  Is that right?
 7   A.   That's right.
 8   Q.   Okay, and if you look at the second page,
 9        Line 49, "She knows its NOPD."  Do you see
10        that?
11   A.   Yes.
12   Q.   Does that refer -- is there -- do you know
13        why that would be written on there?
14                  MR. MOST:
15                  Objection as to form.
16   BY MR. ROQUEMORE:
17   Q.   Let me ask you this.  At that -- does this
18        indicate to you that at this time the name
19        of -- of Rodney Vicknair was not known in
20        full?
21                  MR. MOST:
22                  Objection as to form.
23                  THE WITNESS:
24                  I'm not sure.  I'm not sure.  I'm
25              not sure that they would have
```

```
 1                introduced a name.  They might have
 2                waited for her to try and say it.
 3                I'm not really sure.  I -- I don't
 4                want to speculate.  I don't know.
 5    BY MR. ROQUEMORE:
 6    Q.   Okay, but at the time when Stella met with
 7         PIB and the mother and the caseworker or
 8         there was a phone -- a phone call, this was
 9         before they met in person.  Is that right?
10    A.   This (indicating)?
11    Q.   Yeah.
12                    MR. MOST:
13                    Objection as to form.
14                    THE WITNESS:
15                    Yes, according to the notes,
16              yeah, it was a phone call.
17    BY MR. ROQUEMORE:
18    Q.   But do you -- do you -- on the same line on
19         that same date, there was a meeting
20         scheduled and set up where PIB met with the
21         mom and the child and the caseworker.  Is
22         that your understanding?
23    A.   I -- I know that they did -- they were
24         going to meet with her fairly soon to try
25         and get some cooperation, yes.
```

1    Q.   Do you know the date of that meeting?

2    A.   I don't.

3    Q.   Okay.  Let me show you "Exhibit No. P," and

4         like the two exhibits before, this is a

5         handwritten -- these are handwritten notes.

6         (Counsel hands document to witness.)  Is

7         that right?

8    A.   Yes.

9    Q.   And the same person handwrote it?

10   A.   Looks the same.

11   Q.   And this is dated 9-21-2020, and -- and it

12        looks to be -- at the top it says, "RIGHT

13        SOCIAL WORKER PHONE CALL."  You see that?

14   A.   Yes.

15   Q.   And this is the type of -- type of notes

16        that Stella Cziment would have taken to --

17        to record the information that she was

18        getting from the phone call?

19   A.   That's right.

20   Q.   Is that right?

21   A.   Yes.

22   Q.   Okay.  If you look down to Line 16, it says

23        "CHILD NOT PARTICIPATING."

24   A.   Yes.

25   Q.   Was -- was the child participating at that

```
1       time?

2    A.    It looks like not from that note.  It looks

3          like not from that note.
```



```
16                    MR. MOST:

17                    Objection to form, and I'll note

18               that this has already been excluded

19               from this case.

20                    THE WITNESS:

21                    I'm not sure.  I'm not sure.  I

22               think you just take notes as you're

23               going through an interview.  I'm not

24               sure what would be relevant or not.

25               I'm not sure.
```

```
 1   BY MR. ROQUEMORE:
 2   Q.   Was there an issue with an investigation
 3        independent of Rodney Vicknair going on
 4        about possible sexual abuse of this child?
 5                  MR. MOST:
 6                  Same objection.
 7                  THE WITNESS:
 8                  I -- I don't know what stage the
 9                  original investigation was.
10   BY MR. ROQUEMORE:
11   Q.   The original investigation being?
12   A.   The -- why NOPD went to -- he was
13        transporting her to begin with.  So that
14        underlying case that had brought the child
15        into contact with Vicknair, I don't know
16        what the status of that was at this time,
17        and I don't even know if it was that one,
18        because I know she had had some -- you
19        know, some -- she had had a history of
20        some, you know, adults mistreating her.
21   Q.   Okay.  Let's look at --
22                  MR. MOST:
23                  Yeah, I think we skipped from "N"
24              to "P" with no "O."
25                  MR. WILLIAMS:
```

