UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


RAYNE UPTON, individually and on
behalf of her minor daughter,
G.H.                          DOCKET NO. 2:21-CV-407
         Plaintiff

V                                    JUDGE: CARL BARBIER

RODNEY VICKNAIR, SHAUN FERGUSON
THE CITY OF NEW ORLEANS; DOE         MAGISTRATE: KAREN WELLS ROBY
DISTRICT COMMANDER; DOES 1 TO 10;
And XYZ INSURANCE COMPANIES 1 to 10,
         Defendants


        DEPOSITION OF ARLINDA WESTBROOK, given

in the above-entitled cause, pursuant to the

following stipulation, before Raynel E. Schule,

Certified Shorthand Reporter in and for the

State of Louisiana, at the Office of the City

Attorney, 1300 Perdido Street, City Hall - Room

5E03, New Orleans, Louisiana, 70112, commencing

at 10:10 o'clock a.m., on Tuesday, the 9th day

of April, 2024.

1                    I N D E X

2                                      Page

3   Caption                            1

4   Appearances                        3

5   Agreement of Counsel               4

6   Examination

7          MR. MOST                     5

8          MR. ST. RAYMOND            63

9

10  Reporter's Certificate            65

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    APPEARANCES:

 2
      For the Plaintiff:
 3
      MOST & ASSOCIATES
 4    Attorneys at Law
      BY:  WILLIAM MOST, ESQ.
 5    201 St. Charles Avenue, Suite 2500 #9685
      New Orleans, Louisiana    70170
 6
 7    For the Defendants:

 8    CORWIN ST. RAYMOND, ESQ.
      JIM ROQUEMORE, ESQ.
 9    Assistant City Attorneys
      1300 Perdido Street
10    City Hall - Room 5E03
      New Orleans, Louisiana  70112
11
12
13
      Reported By:  Raynel E. Schule
14                  Certified Shorthand Reporter
                    State of Louisiana
15
16
17
18
19
20
21
22
23
24
25
```

1           S T I P U L A T I O N

2        It is stipulated and agreed by and

3 between Counsel for the parties hereto that the

4 DEPOSITION OF ARLINDA WESTBROOK is hereby being

5 taken pursuant to the Federal Rules of Civil

6 Procedure for all purposes in accordance with

7 law;

8        That the formalities of reading and

9 signing are specifically waived;

10       That the formalities of sealing,

11 certification, and filing are hereby

12 specifically waived.

13       That all objections, save those as to

14 the form of the question and responsiveness of

15 the answer, are hereby reserved until such time

16 as this deposition or any part thereof is used

17 or sought to be used in evidence.

18          * * * * *

19       Raynel E. Schule, Certified

20 Shorthand Reporter in and for the State of

21 Louisiana, officiated in administering the oath

22 to the witness.

23

24

25

```
 1        ARLINDA WESTBROOK, having been first
 2        duly sworn by Raynel E. Schule, was examined
 3        and testified on her oath as follows:
 4                        EXAMINATION
 5   BY MR. MOST:
 6   Q.   All right.  Good morning, Ms. Westbrook.
 7        How are you?
 8   A.   Good morning.  How are you?
 9   Q.   I'm good, thanks.  We met before, but in a
10        different capacity.  I'm now the attorney
11        for G.H., the Plaintiff in a lawsuit
12        against the City.
13   A.   Okay.
14   Q.   You are not a defendant in the case, but
15        you've been asked to be here as a witness
16        today.
17   A.   Okay.
18   Q.   Could you give us your full name for the
19        record.
20   A.   Arlinda Pierce Westbrook.
21   Q.   Okay, and I'm going to ask you for your
22        homes address, but I'm going to go off the
23        record to do it so that that's not in the
24        transcript.
25   A.   Okay.
```

```
 1                  MR. MOST:
 2                  Can we go off the record, please.
 3                  (Off the record.)
 4    BY MR. MOST:
 5    Q.   Ms. Westbrook, have you ever given a
 6         deposition before?
 7    A.   Yes.
 8    Q.   Roughly how many, just ballpark have you
 9         given?
10    A.   Maybe ten.
11    Q.   Okay.
12    A.   I'm not sure.
13    Q.   So you understand that you're under oath
14         today?
15    A.   Yes.
16    Q.   And that your answers here today have the
17         same force as if we're in a courtroom with
18         a Judge and Jury?
19    A.   Yes.
20    Q.   Is there anything, whether it's fatigue,
21         illness, medication, sickness, or anything
22         else that will prevent you from
23         understanding my questions and answering
24         them truthfully and completely?
25    A.   No.
```

```
 1   Q.   If you need to take a break at any time,
 2        just let me or Mr. St. Raymond know, and
 3        we'll take a break.
 4   A.   Okay.
 5   Q.   If I ask a question that is unclear or you
 6        don't understand the question, will you
 7        agree now to tell me that that's the case
 8        rather than just trying to answer it?
 9   A.   Yes.
10   Q.   Okay, and have you brought any documents
11        with you today?
12   A.   No.
13   Q.   Did you take any steps aside from talking
14        to an attorney about preparing for this
15        deposition?
16   A.   No.
17   Q.   Did you look at any documents to prepare
18        for this deposition?
19   A.   Documents, I don't -- I don't recall.
20   Q.   Whether --
21   A.   Maybe -- maybe text messages.
22   Q.   Okay.  Anything else other than text
23        messages, whether emails, reports, police
24        documents, anything else?
25   A.   No.
```

1  Q.   Did you talk to anyone besides an attorney

2       in preparation for this deposition?

3  A.   No.

4  Q.   And did you take any notes to prepare for

5       this deposition?

6  A.   No.

7  Q.   I'm going to mark this as "Exhibit A."

8       (Counsel hands document to witness.)  Do

9       you see what we've designated as "Exhibit

10      A" is a picture of a phone showing text

11      messages to an Arlinda dated September

12      18th, October 6th, and October 8th, 2020?

13 A.   Yes.

14 Q.   When you said you looked at text messages

15      to prepare for this deposition, are these

16      the text messages that you're talking

17      about?

18 A.   Yeah, and I don't know if it was so much

19      prep you intimated.  I think you said text

20      messages, but, yes, I saw these text

21      messages before.

22 Q.   Okay.  Did you look at any other text

23      messages in the anticipation or preparation

24      of this deposition?

25 A.   No.  Just this one.

