```
1        EXAMINATION BY MR. ROQUEMORE:

2        Q.     My name is Jim Roquemore.  I'm an

3   attorney.  I represent the City of New Orleans in

4   this case.  We met before we started.  And so,

5   before we get started, state your full name for the

6   record?

7        A.     Berre Burch.

8        Q.     Are you a doctor?  Do you go by doctor?

9   Do you prefer that?

10       A.     That is fine.  Whatever is fine.

11       Q.     I'll call you Dr. Burch.  Have you ever,

12   do you know what you are here for today?

13       A.     I do.

14       Q.     And what is your understanding?

15       A.     It's to testify as the G███ H████

16   case.  I don't know particular, like particulars

17   beyond that.

18       Q.     We will get into that.  Have you ever

19   been a witness in a court case before?

20       A.     I have not.

21       Q.     Have you ever given a deposition?

22       A.     I have not.

23       Q.     Okay.  So I'm going to explain what the,

24   what goes on and just make sure that we are all on

25   the same page.  This is our opportunity to ask you
```

```
 1    Actually, on 3441, there's an entry that starts on

 2    September 16th.  And carried over to the next page,

 3    to 3442.  Right?

 4         A.    Uh-huh (affirmative response).

 5         Q.    And so, Andrea Wright is meeting G█████

 6    at an outdoor picnic table?

 7         A.    Yes.

 8         Q.    This is during COVID?

 9         A.    Yes.

10         Q.    Outdoor is more healthy.  So we are

11    having counseling at the picnic table.

12               (As read)  Engaging in a session.

13    Psychoeducation.

14               Right?

15         A.    Yes.

16         Q.    And this is where:

17               (As read)  G█████ did discuss a

18    friendship within an adult male NOPD officer who has

19    been making her uncomfortable.

20               Right?

21         A.    Yes.

22         Q.    To your understanding, this is the first

23    time that G████████ has mentioned having a

24    friendship with an NOPD officer?

25         A.    Yes.
```

```
 1        Q.    Okay.  So the first time that Children's

 2   Bureau has any information that there's this

 3   relationship or contact with an NOPD officer is on

 4   September 16th?

 5        A.    Yes.

 6        Q.    Okay.  And Andrea, this note continues:

 7              (As read)  LCSW and G█████ discusses

 8   friendship, and explored what made her

 9   uncomfortable.

10              Correct?

11        A.    Uh-huh (affirmative response).  Yes.

12        Q.    On this day, did G███████say anything

13   about sexual contact between the NOPD officer and

14   herself?

15        A.    It did not appear to be the case, no.

16        Q.    And there was no indication on this day

17   that there had ever been sexual contact between

18   G█████ and this NOPD officer?

19        A.    Not that was known to Children's Bureau.

20        Q.    Okay.  However, Andrea, after this, came

21   and talked to you; is that right?

22        A.    Yes.

23        Q.    Do you have particular memory of that

24   conversation?

25        A.    I think part of what, there were
```

```
 1   concerning behaviors.

 2        Q.    This is from your memory?

 3        A.    From my memory.

 4        Q.    Tell me what you remember from your

 5   conversations.

 6        A.    I remember there were concerning

 7   behaviors that didn't rise to the level of a

 8   mandated reporter and the ability to breach

 9   confidentiality.  But things that, like, just

10   getting a phone number, making ongoing contact,

11   stopping by the house, taking pictures, those kinds

12   of things where appropriate.  Just behavior that is

13   completely not appropriate for an officer.

14             And trying to figure out what is the

15   right avenue to report and to get G███ and R███ on

16   board with reporting.  And where that line between

17   mandating reporting, their cooperation, and sort of

18   what that gray area is, and what are our options to

19   move this forward.

20        Q.    Sure.  So this is September 16th?

21        A.    Uh-huh (affirmative response).

22        Q.    Andrea has come to you?

23        A.    Yes.

24        Q.    And from what I understand, from what

25   you're saying is that this was not a situation that
```

```
 1   was a mandatory reporting situation, in your
 2   estimation?
 3        A.    Did not have a disclosure of abuse at
 4   this point.
 5        Q.    But, it was concerning?
 6        A.    Incredibly concerning.
 7        Q.    And you wanted to find out what you
 8   could do to promote her mental health and --
 9        A.    Safety.
10        Q.    -- to make sure that, safety, to make
11   sure that this was appropriately addressed?
12        A.    Yes.
13        Q.    Okay.  Now, Andrea did make, makes a
14   note on September 16th.  And she discussed, she said
15   she:
16             (As read)  Discussed making report to
17   NOPD as an ethical concern rather than typical
18   mandating report, as there's no clear criminal or
19   mandated report.
20             Is that right?  That's what it says,
21   right?
22        A.    Yes.
23        Q.    That's accurate?
24        A.    Yes.  At this point, we don't have, it
25   doesn't fall under the mandated reporting where we
```

