UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

RAYNE UPTON, individually and on
behalf of her minor daughter,
G.H.                                          DOCKET NO. 2:21-CV-407
    Plaintiff

V                                             JUDGE: CARL BARBIER

RODNEY VICKNAIR, SHAUN FERGUSON
THE CITY OF NEW ORLEANS; DOE                  MAGISTRATE: KAREN WELLS ROBY
DISTRICT COMMANDER; DOES 1 TO 10;
And XYZ INSURANCE COMPANIES 1 to 10,
    Defendants


    DEPOSITION OF SHERIFF SUSAN AMELE

HUTSON, given in the above-entitled cause,

pursuant to the following stipulation, before

Raynel E. Schule, Certified Shorthand Reporter

in and for the State of Louisiana, at Orleans

Justice Center, 2800 Perdido Street, Building A,

New Orleans, Louisiana, 70112, commencing at

10:45 o'clock a.m., on Monday, the 8th day of

May, 2024.

```
 1         department.  She's right -- right under him
 2         or right next to the Chief of Operations at
 3         least in terms of leadership in the
 4         department.  It has to be somebody at a
 5         high level.  You cannot put it at a lower
 6         level or it will be spread before they can
 7         do anything.
 8    Q.   So you -- you asked Chief Ferguson to take
 9         action, to ask his -- his command structure
10         to take action on this matter urgently?
11    A.   Yeah, I needed him to get ahold of PIB and
12         probably Westbrook or Richardson so they
13         can take it and -- and handle it.
14    Q.   Okay.  Did you ask him to do anything else?
15    A.   If I did, I don't - I don't recall.
16    Q.   Okay.  Did you ask him to follow up with
17         you about what steps he took?
18    A.   Again, I don't recall, but what we do in
19         these particular -- or what we did in those
20         particular types of cases is we then
21         monitor them.  So I had already told Deputy
22         Police Monitor Stella Cziment, you know, be
23         with Richardson, stay on this.  Whatever
24         happens, be there.  And because of what we
25         were hearing, we knew that the family was
```

```
 1        believe is what we were going to do or
 2        maybe we had a roster.  We had access to
 3        information from the NOPD.  So we would
 4        have searched by Rodney to see if we can
 5        see -- find last names.
 6   Q.   But at the time that this summary was being
 7        written on September 18th, the OIPM did not
 8        know the last name of -- of the Rodney?
 9   A.   That's right.
10   Q.   Right?  And you'll agree that this
11        statement written by -- written up in
12        "Exhibit J" summarizes the full extent of
13        the information that was known to OIPM at
14        that stage, right?
15   A.   It looks like it, yes.
16   Q.   And there's nothing in exhibit -- nothing
17        that you knew related to a sexual -- that
18        OIPM knew about sexual assault that
19        wouldn't have been put into this -- this
20        "Exhibit J"?
21             MR. MOST:
22             Objection to form.
23             THE WITNESS:
24             We would have put it in there if
25        we had had it, that's for sure.
```

```
 1   BY MR. ROQUEMORE:
 2   Q.   Okay, and I want you to take a close look
 3        at "Exhibit J" and show me exactly where or
 4        show me where it describes a sexual assault
 5        having been made by a NOPD officer.
 6   A.   I don't see that in there.
 7   Q.   So you don't see any mention of a sexual
 8        assault in this one, in this document?
 9   A.   Not by Officer Vicknair or the officer, but
10        there's -- you know, it mentions that she
11        had some other assaults; she has had some
12        other assaults, but not Vicknair.
13   Q.   In fact, Vicknair's name isn't mention in
14        "Exhibit J" at all?
15   A.   Right, right, or the officer they're
16        talking about in here does not mention him
17        doing that, no, and no, his name is not --
18        last name is not mentioned.
19   Q.   And it's true in order for an officer to be
20        -- to have a complaint made, a formal
21        complaint made to the PIB, you have to have
22        the full name of the officer.  Would you
23        agree with that?
24             MR. MOST:
25             Objection to the form.
```

```
 1              THE WITNESS:
 2              No, we didn't always have that.
 3         Like, say, you know, somebody would
 4         say, I was -- I don't know who
 5         arrested me, but he beat me up on --
 6         it was this day and this time, you
 7         don't have to give a name or
 8         anything, and you can even file it
 9         anonymously, and then at that point,
10         we would put as much information as
11         we had.  I don't remember if we had
12         access to police reports at this
13         time, but we would have looked up a
14         police report for it; we would have
15         looked, you know, in the police
16         report database.  We would have been
17         probably able to identify them, but
18         if not, we still would have filed it
19         without the name.
20   BY MR. ROQUEMORE:
21   Q.   Okay, and at this -- at this point in time,
22        was a complaint opened up with the PIB?
23   A.   On the 18th?
24   Q.   Yes.
25   A.   I don't believe so.
```

```
 1   Q.   Do you know why not?
 2   A.   Well, we don't have -- we did not have
 3        enough information at this point in time,
 4        but we -- we also didn't have the girl's
 5        permission to move forward, and we didn't
 6        hear -- like, if they -- if they had told
 7        us specifically he beat her up or he
 8        sexually assaulted her or something
 9        physical, it was a physical danger to her,
10        then we would have called them right away,
11        but without any of that detail, we would
12        have -- and -- and with their -- the
13        caregivers, their reluctance, we would have
14        waited for more information and the
15        mother's help.
16   Q.   Okay.  Explain a little bit more about the
17        -- the -- the permission not being given by
18        the -- by the complainants.
19   A.   Yeah, so one of the things we -- you know,
20        when they come to talk to us, we -- we
21        don't share anything outside that process
22        without their permission, unless they came
23        and told us an officer is hurting somebody,
24        you know, somebody is in danger of being
25        hurt, something like that.
```

```
 1    Q.   Like actively child molesting, child sexual
 2         assaulting, correct?
 3    A.   That's right.  That's right.
 4    Q.   Okay, but in this case that was not -- that
 5         was not the situation, right?
 6    A.   It did -- that's not -- but it walked right
 7         up to the line here.  We were a little
 8         nervous definitely about it, but we also
 9         knew because of the trust issues and all
10         that was going on with the child that --
11         and her mother that we needed to, like, you
12         know, move carefully.
13    Q.   Okay.  Given the lack of permission at this
14         stage, what was OIPM authorized to do?
15    A.   At this stage we're trying to get -- we had
16         to come up with a gameplan to try to get
17         the family on board.  So you've got the
18         caregivers there who --
19    Q.   Caregiver being mom?
20    A.   I'm sorry.  The professionals.
21    Q.   Counselors?
22    A.   Yeah, the counselors.  So I don't even
23         think we had the girl's name.  I'm pretty
24         sure we didn't even have her name.  Yeah,
25         they didn't even give it to us.  So we
```

