UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| RAYNE UPTON, INDIVIDUALLY AND ON BEHALF OF HER MINOR DAUGHTER, G.H. | CIVIL ACTION |
| VERSUS | No. 21-407 |
| RODNEY VICKNAIR, ET AL. | SECTION: "J"(4) |

## ORDER AND REASONS

Before the Court are a *Motion for Reconsideration* **(Rec. Doc. 214)** filed by Plaintiff, G.H.; an opposition (Rec. Doc. 215) filed by Defendant the City of New Orleans ("the City"); and Plaintiff's reply (Rec. Doc. 217). Having considered the motion and memoranda, the record, oral argument on the motion, and the applicable law, the Court finds that the motion should be **GRANTED.**

## FACTS AND PROCEDURAL BACKGROUND

On September 23, 2020, Rodney Vicknair,[1] who was then employed as an officer with the New Orleans Police Department ("NOPD"), sexually assaulted G.H., who was then a minor child.[2] The parties in this case dispute whether this assault was the first and only time Vicknair sexually assaulted G.H. Vicknair was later convicted in federal court for deprivation of rights under color of law, specifically for depriving G.H. of her fundamental right to bodily integrity while acting as a police

---

[1] Rodney Vicknair was formerly named a Defendant in this case but died on January 1, 2024. On January 9, 2024, the Court granted Plaintiff's motion to dismiss all claims against Vicknair with prejudice. (Rec. Doc. 119)

[2] After reaching the age of majority in July 2023, G.H. was substituted for her mother as Plaintiff in the instant case.

1

officer. The court sentenced him to imprisonment for a term of 168 months.

Vicknair had been an NOPD officer since 2007. Before hiring Vicknair, NOPD had reviewed Vicknair's criminal history, which included five arrests and one conviction: (1) arrest for two counts criminal damage to property and two counts illegal use of a weapon, (2) arrest for attempted burglary, (3) arrest and conviction for simple battery against a juvenile, (4) arrest for disturbing the peace, and (5) arrest for simple battery and aggravated assault.

Vicknair first met G.H. on May 26, 2020, when he responded to a call to the NOPD and escorted then-14-year-old G.H., who was a victim of attempted rape, to the emergency room to undergo a forensic exam (i.e. a rape kit). In the emergency waiting room, Vicknair told G.H. that she could tell him things that she would not tell her mother and showed G.H. photos of his daughter scantily clad. He also gave G.H. his cell phone number and offered to mentor and speak with her outside of work. In the four months that followed the emergency room visit, Vicknair continued to developed an inappropriate relationship with G.H. Vicknair visited G.H.'s residence unannounced at least ten times while on- and off-duty, spoke on the phone and exchanged explicit Snapchat messages with G.H., took a photo with G.H. while hugging her from behind with their faces touching, touched G.H.'s breast and buttocks under her shirt, discussed G.H.'s sexual relationship with a 50-year-old man, and sexually assaulted G.H. at least once.

Plaintiff sued the City, alleging, among other things, municipal liability because Superintendent Shaun Ferguson and the City established, condoned,

ratified, and encouraged customs, policies, patterns, and practices that caused the deprivation of her rights because NOPD failed to implement sufficient training or oversight for officers. (Rec. Doc. 79, at 27).[3] [4] Specifically, Plaintiff summarized this claim as four theories of liability under *Monell*: (1) improper hiring, (2) improper supervision, (3) improper training, and (4) improper retention. (Rec. Doc. 135, at 5).

On cross-motions for summary judgment, the Court concluded that Plaintiff presented sufficient evidence to defeat summary judgment on her *Monell* claim based on improper hiring, but the Court granted Defendants' motion for summary judgment as to the *Monell* claim under the theories of improper supervision, training, and retention. (Rec. Doc. 157, at 35).[5] For the improper supervision theory, the Court found that, notwithstanding whether Plaintiff presented evidence that the policymakers failed to act or take certain action, Plaintiff failed to present evidence that the failure to supervise was the moving force behind the deprivation of G.H.'s

---

[3] The Court had previously dismissed Plaintiff's municipal liability claims. (Rec. Doc. 36). Plaintiff filed a motion to reconsider the dismissal based on data analysis regarding NOPD's responses to sexual abuse by NOPD officers included in a previously unavailable report. (Rec. Doc. 66). The Court granted the motion, dismissing the claims without prejudice, and allowed Plaintiff to amend her complaint. (Rec. Doc. 78). Defendants note that, in the Consent Decree case monitoring the NOPD, the Consent Decree Monitor examined the data underlying the report Plaintiff relies on here and did not find a pattern of under-investigation, neglect, or concealment with regard to sexual assault cases involving NOPD officers. (Rec. Doc. 215, at 1 n.1).

