UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


RAYNE UPTON, individually and          DOCKET NO.
On behalf of her minor
Daughter, G.H.                         2:21-cv-407

              Plaintiff,               JUDGE BARBIER

                                       MAG. ROBY

VERSUS

RODNEY VICKNAIR, SHAUN FERGUSON,
THE CITY OF NEW ORLEANS; DOE
DISTRICT COMMANDER; DOES 1 TO 10;
and XYZ INSURANCE COMPANIES 1 TO 10,


              Defendants.

**KEY**

**Yellow:** Plaintiff's Designations

**Green:** Defendant's Designations

**Green With Yellow Bar on Left:**
Joint Designation


              DEPOSITION OF RODNEY PAUL VICKNAIR,

given in the above-entitled cause, pursuant to the

following stipulation, before Sandra P. DiFebbo,

Certified Shorthand Reporter, in and for the State

of Louisiana, at Guste, Barnett, Schlesinger &

Alpaugh, LLP, 639 Loyola Avenue, Suite 2130, New

Orleans, Louisiana, on the 9th day of June, 2023,

commencing at 12:10 PM.

```
 1                    Thank you.  Mr. Vicknair, are you
 2                ready to get started?
 3                THE WITNESS:
 4                    Yes, sir.
 5                RODNEY PAUL VICKNAIR, 2114 Teal Street,
 6                Slidell Louisiana, 70460, having been
 7                first duly sworn, was examined and
 8                testified on his oath as follows:
 9   EXAMINATION BY MR. MOST:
10           Q.   Mr. Vicknair, my name is William Most.
11   I'm an attorney, and I represent Rayne Upton, the
12   plaintiff in this case.
13           A.   Correct.
14           Q.   How are you doing today?
15           A.   Day by day, you know.  That's all you can
16   do with these tumors in your head.
17           Q.   Yeah.  Well, I understand that you have
18   these tumors in your head, so I'm going to ask you
19   some questions that are sort of nonstandard for
20   depositions, but they sort of are to figure out how
21   good your memory is, how good your thinking is
22   today, so that if anyone ever wonders, you know,
23   how reliable is his testimony today, they have a
24   sense of it.  All right?
25           A.   Yes, sir.
```

```
 1

 2

 3        Q.   You understand that you're under oath

 4   here today?

 5        A.   Yes.

 6        Q.   You understand that your answers here

 7   today have the same force as if we were in a

 8   courtroom with a judge or a jury?

 9        A.   Yes, sir.

10        Q.   And you realize that being under oath

11   means you are sworn to tell the truth?

12        A.   Yes, sir.

13        Q.   And you will tell the truth today?

14        A.   Yes, sir.

15        Q.   Does any of your medical conditions

16   affect your ability to understand the difference

17   between a truth and a lie?

18        A.   Not that I'm aware of.

19        Q.   I see that we've got a medication list on

20   the table in front of us.  These are medications

21   your doctor recommended?

22        A.   Yes.

23        Q.   Have you taken any medications today?

24        A.   No, not today.

25        Q.   Are any of the medications necessary for
```

1   you to think clearly?

2       A.   Do I use any of them to think clearly?

3       Q.   Yes.

4       A.   Not that I'm aware of.

5       Q.   I'm asking because I want to see if not

6   taking one of these medications might make it hard

7   to think clearly, but it doesn't sound like that's

8   the case.

9       A.   No.

10      Q.   Does your medical condition impair your

11  memory?

12      A.   Yes.

13      Q.   Will you be able to tell me when you are

14  unable to remember something?

15      A.   Yeah.  If I can't remember, I'll tell

16  you.

17      Q.   And does your medical condition cause you

18  to remember things that aren't true?