```
 1                     We're coming to two hours.  How
 2              much longer you're going to be?
 3                     MR. ROQUEMORE:
 4                     I'm almost finished.
 5    BY MR. ROQUEMORE:
 6    Q.   All right.  I'm going to show you what has
 7         been marked as "Exhibit O."  (Counsel hands
 8         document to witness.)
 9    A.   "O"?
10    Q.   Yes, "Exhibit O."  This is a text message,
11         September 21st.  Mr. Most already asked you
12         about this in a previous exhibit.  I'm just
13         going to re-mark as "Exhibit O" just for
14         continuity purposes.  You're -- you're
15         familiar with this text message, right?
16    A.   Yes.
17    Q.   Okay.  Who -- and who's Sergeant Garcia
18         that's -- that was referred to?
19    A.   I believe that's Sergeant Omar Garcia.
20    Q.   And this indicates that Sergeant Garcia
21         found the transporting officer.  Do you
22         know when Sergeant Garcia found the
23         transporting officer?
24    A.   I do not.
25    Q.   It could have been on Monday, September
```

```
 1        21st?
 2   A.   Could be.
 3   Q.   Okay, and this -- this is information
 4        Stella Cziment is texting to you, right?
 5   A.   Yes, yes.
 6   Q.   And it says, "It is a Rodney (but first
 7        district - not third as believed by
 8        family."  Do you see that?
 9   A.   Yes.
10   Q.   Was there any -- did the family originally
11        tell you that it was Third District, but
12        that was incorrect?
13   A.   I remember seeing some notes about that, so
14        we definitely must have gotten that
15        information.
16   Q.   From the family?
17   A.   Yes.
18   Q.   Okay, and would that have slowed down the
19        process of actually identifying who Rodney
20        Vicknair was?
21   A.   If there were a bunch of Rodneys it might
22        have.
23   Q.   Do you know how many Rodneys there were in
24        the NOPD?
25   A.   I do not remember now.
```

1   Q.   Okay, and then there's a portion of the
2        text where Ms. Cziment says, "Mom is saying
3        she will cooperate so hopefully she won't
4        change her mind."  You see that?
5   A.   Yes.
6   Q.   Okay, and -- and then there's a line, "At
7        least we got her permission for us to have
8        more information which enabled us to find
9        the officer."
10  A.   Yes.
11  Q.   Okay, and so what does that indicate to you
12       about permission to use regarding the name
13       of the Rodney Vicknair?
14  A.   It sounds like we confirmed that with her
15       that we -- he was identified on that
16       Monday.
17  Q.   Is it -- does that indicate that to you at
18       some point there was -- the family was not
19       cooperating, but then later they changed --
20       they changed their cooperation and then you
21       were able to identify the officer?
22  A.   I think there were issues with them feeling
23       comfortable cooperating, yes.
24  Q.   And that would have been from September 17
25       through September 21st.  Is that -- is that

```
 1        fair?
 2   A.    It look right, yes.
 3   Q.   Okay, and then there's concern about mom
 4        not cooperating -- cooperating again,
 5        right?
 6   A.    That's right.
 7   ████████████████████████████████████████
 8   ██████████████████████████████████████████
 9   ████████████████████████████████████████
10   ██████████████████████
11                   MR. MOST:
12                   Objection as to form.  I think
13              that was excluded from this case.
14                   THE WITNESS:
15                   No, I'm not aware of who that is.
16   BY MR. ROQUEMORE:
17   Q.   Okay.  Those are all the questions I have.
18                   FURTHER EXAMINATION
19   BY MR. MOST:
20   Q.   Okay.  Just a few very brief followups.
21        Sheriff Hutson, you were asked about a
22        Cecile Tebo.  Do you know a Cecile Tebo?
23   A.    I do.
24   Q.   In 2020 she worked for the NOPD as Director
25        of Officer Assistance Program?
```

```
1    A.    That's right.
2    Q.    Okay, and you talked with Mr. Roquemore
3          about how you used the phrase, "potential
4          sexual abuse by an officer"?
5    A.    Yes.
6    Q.    And that was because there was an
7          allegation of sexual abuse, but it was not
8          yet proven.  Is that correct?
9    A.    To the best of my recollection.
10   Q.    Okay, and Mr. Roquemore asked you about,
11         you know, what would happen if the Law
12         Department asked OIPM for documents.  Do
13         you recall the law -- the City Law
14         Department ever asking OIPM for documents
15         about this case?
16   A.    I don't recall the specifics, no, sir.
17   Q.    Okay.  That's all I've got.  Sheriff, thank
18         you very --
19                  FURTHER EXAMINATION
20   BY MR. ROQUEMORE:
21   Q.    No, I've got -- I've got some followup.
22         I'm going to show you what has been marked
23         as --
24                  MR. WILLIAMS:
25                  Is this a --
```