```
1    Q.   Great.  And what was your role in 2020?
2    A.   I was Deputy Chief of Public Integrity
3         Bureau.
4    Q.   And the Public Integrity Bureau is the --
5         the part of the New Orleans Police
6         Department that investigates officer
7         misconduct and law violations, correct?
8    A.   Yes.
9    Q.   It's essentially the Internal Affairs
10        Department for the NOPD?
11   A.   Correct.
12   Q.   And when did you leave that role?
13   A.   Not until September of '22.
14   Q.   And are you currently still employed by the
15        New Orleans Police Department?
16   A.   No.
17   Q.   And what -- what is your role now?
18   A.   Well, I'm retired and -- retired, and I do
19        consulting work now.
20   Q.   Consulting relating to police oversight?
21   A.   Yes.
22   Q.   I want to discuss some basic principles
23        before we move to the facts of this case
24        and see if you agree with these basic
25        principles.  The first is, NOPD should not
```

```
 1          hire habitual offenders to be police
 2          officers?
 3                          MR. ST. RAYMOND:
 4                          Object to form.
 5     BY MR. MOST:
 6     Q.    Would you agree?
 7     A.    Ask -- ask the question again.
 8     Q.    Sure.  Subject to the objection, NOPD
 9          should not hire habitual offenders to be
10          police officers.  Would you agree?
11     A.    I'm assuming you mean habitual offenders of
12          crimes?
13     Q.    Huh-huh.
14     A.    Yes.
15     Q.    NOPD should not leave an officer
16          unmonitored on the street once there's an
17          indication they may be involved in
18          potential child sex abuse?
19                          MR. ST. RAYMOND:
20                          Object to form.
21     BY MR. MOST:
22     Q.    Would you agree?
23     A.    Yes.
24     Q.    NOPD should not leave an officer on the
25          street unmonitored once there's probable
```

```
 1        cause to arrest that officer.  Would you
 2        agree?
 3   A.   Yes.
 4   Q.   If NOPD finds out an officer has sexually
 5        assaulted a child, NOPD should try to find
 6        out if there are other victims.  Would you
 7        agree?
 8   A.   Yes.
 9   Q.   Thank you.  And I'm using Ms. Westbrook.
10        Would you prefer that I use your rank
11        still?  You still go by your rank?
12   A.   Most people still use the rank, but it
13        doesn't matter to me.  I don't --
14   Q.   Okay.
15   A.   I'm not big on titles.
16   Q.   Okay, and -- and Deputy Superintendent or
17        Deputy Chief is your highest rank?
18   A.   Yes.
19   Q.   Okay.  Deputy Chief Westbrook, you're aware
20        that this case we're here for today
21        involves an officer named Rodney Vicknair?
22   A.   Yes.
23   Q.   What's your general understanding of what
24        that case is about?
25   A.   General understanding in terms of that
```

```
 1            there was a Federal investigation that we
 2            launched.  He was arrested and -- for
 3            sexual assault.  That's pretty much it.
 4            You know, stuff you may hear on the news.
 5            I don't have a lot of recollection of the
 6            actual case itself in terms of the charges.
 7      Q.    Huh-huh.
 8      A.    But I know it involves a sexual assault.
 9      Q.    And you understand that this case we're
10            here for today is the civil case by the
11            victim against the City of New Orleans for
12            Mr. Vicknair's conduct?
13      A.    Yes.
14      Q.    And it -- was it in the year 2020 that NOPD
15            arrested Mr. Vicknair?
16      A.    I'm not sure about that.
17      Q.    Okay.  Were you involved in the
18            investigation and arrest of Mr. Vicknair?
19      A.    Wouldn't have been involved in the
20            investigation so much, but would have been
21            involved in the decision to arrest.
22      Q.    Huh-huh.  So you were head of the
23            department within NOPD that investigated
24            and arrested Mr. Vicknair, correct?
25      A.    Yes.
```

1   Q.   How did you first learn that there might be
2        a problem with Mr. Vicknair's conduct?
3   A.   I don't remember when I first learned there
4        may be a problem.  I know that on a certain
5        date, I'm not a hundred percent sure of
6        when, Stella Cziment came into our office
7        and didn't know an officer's name, didn't
8        have much information, and my only -- she
9        was meeting with the Captain at the time.
10       My only involvement was to approve for an
11       investigator to at least start
12       investigating to see if, in fact, who it
13       potentially was and what the case may be
14       about, but there wasn't much information on
15       that day.
16  Q.   Okay.  So the first you learned about the
17       circumstances that led to Officer
18       Vicknair's arrest was through an in-person
19       meeting with Stella Cziment.  Is that
20       right?
21  A.   Yes.
22                    MR. ST. RAYMOND:
23                    Object to form.
24  BY MR. MOST:
25  Q.   And Stella Cziment at the time was the

```
1          Deputy of the Independent Police Monitor?
2     A.    Yes.
3     Q.    Do you recall if that was on a Monday?
4     A.    I think it was Monday.
5     Q.    And so you learned about the potential
6           issue, Mr. Vicknair, and then you
7           authorized the opening of a criminal
8           investigation into Mr. Vicknair.  Is that
9           correct?
10    A.    No.
11                    MR. ST. RAYMOND:
12                    Object to form.
13    BY MR. MOST:
14    Q.    What part of that is incorrect?
15    A.    No.  There was no potential anything.  It
16          was just that there was an officer, and
17          there was some question about the
18          relationship at the time, but there was
19          nothing criminal, nothing other than
20          administrative that he was talking to a
21          young girl.
22    Q.    Okay.  So on that Monday you learned
23          through an in-person meeting from Stella
24          Cziment that there was some issue involving
25          interactions between this officer and a
```

```
 1          young girl, and so you authored --
 2          authorized an administrative investigation
 3          into that officer.  Is that correct?
 4    A.    No.  We didn't even have an officer name
 5          when Ms. Cziment was in our office.  We
 6          didn't know who it was.  We didn't even
 7          know if it was NOPD at the time.
 8    Q.    Did you -- was it determined that day who
 9          the officer was?
10    A.    I don't know that.  The investigator would
11          have to -- I'm -- I'm just not sure.  I
12          just know in that meeting where I was
13          there, the whole reason I was there was for
14          me to get someone to help figure out who it
15          was and whether it, in fact, was a NOPD
16          officer.
17    Q.    Okay, but no one brought to your attention
18          the situation prior to that in-person
19          meeting with Stella Cziment on Monday,
20          correct?
21    A.    Oh, no.
22    Q.    You didn't, for example, get a call from
23          Chief Ferguson about that situation prior
24          to that meeting with Stella Cziment, did
25          you?
```

```
 1   A.    No.
 2                    MR. ST. RAYMOND:
 3                    Object to form.
 4   BY MR. MOST:
 5   Q.    Did Chief Ferguson reach out to you in any
 6         way about the situation prior to your
 7         in-person meeting with Stella Cziment?
 8   A.    I don't recall having -- no, no.  The first
 9         time was when I met with Stella that
10         Monday.  That was -- that's why they had to
11         call me in.  I didn't -- I didn't have any
12         information about it at all.  So they were
13         letting me know this is why I'm here, and
14         we need to figure out whether this is a
15         NOPD officer or not --
16   Q.    Okay.
17   A.    -- is the only reason I was involved.
18   Q.    So you do recall that that was the first
19         you learned about the situation.  Is that
20         correct?
21   A.    Not the situation.  That that was an
22         officer that we needed to figure out --
23         that they had gotten a call from a
24         third-party, and we needed to figure out
25         whether this was our officer that was
```

```
 1          involved and then do an investigation to
 2          determine what the nature of the
 3          relationship was.
 4     Q.   Okay.  To your knowledge, did PIB take any
 5          steps with regard to that officer over the
 6          weekend before that Monday meeting?
 7                    MR. ST. RAYMOND:
 8                    Object to form.
 9                    THE WITNESS:
10                    I'm not aware.  I didn't have any
11               information, so I don't know from my
12               perspective, no.
13     BY MR. MOST:
14     Q.   Okay.  So the -- the text message in front
15          of you marked "Exhibit A," do you see --
16          are these text messages that went to you?
17     A.   I mean, I don't have the phone.  I'm
18          assuming, but I don't -- I don't recall
19          that just from looking at it, no.
20     Q.   Okay.  You don't have any recollection of
21          receiving these text messages?
22     A.   No, not other than, you know, being shown
23          this for this case, no.
24     Q.   Do you have any reason to think these are
25          text messages that did not go to your
```