1  can just discard clients' wishes about disclosing

2  personal health information.  But there are really

3  concerning practices by a police officer that have

4  the potential to impact her safety.

5      Q.    Absolutely.  But I just, your balance

6  that you are making is that G█████ H█████ was not

7  consenting to disclose --

8      A.    Her caregiver.  She can't consent.

9  She's 15.

10      Q.    So neither Mom nor G█████ were consenting

11  to disclose this relationship by the NOPD officer?

12      A.    I think that's what it says in the

13  report.  But we did not have written consent to do

14  that.

15      Q.    So you couldn't go forward with anything

16  until you got the client on board?

17      A.    Yes.

18      Q.    Okay.  But still, so, there's nothing

19  that anybody could have done to find out who this

20  person was, this NOPD officer, until Mom and G█████

21  got on board, or Mom, at least Mom got on board,

22  correct?

23      A.    I don't know that that's true.

24      Q.    Okay.  But so you explored --

25      A.    There's limits of what we could do.

1      Q.      You couldn't disclose?

2      A.      Right.

3      Q.      On the 16th, there was, was there any

4   indication of what this officer's name was?

5      A.      I have to look in the record here.  It

6   says:

7              (As read)  She declined to provide the

8   officer's full name, and expressed now feeling

9   uncertainty about reporting.

10     Q.      She being G███ or she being R███

11  Upton?

12     A.      Looks like G███ here.

13     Q.      Looks like, according to this report,

14  you have a conversation with Andrea Wright?

15     A.      Uh-huh (affirmative response).

16     Q.      And then, the next entry, is there a

17  text to Mom and G███ about connecting about this

18  concern; is that correct?

19     A.      Yes.

20     Q.      Okay.  So there's a call that's recorded

21  to Ms. H███ on the 16th about concerns about the

22  police officer's inappropriate behavior, right?

23     A.      Yes.

24     Q.      And from what we discussed, the

25  inappropriate behavior was still was not criminal

```
 1   behavior, correct?

 2        A.    As far as we knew.

 3        Q.    No child sexual assault by an officer

 4   upon a minor, right?

 5        A.    Not that was disclosed to us.

 6        Q.    And you had no reason to suspect that,

 7   right?

 8        A.    Correct.

 9        Q.    And but it was inappropriate, correct?

10   An ethical problem?

11        A.    Yes.  Well, ethical and increased this

12   child's risk, placed her at risk for further harm.

13        Q.    Okay.  And now, the, if you continue on

14   this entry, there's a part where they talk about

15   the, where Andrea writes:

16              (As read)  Concerning behavior.  And

17   expressed concerns about retaliation when LCSW

18   reported, discussed reporting this behavior to PD as

19   an ethical concern.

20        A.    Uh-huh (affirmative response).

21        Q.    (As read)  Ms. H▇▇▇ processed her

22   concerns and safety implications.

23              Right?

24        A.    Yes.

25        Q.    When you say safety implications, is
```