| | | |
|---|---|---|
| 1 | | didn't have anybody to reach out to or |
| 2 | | contact, although we were -- you know, we |
| 3 | | could have -- we did look in here about |
| 4 | | trying to see if we could research the -- |
| 5 | | where he transported her I think and then |
| 6 | | try -- and, of course, looking for the |
| 7 | | database to figure out how many Rodneys |
| 8 | | were in there, and who -- you know, see |
| 9 | | what we could do from there, but no, we |
| 10 | | didn't -- we didn't have enough to do |
| 11 | | anything at that point. |
| 12 | Q. | Did you check to see if there was a -- a |
| 13 | | mandatory reporting made by any of the |
| 14 | | counselors? |
| 15 | A. | I don't think -- I don't know if I'd have a |
| 16 | | place -- oh, you mean, like, in -- in the |
| 17 | | police report? I -- I don't know that we |
| 18 | | have access to a database to look at that. |
| 19 | Q. | Okay, but this would be something that if |
| 20 | | the counselors believed that a child sexual |
| 21 | | assault had occurred, that would be |
| 22 | | something that a Licensed Clinical Social |
| 23 | | Worker would be mandatory -- be required by |
| 24 | | law to report to law enforcement? |
| 25 | A. | I believe that's -- that's -- yeah. |

```
 1   A.   Well, that's their job to investigate their
 2        own, and if necessary, to, you know, make
 3        -- you know, do investigations,
 4        surveillance, get people removed from duty,
 5        whatever.  That's their job to do that.
 6   Q.   Okay, and do you remember what PIB did
 7        next?
 8   A.   Just from what we're seeing here, I see
 9        that we had some things set up for that
10        Monday for us to -- to kind of monitor
11        their dealings with I think the girl and
12        her mother.
13   Q.   And was there any -- anything inappropriate
14        about setting up meetings with the mother
15        and the counselor and PIB on Monday rather
16        than doing it Friday night or Saturday or
17        Sunday?
18   A.   I don't know what happened between -- at --
19        at NOPD between Friday and Monday, but from
20        the tenor of my messages with Stella, it
21        doesn't look like there was anything
22        alarming going on.  So I -- I don't -- I
23        don't think there was anything wrong with
24        that from what I've seen so far.
25   Q.   There was nothing wrong with waiting 'til
```