[4] Plaintiff also moved for summary judgment on her claims against Vicknair, arguing that his civil liability for her § 1983 claim and state law claims (assault, battery, false imprisonment, and negligence) were established by the doctrine of collateral estoppel because of Vicknair's conviction under 18 U.S.C. § 242. (Rec. Doc. 87). The Court granted the motion as to Plaintiff's § 1983 claim, battery claim, assault claim, and false imprisonment claim, but denied the motion as to Plaintiff's negligence claim. (Rec. Doc. 107).

[5] The Court also found that Defendants were entitled to summary dismissal of Plaintiff's § 1983 claims for civil rights violations, Negligence and Negligent Infliction of Emotional Distress, Negligent training and discipline, and punitive damages. (Rec. Doc. 157, at 35). The sole remaining claims for trial were therefore Plaintiff's *Monell* claim for improper hiring, vicarious liability for Vicknair's state law torts, and direct negligence in hiring. *Id.*

3

constitutional rights. *Id.* at 25. The Court specifically noted that there was no evidence in the record of a strong connection between Vicknair's choice to sexually assault a minor and the NOPD's failures to arrest him within two days rather than four, failure to monitor the number of times he returned to G.H.'s house, or failure to staff the initial call for service in May 2020 with a sex crimes and child abuse specialist. *Id.* at 26-27.

Trial was set to begin on March 18, 2024. On March 14, 2024, Plaintiff alerted the Court to new evidence as reported in a Washington Post story about this case.[6] The evidence was a text message on Friday, September 18, 2020 from Susan Hutson, the head of the Office of the Independent Police Monitor, directly to the then-Chief of Police Shaun Ferguson. The text message read: "Hey Shaun. I need to reach Arlinda urgently, if she's near you can your all [sic] her to call me? It's about potential sexual abuse of a minor by an officer". (Rec. Doc. 214-1, at 1). The Court continued the trial and allowed limited additional discovery, including the depositions of Shaun Ferguson, Susan Hutson, and Arlinda Westbrook.

The instant motion seeks reconsideration of the dismissal of Plaintiff's improper supervision theory under *Monell*. (Rec. Doc. 214). Plaintiff points to the new evidence that, five days before Vicknair's final sexual assault of G.H., NOPD's chief policymaker had an explicit warning regarding potential sexual abuse of a minor by an officer but did not take any action to initiate an investigation into the matter. (Rec.

---

[6] Jessica Contrera, Jenn Abelson, and John D. Harden, *A police officer took a teen for a rape kit. Then he assaulted her, too.* WASH. POST, Mar. 14, 2024, https://www.washingtonpost.com/dc-md-va/interactive/2024/new-orleans-police-child-sexual-abuse-rodney-vicknair/.

Doc. 214-1, at 2-3). In addition to the text message the Washington Post reporters uncovered, Plaintiff deposed Hutson and Ferguson regarding the initiation of an investigation into Vicknair. After Hutson texted Ferguson, they spoke on the phone, and Hutson gave Ferguson Vicknair's first name and conveyed that the situation was urgent. *Id.* at 2. Ferguson testified that he did not take any action after this conversation. *Id.*

Plaintiff also deposed Arlinda Westbrook, the then-head of NOPD's Public Integrity Bureau, who was mentioned in the text messages. Westbrook testified that she did not recall Ferguson contacting her about an officer sexually abusing a child and that the first time she learned about Vicknair's conduct was during an in-person meeting with Stella Cziment from the Independent Police Monitor the Monday after Hutson and Ferguson spoke. (Rec. Doc. 214-6, at 14).[7]

---

[7] The Court previously relied on the following timeline of events during this critical time period. On September 16, 2020, G.H. discussed with her counselor Andrea Wright of the New Orleans Children's Bureau, that an NOPD officer had been making her uncomfortable but declined to provide the officer's full name. On September 18, Ms. Wright's supervisor, Dr. Berre Burch, spoke with a member of the Office of the Independent Police Monitor ("OIPM") regarding concerns with respect to the interactions between G.H. and an NOPD officer named Rodney.