19      A.   Not that I'm aware of.

20

21

22

23

24

25



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20       Q.   What is your most recent phone number?
21       A.   (225) 290-9227.
22
23
24
25

14

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10        Q.   So this document that is in front of you,
11   it says -- do you see that it says, "Factual Basis"
12   on it?
13        A.   Right.
14
15
16
17
18        Q.   Do you remember signing this document?
19        A.   Yes.
20        Q.   And this is a factual basis document from
21   your criminal case, right?
22        A.   Correct.
23
24
25
```

```
 1
 2
 3
 4
 5
 6
 7         Q.   At the very top, in the first sentence,
 8    it says, "The defendant admits that these facts are
 9    true."
10         A.   Okay.  I see it.
11         Q.   Yeah.  So, Mr. Vicknair, are the facts in
12    here true?
13         A.   Okay.  I'm sorry.  Can you say it again?
14         Q.   Are the facts in this document true?
15         A.   Honestly, no.
16         Q.   Okay.  Are most of the facts in here
17    true?
18         A.   No.
19
20
21
22
23
24
25
```

```
 1

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14        Q.   You've been arrested more than one time,

15   agreed?

16        A.   Yes.

17        Q.   You had been arrested one or more times

18   before you became an NOPD officer, right?

19        A.   Yes.

20        Q.   In the course of applying to be an NOPD

21   officer, did you have to tell NOPD about your prior

22   arrests and convictions?

23        A.   Yes.  As far as I remember I did.

24        Q.   Did you tell NOPD about your prior

25   arrests and convictions when you applied to be an
```

NOPD officer?

A.   I'm pretty sure I did, because I knew they would do a background check.

Q.   Did you tell them that in writing or verbally or both?

A.   I think it was on the -- I think it was verbally, when they did what they call that -- not the lie detector test, the stress test, or whatever.  That one.

Q.   Even if one of your prior arrests or convictions doesn't show up in the written records, you told NOPD verbally about it during that stress test; is that right?

A.   Yes.

Q.   I'm going to mark as Exhibit D this document I'm handing to you, Mr. Vicknair.  Can you read this document?  Can you see it?

A.   Yes.

Q.   Is this about a -- see on the other side -- do you see that this is about a simple battery on a juvenile in Ascension Parish?

A.   Yep.

Q.   Was this something you were arrested for?

A.   I think I was given like a summons or something.  I don't remember.  I don't think I was

1    physically taken into custody.

2

3

4

5

6

7         Q.                    Do you remember what you were

8    accused of in this criminal case?

9         A.    It says simple battery.

10        Q.    Right.  Do you recall that you were

11   accused of simple battery against Bernice?

12        A.    No.

13        Q.    Who were you accused of simple battery

14   against?

15        A.    I don't even know -- recall the guy's

16   name.  I remember it was for an altercation at a

17   skating rink where I hit somebody in the head with

18   a pool stick.

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12        Q.                All of the times you went to Gabby

13   Hainey's house, did you go to her house as a police

14   officer?

15        A.   I would say -- I would have to say as an

16   official capacity, no.  I wasn't doing it as a

17   police officer.  There was one time I did it just

18   as a friend.

19        Q.   Which time was that?

20        A.   The night that Gabby called and said that

21   her and her friends had been out ██████████, and

22   she was afraid that her mom was going to be able to

23   smell it all over her, and she asked me if I could

24   pull up in front of her house and let her stand

25   there and talk to me and see if I could smell ████

1    ██████ on her.  So I said okay.  So I did, and I told

2    her, I said, "No.  You don't smell ██████.  All

3    I'm smelling is just the outside, and it smells

4    like you've been sweating."  And she said they had

5    been dancing or something, and I said, "If your mom

6    is asleep on the couch, just go in and go take a

7    shower and leave your mom alone.  Don't worry about

8    it," and that was the last time.

9         Q.   So I think you told investigators that

10   you went over to Gabby Hainey's about 12 or 13

11   times; is that right?

12        A.   That is both police-wise -- because I

13   responded to maybe ten, 11 calls over there.

14        Q.   So you went over to her house about 12 or

15   13 times approximately, right?

16        A.   Yeah.

17

18

19

20

21

22

23        Q.   The vehicle that you went over to Gabby

24   Hainey's house the final time, which vehicle was

25   that?

1    A.   That was my personal vehicle, the gray
2  Tundra.
3    Q.   Do you have any NOPD symbols in that
4  truck, like floor mats or anything else?
5    A.   No.  The only NOPD symbol I had was the
6  placard that we put on our dash to park around the
7  station.  That was it.
8    Q.   So in this truck that you went in the
9  final time, you had an NOPD placard in the front
10  window?
11    A.   Yes.
12    Q.   And that indicates that you can park that
13  car in NOPD officer parking areas?
14    A.   At our station, yeah.
15    Q.   If you need to go to the courthouse in
16  that vehicle, can you park in law enforcement
17  officer parking?
18    A.   Yes.
19
20
21
22
23
24
25