```
 1              MR. ROQUEMORE:
 2              He asked about --
 3              MR. WILLIAMS:
 4              He asked his follow-up questions.
 5         You just finished your deposition.
 6         Like, I'm not going to hold up the
 7         deposition, but if this is not ever
 8         ending we'll go to Court.
 9              MR. ROQUEMORE:
10              This is not -- this is not never
11         ending.  This is clear -- this is
12         just the things that he covered.
13              MR. WILLIAMS:
14              Well, he asked four questions.
15              MR. ROQUEMORE:
16              Yeah, yeah, so I'm going to ask
17         about requesting the document
18         request.
19              MR. WILLIAMS:
20              Okay.  So we're going to -- we
21         can't go back and forth.  That's --
22         I -- but go ahead, proceed.
23              MR. ROQUEMORE:
24              Okay.  What number are we on?
25              THE COURT REPORTER:
```

```
 1                    "Q."
 2    BY MR. ROQUEMORE:
 3    Q.   All right. "EXhibit Q," you see "Exhibit
 4         Q"? (Counsel hands document to witness.)
 5         This look to be a request from Mike
 6         Laughlin of the City Attorney's Office to
 7         the Police Monitor.  Is that right?
 8    A.   Yes.
 9    Q.   And this was December 6th, 2021.  This was
10         after you left; is that right?
11    A.   Yes.
12    Q.   But the email that's sent would be an
13         appropriate email to make a request?
14    A.   That's right.
15    Q.   And if you look on -- three pages in, John
16         Williams -- John Williams, was he a lawyer
17         for OIPM at that time?
18    A.   Yes, he was.
19    Q.   And he -- and he responded to -- he would
20         be the person to respond to public records
21         requests?
22    A.   That's right.
23    Q.   And this looks to be -- on Page 3, it looks
24         to be a -- the proper form of a -- of the
25         request of a response.  Is that right?
```

```
 1   A.   Yes.
 2   Q.   Okay, and you don't have any reason to
 3        believe that the following documents were
 4        not the sum total of documents that were
 5        produced?
 6   A.   Say that again.
 7   Q.   You don't have any reason to believe that
 8        the -- the remainder of this exhibit are
 9        not the documents that were produced by
10        OIPM to the -- to the City of New Orleans;
11        is that right?
12   A.   No.
13   Q.   Those are all the question I have.  Thank
14        you.
15                    MR. MOST:
16                    Sheriff, thank you for your time
17             today.
18                    THE WITNESS:
19                    Thank you-all.
20                    MR. WILLIAMS:
21                    And we'd like -- we'd like a
22             transcript.  I'll give you my card.
23                    (Whereupon, the taking of the
24             witness' testimony was concluded.)
25
```

```
 1              C E R T I F I C A T E
 2              THIS CERTIFICATION IS VALID ONLY FOR
    A TRANSCRIPT ACCOMPANIED BY MY ORIGINAL
 3  SIGNATURE AND ORIGINAL REQUIRED SEAL ON THIS
    PAGE.
 4
                I, RAYNEL E. SCHULE, Certified Court
 5  Reporter, #77005, in good standing, in and for
    the State of Louisiana, as the officer before
 6  whom this testimony was taken, do hereby certify
    that SHERIFF SUSAN HUTSON, after having been
 7  duly sworn by me upon authority of R.S. 37:2554,
    did testify as hereinbefore set forth in the
 8  foregoing 88 pages; that this testimony was
    reported by me in stenotype reporting method,
 9  was prepared and transcribed by me or under my
    personal direction and supervision, and is a
10  true and correct transcript to the best of my
    ability and understanding; that the transcript
11  has been prepared in compliance with transcript
    format guidelines required by statute or by
12  rules of the Board, that I have acted in
    compliance with the prohibition on contractual
13  relationships, as defined by Louisiana Code of
    Civil Procedure Article 1434 and in rules and
14  advisory opinions of the Board; that I am not of
    counsel, not related to counsel or to the
15  parties herein, nor am I otherwise interested in
    the outcome of this matter.
16
17
18  4-29-2024
19  Date                     Raynel E. Schule, CSR
                             Certified Shorthand Reporter
20                           State of Louisiana
21
22
23
24
25
```