```
 1        phone?
 2   A.    No, no, I don't have any reason to think.
 3   Q.    Okay.  Do you have any reason to think
 4        these are not text messages sent from Susan
 5        Hutson to you in 2020?
 6   A.    I mean, if she stated I -- you know, if
 7        she's saying she sent them, then no, I
 8        don't have any reason to --
 9   Q.    Okay.
10   A.    -- deny that.  I guess my only -- just to
11        clarify, my only question would be just
12        making sure I received it.  That's what I
13        don't know, because I don't have the phone.
14        I don't know if it -- I mean, I know she
15        sent it.  I'm just not sure I received it
16        or whatnot.  I just don't know.  I just
17        don't have a recollection of it.
18   Q.   In 2020 when you were head of PIB, did you
19        sometimes text with Susan Hutson?
20   A.    Yes.
21   Q.   And did you ever have trouble receiving
22        text messages that she sent?
23   A.    Not receiving text messages, but sometimes
24        we had trouble getting in touch with each
25        other, yes.
```

```
 1    Q.   Huh-huh.  Do you see that the first text
 2         message here on September 18th, 2020, says,
 3         "Hey Arlinda.  This is an urgent call.
 4         Please call me"?
 5    A.   Huh-huh, yes.
 6    Q.   Do you recall if you called Susan Hutson at
 7         that time?
 8    A.   No, I don't have any recollection of
 9         calling her at the time, no.
10    Q.   Okay.  Do you have any recollection of
11         doing anything in response to this text
12         message?
13    A.   No, because I don't know what was going on.
14         I could be traveling.  All I know is that
15         Monday when I saw Stella, the reason she
16         was there is because no one could get in
17         touch with me.  So there's no reason to
18         believe anybody got in touch with me before
19         that Monday.
20    Q.   Okay.  Do you recall in September of 2020
21         if Chief Ferguson contacted you about a
22         potential sexual abuse by -- by an officer
23         -- let me rephrase.  Do you recall in
24         September of 2020 if Chief Ferguson reached
25         out to you about potential child sexual
```

```
1          abuse by an officer situation?
2                      MR. ST. RAYMOND:
3                      Object to the form of the
4              question.
5                      THE WITNESS:
6                      September when?
7    BY MR. MOST:
8    Q.    2020.
9    A.    That's the whole month of September or -- I
10         -- I don't recall, but I'm -- I'm just -- I
11         know if you're asking me about the 18th or
12         another date.
13   Q.    Sure.  Do you recall Chief Ferguson ever in
14         your career reaching out to you about a
15         potential child sexual abuse by an officer
16         situation?
17   A.    I don't.  Typically I would be reaching out
18         to him.  So I -- I'm not -- but I don't
19         recall that.
20   Q.    Okay.  If Chief Ferguson had told you it
21         was a potential child sexual abuse by an
22         officer situation, would you have directed
23         that a criminal investigation be opened
24         that day?
25                      MR. ST. RAYMOND:
```

```
 1                    Object to form.
 2                    THE WITNESS:
 3                    We would have started an
 4            investigation to determine from a
 5            probable cause perspective.  So we
 6            would start some form of
 7            investigation.  I just don't know if
 8            it would necessarily be criminal
 9            immediately.
10   BY MR. MOST:
11   Q.   Sure.  So if Chief Ferguson came to you and
12        said, "We have a potential child sexual
13        abuse by an officer situation," you would
14        have opened some kind of investigation that
15        day, agreed?
16   A.   We would start a process of investigating,
17        you know -- we would start a process of
18        making a determination first if it's NOPD,
19        who the officer may be.  So there are a
20        number of steps before you would actually
21        necessarily determine whether you have a
22        formal investigation being started.
23   Q.   Sure.  And that process would begin the day
24        that Chief Ferguson told you we had a
25        potential child sexual abuse by an officer
```

```
 1        situation, agreed?
 2   A.    Yes.
 3   Q.    If he told you that on a Friday, would PIB
 4        wait until Monday to begin that process or
 5        would it begin that process on that Friday?
 6   A.    It would begin on that Friday.
 7   Q.    Does PIB have officers -- or in 2020 did
 8        PIB have officers who would work over
 9        weekends?
10   A.    Yes.
11   Q.    So an invest -- the process of that might
12        lead to an investigation could begin on a
13        Friday, a Saturday, or a Sunday?
14   A.    If we were notified, yes.
15   Q.    In your role as Deputy Superintendent of
16        PIB, setting aside an officer killing
17        someone, is there anything more serious for
18        PIB than an officer sexually abusing a
19        child?
20              MR. ST. RAYMOND:
21              Object to form.
22              THE WITNESS:
23              I think all of my criminal cases
24           are serious, so I don't know if
25            there's a more or less.  Anything
```

```
 1                criminal would be serious.
 2   BY MR. MOST:
 3   Q.   Surely some kinds of crimes are more
 4        serious than others; would you agree?
 5   A.   No.  They're just crimes to me.  So they --
 6        they're all serious.
 7   Q.   So you wouldn't say that an officer
 8        murdering someone is more serious than an
 9        officer shoplifting a candy bar?
10                     MR. ST. RAYMOND:
11                     Object to form.
12                     THE WITNESS:
13                     Well, that would be different if
14                you're talking about felony versus
15                misdemeanor, than yes.  Felony or
16                any type of felony would be
17                considered serious, but in -- under
18                our rules, any criminal activity
19                along with discrimination and
20                certain others under our Consent
21                Decree are considered serious
22                misconduct.  So that's why I'm using
23                the term serious.  That's a term
24                that we use.  You have minor
25                misconduct; you have serious
```

```
 1                  misconduct.  All criminal would be
 2                  serious.
 3     BY MR. MOST:
 4     Q.   So a potential child sexual abuse by an
 5          officer would be serious misconduct; you
 6          agree?
 7     A.   Yes.
 8     Q.   Okay.  So going to the Monday that you had
 9          an in-person meeting with Stella Cziment,
10          what do you recall Stella conveying to you
11          about the situation involving the officer?
12     A.   I -- I wouldn't necessarily call it an in-
13          person meeting as much as she met with my
14          Captain, and they only pulled me in because
15          I don't necessarily get involved in the
16          day-to-day of an investigation to get
17          authorization to have my SIS Lieutenant do
18          an investigation because we didn't know
19          what -- what they had or who they had.  So
20          there was nothing really conveyed.  That's
21          the whole reason for SIS needing to be
22          involved because there was no allegations
23          at that time, and so they were using my SIS
24          to determine what we had.
25     Q.   Okay.  SIS is Special Investigative
```

```
 1        Services?
 2   A.    Yes.
 3   Q.    And that's a team that PIB can assign to
 4         surveil an officer?
 5   A.    Yes.
 6   Q.    So -- so you were -- if I'm understanding
 7         you correctly on that Monday, you were
 8         pulled into a meeting between Stella
 9         Cziment and was it Captain Sabrina
10         Richardson?
11   A.    Yes.
12   Q.    And you were asked to authorize SIS
13         monitoring of this officer?
14                  MR. ST. RAYMOND:
15                  Object to form.
16                  THE WITNESS:
17                  No.  SSI to make a determination
18            and to see who, if any, was this --
19            did the officer work for us so to --
20            to start looking into what we may
21            have.
22   BY MR. MOST:
23   Q.    Okay.
24   A.    They didn't have any information at that
25         point.
```