BERRE BURCH - ROUGH DRAFT on 05/09/2024

84

```
1       Q.     And did G███  have a concern about being
2   taken back to the hospital as a result of making a
3   complaint?
4       A.     I think because the officer knew her
5   mental health history, she was afraid that that
6   would be used against her.
7       Q.     For what purpose?
8       A.     That she would be returned to the
9   hospital.  So hospitalization.
10       Q.     So she wanted to, she had a fear that,
11   whether unreasonable or reasonable, that if she made
12   a complaint, she was going to be taken again and
13   admitted to the hospital?
14       A.     Yes.
15       Q.     All right.  The final line of this
16   9/16/20 entry regards a text exchange between G███
17   and Andrea, where G███  again, declined to provide
18   the officer's full name and expressed now feeling
19   uncertain about reporting, right?
20       A.     Yes.
21       Q.     And so therefore, Andrea suggested
22   meeting the next day?
23       A.     Yes.
24       Q.     So this is pushed off another day,
25   right?
```

```
 1        A.     Yes.

 2        Q.     Okay.  And you would agree that a report

 3   could not be made solely because Ms. H███ and

 4   G███ weren't cooperating on the 16th?

 5        A.     We didn't have the information that we

 6   needed.  And yes.  I think we were also trying to

 7   figure out who would take this report.  Would it go

 8   to NOPD, which I think they would be less likely to

 9   participate.  Are there other options?  So it was

10   also us trying to understand what the process would

11   be.  Because we had not ever made a mandated report

12   related to a police officer, or a report of

13   potential.

14        Q.     I understand.  You have obligation to

15   your client for privacy and confidentiality.  By the

16   same token, you have a responsibility to your client

17   for protecting her.

18        A.     Yes.

19        Q.     That's the edge that you were balancing

20   on?

21        A.     Yes.

22        Q.     On the next day, on the 17th, Ms. Wright

23   enters another log report.  And again, on this day,

24   G███ is saying she does not want a report to be

25   made?
```

1   But it is in one of the documents.

2       Q.    That's okay.  I'm not asking you what is

3   on the notes.  I'm asking you what you remember.

4       A.    Yes.  I don't remember any.

5       Q.    Okay.  And did you, what did you tell

6   them about your concerns?

7       A.    I told them that I would have to look at

8   the notes.  But basically that we had some really

9   concerning behavior by an officer with one of our

10  clients.  That I really would like to empower the

11  family to make the call and contact them and share

12  what had happened.

13          I would have to look at the document.

14  Essentially at that point, we knew Officer Rodney.

15  So we shared the name.  And described some of the

16  behavior, concerning behaviors that had been shared

17  with us.

18      Q.    And so, I want to drill down on what

19  specifically the behaviors that you related to OIPM.

20  Do you remember what exactly you told her?

21      A.    No.  I would have to look at the notes

22  from the call.

23      Q.    Was it, is it fair to say there was a

24  picture with hugging going on?

25      A.    I think that, like, yeah.  The officer

1     had put his arm around the her.

2          Q.     That was one of the primary concerns?

3          A.     That was one of the concerns that she

4     shared.

5          Q.     And the other one was him driving by and

6     saying, Nice ass, or shouting, Nice ass, to her?

7          A.     Yes.  One of the behaviors.

8          Q.     And was one of the concerns him coming

9     around the house?

10         A.     That was a concern.  And calling.

11         Q.     And calling?

12         A.     Yes.  And I think giving a minor victim

13    his phone number.

14         Q.     Was there anything else that you can

15    think?

16         A.     Off the top of my head, I would rely on

17    notes from that.

18         Q.     You will agree that there's nothing that

19    you told them about a sexual assault having occurred

20    by the officer?

21         A.     We did not have information about a

22    sexual assault.  That would not have been shared.

23         Q.     So you did not share any fears that

24    sexual assault was going to happen?

25         A.     I don't know if that was said.  But, I

1      Q.      What does that mean?

2      A.      I think I gave Officer Rodney, which we

3   knew to be the case.  And I used, I don't know if I

4   used her first name.  But I kept it as anonymous as

5   possible.  And just tried to walk that fine line of

6   what I could keep protected and what I knew to be

7   true.  And with the cooperation that I had, as far

8   as I could move forward.

9      Q.      You didn't give the names of G█████████

10  or her mom?

11     A.      I don't, I don't remember.

12     Q.      But that's what anonymously generally

13  means?

14     A.      As anonymous as possible is what I think

15  the phrase we used.

16     Q.      You had the name Rodney?

17     A.      Officer Rodney.

18     Q.      Officer Rodney.  Did you have his last

19  name?

20     A.      Did not.

21     Q.      Okay.  So it includes in this entry:

22              (As read)  LCSW also shared that IPM

23  expressed wanting to engage in safety planning, and

24  address safety for the family.