On September 21, 2020, G.H.'s counselor relayed to NOPD G.H's mother, Rayne Upton's, concerns regarding the relationship between Vicknair and G.H. Later that day on September 21, 2020, NOPD Sergeant Lawrence Jones interviewed Ms. Upton, who explained that she initially thought G.H's and Vicknair's relationship was a positive influence, but Ms. Upton had become uncomfortable with his frequent visits.

On September 22, 2020, Sergeant Jones prepared a NOPD Introduction letter informing Ms. Upton of the tracking number of her Public Integrity Bureau complaint and that Sergeant Jones was the investigator.

On September 23, 2020 at around 11:00 a.m., G.H.'s counselor reported to NOPD that G.H. had had sex with a 45 year-old man named "Jim." However, the counselor later requested to cancel that police report because G.H. had threatened self-harm if anything happened to the suspect.

Later that day, on September 23, 2020 at around 11:00 p.m., Vicknair went to G.H.'s house and told G.H. to come outside and get into his vehicle. By this date, G.H. had turned 15 years old. G.H. sat in the passenger's seat, and Vicknair locked the doors so she could not leave. Vicknair leaned over G.H., confined her against her will, and touched her bare breast with his hands. Without G.H.'s consent, Vicknair digitally penetrated her vagina twice. During this incident, Vicknair was off-duty,

5

Plaintiff contends that all of this new evidence "dramatically changes the strength" of her improper supervision *Monell* theory. (Rec. Doc. 214-1, at 3). Plaintiff also requests in the alternative that the Court should grant this motion as a sanction for the City's failure to produce the evidence described above in response to Plaintiff's initial requests. (Rec. Doc. 214-1, at 7-8). In response, Defendants argue that the City did not engage in discovery misconduct because Defendants responded to the request by objecting to it as vague, ambiguous, overly broad, and unduly burdensome, and Plaintiff never sought to resolve this objection or compel discovery. (Rec. Doc. 215, at 10-11). Additionally, the City argues that sanctions are inappropriate because of an absence of a showing of bad faith or bad conduct. *Id.* at 11.

Defendants concede that Ferguson, as NOPD superintendent, was a final policymaker for purposes of municipal liability under § 1983. (Rec. Doc. 215, at 7-8). However, Defendants argue that there remains no evidence to support the other two required elements of Plaintiff's *Monell* claim: an official policy nor a violation of constitutional rights whose moving force is the policy or custom. *Id.* at 8.

In reply, Plaintiff argues that, when a final policymaker is directly involved, no written policy is needed to prove a *Monell* claim, because the action or inaction of the final policymaker is the official policy. (Rec. Doc. 217). Because of Ferguson's inaction, Plaintiff argues, Vicknair had a window of unsupervised time to sexually assault a minor, and a reasonable jury could find deliberate indifference. *Id.* at 3.

The Court held oral argument on the motion for reconsideration on June 12,

---

out of uniform, and in his personal vehicle. However, his vehicle had an NOPD placard in the front window that allows officers to park in law enforcement officer parking.

2024 and granted the motion from the bench. (Rec. Doc. 218). The Court provides the
following reasons.

## **LEGAL STANDARD**

The Federal Rules of Civil Procedure do not expressly allow motions for
reconsideration of an order. *Bass v. U.S. Dep't of Agric.*, 211 F.3d 959, 962 (5th Cir.
2000). However, the Fifth Circuit has consistently recognized that parties may
challenge a judgment or order under Federal Rules of Civil Procedure 54(b), 59(e), or
60(b). *Southern Snow Manufacturing Co, Inc. v. Snowizard Holdings, Inc.*, 921 F.
Supp. 2d 548, 563–64 (E.D. La. 2013). Rules 59 and 60, however, apply only to final
judgments. *Snowizard*, 921 F. Supp. 2d at 564. "Therefore, when a party seeks to
revise an order that adjudicates fewer than all the claims among all of the parties,
Federal Rule of Civil Procedure 54(b) controls." *Id.* (citing *Halena Labs. Corp. v.
Alpha Scientific Corp.*, 483 F.Supp.2d 538 (E.D. Tex. 2007)).