```
 1
 2        Q.   NOPD knew about how you were a community-
 3   oriented officer, right?
 4        A.   Uh-huh.
 5        Q.   And NOPD knew about how you were
 6   interacting with members of the community and
 7   making friends whether they were adults or under-
 8   age girls, right?
 9        A.   Yes.
10        Q.   And NOPD approved of you making
11   friendships with adults and with underage girls,
12   agreed?
13              MR. ROQUEMORE:
14                   Objection, form, foundation.
15              THE WITNESS:
16                   I'm not going to say they approved.
17                   They never -- I was never told anything
18                   about it, so.
19   BY MR. MOST:
20        Q.   But they knew about it, and they didn't
21   tell you not to do it, agreed?
22        A.   Correct.
23
24
25
```

49

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16          Q.   Did you -- so after your criminal

17     conviction, did you add Gabby Hainey as a

18     connection on Snapchat?

19          A.   No.

20

21

22

23

24

25

1

2

3

4       Q.    Have you reached out to Gabby at all or

5   communicated with Gabby after your conviction?

6       A.    No.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

55

1

2

3

4

5

6

7

8

9

10

11

12        Q.   So going back a little bit to your prior

13   arrests, you were arrested for a simple burglary in

14   1986.  Do you remember that?

15        A.   Yes.

16        Q.   Did you disclose that to NOPD?

17        A.   Yes.

18        Q.   And the simple battery that we looked at,

19   did you disclose that to NOPD?

20        A.   Yep.

21        Q.   In 1990, you were arrested for disturbing

22   the peace in Ascension Parish?

23        A.   Yep.

24        Q.   Did you disclose that one to NOPD?

25        A.   Yes.

1    Q.   Was that the one with the pool stick in

2  the skate park?

3    A.   No.  I think that one -- this one -- I

4  think that one was just for general fighting.

1

2

3

4

5

6

7          Q.   So the final time you met Gabby, she got

8    into your car, correct?

9          A.   I'm sorry.  What?

10         Q.   The final time you met Gabby, she got

11   into your car?

12         A.   Negative.

13

14

15

16

17

18

19         Q.   Did she ever get into your Toyota Tundra

20   at any time?

21         A.   No.

22         Q.   Did she ever get into your NOPD vehicle

23   at any time?

24         A.   When I transported her to the hospital,

25   yeah.

```
 1

 2

 3

 4

 5

 6

 7

 8    BY MR. MOST:

 9          Q.   So the conversation that we've had so far

10    it's felt to me like a pretty normal back and forth

11    where you answered my questions fairly normally and

12    rapidly.  Would you agree with that?

13          A.   Yes, sir.

14          Q.   Has your medical condition or anxiety

15    made any of the answers you've given to me so far

16    not reliable or not truthful?