```
1    Q.   So you were asked to authorize SIS trying
2         to identify this officer and what -- what
3         information about this officer?
4    A.   Just identify and see what we had.  There
5         was still no allegation at the time that I
6         recall other than we have an officer; we
7         got a third-party complaint, and we don't
8         have much information about it.
9    Q.   Do you recall what the complaint was about?
10   A.   No, just that this social worker thought
11        that this -- that there was a relationship
12        with this young girl that she thought was
13        concerning.
14   Q.   Okay.  Anything else than just describing
15        it as concerning?
16   A.   No.
17   Q.   Is -- was Omar Garcia part of SIS?
18   A.   No.
19   Q.   And did they identify the officer that day?
20   A.   I don't recall if it was -- I know it
21        wasn't when we were in the meeting, but
22        it's possibly later on.  I'm not sure.  I'm
23        not sure if they were actually able to
24        identify.  I thought it took a couple of
25        days.
```

1    Q.   Are you aware that there was a call with

2         the -- the victim and the counselor that

3         day?

4    A.   No, not with the -- you said the victim and

5         the counselor?

6    Q.   The minor.

7    A.   Call between who?

8    Q.   PIB and the minor.

9    A.   Who at PIB?

10   Q.   Do you know of any call --

11   A.   No, I don't, no.

12   Q.   Were you involved with the investigation or

13       the process of identifying this officer any

14       further on that Monday?

15   A.   No.

16   Q.   Did you ask any of your staff to update you

17       about the situation on that Monday?

18   A.   I don't think on that Monday.  It might

19       have been even -- I know there was some

20       issue with trying to get in touch with the

21       mother and the victim.

22   Q.   Huh-huh.

23   A.   And Stella's office was going to assist us

24       with that, but that's -- that's all I can

25       recall.

```
 1    Q.   Okay.  Do you recall talking to Stella
 2         further that day?
 3    A.   No.
 4    Q.   Do you recall anything else about this
 5         investigation of this officer from that
 6         Monday?
 7    A.   No.
 8    Q.   Did you ask any member of your team to
 9         provide you with regular updates about the
10         situation?
11    A.   I didn't have anything at that time to --
12         to get regular.  Generally, the regular
13         updates would come because I know I have a
14         criminal case or something like that.  I'm
15         -- I would assume, though, because my staff
16         was pretty good about, you know, checking
17         in or -- or talking to me, but I just don't
18         have a recollection of anything other than
19         having some difficulty getting in touch
20         with or getting the mother to cooperate,
21         and so I looked at this I know as one of
22         the cases that we worked together with the
23         IPM Office.
24    Q.   And at that time, did it require your
25         authorization to open a criminal
```

```
 1          investigation into an officer?
 2   A.   No.  I mean, the -- we are allegation
 3          driven.  So once you get an allegation, the
 4          case opens.
 5   Q.   Okay.  What do you recall next about this
 6          officer, this situation?
 7   A.   The next recollection I have is the -- this
 8          forensic interview that was scheduled I
 9          think it was end of the week, and that same
10          day there was an arrest made.
11   Q.   Okay.  Do you recall being updated on the
12          matter at any time before that forensic
13          interview?
14   A.   Updated in the sense of being able to set
15          up the forensic, you know, letting me know
16          we were able to set up a forensic
17          interview.  We will be able to talk to the
18          young lady that day to figure out what we
19          have.  That's about it.
20   Q.   Do you recall any -- being provided any
21          information about the situation prior to
22          being updated that -- or setting up a
23          forensic interview?
24   A.   Just like I said before, just the
25          difficulty in cooperation from the mom at
```

```
 1        the time and needing the IPM's office to
 2        assist.
 3   Q.   Do you recall prior to that discussion of
 4        setting up a forensic interview, do you
 5        recall asking for updates from any member
 6        of your team about the situation prior to
 7        that?
 8   A.    I don't recall that, but that would be --
 9        in our course, you know, I would get
10        updates.
11   Q.    Huh-huh.
12   A.   If there's something to update me on.
13   Q.    So if the forensic interview happened on a
14        Thursday and your conversation with Ms.
15        Cziment happened on Monday, it sounds like
16        you don't have any recollection of being
17        involved with this matter Tuesday,
18        Wednesday -- Tuesday or Wednesday; would
19        you agree?
20                   MR. ST. RAYMOND:
21                   Object to form.
22                   THE WITNESS:
23                   No, I don't -- I don't have
24              recollection only because once I
25              assign an investigator that
```

```
 1                    communication would be happening
 2                    with Ms. Cziment and the
 3                    investigator as they're working it
 4                    together.  I would be called in
 5                    again when there's time to take some
 6                    action like an arrest.
 7   BY MR. MOST:
 8   Q.   Something else you could be called in --
 9        called in for would be to authorize
10        surveillance of an officer, correct?
11   A.   You said surveillance, yes.
12   Q.   Are you aware that Sergeant Lawrence Jones
13        was assigned to investigate the matter?
14   A.   Yes.
15   Q.   Okay.  Are you familiar with the fact that
16        on Day One of Sergeant Jones' investigation
17        that Monday, September 21st, he learned
18        that the officer made inappropriate
19        comments and took a very inappropriate
20        picture with a 15-year-old girl?  Are you
21        familiar with that?
22                    MR. ST. RAYMOND:
23                    Object to form.
24                    THE WITNESS:
25                    No.
```

```
 1    BY MR. MOST:
 2    Q.   Are you familiar that Sergeant Jones
 3         characterized the photo as a seductive
 4         photo of the officer and the girl?
 5                   MR. ST. RAYMOND:
 6                   Object to form.
 7                   THE WITNESS:
 8                   When you say, "aware," you mean
 9              in a report?  I'm -- I'm not sure
10              what you mean by "aware."  Can you
11              clarify.
12    BY MR. MOST:
13    Q.   Yeah.  Are you aware that at any point
14         Sergeant Jones saw what he considered to be
15         a seductive photo of the -- of Officer
16         Vicknair with the child?
17                   MR. ST. RAYMOND:
18                   Object to form.
19                   THE WITNESS:
20                   No, I don't have any independent
21              recollection of that.
22    BY MR. MOST:
23    Q.   Okay.  Do you have any recollection that
24         the officer -- that Sergeant Jones found
25         out that Officer Vicknair had been texting
```

```
 1          the minor frequently over a period of
 2          months referring to her by pet names like
 3          baby doll and sending her selfies.  Are you
 4          familiar with that?
 5                    MR. ST. RAYMOND:
 6                    Object to form.
 7                    THE WITNESS:
 8                    I'm only familiar that they had
 9               some type of friendship at the time
10               as I recall from the Monday meeting,
11               and it was some type of friendship.
12               I'm not -- I don't have any
13               recollection of anything sexual
14               until that forensic interview.
15     BY MR. MOST:
16     Q.   Okay.  So this may not be in your
17          recollection, but let's suppose that on
18          that Monday, September 21st, PIB through
19          Sergeant Jones learned about a seductive
20          photo, the text messages, the pet names,
21          the selfies, et cetera.  Should NOPD have
22          left the officer unmonitored on the streets
23          after that?
24                    MR. ST. RAYMOND:
25                    Object to form.
```