25              Do you see that?

```
 1    Is that therapeutic, or is that legally mandated?

 2         A.    It's both, right?  It's how we gain

 3    trust with clients.  It's how they start to, like,

 4    feel comfortable sharing what their experiences are.

 5    It's a pretty key part of our work.

 6         Q.    All right.  So Friday the 18th,

 7    something happened on Sunday.  Do you see the entry

 8    for September 20th?

 9         A.    Uh-huh (affirmative response).

10         Q.    Tell me what you remember, after

11    reviewing the entry, tell me what happened on

12    Sunday?

13         A.    So there is another incident of sexual

14    assault.  Reports are made.  And then, there's the

15    linking of, with the reporting, figuring out how

16    NOPD responds and IPM and all of these intersected

17    entities.  We start to make sense much all of this.

18         Q.    Okay.  So on the 20th, there's a report

19    that G██████ had had sex with her adult friend

20    named Jim; is that right?

21         A.    Correct.

22         Q.    And that was a mandatory reporting

23    situation, correct?

24         A.    For sure.

25         Q.    But there's also, you are in the middle
```

```
 1    of trying to get the concerns about Rodney dealt

 2    with, with the NOPD?

 3         A.    Correct.  With IPM.

 4         Q.    With the independent --

 5         A.    Yes.

 6         Q.    It was your understanding, on Friday,

 7    that you were also going to be talking to?

 8         A.    Yes.

 9         Q.    -- the NOPD?

10         A.    Yes.

11         Q.    And that IPM was going to be

12    facilitating that; is that right?

13         A.    Yes.

14         Q.    And you were going to be facilitating

15    your client's contact with law enforcement?

16         A.    Yes.

17         Q.    So all this was going on, and this is

18    why it had to happen on Monday?

19         A.    Uh-huh (affirmative response).

20         Q.    That's yes?

21         A.    Yes.

22         Q.    Was there any way that it could have

23    been done any faster than having, from the time that

24    you first learned that there was an officer with

25    inappropriate behavior, to having the meeting, is
```

 1   clients to forensic interviews and thing like that,

 2   just to provide emotional support, and to be there

 3   as a resource.

 4       Q.    Based upon your understanding of the

 5   situation, your continual talking to Andrea Wright,

 6   was it appropriate to schedule the meeting on

 7   Monday, the 21st, to discuss with law enforcement

 8   the concerns about Officer Rodney?

 9       A.    Given the information that we had, I

10   think there was substantial concern about risk.  But

11   that was when we had the client agree to do that.

12   And when we were next in the office.  And we had

13   shared all the information that the caregiver was

14   willing to share and the child was willing to share.

15       Q.    So --

16       A.    So OIPM had all the information that we

17   had at the end of that week.

18       Q.    My question is, was it appropriate from

19   where you are sitting to meet on Monday?

20       A.    Yes.  I think given what we knew, it

21   was.  But kind of what we know in hindsight, I

22   think, it's still -- yeah.  I wish that we would

23   have moved forward even faster.

24       Q.    Okay.  That's the benefit of being where

25   you are now?

```
 1       A.    Yes.

 2       Q.    But on Friday, the decision was made to

 3  let's meet on Monday, right?

 4       A.    Yes.  Yes.  Yes.

 5       Q.    And based on the information you knew on

 6  Friday, that seemed to be appropriate, right?

 7       A.    Yes.

 8       Q.    Okay.  But Sunday comes.  And the

 9  disclosure about Jim and G████████ having sex is

10  revealed, right?

11       A.    Correct.

12       Q.    And then, you have to make a mandatory

13  report?

14       A.    Correct.

15       Q.    So, I'm going to, let's go to Page 3562.

16  And this is the DCFS report for 9/20?

17       A.    Yes.

18       Q.    Are you looking at the 3562?

19       A.    Uh-huh (affirmative response).

20       Q.    Tell me when you're there.

21       A.    Okay.

22       Q.    Okay.  So it starts on 3562, and it goes

23  to 3566; is that correct?

24       A.    Yes.

25       Q.    Okay.  And let's, this report was filled
```

BERRE BURCH - ROUGH DRAFT on 05/09/2024

106

```
 1    for a response to this particular question, as
 2    mandatory reporter?
 3         A.    I think she actually put what she knew
 4    to be, what she knew to be true.  This is what, this
 5    is the allegation or the concern that came out.
 6         Q.    This is the reason why they are making
 7    the report?
 8         A.    Yes.
 9         Q.    And in this case, she is saying:
10              (As read)  MS. R███ H██████, Mom,
11    informed LCSW that G████████ had disclosed to a
12    friend that she and an adult man, 50 years old, had
13    sex?
14         A.    Uh-huh (affirmative response).
15         Q.    Right?
16         A.    Uh-huh (affirmative response).
17         Q.    Okay.  So this was, this was the report.
18    And then there's some more detail about what is
19    known about her situation.  And that's contained in
20    the paragraph, the bottom of 3565?
21         A.    Uh-huh (affirmative response).
22         Q.    Is that right?  Goes into more details,
23    facts, and her history?
24         A.    Yes.
25         Q.    So, she relates -- when I say she, I'm
```

1  Q.  In fact, there's a number of places in

2 this report where G███████ is denying that she had

3 sex with Jim, right?