"Rule 54(b) allows parties to seek reconsideration of interlocutory orders and
authorizes the district court to 'revise[ ] at any time' 'any order or other decision ...
[that] does not end the action.' *Austin v. Kroger Texas, L.P.*, 864 F.3d 326, 336 (5th
Cir. 2017) (quoting Fed. R. Civ. P. 54(b)). Reconsideration of interlocutory orders
under Rule 54(b) is less stringent than reconsideration of judgments under Rule 59(e).
*Id.* (finding that district court abused its discretion in denying plaintiff's motion for
reconsideration under Rule 59(e) rather than under Rule 54(b)). Under Rule 54(b),
"the trial court is free to reconsider and reverse its decision for any reason it deems
sufficient, even in the absence of new evidence or an intervening change in or

clarification of the substantive law." *Id.* (quoting *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 185 (5th Cir. 1990)).

<u>**DISCUSSION**</u>

Reconsideration is warranted in this exceptional case, and the *Monell* claim for negligent supervision should be reinstated. On summary judgment, the Court previously found that Plaintiff did not present sufficient evidence that the NOPD's supervision policies (or lack thereof) were the moving force behind the deprivation of Plaintiff's constitutional rights. Plaintiff previously argued "but-for" causation, instead of presenting evidence of the heightened causation and culpability as required by the "moving force" element for *Monell* claims. However, the Court finds that the new evidence Plaintiff presented in the instant motion creates a genuine issue of material fact as to two of the three essential elements of the *Monell* claim, and third element is undoubtedly satisfied. Accordingly, there is sufficient evidence to allow her *Monell* claim for negligent supervision to go to the jury.

In general, municipalities cannot be held liable solely for employing a tortfeasor; that is, they "cannot be held liable under § 1983 on a respondeat superior theory." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978). However, a municipality may be subject to liability pursuant to § 1983 when the municipality maintains an unconstitutional policy or custom. *Valle v. City of Houston*, 613 F.3d 536, 542 (5th Cir. 2010) (citing *Monell*, 436 U.S. at 691). "To establish municipal liability under § 1983, a plaintiff must show that (1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a

8

constitutional right." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)

(citing *Monell*, 436 U.S. at 694).

There are three ways to establish a municipal policy for the purpose of *Monell*

liability:

> First, a plaintiff can show "written policy statements, ordinances, or
> regulations." Second, a plaintiff can show "a widespread practice that is
> so common and well-settled as to constitute a custom that fairly
> represents municipal policy." Third, even a single decision may
> constitute municipal policy in "rare circumstances" when the official or
> entity possessing "final policymaking authority" for an action "performs
> the specific act that forms the basis of the § 1983 claim."

*Webb v. Town of Saint Joseph*, 925 F.3d 209, 214–15 (5th Cir. 2019). For the third

category of *Monell* claims, "a final decisionmaker's adoption of a course of action

'tailored to a particular situation and not intended to control decisions in later

situations' may, in some circumstances, give rise to municipal liability under § 1983."

*Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 406 (1997) (quoting

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986)). Here, Plaintiff does not

allege a written policy or widespread practice. Instead, her argument centers on

whether an official with final policymaking authority took the actions underpinning

her § 1983 claim: Ferguson's failure to supervise or order an investigation after an

explicit warning directly to Ferguson about potential sexual abuse of a minor by an

officer, causing Vicknair's sexual assault of Plaintiff five days later. (Rec. Doc. 214-1,

at 7).

The parties agree that Ferguson, as the Superintendent of the NOPD, was the

final policymaker, and the Court also concludes that this assessment is correct.

Whether an official is a final policymaker is a question of state and local law. *Garza v. City of Donna*, 922 F.3d 626, 637 (5th Cir. 2019) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124 (1988)). The City's Code of Ordinances states that the head of the Department of Police is charged with, among other things, "organiz[ing], administer[ing], supervis[ing], and disciplin[ing]" the City's police force. *Winn v. New Orleans City*, No. 12-1307, 2014 WL 790870, at *10 (E.D. La. Feb. 26, 2014) (citing New Orleans, La. Code of Ordinances, pt. 1, art. iv, ch. 5, § 4–501)). This conferment of authority establishes Ferguson as the final policymaker of the City's police department. *See id.* (collecting other cases in this court arriving at the same conclusion). Accordingly, Ferguson's one-off, discretionary decisions can generate official municipal policy, and therefore, municipal liability for the City. *See Webb*, 925 F.3d at 219 (finding that a certain affirmative decision by the mayor of a town made the case fall into the narrow range of cases where municipal liability can stem from individual, one-off decisions by a policymaker).