17          A.   No.

18

19

20

21

22

23

24

25
```

1

2

3      Q.   Did you one time take your flashlight and

4   go into her bedroom and shine it in her bedroom?

5      A.   Yes.  When her mom asked me to stop by, I

6   stopped by.  It was a couple of hours later, and I

7   said, "So what is going on?"  She said, "Nothing.

8   She just won't get out of bed."  I said, "Well, go

9   wake her up."  She said, "Come with me."  So we

10   went into the room, and she said, "Shine your light

11   in her eyes," because, you know, those police

12   lights are so bright.  So when I shined my light

13   like this, in her face, her mom grabbed the covers

14   and tried to pull her up, and when she pulled her

15   up, I didn't realize until her mom pulled the

16   covers up that the girl didn't have a top on, and

17   that was it.

18      Q.   So you saw her breasts that one time?

19      A.   Yes.

20      Q.   Did you see her breasts any other times?

21      A.   No.

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23          Q.    Mr. Most asked you a question about

24     Exhibit C, so I would ask you to pull that in front

25     of you.  We'll start off with that.  You see that

64

1    is a Factual Basis in your criminal case?

2         A.    Yes, sir.

3         Q.    You've seen this before.  You looked at

4    it today, right?

5         A.    Yes.

6         Q.    I remember your testimony being that you

7    disagreed with some or all of it; is that right?

8         A.    Correct.

9         Q.    Is that fair?

10        A.    Correct.

11        Q.    Let's go through this and find out what

12   you have to say about it.  The second full

13   paragraph starts, "Rodney Vicknair was a Police

14   Officer with the New Orleans Police Department."

15   You see that?

16        A.    Yes, sir.

17        Q.    Is that a true statement?

18        A.    Yes.

19        Q.    Is it also true that you applied to

20   become a police officer on or about June 21st,

21   2007?  Is that your remembrance?

22        A.    Yes.

23        Q.    Is that correct? And before that, what

24   were you doing?

25        A.    I was working at Baptist Hospital with

1    Tenet Healthcare.

2          Q.    You were about 20 years old at that time?

3          A.    In 2007?

4          Q.    Yes, sir.

5          A.    I was 40.

6          Q.    To jump forward, you resigned from the

7    police department effective January 13th, 2021.  Is

8    that also right?

9          A.    Correct.

10         Q.    You resigned -- the reason why you gave

11   for your resignation was because you had been

12   arrested; is that correct?

13         A.    Correct.

14         Q.    Is there any other reason why you

15   resigned? How did that decision come about?

16         A.    From Sergeant Jones, I think it was, with

17   PIB.

18         Q.    Tell me what happened. How did that

19   decision come about with regard to Jones?

20         A.    He said that he wanted to meet me in

21   Laplace to sign the resignation paperwork, and we

22   met at the St. John Parish Sheriff's Office, and I

23   asked him -- you know, he said just write why

24   you're resigning.  Just say you got arrested or

25   whatever you want, so that's what I wrote.

68

```
 1

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15        Q.   As a police officer -- well, I mean, it's

16   fair to say as a police officer you understand that

17   it is illegal for a police officer to have sex with

18   an underage male or female; is that right?

19        A.   Of course, yes.

20        Q.   You also understand that it is not NOPD

21   policy to have a sexual relationship with an

22   underage person as a police officer?

23        A.   Yes, sir.

24

25
```

1

2

3

4

5

6

7       Q.   At some point in time, you gave Gabby

8   your telephone number; is that right?

9       A.   No.  I gave her mom my business card.

10      Q.   Did you put that in any report to NOPD

11  that you gave the mom your business card?

12      A.   No.

13      Q.   Did you tell any of your fellow officers

14  at the scene, the detective, for example, that you

15  were giving your business card to Gabby's mother?

16      A.   The only person other than -- the only

17  person that knew was the mental health counselor

18  that came in, because she was -- and the doctor

19  that was talking to her, because they were in the

20  room when I did it.

21

22

23

24

25

```
 1

 2

 3               .

 4       .

 5          Q.   Is it your testimony that you did not

 6   give Gabby your personal telephone number at all?

 7          A.   No.  Just her mom.

 8          Q.   How did Gabby get your personal phone

 9   number?

10          A.   I guess from her mom. When I handed her

11   mom my business card, she was sitting right next to

12   us.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2

3

4

5

6     .       Q.   Let's look at Exhibit C again, this

7 Factual Basis, just to walk through and keep this

8 in order.  The second paragraph, second sentence

9 then.  In May 2020, Vicknair, while working in his

10 capacity as a police officer, escorted a 14 year

11 old girl, who was a victim of sexual assault, to

12 the hospital to undergo forensic exam, i.e, a rape

13 kit.  Is that something you disagree with?