```
 1                THE WITNESS:
 2                We would have to do an
 3           investigation.  We need a victim
 4           we'd have to speak to and have an
 5           actual interview.  That's the
 6           purpose of the forensic interview.
 7           We have to have probable cause to
 8           take the next step.
 9   BY MR. MOST:
10   Q.  My question isn't about an arrest but just
11       should NOPD have left the officer
12       unmonitored after learning those facts?
13                MR. ST. RAYMOND:
14                Object to the form.
15                THE WITNESS:
16                I'm saying you have to do an
17           investigation.  So we would have to
18           go through the process of
19           investigating and need some
20           statement from someone other than a
21           third party.  We would have to have
22           talked with the victim or potential
23           victim.
24   BY MR. MOST:
25   Q.  Okay.  Let's say the victim had been talked
```

```
 1        to on that day.  Should NOPD have left the
 2        officer unmonitored on the street after
 3        that?
 4                    MR. ST. RAYMOND:
 5                    Object to form.
 6                    THE WITNESS:
 7                    Depends on what the victim said
 8              that day.
 9   BY MR. MOST:
10   Q.  Okay.  So you don't think those facts are
11        sufficient just to monitor the officer?
12                    MR. ST. RAYMOND:
13                    Object to form.
14                    THE WITNESS:
15                    No.
16   BY MR. MOST:
17   Q.   Okay.  You don't think those facts are
18        sufficient to take the officer off the
19        street and assign him to an administrative
20        role?
21                    MR. ST. RAYMOND:
22                    Object to form.
23                    THE WITNESS:
24                    I'm not sure what you're -- what
25              I'm saying is when we do that is
```

```
 1                    because we have a criminal
 2                    allegation, and that's when we take
 3                    action.  We have to have a criminal
 4                    allegation.  So no, there's nothing
 5                    that's in what you just stated that
 6                    is criminal in nature.
 7     BY MR. MOST:
 8     Q.  You have to have a criminal allegation to
 9         surveil an officer?
10     A.   We have to have a criminal allegation to
11         take him off the streets is what you were
12         asking me about earlier.
13     Q.   What about surveillance, should NOPD have
14         surveilled the officer based on those
15         facts?
16     A.   I --
17                    MR. ST. RAYMOND:
18                    Object to form.
19                    THE WITNESS:
20                    I -- I wouldn't surveil when I
21            don't know who the -- when I do a
22            surveillance, it's because I'm
23            trying to gather evidence for
24            someone that I don't know whether
25            they're involved or not.  So if I
```

```
 1              already have a name, then I just
 2              start my investigation.
 3    BY MR. MOST:
 4    Q.   Okay.  Did you at any point authorize
 5         surveillance of Rodney Vicknair?
 6    A.   I don't recall.  Everything happened
 7         quickly.  It was -- got a statement,
 8         arrested that day, so no.  So it was all
 9         done within it sounds like from your
10         timeline within a week.
11    Q.   So is the answer you don't recall whether
12         you authorized surveillance of Vicknair or
13         did you not authorize surveillance of
14         Vicknair?
15    A.   I don't recall authorizing surveillance of
16         Vicknair.
17    Q.   Okay.  PIB's Special Investigative Section
18         -- is it Special Investigative Section or
19         Service?
20    A.   Special -- Special Investigative Services.
21    Q.   Okay.
22    A.   Or Section.  I'm sorry.  Section.
23    Q.   Okay.  We'll call it SIS.
24    A.   Yeah, it's -- it's hard after a couple of
25         years.
```

```
 1   Q.   Yeah.  You were able to as head of PIB
 2        authorize SIS to surveil officers suspected
 3        of misconduct, correct?
 4   A.   Yes.
 5   Q.   And that could be criminal or non-criminal
 6        misconduct, correct?
 7   A.   That -- it depends on what it is, meaning
 8        if there's a need for surveillance.  This
 9        case did not have from what you're telling
10        me, I'm not -- I would probably have to
11        even change the answer if I -- only way I
12        would be doing a surveillance is because I
13        don't know.  We have an allegation with no
14        officer, and we're trying to determine who,
15        in fact, has potentially committed this
16        allegation.  So there -- the purpose of
17        surveillance is because we actually have
18        something to surveil.
19   Q.   So you're suggesting the only time that PIB
20        would use surveillance is if an officer's
21        identity is unknown?
22   A.   No.  We would -- we would use it for
23        different situations.  Sometime the officer
24        would be known, but we don't have facts to
25        support the evidence or we don't have
```

```
 1            enough, but it depends on what type of case
 2            it is.  Everything wasn't surveilled, no.
 3            Most cases didn't have surveillance.  It's
 4            rare.
 5   Q.    So PIB could use surveillance to identify
 6            an unknown officer, correct?
 7   A.    Possibly, yes.
 8   Q.    Or collect information or evidence about an
 9            officer suspected of misconduct, correct?
10   A.    Possibly, yes.
11   Q.    Or if there's a concern that the officer
12            might be a danger to surveil the officer to
13            protect people from potential danger from
14            the officer; agreed?
15   A.    No.  If I know he's a danger, he's pulled
16            off the street immediately.
17   Q.  Okay, and if Chief Ferguson had told you
18            that there was a potential child sexual
19            abuse by an officer situation, that would
20            suggest to you an officer who may be a
21            danger, correct?
22                    MR. ST. RAYMOND:
23                    Object to form.
24                    THE WITNESS:
25                    You have to ask that again.  I'm
```

```
 1                    sorry.
 2    BY MR. MOST:
 3    Q.   Sure.  So you just talked about if an
 4         officer may be a danger, they would be
 5         pulled off the streets, correct?
 6    A.   Yes.
 7    Q.   If Chief Ferguson told you an officer was
 8         involved in a potential child sexual abuse
 9         by an officer situation, would that fall
10         within what you consider to be a danger?
11                    MR. ST. RAYMOND:
12                    Object to form.
13                    THE WITNESS:
14                    We would still have to determine
15              whether we have the officer -- so
16              I'm not -- you'd have to rephrase
17              your question.
18    BY MR. MOST:
19    Q.   Sure.  So if Chief Ferguson said there's a
20         potential child sexual abuse by an officer
21         situation, PIB identified the officer,
22         would that fall within what you're saying
23         is a potential dangerous situation?
24    A.   It -- it -- but it wouldn't be -- we would
25         still have to investigate.  So meaning just
```

```
 1        him making a call, it would be, Chief,
 2        investigate it.  It wouldn't be take
 3        action.  We still have to have something
 4        like a victim or someone --
 5   Q.   Huh-huh.
 6   A.   -- who is corroborating.  So we don't just
 7        -- no, we don't just get an anonymous
 8        complaint or somebody walk in and just make
 9        a complaint with no other information and
10        then -- because they have due process.
11        Officers have due process.  So we go
12        through steps, something to verify the
13        allegation.
14   Q.   Okay.  SIS' surveillance could take the
15        form of following an officer, correct?
16   A.   Yes.
17   Q.   Could it also take the form of watching the
18        location of the GPS device in the officer's
19        vehicle?
20   A.   I -- I'm not sure.  We would -- typically
21        we would have to have some -- we have our
22        own devices, and we would have to have
23        enough evidence, and a lot of times, we
24        even have to have warrants to place that on
25        someone's car, but no, not just in general,
```