4  A.  Right.  But here, you were saying that

5 if she had had sex with him at Mardi Gras.  But that

6 does not say here that she had sex with him at Mardi

7 Gras.

8  Q.  I can say that in prior depositions with

9 G███████ there's other information.

10  A.  Okay.

11  Q.  I'm not asking --

12  A.  I'm just trying to read for the

13 timeline.  Okay.

14  Q.  But the bottom line --

15  A.  What I know, yes.

16  Q.  The bottom line is that a friend told

17 Ms. H█████ that G███████ had sex with Jim?

18  A.  Yes.

19  Q.  And that report was made to Andrea, who

20 directly took action, because of the seriousness of

21 this allegation?

22  A.  Yes.

23  Q.  And you would agree that this is a

24 serious allegation that requires immediate action?

25  A.  Yes.

1     Q.    Okay.  The last line, there's a mention

2  of NOPD officer?

3     A.    Uh-huh (affirmative response).

4     Q.    Do you see that?

5     A.    Yes.

6     Q.    It said:

7     (As read)  It should also be noted that

8  ████ recently disclosed an NOPD officer making her

9  feel uncomfortable, calling nice ass to her, putting

10  arm around her waist.

11     Hugging.

12     (As read)  And this is planned to be

13  addressed on Monday with IPM.

14     A.    Yes.

15     Q.    There's, if there had been an allegation

16  that there was sexual assault known or risk of

17  danger of sexual assault, that would have been

18  included, you would agree, in this part, talking

19  about the NOPD officer?

20     A.    I think she includes it because there is

21  a risk.  And an active, like, process underway.

22     Q.    But what, she doesn't say anything about

23  a sexual assault?

24     A.    She doesn't say sexual assault.

25     Q.    She doesn't say --

```
 1        A.     Every case is different, right?  Some

 2  have witness, and you may not have a child that

 3  participates.  But if you have witnesses or photos

 4  or videos.  There are many different factors.  And

 5  resources available to law enforcement and sort of

 6  the combination of factors.

 7               Having a cooperating victim is great.

 8  But even in the absence of that, there are other

 9  tools, and the combination of those can either

10  facilitate or hinder.  Doesn't always come down to

11  just the victim's cooperation.

12        Q.     Okay.  And it your understanding on the

13  21st, that there's still no allegation, no facts to

14  show that any sexual assault had happened that had

15  been perpetrated by Rodney Vicknair against

16  G███████ H██████?

17        A.     What is the date of the forensic

18  interview?

19        Q.     The forensic interview is on the 25th,

20  which is Friday.

21        A.     At that point that I'm aware of, no.

22        Q.     So, just to jump ahead.  It wasn't until

23  the forensic interview happened that any indication

24  was made to you that there was any sexual assault by

25  Rodney Vicknair; is that fair?
```

BERRE BURCH - ROUGH DRAFT on 05/09/2024

119

```
 1        A.    That is my understanding, yes.

 2        Q.    Okay.  On the 21st, 22nd, and 23rd,

 3  based upon your understanding of the report, what

 4  was, if any, the counsel provided to G█████ about

 5  making contact, continuing contact with the NOPD

 6  officer?

 7        A.    Whatever is in the record is what I

 8  know.

 9        Q.    Okay.  And if the record doesn't show

10  that G█████ was ever counseled not to have

11  contact with the officer, that would be accurate?

12        A.    That, that's the only information that I

13  would have available to me.  I don't know if that

14  counsel happened or not.  If it's not in here, I

15  wouldn't be able to speak to it.

16        Q.    Okay.  You are not aware of Andrea ever

17  telling G█████, Listen, this is inappropriate.

18  You need to stop.  You need to stop your contact

19  with this officer?

20        A.    I don't.  I don't know that, if that

21  occurred.  I also don't know if she knew that

22  ongoing contact was happening.

23        Q.    It's not being disclosed to the

24  counselor.  And there was no, no opportunity to have

25  any counseling about that subject?
```