After establishing an official municipal policy promulgated by an authorized policymaker, a plaintiff must then show that the policy was the "moving force" behind the constitutional violation. *Id.* (citing *Alvarez v. City of Brownsville*, 904 F.3d 382, 390 (5th Cir. 2018) (en banc)). "The moving force analysis requires that rigorous standards of culpability and causation. . . be applied to ensure that the municipality is not held liable solely for the actions of its employee[s]." *Smith v. Carruth*, No. 15-4570, 2017 WL 785345 at *7 (E.D. La. Mar. 1, 2017) (citing *Brown*, 520 U.S. at 405; *Mason v. Lafayette City-Par. Consol. Gov't*, 806 F.3d 268, 280 (5th Cir. 2015)).

Causation requires a direct causal connection between the policy and the constitutional deprivation, and this causal connection is higher than but-for causation. *Id.* Culpability requires a plaintiff show that the municipality "promulgated the policy with deliberate indifference to the known or obvious consequences that constitutional violations would result. *Id.* And then to base deliberate indifference on a single incident, she must show that "the specific injury suffered" was "the highly predictable consequence" of that incident. *Valle v. City of Houston*, 613 F.3d 536, 542 (5th Cir. 2010). An injury is highly predictable if "it must have been obvious that the highly predictable consequence of not supervising [the employees] was that they would" commit the specific constitutional violation alleged. *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 850 (5th Cir. 2009).

Plaintiff contends that the official policy here, as promulgated by Superintendent Ferguson, was manifested in the single action by Ferguson: his failure to act or immediately initiate an investigation or begin surveilling Vicknair over the weekend, after receiving credible information Friday afternoon that one of the NOPD's officers had sexually assaulted a child. The new evidence that Plaintiff presented in the instant motion creates genuine issues of fact as to both the "moving force" and "deliberate indifference" requirements of her municipal liability claim.

First, a jury could reasonably conclude that there was a direct causal link between NOPD's policy, as promulgated by Ferguson, and the constitutional violation that occurred here. Whether a sufficient causal link exists is a question of fact. *See Jett v. Dall. Indp. Sch. Dist.*, 491 U.S. 701, 737 (1989). Here, Ferguson testified that

11

he received the following text message from Susan Hutson, the head of the Office of the Independent Police Monitor, on Friday September 18, 2020, at 5:13 p.m.: "Hey Shaun. I need to reach Arlinda [Westbrook, then the head of the NOPD Public Integrity Bureau] urgently, if she's near you can your all [sic] her to call me? It's about potential sexual abuse of a minor by an officer." (Rec. Doc. 214-4, at 23). After receiving that text, Hutson and Ferguson spoke by phone. Hutson testified that Ferguson told her Arlinda Westbrook was out of town, that Hutson told Ferguson Vicknair's first name (Rodney), and that there were "actual possible crimes being committed as opposed to just administrative misconduct." (Rec. Doc. 214-5, at 18-19). She also testified that she needed Ferguson to reach out to the head of PIB and was texting and calling on a Friday late afternoon because she thought this was something urgent that could not wait until Monday. *Id.* at 23. Ferguson testified that he did not recall taking any action, including contacting the PIB, regarding this allegation. (Rec. Doc. 214-4, at 25). Arlinda Westbrook testified that Ferguson did not reach out to her, and she only learned of the situation from the deputy chief of the PIB at work on the following Monday, September 21, 2020. (Rec. Doc. 214-6, at 16).

Throughout the week leading up to the Friday, September 18, 2020 text message, G.H. discussed with her counselor that an NOPD officer made her uncomfortable, but she was reluctant to make a report against him or provide his full name. (Rec. Doc. 215, at 4). On Friday, September 18, 2020, Plaintiff's counselor's supervisor, Dr. Berre Burch, spoke with a member of the OIPM regarding concerns regarding an NOPD officer's interactions with Plaintiff, and Dr. Burch did not

mention sexual assault. *Id.* On Sunday, September 20, 2020, Plaintiff's mother reported to Plaintiff's counselor that the Plaintiff was sexually assaulted by a 50-year-old man named Jim, and the counselor made a mandatory report to the Louisiana Department of Family and Children Services. *Id.* at 6. That report also noted that Plaintiff had recently disclosed that an NOPD officer was making her feel uncomfortable, and that this would also be addressed on Monday in a meeting with the OIPM. *Id.* The PIB deputy chief met with Plaintiff's mother and a caseworker on Monday, September 21, 2020. (Rec. Doc. 214-5, at 75).