14        A.   No.  I agree with it.

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2

 3

 4

 5

 6      BY MR. ROQUEMORE:

 7          Q.    Mr. Vicknair, we are still on Exhibit C.

 8    Pull it in front of you right there.  Flip it over

 9    to the front page.  There you go.  Second -- third

10    full paragraph.  Last sentence.  "On one occasion

11    he touched V1's breast under her shirt, and on

12    another occasion he touched V1's buttocks over her

13    clothes."  Is this a statement you disagree with or

14    do you agree with it?

15          A.    I disagree with it.

16          Q.    Do you have any comment about it?  Is it

17    true in part?

18          A.    No.

19          Q.    Not true in any part?

20          A.    No.

21

22

23

24

25
```

19      Q.   It says -- the next sentence, at the very

20   -- the last sentence that starts on the bottom of

21   the page, and it continues to the next page.  He

22   asked her to come outside and get in his vehicle.

23   Is that true?

24      A.   No.  I asked her to come outside and

25   stand next to the vehicle.  She wanted me to see if

```
 1    I could smell ████████ her.

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24        Q.   The statement on the second page

25    continues.  The victim got into the passenger seat
```

1    while Vicknair remained in the driver's seat.  I'm

2    assuming you are saying that that is not correct?

3          A.   I'm sorry?

4          Q.   Is that not correct?  That's not correct?

5    She got into the passenger seat --

6          A.   No.

7          Q.   And you remained in the driver's seat. Is

8    that true or false?

9          A.   I was in the driver's seat.

10         Q.   Did she get in the passenger seat?

11         A.   No.

12         Q.   That's a no?

13         A.   No.

14         Q.   The next sentence says, "Vicknair locked

15   the doors so V1 could not leave."  Is that true or

16   false?

17         A.   False.

18         Q.   Vicknair leaned over towards the victim

19   causing her to fear for her physical safety,

20   confining her against her will, all of which

21   constituted kidnapping.  Is that something you

22   agree or disagree with?

23         A.   Disagree with.

24         Q.   Does it have any truth at all?

25         A.   No.

1          Q.   Then Vicknair engaged in a sexual act

2     with the victim without her consent.   Is that true

3     or false?

4          A.   False.

5          Q.   False?

6          A.   Yes.

7          Q.   Any truth at all?

8          A.   No.

9          Q.   You're not claiming that she consented?

10         A.   No.

11         Q.   Are you claiming that there was no sexual

12    act at all?

13         A.   Correct.

14         Q.   Did you touch her under her shirt?

15         A.   No.

16         Q.   Did you ask -- did you have sexual

17    conversation at all during this time?

18         A.   No.

19         Q.   Intentionally touched her genitals under

20    her clothing.   True or false --

21         A.   False.

22

23

24

25

1    Q.   You signed this.  When you signed this,

2  what actions were you thinking that you were saying

3  were wrong and against the law?

4    A.   When I signed this, I was just signing it

5  to hurry up and get all this over with.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              to me like a person instead of talking
 2              at me like a piece of garbage.
 3         MR. ROQUEMORE:
 4              I understand.  You have a serious
 5              charge against you, and we are trying
 6              to get --
 7         THE WITNESS:
 8              I just wanted to say I appreciate
 9              that.  You, too.
10         MR. MOST:
11              Sure.
12    BY MR. MOST:
13         Q.   Mr. Vicknair, you mentioned having some
14    hearing issues.  Did you have any trouble hearing
15    my questions today?
16         A.   No, sir.  I heard yours.  You are sitting
17    right there by me.
18         Q.   Mr. Roquemore showed you some policies,
19    some NOPD policies.
20         A.   Yes.
21         Q.   The way you interacted with Gabby Hainey,
22    was it consistent with those policies?
23         A.   No.
24         Q.   In what ways was it not consistent?
25         A.   Well, it wasn't -- it was unprofessional,
```

1    and it was a violation of law.

2          Q.   Which part was a violation of law?

3          A.   Probably most of it.

4          Q.   So most of your interactions with Gabby

5    Hainey were a violation of law?

6          A.   Yeah.