```
 1         it's not a routine thing that they would
 2         do.
 3    Q.   Okay.  PIB wouldn't need a warrant to track
 4         the already existing GPS device in an
 5         officer's vehicle?
 6    A.   No, no, but you still would have to have an
 7         allegation.
 8    Q.   Huh-huh.  Let's suppose that on Day 2 of
 9         Sergeant Jones' investigation PIB learned
10         through him through reviewing body camera
11         footage of Officer Vicknair and the child
12         showing that Officer Vicknair had shown
13         modeling photos to the child, given his
14         phone number to the child, and taken a
15         picture of the child in the examination
16         room for a rape kit.  Would those facts be
17         enough to begin surveillance of the
18         officer?
19                   MR. ST. RAYMOND:
20                   Object to form.
21                   THE WITNESS:
22                   I don't -- I don't know what
23              you're -- you'd have to kind of
24              rephrase that, because I'm -- I'm
25              not understanding, because he was an
```

```
 1                   investigator, so he would have the
 2                   ability to take pictures.  So I'm
 3                   not sure what you're talking about.
 4   BY MR. MOST:
 5   Q.   No, I'm sorry.  Let's say that on Day 2 of
 6        Sergeant Jones' investigation of Officer
 7        Vicknair --
 8   A.   Okay.
 9   Q.   -- he reviewed body-worn camera footage of
10        when Officer Vicknair took the child to the
11        hospital to get a rape kit.
12   A.   Took her to the hospital for a previous
13        rape?
14   Q.   Correct.  And let's say in watching that
15        video, Sergeant Jones saw Officer Vicknair
16        show modeling photos to the child, give
17        Vicknair's phone number to the child, and
18        take a picture of the child in the rape kit
19        examination room, all of those facts
20        completely unacceptable for an officer to
21        do, correct?
22                   MR. ST. RAYMOND:
23                   Object to form.
24                   THE WITNESS:
25                   Possibly.  It just depends on
```

```
 1                 what role he was, but
 2                 administratively possibly, yes.
 3      BY MR. MOST:
 4      Q.   Is there any situation where it's
 5           acceptable for an officer to show modeling
 6           photos to a -- to a child?
 7                     MR. ST. RAYMOND:
 8                     Object to form.
 9                     THE WITNESS:
10                     You keep saying, "modeling
11                photos," I don't -- what type of
12                modeling -- if they're friends,
13                that's what I'm trying to figure out
14                what do you mean by modeling photos?
15      BY MR. MOST:
16      Q.   Like women in bikinis.
17      A.   To a female child?
18      Q.   Huh-huh.
19      A.   I -- I mean, if they had a friendship, I
20           don't -- I'm not sure what --
21      Q.   Let's say there's no pre-existing
22           friendship.  Is there any situation where
23           it's acceptable for an officer to show a
24           female child that he met that day modeling
25           photos of women in bikinis?
```

```
 1                   MR. ST. RAYMOND:
 2                   Object to form.
 3                   THE WITNESS:
 4                   I'm -- I'm just really -- I would
 5              have to have more facts about it.  I
 6              mean, if that came in, we would
 7              still need to have some information
 8              about it, in what capacity, how.  So
 9              I'm -- just showing modeling photos
10              to a female, a clothed female, I'm
11              just not sure.  At most you might
12              have something professional, but I'm
13              not -- I'm not quite sure what
14              policy you'd be referring to.
15   BY MR. MOST:
16   Q.   Okay.  Is it acceptable for an officer to
17        give his -- his phone number to an underage
18        rape victim?
19                   MR. ST. RAYMOND:
20                   Object to form.
21                   THE WITNESS:
22                   That -- that's what I'm saying,
23              you're -- you're -- it's the way
24              you're asking the question.
25              Officers have friendships and
```

```
 1                sometimes support of victims all the
 2                time, and so we don't have
 3                necessarily any particular policy
 4                that says an officer can't mentor or
 5                support a young person.
 6   BY MR. MOST:
 7   Q.   Okay.  So that's not a red flag for you?
 8   A.   No.
 9                MR. ST. RAYMOND:
10                Object to form.
11   BY MR. MOST:
12   Q.   Are the modeling photos a red flag to you?
13                MR. ST. RAYMOND:
14                Object to form.
15                THE WITNESS:
16                The modeling -- first of all, I
17           wasn't aware of any modeling photos,
18           but no, not by itself.  I'd have to
19           have a little bit more information.
20   BY MR. MOST:
21   Q.   Okay.  An officer taking a photo of an
22        underage rape victim in an examination
23        room, is that acceptable?
24                MR. ST. RAYMOND:
25                Object to form.
```

```
 1                    THE WITNESS:
 2                    If it's not in the course of the
 3               investigation, yes.
 4    BY MR. MOST:
 5    Q.   Does that -- does that raise a red flag to
 6         you?
 7    A.   A red flag?
 8    Q.   Huh-huh.
 9    A.   Possibly, yes.  I would -- I mean, I would
10         look into it.
11    Q.   Okay.  So if Sergeant Jones learned about
12         these facts that we discussed on the second
13         day of his investigation, at that point
14         should NOPD have either taken Officer
15         Vicknair off the streets or begin
16         monitoring him?
17                    MR. ST. RAYMOND:
18                    Object to form.
19                    THE WITNESS:
20                    No.  You need to -- you still
21               have to have a victim.  What I'm
22               saying is he has to have an
23               interview of somebody and go from
24               there.  You still have to figure out
25               -- you -- you have that information.
```

```
 1                    Now you've got to corroborate that
 2                    information with someone.  Not just
 3                    information by itself.  You have to
 4                    do an investigation.
 5      BY MR. MOST:
 6      Q.   Okay.  So it's okay at that point to leave
 7           Vicknair on the streets unmonitored; would
 8           you agree?
 9                         MR. ST. RAYMOND:
10                         Object to form.
11                         THE WITNESS:
12                         I don't -- I don't know what you
13                    think the monitoring is or what that
14                    -- that process is.  I'm not quite
15                    sure, but yes, until I have
16                    information that corroborates a
17                    criminal allegation, then yes,
18                    officers have due process, and they
19                    would stay on the street.
20      BY MR. MOST:
21      Q.   You don't think it's a crime to take a
22           photo of an underage rape victim in an
23           examination room?
24                         MR. ST. RAYMOND:
25                         Object to form.
```

```
 1                      THE WITNESS:
 2                      It depends on -- like I say, if
 3               you're doing it in your capacity,
 4               then no.  I just -- I would have to
 5               have more facts than just that.
 6    BY MR. MOST:
 7    Q.   Let's say he was taking -- Officer Vicknair
 8         was taking the picture so that he would
 9         have a picture of the minor to put in his
10         phone associated with her phone number.
11                      MR. ST. RAYMOND:
12                      Object to form.
13                      THE WITNESS:
14                      I don't -- you're doing
15               speculation.  I just -- I don't -- I
16               don't know in what -- like I said
17               when I -- if I only got the
18               information of the picture --
19    BY MR. MOST:
20    Q.   Huh-huh.
21    A.   -- I would need to figure out whether some
22         of the things you're saying now is what it
23         was used for.
24    Q.   Okay.  So Vicknair testified that he went
25         to the minor that he met in the course of
```

1      taking her to the hospital for a rape
2      examination, that he went to her house
3      subsequently 12 or 13 times.
4   A.    Okay.
5   Q.    That's a major red flag; would you agree?
6                    MR. ST. RAYMOND:
7                    Object to the form.
8                    THE WITNESS:
9                    No, not necessarily, because the
10             -- because she's there with her mom.
11             So I -- no, it wouldn't be a red
12             flag if he's going to the house.
13  BY MR. MOST:
14  Q.    You don't think it's a -- a red flag for an
15      officer to return to the home of a minor
16      rape victim 12 or 13 times?
17                   MR. ST. RAYMOND:
18                   Object to form.
19                   THE WITNESS:
20                   What I'm saying is, I'm assuming
21             because you're saying, "the home,"
22             the parent is there.  So no, not
23             necessarily because that means that
24             he has permission to go.
25  BY MR. MOST:

```
1   Q.   Okay.  Between Monday when you met with
2        Stella Cziment and when Officer Vicknair
3        was arrested --
4   A.   Okay.
5   Q.   -- did you talk to Chief Ferguson at all
6        about the Vicknair situation?
7                  MR. ST. RAYMOND:
8                  Object to form.
9                  THE WITNESS:
10                 I don't recall us having a
11             conversation.  Only time we may is
12             if -- if we -- once we had something
13             possibly, but before I would make an
14             arrest, I would have talked to him.
15             So at some point that week, I'm sure
16             we talked.  I just know it would
17             have been closer to when I got back
18             involved, which would have been the
19             arrest.  So that was Thursday or
20             Friday, whenever the arrest
21             happened, that's when him and I
22             would have been talking about it.
23             We don't talk about cases when
24             they're ongoing --
25   BY MR. MOST:
```

```
1    Q.   Okay.
2    A.   -- until there's action to be taken.
3    Q.   So you don't recall talking to Chief
4         Ferguson, but if it had happened, it would
5         have happened between the forensic
6         interview and the arrest?
7    A.   Yes.
8    Q.   Okay.  You don't recall Chief Ferguson
9         asking you to keep him updated about the
10        status of this investigation, do you?
11   A.   No, but I mean, that's -- that's a typical
12        thing we would say for any investigation
13        that involved, you know, something
14        criminal.  So I -- I just don't recall in
15        terms of it other than once we would have
16        had the forensic, I'm sure if I had called
17        him, and we're about to make an arrest,
18        then yes, we would keep him updated.
19   Q.   Are you aware Chief Ferguson communicating
20        with any member of the PIB team about this
21        matter?
22   A.   No.
23   Q.   If Chief Ferguson were to contact PIB about
24        the Vicknair matter, it would have been
25        through you, correct?
```

```
 1              MR. ST. RAYMOND:
 2              Object to the form.
 3              THE WITNESS:
 4              Not necessarily me or my Captain.
 5    BY MR. MOST:
 6    Q.   Okay.  Let's move -- let's move on to what
 7         I'll mark as "Exhibit B."  (Counsel hands
 8         document to witness.)  This is a
 9         demonstrative that we created.  I want to
10         go through it with you and look at some
11         documents to see if it's exact to your
12         understanding.  So Exhibit -- do you see
13         that "Exhibit B" is a chart that says at
14         the top, "Rodney Vicknair Pre-NOPD Criminal
15         History"?
16    A.   Okay, yes.
17    Q.   And you see it has a list of seven
18         different arrests and/or convictions?
19    A.   Yes.
20    Q.   Okay.  So we're going to look at some
21         documents and see if this demonstrative is
22         correct.  That's "C."  (Counsel hands
23         documents to witness.)  Do you see that the
24         document marked "Exhibit C" here is
25         documents from an evaluation of Police
```

1      Recruit Applicant Rodney P. Vicknair?

2  A.   Yes.

3  Q.   And are you familiar with documents like

4      this associated with the hiring of officers

5      at NOPD?

6  A.   No.

7  Q.   Okay.  Do you understand that NOPD does a

8      background check and investigation before

9      an officer is hired by NOPD?

10 A.   Yes.

11 Q.   And that involves in part looking at the

12     criminal history of the officer?

13 A.   Yes.

14 Q.   Okay.  So if you'll look at it says "Joint:

15     and then 7 at the bottom, at the bottom

16     right --

17 A.   Huh-huh.

18 Q.   -- Exhibit Page Joint 7.

19 A.   7, okay.

20 Q.   Do you see that this describes an -- under

21     "Arrest History Information," it describes

22     that "Mr. Vicknair noted and indicated he

23     was arrested" -- "arrested for disturbing

24     the peace in Gramercy, Louisiana, in March

25     1982, and paid the fine."  Do you see that?

```
 1   A.   Yes.
 2   Q.  So that would be -- that would mean that
 3        the first line on that chart is correct,
 4        March 1982, arrest and conviction for
 5        disturbing the peace?
 6                   MR. ST. RAYMOND:
 7                   Object to the form.
 8                   THE WITNESS:
 9                   I don't know if any of this is
10                correct or not.  I'm not looking at
11                any legal documents.  I'm just
12                looking at what you put together.
13   BY MR. MOST:
14   Q.   Okay.  So at least this first line of a
15        March 1982 arrest and conviction for
16        disturbing the peace is reflected in Mr.
17        Vicknair's arrest history information?
18                   MR. ST. RAYMOND:
19                   Object to the form.
20                   THE WITNESS:
21                   Now, what -- what exactly is
22                this?  Yeah, I'm -- I'm not familiar
23                with this document.  I don't do
24                anything with it, but if you're
25                asking me about what's written here,
```

```
 1              I see something about paying a fine.
 2   BY MR. MOST:
 3   Q.   Huh-huh.  Okay.
 4   A.   Like I say, I'm PIB.  I don't do anything
 5        with --
 6   Q.   PIB doesn't ever look at an officer's
 7        criminal history?
 8   A.   No.  We look at disciplinary histories.
 9   Q.   Okay.  Would you agree however that an
10        officer who had the criminal history on
11        this demonstrative should not be hired by
12        NOPD?
13                  MR. ST. RAYMOND:
14                  Objection to form.
15                  THE WITNESS:
16                  No, I can't agree.  I don't know
17             what the -- what they do in
18             background, how they determine
19             whether they hire someone.  I don't
20             know what the end result of some of
21             these.  I see a bunch of arrests,
22             not necessarily convictions.  I just
23             don't -- no, I -- I can't really
24             speak to it.  I just know enough
25             about it.
```

1    BY MR. MOST:

2    Q.   So you don't have any opinion about whether

3         an officer who has this criminal history

4         before being hired should be hired by the

5         NOPD?

6    A.   No, I don't have an opinion one way or the

7         other.

8    Q.   Okay.  Are you familiar with the Washington

9         Post article that came out in March of this

10        year about Rodney Vicknair?

11   A.   I heard about it when something was on the

12        news, but no, I'm not familiar with it,

13        didn't read it or anything.

14   Q.   Okay.  Since that story came out, have you

15        talked to anybody about the Vicknair case?

16   A.   Attorneys.

17   Q.   Okay.  Anybody else?

18   A.   I don't recall.  Only other person that

19        might have called was Ferguson just to say

20        he had to do a deposition.  That was it.

21   Q.   Anybody else?

22   A.   No, not that I recall.

23   Q.   Did you talk to Sheriff Susan Hutson about

24        it?

25   A.   I think when the story came out, yes.