A reasonable jury could conclude that this evidence shows that the NOPD Superintendent ignored credible notice that an NOPD officer had sexually assaulted a child, and that an investigation of that officer only began three days later after subsequent and additional notice was provided to the OIPM and PIB. Vicknair sexually assaulted Plaintiff just five days after Superintendent Ferguson received notice regarding Vicknair's potential sexual assault of Plaintiff. The temporal and factual closeness between this notice and the constitutional violation that occurred, along with the Superintendent's authority to order or supervise an investigation of the potential violation, suggests a causal connection that is higher than but-for causation. Thus, this evidence creates a question of material fact regarding the causation question for the jury's moving force analysis.

The City emphasizes that, on the date Hutson texted Ferguson regarding the officer's sexual abuse, Plaintiff had never explicitly reported that Vicknair had sexually assaulted her. (Rec. Doc. 215, at 4, 5, 6, 8, 9). The jury is welcome to consider

these facts in its analysis of the City's municipal liability. However, the fact remains that Hutson, a credible source, expressed the urgency surrounding potential sexual abuse of a minor by an NOPD officer in her text and phone call with Ferguson, and then Ferguson failed to initiate an urgent investigation. The City cannot show the absence of a genuine issue of material fact as to causation, and therefore, summary judgment based on causation was inappropriate.

This new evidence also creates an issue of fact as to the culpability requirement of the moving force element. Again, culpability requires a plaintiff to "demonstrate a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Valle*, 613 F.3d at 542 (citing *Brown*, 520 U.S. at 411). "Deliberate indifference is a high standard—a showing of simple or even heightened negligence will not suffice." *Id.* (quoting *Piotrowski*, 237 F.3d at 579) (internal quotation marks omitted). Instead, a plaintiff must provide "proof that a municipal actor disregarded a known or obvious consequence of his action." *Brown*, 520 U.S. at 410.

Compared to the evidence provided to the Court previously on summary judgment, the new evidence as outlined above demonstrates that Ferguson, acting as the final policymaker for NOPD, disregarded known or obvious consequences of his action—that the officer would sexually assault the minor, as he was warned about just a few days prior. Ferguson testified that, upon receiving this warning, he should have referred Hutson to the head of the PIB that same day, but he did not do so and did not provide any rationale for that failure. (Rec. Doc. 214-4, at 25-26). Considering

14

the urgency of action required in a situation involving sexual abuse of a minor and the actual delay in action/investigation that occurred, the Court concludes that there remains a triable issue of fact as to the City's degree of culpability. Furthermore, the warning that Ferguson received was not a generalized warning regarding potential abuse; the warning was specific to the facts of this case. Crucially, the highly predicable consequence of this single incidence of deliberate indifference (ignoring a warning regarding a certain officer sexually abusing a certain child) is the subsequent violation that occurred here: that same officer sexually abused that same child just a few days later. Accordingly, a jury may reasonably find that Plaintiff's claim here was based on a single incident of deliberate indifference.

Because Plaintiff has presented sufficient evidence to create an issue of fact on each element of her *Monell* claim for inadequate supervision, reconsideration is appropriate here.[8]

Accordingly,

---

[8] In the instant motion, Plaintiff also requests, in the alternative to granting the motion based on the new evidence, that the Court grant the motion as a sanction for the City's withholding evidence. (Rec. Doc. 214-1, at 7-8). The Court previously sanctioned the City for this action by requiring the City to arrange and pay for the depositions of Ferguson, Hutson, and Westbrook. (Rec. Doc. 207). Here, the Court has found that the new evidence warrants reconsideration, and therefore Plaintiff's request for reconsideration as a sanction is denied.

## <u>CONCLUSION</u>

**IT IS HEREBY ORDERED** that Plaintiff's *Motion for Reconsideration* **(Rec. Doc. 214)** is **GRANTED**, and Plaintiff's improper supervision theory of *Monell* liability is reinstated.

New Orleans, Louisiana, this 20th day of June, 2024.

_____
CARL J. BARBIER
UNITED STATES DISTRICT JUDGE