```
 1    Q.   Okay.  And if you need to take a call or
 2         something.
 3    A.   No, no, that's -- I'm good.  Yeah, I think
 4         she -- she -- she just called to say that
 5         she didn't know what the story was about
 6         and why they were running a story; nobody
 7         had asked her about it and wanted to get in
 8         touch with Chief Ferguson.  So that was the
 9         only reason she called me.  She didn't have
10         a number for him.
11    Q.   Okay.
12    A.   And wanted him to understand she hadn't
13         thrown anybody under the bus, didn't know
14         anything about this and didn't know why
15         they were running a story like that.
16    Q.   And you said you also talked to Chief
17         Ferguson about the Vicknair matter this
18         year?
19    A.   Just getting him in touch with the Sheriff
20         and that he had a deposition.  That was it.
21    Q.   Did you the two of you discuss anything
22         else about the matter?
23    A.   And the fact that, you know, he didn't have
24         any recollection of it, and that was it.
25    Q.   So Chief Ferguson told you he didn't have
```

```
 1        any recollection about the -- the Vicknair
 2        matter?
 3   A.   No.  Just in terms of the story, just
 4        understanding what that story was about.  I
 5        mean, you know, people make phone calls
 6        because it ran in the news and just wanted
 7        to know if I remember anything, and I said,
 8        no, I really just don't have a lot of
 9        recollection about what happened in that
10        case.
11   Q.   And he also said that he had no
12        recollection about the case?
13   A.   No, just -- just not in terms of getting
14        the texts and all that stuff that -- that
15        was running.  He was very upset about it,
16        because he didn't -- no.  I don't know if
17        later he had, but that night he was just
18        very upset that they had run a story like
19        that, because he didn't have any
20        recollection of being involved in it at
21        all.
22   Q.   Okay, and he told you, Chief Ferguson told
23        you over the phone after the Washington
24        Post story he didn't have any recollection
25        --
```

```
 1   A.   I don't know anything about the Washington
 2        Post story.
 3   Q.   Did he tell you if he had any recollection
 4        about the Vicknair matter?
 5   A.   What I'm saying is this the only -- the
 6        only time we talked is when it ran in the
 7        news.  That was it.
 8   Q.   Right.  I'm trying to understand what he
 9        told you about his recollection of the
10        Vicknair matter.  What did he tell you
11        about if he had any or no recollection of
12        the Vicknair matter?
13   A.   No, no recollect -- no recollection.  He
14        wouldn't on details about cases like that.
15         So that's why he was so upset about his
16        name being connected at all.
17   Q.   Okay.  So the -- the phone that we looked
18        at the text messages here today, was that
19        your work phone or was that a personal
20        phone?
21   A.   I don't know.  What number is it?
22   Q.   I'm not sure.
23   A.   I don't know.
24   Q.   When you texted with Susan Hutson when you
25        were head of PIB, would you text with her
```

```
 1          on a personal phone or a work phone?
 2   A.   Depends on what it is.  We were friends
 3        also.  So if it was personal, generally it
 4        would be my personal phone.  If it was work
 5        related, it would be my police phone.
 6   Q.   And what happened with your work phone when
 7        you left PIB?
 8   A.   I still had it when I left PIB.
 9   Q.   Okay, and what happened with that phone
10        when you left NOPD?
11   A.   No, when I left PIB is when I left NOPD.
12   Q.   Oh, okay.
13   A.   And I still had the phone when I was with
14        the City.
15   Q.   Okay.
16   A.   What I don't know is what happened after I
17        left the City.  I don't know.
18   Q.   Did you return the phone to the City when
19        you left the City's employment?
20   A.   It -- yeah, with anything else that I had
21        to return, keys and things of that nature,
22        yes.
23   Q.   At any point prior to 2024, did anyone come
24        and ask you for text messages or documents
25        related to the Vicknair case?
```

1    A.   No.

2    Q.   At any point prior to 2024, did anyone come

3         to you and ask you to preserve or save

4         documents or text messages, anything else

5         related to the Vicknair case?

6    A.   No.  I mean, I wasn't employed with the

7         City, but no, I didn't have any

8         communication until I was subpoenaed for

9         this.

10   Q.   Okay.  So in 2020, 2021, 2022, or through

11        the end of your time at the City, no one

12        asked you to preserve or save or collect

13        any documents related to the Vicknair case;

14        agreed?

15   A.   I don't -- I don't know if there would be

16        anything to save, reserve, meaning we did

17        an investigation.  So we would have had --

18        we would work with the -- our Federal

19        partners to do whatever we needed to do to

20        prove our case, but that would be it.

21   Q.   No one asked you for your text messages for

22        example; agreed?

23   A.   No.

24   Q.   Okay.  That's the questions I have for now.

25                  MR. MOST:

```
 1                    Jim or Corwin, you guys are going
 2              to have followup questions?
 3                    MR. ST. RAYMOND:
 4                    I just have just a couple of
 5              followups.
 6                         EXAMINATION
 7    BY MR. ST. RAYMOND:
 8    Q.   There was -- there were some questions
 9         concerning about the use of the word
10         victim.  I want to make sure we understand
11         what it is you, your understanding of what
12         is a victim in relation to a PIB complaint.
13    A.   Someone who comes to us and expresses that
14         something criminal occurred, and so the
15         victim would be the actual person that the
16         offense happened to.
17    Q.   Okay.  Did you -- did you speak to a
18         victim on -- on Monday, September 21st?
19    A.   No.
20    Q.   Were you aware that there was a victim on
21         September 21st, 2021?
22    A.   No.
23    Q.   What was your understanding of -- of what
24         information you received on September 21st?
25    A.   That we had a social worker that called,
```

```
1        and because she had a patient who had had a
2        history of having issues with trauma in the
3        past, and that there was an actual
4        investigation that was going that she
5        wanted to make sure that she again was not
6        -- I don't know if the word was trying to
7        start a friendship or relationship with --
8        you know, it was something -- it was more
9        on the child's side in terms of wanting to
10       make sure there was nothing happening and
11       it wasn't -- the child, there was never
12       anything sexually, nothing -- nothing
13       sexual or anything.  It was just she had
14       some concerns about this friendship, and it
15       was always about this friendship that,
16       like, a mentorship with this officer, and
17       that's all we were aware of that particular
18       day.
19  Q.   That's all I have.
20            MR. MOST:
21            Okay.  Arlinda, thank -- Deputy
22       Chief Westbrook, thank you very much
23       for your time.
24            THE WITNESS:
25            Thank you.
```

```
 1              (Whereupon, the taking of the
 2          witness' testimony was concluded.)
 3
 4
 5              C E R T I F I C A T E
 6          THIS CERTIFICATION IS VALID ONLY FOR
    A TRANSCRIPT ACCOMPANIED BY MY ORIGINAL
 7  SIGNATURE AND ORIGINAL REQUIRED SEAL ON THIS
    PAGE.
 8
            I, RAYNEL E. SCHULE, Certified Court
 9  Reporter, #77005, in good standing, in and for
    the State of Louisiana, as the officer before
10  whom this testimony was taken, do hereby certify
    that ARLINDA WESTBROOK, after having been duly
11  sworn by me upon authority of R.S. 37:2554, did
    testify as hereinbefore set forth in the
12  foregoing 64 pages; that this testimony was
    reported by me in stenotype reporting method,
13  was prepared and transcribed by me or under my
    personal direction and supervision, and is a
14  true and correct transcript to the best of my
    ability and understanding; that the transcript
15  has been prepared in compliance with transcript
    format guidelines required by statute or by
16  rules of the Board, that I have acted in
    compliance with the prohibition on contractual
17  relationships, as defined by Louisiana Code of
    Civil Procedure Article 1434 and in rules and
18  advisory opinions of the Board; that I am not of
    counsel, not related to counsel or to the
19  parties herein, nor am I otherwise interested in
    the outcome of this matter.
20
21
22  4-30-2024    _____
    Date                 Raynel E. Schule, CSR
23                       Certified Shorthand Reporter
                         State of Louisiana
24
25
```

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25